# UNITED STATES COURT OF APPEAL
## FOR THE ELEVENTH CIRCUIT
_____

## CASE NO. 15-14132-D
_____

### MOTIVATION, INC.

**Claimant/Appellant,**

**vs.**

### JTR ENTERPRISES, LLC,

**Plaintiff/Appellee.**

_____

**On appeal from the United States District Court for
the Southern District of Florida, Miami Division
Case No. 4:11-Civ-10074**

---

## APPELLEES' JOINT MOTION TO DISMISS APPEAL

---

John T. Rogerson, III (FBN: 832839)      Jeffrey B. Crockett (FBN: 347401)
john.rogerson@arlaw.com                   jcrockett@coffeyburlington.com
**ADAMS AND REESE LLP**                   **COFFEY BURLINGTON, P.L.**
**501 Riverside Avenue, 7th Floor**       David J. Zack (FBN: 641685)
**Jacksonville, FL 32202**                **2601 South Bayshore Drive, Penthouse**
**Telephone:  (904) 355-1700**           **Miami, Florida  33133**
**Facsimile:   (904) 355-1797**          **Telephone:  (305) 858-2900**
                                          **Facsimile:  (305) 858-5261**


*Counsel for Young Conaway Stargatt & Taylor, LLP and Bruce L. Silverstein, Esq.*

**CERRTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, Appellees Young Conaway Stargatt & Taylor, LLP and Bruce L. Silverstein, Esq., hereby state the following individuals and entities with any known interest in the outcome of this appeal:

Kendall B. Coffey

Jeffrey B. Crockett

Stephen Elchlepp

Kim Fisher

John Gravante

David Horan

JTR Enterprises LLC

Hon. James L. King

Jay Miscovich

Hugh J. Morgan

Motivation Inc.

Hon. K. Michael Moore

Bruce L.. Silverstein

John Siracusa

Paul D. Sullivan

John E. Tuthill

Marlow V. White

Young Conaway Stargatt & Taylor, LLP

David J. Zack

Appellees, Young Conaway Stargatt & Taylor, LLP ("YCST") and Bruce Silverstein ("Silverstein"), hereby move to dismiss the appeal of Motivation, Inc. ("Motivation") from the denial of its motion for sanctions against YCST and Silverstein (together, "Appellees"). Notwithstanding the district court's proper denial of Motivation's motion (on the merits), the district court lacked jurisdiction to entertain the motion in the first instance. As such, Motivation's appeal should be dismissed for lack of jurisdiction and the sanctions proceedings below should be vacated.

This case arises from an *in rem* action filed in 2010 by JTR Enterprises, LLC ("JTR"), seeking a declaration of ownership and salvage rights as to "an unknown quantity of Colombian Emeralds, Amethysts, and Quartz crystals" (the "*Res*") alleged to have been found in international waters in the Gulf of Mexico by JTR's Managing Member, Jay Miscovich ("Miscovich"). Following a bench trial in December 2012, the trial court found the evidence in equipoise as to whether Miscovich found the *Res* or "salted" the discovery site, and entered a Final Order, on January 25, 2013, by which the court denied JTR any relief. *See* DE 199 (the "Final Order").

Nearly a year following the entry of the Final Order, at a post-trial evidentiary hearing on sanctions against Miscovich and JTR (the "First Sanctions Hearing"), a Colombian store owner testified that he had sold Miscovich some 80 pounds of emeralds in 2010, leading the district court to find that "by purchasing the emeralds and then 'finding them' at the bottom of the ocean, Miscovich engaged in a fraud to vastly increase their value as purported 'sunken treasure.'" DE 445 at 2-3. The district court further found that "Miscovich managed to successfully convince his investors, lawyers, employees of the Smithsonian, appraisers, jewelers, family, friends, the general public, and many others, including investigative reporters from CBS' 60 Minutes, that he had discovered and recovered this treasure from the seafloor in early 2010." *Id*. at 19.

Following the First Sanctions Hearing, Motivation filed a motion for sanctions against Appellees, who were outside counsel to JTR and Miscovich. *See* DE 407. Motivation did not contend that Appellees knew of any fraud when they were retained to represent Miscovich and JTR in 2011, but argued that Appellees should not have continued to represent their clients when alleged "evidence of fraud" emerged in the *in rem* action. *See id*. at 6. Motivation did not tell the Court what

Motivation's internal emails revealed: that Motivation knew that there was no evidence of Appellees' knowing participation in any fraud, but that (i) Motivation targeted Appellees because they were seen as "a deep pocket," and (ii) Motivation was "rely[ing] on their desire to settle and not be dragged thru a messy highly publicized trial" *See* DE 559 at 47, 49; DE 459 at 11-13.

The trial court, Hon. James Lawrence King, accepted Motivation's invitation for an inquisition of Appellees' knowledge of their clients' actions by an order to show cause (the "OSC") (DE 451), and rejected Appellees' challenges to subject matter and personal jurisdiction (DE 459). Following a thirteen day evidentiary hearing in November and December of 2014, Appellees prevailed on the merits.[1] Through this appeal, Appellant Motivation frivolously challenges that fact-finding. This motion argues that the entire sanctions proceeding was begun without jurisdiction, and therefore, that all rulings of the district court should be vacated, and this appeal dismissed as a result. *See, e.g.*, *Boyd v. Homes of Legend, Inc.,* 188 F. 3d 1294, 1298 (11th Cir. 1999) (internal citations omitted) (when district court lacked jurisdiction, this Court has jurisdiction only to correct error in entertaining the suit).

## SUMMARY OF ARGUMENT

In the district court, Motivation sought the unprecedented relief of securing an award of sanctions in favor of a non-party with no standing against non-parties who were not counsel of record and who were non-residents of the State of Florida and not served with legally valid process. The district court (per Judge King) erred in indulging Motivation.

At its core, the adversarial system of civil jurisprudence pits one or more plaintiffs against one or more defendants. In appropriate circumstances, a non-party is permitted to intervene. To do so, however, the intervenor must have standing – which Motivation lacked in this matter (as shown in Argument I, *infra*). Absent standing, a putative intervenor cannot invoke the limited jurisdiction

---

[1] Appellees contested the district court's jurisdiction to sanction them, but Judge King overruled those threshold objections, and compelled Appellees to show cause why they should not be sanctioned without even affording them an opportunity to take discovery. *See* D.E. 488. Thereafter, Judge King conducted a lengthy evidentiary hearing, which ultimately resulted in determination that there was no factual basis to sanction Appellees. *See* D.E. 528 (granting equivalent of directed verdict to YCST and Sullivan); D.E. 568 (opinion and order denying sanctions as to Silverstein); D.E. 592 (opinion and order denying Motivation's motion for reconsideration).

of the federal courts – including on appeal. Nor can a district court reach outside of the proceedings before it, and sanction a party's outside attorneys, who were not counsel of record before the district court and not charged with violating an order of the court (as shown in Argument II, *infra*). This is particularly the case where, as here, the non-party Appellees have not been brought before the district court through any legally valid process (as shown in Argument III, *infra*).

## MOTIVATION'S IMPROPER ROLE IN THE PROCEEDINGS BELOW

As shown below, (i) Motivation wrongfully injected itself into the *in rem* proceeding with a factually implausible and legally frivolous claim of intervention that was dismissed by the court, and (ii) Motivation amended its dismissed claim to assert a concocted claim that Motivation later disclaimed. The record below reflects that Motivation's true purpose in seeking to intervene was (i) to serve as the self-anointed "Treasure Police," and (ii) to provide Motivation a forum to disparage a new business competitor.[2] Without regard to Motivation's *bona fides* (or lack thereof), however, Motivation's concession that it lacked any ownership interest in the "*Res*" means that Motivation lacked standing to participate in the *in rem* proceeding (as shown in Argument I, *infra*).[3]

The proceeding below was an *in rem* action to declare title to the *Res* of the action. Because the action was *in rem*, JTR did not sue any individual or entity. Moreover, JTR's complaint alleged little more than that Miscovich discovered the *Res* in a specified location within the Gulf of Mexico (the "Salvage Site"), while exploring the area with Steve Elchlepp, Jr. ("Elchlepp"). The complaint contained no allegations as to the origin or value of the *Res* – which remained to be investigated after title to the *Res* was established. *See* D.E. 1 (Complaint).

Motivation claims to be a successor to Treasure Salvors, Inc. ("Treasure Salvors"), which was granted certain rights to certain cargo on two Spanish Galleons (the "*Atocha*" and "*Margarita*")

---

[2] For a more detailed discussion of the record of Motivation's true motivation for injecting itself into the *in rem* action below, *see* D.E. 142, at 3-4 & nn.5-6 (JTR's Opposition to Motivation's Motion for Sanctions); D.E. 459, at 36-40 (Appellees' Motion to Quash and Opposition to Amended Motion for Sanctions), pertinent excerpts of which are attached as Exhibits 1 and 2, respectively.

[3] After conceding that it had no valid claim to the *Res* – and thereby lacked standing in the *in rem* action – Motivation sought to pass itself off as a "*qui tam relator*." The court struck Motivation's references to being a *qui tam relator* from the record because "there are no facts before this Court that would indicate that Motivation is actually working on behalf of a government entity with its expressed consent." D.E. 360. Motivation did not appeal this ruling, and is bound thereby.

that sank in the Atlantic Ocean in the 17th Century. Motivation injected itself into the *in rem* action on a theory that was, itself, a "fraud." Specifically, Motivation claimed that the *Res* had been cargo on the *Atocha*, which had floated in a barrel against prevailing currents to the Salvage Site that was many miles away from the *Atocha* wreck site. *See* D.E. 10 (Complaint in Intervention). Motivation's claim was not only implausible (and contrary to the laws of physics), but it was fraudulently based on a 1976 district court order that had been vacated, in pertinent part, on appeal.[4] Based on the foregoing, JTR successfully moved to dismiss Motivation's complaint in intervention. *See* D.E. 92.

Motivation next filed an amended claim that posited, with no evidence whatsoever, a concocted theory of a possible theft of *Atocha* emeralds from Motivation. Less than two months later, however, Motivation conceded that it lacked any ownership interest in the *Res*, and moved to voluntarily dismiss its amended claim. *See* D.E. 118 (Motion to Voluntarily Dismiss Claim).

The *in rem* action thereafter proceeded without Motivation asserting any claim to the *Res*.

## MISCOVICH AND ELCHLEPP

Neither Miscovich nor Elchlepp were parties to the *in rem* action below. Nonetheless, ***after*** Motivation conceded that it had no ownership interest in the *Res*, Motivation moved the district court to sanction Miscovich and Elchlepp for "fraud on the court." Despite the entry of the Final Order denying JTR any relief on January 25, 2013, Judge King ***thereafter*** allowed Motivation to conduct

---

[4] Specifically, Motivation claimed that a district court order, dated February 19, 1976 (the "1976 Order"), had awarded Treasure Salvors ownership "as against the world of the *Atocha* and *Margarita* shipwrecks and their cargo and scatter 'wherever the same may be found.'" In fact, the Fifth Circuit (which then included Florida) limited the scope of the 1976 Order on appeal, stating:

> In affirming the District Court, we do not approve that portion of its [1976] order which may be construed as a holding that Plaintiffs have exclusive title to, and the right to immediate and sole possession of, the vessel and cargo as to other claimants, if any there be, who are not parties or privies to this litigation.

*Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel,* 569 F. 2d 330, 335 (5th Cir. 1978). In a subsequent opinion, the Fifth Circuit directed the district court to "make a fresh and complete record" respecting Treasure Salvors' claim. *Id.* at 571. On remand, the district court denied Treasure Salvors any rights beyond a specific "Injunctive Area." *See Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 546 F. Supp. 919 (S.D. Fl. 1991). It is undisputed that the Injunctive Area ends more than 25 nautical miles away from the Salvage Site. As such, Motivation's claim of potential ownership of the *Res* was legally frivolous and based on a misrepresentation of the status of the 1976 Order from the outset – even if it were assumed (*arguendo*) that the implausible factual underpinning of the putative claim was physically possible.

substantial discovery in support of its sanctions motion, and ultimately entered an order on August 17, 2015 directing Miscovich's estate to pay Motivation's counsel in excess of $1 million (consisting mainly of fees allegedly earned pursuing sanctions after the Final Order was entered). *See* D.E. 591. Miscovich was deceased when Judge King entered that order; neither Miscovich nor his estate were represented in the proceedings below; and Miscovich's estate lacks the financial capacity to appeal the sanctions award – which was prosecuted by Motivation's counsel and granted *in abstentia* and without even a friend of the court to present a defense. By contrast, when this Court was confronted with a motion to sanction JTR for pursuing an appeal of the Final Order, the Court declined to sanction JTR because, among other things, "JTR has not been represented in this matter by conflict-free counsel." *JTR Enterprises, LLC. v. Columbian Emeralds*, No. 13-10870, at 3 (11th Cir. March 21, 2014) (Order).[5] *See also Crowe v. Smith*, 151 F.3d 217 (5th Cir 1998) (reversing monetary sanctions awarded without the full panoply of due process protections, and where proceedings were prosecuted by counsel with a financial interest in the outcome of the proceedings).

**CHIEF JUDGE MOORE RECOGNIZED THE COURT'S LACK OF JURISDICTION OVER APPELLEES, BUT MOTIVATION THEREAFTER MISLED JUDGE KING INTO ALLOWING MOTIVATION TO PURSUE SANCTIONS AGAINST APPELLEES**

At the First Sanctions Hearing (in which Appellees were neither present nor represented) Motivation asked the district court (then Hon. K. Michael Moore) to entertain sanctions against Appellees – who had been outside counsel for JTR, had made no appearance in the *in rem* action resolved a year earlier, and had not participated in the post-Final Order discovery Judge King permitted Motivation to pursue. Chief Judge Moore held that Appellees had not submitted themselves to the court's jurisdiction, and that Motivation had failed to serve Appellees with legally

---

[5] Judge King also entered an order directing JTR to pay Motivation's counsel just under $175,000. *See* D.E. 590. That Order was entered at a time when JTR had *no* counsel, and was based on an earlier ruling that JTR should have made immediate disclosure of certain information that would, if true, have cast doubt on the validity of JTR's claim, and held that JTR should be sanctioned for the relatively brief time during which JTR delayed disclosure to the court. *See JTR Enterprises, LLC v. An Unknown Quantity, Etc.*, Case No. 11-cv-10074-KMM, at ¶¶ 61-65 (June 19, 2014). That prior ruling also was made when JTR was not represented by conflict-free counsel. Additionally, that ruling was not supported by any cited authority, and will be challenged by Appellees if this appeal proceeds on the merits. With all due respect to the district court, there is no applicable statute, rule of court, or common law precept that required JTR to voluntarily disclose "potentially" adverse information at a time when JTR was still investigating the information – which are the indisputable facts during the four months prior to JTR's voluntary disclosure of the information at issue.

valid process. *See* D.E. 333. *See also* D.E. 445, at 3. Chief Judge Moore also reasoned that it would

be "unfair" to drag Appellees into this matter after discovery and other proceedings were completed

without Appellees' involvement. D.E. 373, at 112:24 to 113:9 (observing it would be "unfair to Mr.

Silverstein to have to come in at such a late date"); *see also id.* at 123:23 to 124:7 ("if they're not

within the jurisdiction of the Court, if there is no way to enforce the sanction, then the District Court

should not be in a position of just entering orders that it cannot execute on . . . .").

Following the First Sanctions Hearing, Motivation persuaded Judge King to issue an Order to

Show Cause why Appellees should not be sanctioned for Miscovich's actions (as found by Chief

Judge Moore). Numerous documents Motivation withheld from the court reflect that Motivation set

its sights on Appellees with full knowledge of the lack of any evidence that Appellees were aware of

any fraud, and solely to reach into what Motivation called "deep pockets." For example:

- On February 15, 2013, Motivation's counsel, Gene Lewis ("Lewis"), wrote: "[g]oal for all of us is money judgment against deep pockets" – "#1 Silverstein and firm." D.E. 459, Exh. 112.
- On February 19, 2013, Lewis wrote: "we don't need to be spending a lot of time on these guys except as to how to nail Scott, the firm and Bruce and last resort Sullivan." Motivation's President responded "We need to rely on their desire to settle and not be dragged thru a messy highly publicized trial." *Id.*, Exh. 113.
- On April 9, 2013, Lewis wrote: "All we are after is deep pocket who can pay Kim, us, Hugh and John's folks. [The FBI] has the fraud nailed for Judge King vindication so let's get consensus on how we can wind this down with a solvent judgment debtor(s) in our sights." *Id.*, Exh. 117.
- On April 20, 2013, Lewis wrote: "Friends, let us not forget the mission!!! Silverstein and his law firm, ie a deep pocket! Without that Buster and I are out of here." *Id.*, Exh. 121.

In accordance with its cynical strategy, Motivation refrained from seeking sanctions from JTR's

counsel of record, David P. Horan ("Horan"), because Motivation believed that Judge King "liked"

Horan. As Motivation's counsel wrote on April 16, 2013:

> Buster and all, ***thinking of politics*** here as well as legal positions. You all know my feelings about Horan nonetheless we have a larger issue than him at stake – winning against Silverstein and his firm. As Hugh [Morgan] knows from being "inside the tent" at the courthouse ***Judge King*** may be disappointed but ***still likes Horan***. Look how quick he let him off the hook. So, we need to open, in my view, with letting him out on this Motion. D.E. 459, Exh. 118 (emphasis added).

The next day, Motivation's lead counsel at the sanctions hearing against Appellees wrote:

> We have ample evidence that [Miscovich] has committed fraud and perjury, but ***I don't think we have any evidence that [Horan] or [Silverstein] were aware of the***

6

*fraud* (unless we infer knowledge f[ro]m the epoxy, but that m[ay] be pushing an inference to[o] far). D.E. 459, Exh. 120 (emphasis added).

The record shows that Motivation used the discovery process allegedly directed at JTR to investigate, at leisure, their potential claims against Appellees as "deep pockets" – all while Appellees were non-parties with no rights to participate in that discovery process:

- On May 17, 2013, Lewis wrote: "Judge King has no notion that our problem is not an award of fees and costs but of how Kim, and us, and John's clients get paid—a solvent creditor-Silverstein's FIRM." D.E. 459, Exh. 123.

- On May 24, 2013, another of Motivation's lawyers, Hugh Morgan ("Morgan"), wrote: "We could go to trial with what we have and are going to get in the immediate future but what we don't have at this time are the deep pockets. That is probably going to take more time." *Id.*, Exh. 125.

- On July 1, 2013, Lewis expressed his hope that a deposition of JTR's counsel of record would give Motivation some evidence to go with in regard to its real "target"—YCST: "even if he can corral Silverstein we won't have the real deep pocket until we get his firm understanding they are the target . . . ." *Id.*, Exh. 129.

In this abuse of due process, Motivation even made a calculated decision to ***not*** depose Appellee Silverstein, so as to avoid the presentation of a full record to the district court at the First Sanctions Hearing. As Motivation's lead counsel at the sanctions hearing against Appellees advised Motivation's other counsel: "If you depose BS, he'll just get out his side of the story and the testimony will be admissible at trial." D.E. 459, Exh. 131.[6]

Although Appellees ultimately prevailed on the merits of Motivation's motion for sanctions, Appellees should never have been subjected to a sanctions hearing that was (i) "prosecuted" by a party lacking standing to complain of Appellees' actions, (ii) conducted by a court that lacked the power to sanction Appellees, and (iii) inherently unfair to Appellees who were never served with any legally valid process and not parties to the extensive discovery and other proceedings that preceded the sanctions hearing. This is particularly troubling inasmuch as "the very fact that [an] attorney was charged could bring upon him the sting of disrepute." *NASCO, Inc. v. Calcasieu Television & Radio*,

---

[6] For a more detailed discussion of the record of Motivation's bad faith pursuit of sanctions against Appellees, *see* D.E. 459, at 36-40 (Appellees' Motion to Quash and Opposition to Amended Motion for Sanctions); D.E. 555, at 7-11 (Non-Party Paul Sullivan's Motion for Sanctions); D.E. 559, at 77-81 (Non-Party Silverstein's Proposed Findings of Fact and Conclusions of Law); D.E. 561, at 79-83 (Non-Party Silverstein's Post-Sanctions Hearing Brief). For the Court's convenience, pertinent excerpts of D.E. 459, 555, 559, and 561and their pertinent attachments are attached hereto as Exhibits 2, 3, 4 and 5, respectively.

124 F.R.D. 120, 142 (W.D. La. 1989), *aff'd*, 894 F.2d 696 (5th Cir. 1990), *aff'd sub nom. Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).

**ARGUMENT**

## I. MOTIVATION LACKED STANDING TO SEEK SANCTIONS BELOW AND, THEREFORE, LACKS STANDING TO APPEAL THE DENIAL OF SANCTIONS

In the district court, Appellees challenged Motivation's standing to seek sanctions from Appellees in three separate filings. *See* D.E. 459, at 4, 35-36; D.E. 559, at 77; D.E. 561, at 79. Judge King ruled on the merits of Motivation's motion for sanctions without addressing Appellees' challenge to Motivation's standing. *See* D.E. 488 (Judge King's order denying Appellees' Motion to Quash, which nowhere addresses Motivation's standing); D.E. 568 (Judge King's opinion and order denying Motivation's Motion for Sanctions, which nowhere addresses Motivation's standing). This court's consideration of Appellees' challenge to Motivation's standing is *de novo. See, e.g., Elend v. Basham*, 471 F.3d 1199, 1204 (11th Cir. 2006) (internal citations omitted). As shown below, Appellees' challenge to Motivation's standing was well founded.

"Standing is crucial. The Supreme Court has called it 'perhaps the most important of [the jurisdictional] doctrines.'" *ACLU of Fla. v. Dixie County*, 690 F.3d 1244, 1249 (11th Cir. 2012) (quoting *Allen v. Wright*, 468 U.S. 737, 750, (1984)). As such, the federal courts are "under an independent obligation" to examine standing. *United States v. Hays*, 515 U.S. 737, 742 (1995) (quoting *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 230-231, (1990)). *See also United States v. Edwards*, 728 F.3d 1286, 1291 (11th Cir. 2013) (quoting *Hays*, 515 U.S. at 742). Moreover, if a litigant lacks standing to press a claim in the district court, this Court lacks jurisdiction to address the underlying merits of the litigant's claim. *See, e.g., Kelly v. Harris,* 331 F.3d 817 (11th Cir. 2003).[7]

It is settled law that "intervenors who wish to prosecute an appeal on their own must separately fulfill the injury, causation, and redressability requirements of Article III." *Sierra Club v. Babbitt*, 995 F.2d 571, 574 (5th Cir. 1993) (internal citations omitted). Moreover, where an

---

[7] *See also Palomar Pomerado Health Sys. v. Belshe*, 180 F.3d 1104 (9th Cir. 1999) (dismissing appeal and vacating the district court's ruling based on plaintiff's lack of standing in district court), *cert denied*, 2000 U.S. LEXIS 117 (Jan. 10, 2000); *Auburn Med. Ctr. v. Ala. State Health Planning & Dev. Agency*, 848 So. 2d 269, 272 (Ala. Civ. App. 2003) (dismissing appeal based on the appellant's lack of standing in the lower court).

intervenor was the only party litigating the matter in the district court, the intervenor must have had independent standing to litigate the matter in the first instance. See *United States v. One-Sixth Share, Etc.*, 326 F.3d 36, 40-41 (1st Cir. 2003) (internal citations omitted). Where, as here, a matter is commenced as an *in rem* proceeding, the person or entity that initiates the suit is the plaintiff, and the "property subject to forfeiture is the defendant." *One-Sixth Share*, 326 F.3d at 40.[8] Other persons or entities may intervene as "claimants" in the *in rem* proceeding only if they have a colorable claim of ownership interest in the *res*. As the Fifth Circuit has instructed "the claimant must come forth with some evidence of his ownership interest in order to establish standing," and "a bare assertion of ownership of the *res*, without more, is inadequate to prove an ownership interest sufficient to establish standing." *United States v. $38,570 U.S. Currency*, 950 F.2d 1108, 1112 (5th Cir. 1992). Moreover, the Ninth Circuit has explained that a claimant ultimately "has the burden of establishing, by a preponderance of the evidence, that he has an interest in the property . . ." in order to have standing to intervene in an *in rem* proceeding. *United States v. Real Property, Etc.*, 976 F.2d 515, 520 (9th Cir. 1992) (citing *United States v. One Parcel of Land, Etc.*, 902 F.2d 1443, 1444 (9th Cir. 1990). The Ninth Circuit's holding is the logical result of the Supreme Court's decision in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), which instructs that standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Accord Fla. Pub. Interest Research Group Citizen Lobby, Inc. v. EPA*, 386 F.3d 1070, 1083 (11th Cir. 2004) (quoting *Bischoff v. Osceola County,* 222 F.3d 874, 878 (11th Cir. 2000) (following *Lujan* and testing standing through evidence, as opposed to simply accepting the plaintiff's allegations as true).

Applied to the *in rem* setting, this means that "although at the motion to dismiss stage it is enough to allege the elements of standing, at the summary judgment stage the party with the burden of demonstrating standing must demonstrate that there is a genuine issue of material fact as to the

---

[8] *One-Sixth Share* was a civil forfeiture action, and not an admiralty action. As the court explained in *One-Sixth Share*, however, "[b]y virtue of the roots of *in rem* jurisdiction in admiralty law, the procedures for intervention in civil forfeitures are governed by the Supplemental Rules for Certain Admiralty and Maritime Claims." 326 F.3d at 41. As such, the "standing" jurisprudence established in civil forfeiture actions is equally applicable to *in rem* admiralty actions.

standing elements, and at trial standing must be proved by a preponderance of the evidence." *United States v. $57,790.00 in United States Currency*, 263 F. Supp. 2d 1239, 1242 (S.D. Ca. 2003) (citing *Lujan*, 504 U.S. at 561; *Central Delta Water Agency*, 306 F.2d 938, 947 (9th Cir. 2002)). *See also State v. $ 551,985.00 United States Currency*, 235 P.3d 1268, 2010 Kan. App. Unpub. LEXIS 540, *23-24 (Kan. Ct. App. 2010) (affirming decision that intervenor/claimant in *in rem* proceeding lacked standing based on failure to prove standing by a preponderance of the evidence at trial).

*Lujan* and its progeny (including decisions of this Court) prevent a plaintiff, intervenor, or other claimant from making false allegations that would, if true, sustain standing at the dismissal stage, and then continue to misuse the federal courts despite later proof that the allegations supporting standing were unsupported – which is precisely what happened here. Motivation's lack of standing in the district court was established by both (i) the trial court's ruling (not appealed by Motivation) that Motivation's original claim failed to establish a legally cognizable claim of ownership of the *Res*, and (ii) Motivation's subsequent concession (less than two months after its initial complaint was dismissed) that Motivation's amended claim was factually unfounded. It was only *after* Motivation conceded that it has no ownership claim to the *Res* – and, thereby, lacked standing to intervene in the *in rem* action – that Motivation filed a motion for sanctions and engaged in protracted litigation (including substantial discovery) aimed at obtaining sanctions.

The irony of Motivation's motion for sanctions is that it was advanced by a non-party that invoked the district court's jurisdiction in bad faith through a frivolous intervention in which Motivation was seeking a platform to interfere with an *in rem* action brought by a competitor, and not to present any genuine claim of ownership of the *Res*. As such, Motivation was not harmed by any alleged "fraud on the court." Motivation's motion for sanctions is akin to a complaint by a thief who stole a work of art the owner had represented to be a Rembrandt, but was really a worthless reproduction. Motivation has no one to blame but itself for the costs of its own misuse of the judicial system and had no right to seek sanctions against Appellees in the first place or before this Court.

## II. THE "INHERENT POWER" OF THE DISTRICT COURTS TO SANCTION PARTIES FOR BAD FAITH DOES NOT EXTEND TO APPELLEES

> No statutory mechanism authorizes monetary sanctions against Silverstein, a non-party who was not subject to a Court order and was not counsel of record in the underlying action. The Court's ability to sanction Silverstein can derive only from its "inherent powers."

D.E. 568, at 49.

Appellees challenged the district court's inherent power to sanction Appellees through a Motion to Quash (which also raised other jurisdictional defects). *See* D.E. 459, at 15-21. Relying exclusively upon *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), Judge King denied Appellees' motion through a single paragraph in a four-page order (which also addressed other issues). *See* D.E. 488, at 2. Questions of subject matter jurisdiction are reviewed *de novo*. *See, e.g.*, *Elend v. Basham*, 471 F.3d 1199, 1204 (11th Cir. 2006) (internal citations omitted); *see also Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 619 F.3d 458, 460 (5th Cir. 2010) ("we review *de novo* a district court's invocation of its inherent power") (quoting *FDIC v. Maxxam, Inc.*, 523 F.3d 566, 590 (5th Cir. 2008)). As shown below, Judge King lacked the inherent power to sanction Appellees.

*Chambers* is the leading decision to sustain the existence of the "inherent power" of the district courts to sanction bad faith conduct. *Chambers* does not, however, address, much less sustain, the power of the courts to sanction a party's outside attorneys that are not counsel of record before the district court – especially where, as here, (i) no sanctions were sought from counsel of record in the first instance, and (ii) there was no contention that Movants violated any order of the district court. Rather, *Chambers* involved the limited question of whether the district courts possess the inherent power to sanction a party for contempt of court – which is concededly not at issue here.

> [T]he bad-faith conduct in *Chambers* was undertaken in direct defiance of the sanctioning court. *Chambers* was an action for specific performance of a contract to sell a television station. After signing the contract the owner, Chambers, changed his mind. His efforts to avoid the sale included, *inter alia*, a filing with the Federal Communications Commission seeking permission to replace existing transmission facilities with a new transmission tower to be built on a site beyond the reach of the contract. This filing not only directly violated the district court's order to maintain the status quo pending the outcome of the litigation but also, if successful, would have eviscerated the court's ability to enforce specific performance if it so ordered.

*CJC Holdings, Inc. v. Wright & Lato, Inc.*, 989 F.2d 791, 794 (5th Cir. 1993). *See also Positive Software Solutions, Inc*, 619 F.3d at 460-61 (construing *Chambers* to apply where the conduct at issue is either "in direct defiance of the sanctioning court," or "constitutes 'disobedience to the orders of the Judiciary,'" and instructing that "conduct is beyond the reach of the court's inherent authority to sanction" where it is "neither before the district court nor in direct defiance of its orders") (quotations and citations omitted).[9]

Although the narrow holding in *Chambers* was that the district courts have inherent power to sanction a party for disobedience of their orders, *Chambers* also supports the extension of that power to a party's counsel of record. *Chambers*, 501 U.S. at 43 ("a federal court has the power to control admission to its bar ***and to discipline attorneys who appear before it***") (emphasis added) (internal citations omitted).[10] But, *Chambers* did not even suggest, much less hold, that the inherent powers of the district courts reach beyond a party and its counsel of record, and Appellees are unaware of any decisional law holding that district courts have the inherent power to sanction a party's outside attorneys who have not violated an order of the court and not appeared as counsel of record before the court (and are not even members of the bar of the sanctioning court). Moreover, at least one court has declined to apply the inherent power beyond a party and its counsel of record, reasoning:

> [A]t the pertinent times Walters was New Valley's senior vice president and general counsel. His asserted liability for sanctions is based upon an affidavit he submitted in opposition to plaintiff's summary judgment motion. Rule 11 sanctions are not available against Walters because he was neither "an attorney of record" nor "a party" within the contemplation of the Rule. Brown and Fischer were the attorneys of

---

[9] *See also Thomas v. Tenneco Packaging Co.,* 293 F.3d 1306, 1308, 1320-21 (11th Cir. 2002) ("inherent power to oversee attorneys practicing before it" extended to sanctions for filings "deemed abusive and offensive by the court" directed at opposing counsel); *Citizens Bank & Trust Co. v. Case (In re Case)*, 937 F.2d 1014, 1023 (5th Cir. 1991) (explaining that a district court's inherent authority "is based on the need to control court proceeding[s] and [the] necessity of protecting the exercise of judicial authority in connection with those proceedings" by seeing that the court's orders are obeyed) (citing *Chambers*, 501 U.S. at 43).

[10] This authority stems from "[t]he power of a court over members of its bar." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980)). *See also Natural Gas Pipeline Co. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1411 (5th Cir. 1993) (reasoning that "[t]he inherent power of a court to manage its affairs necessarily includes the authority to impose reasonable and appropriate sanctions on errant lawyers practicing before the courts"), *cert. denied*, 510 U.S. 1073 (1994) (internal citations omitted); *Flaksa v. Little River Marine Constr. Co.*, 389 F.2d 885, 888 n.10 (5th Cir. 1968) (tracing the origins of the inherent power to sanction attorneys to "[t]he power of a court to discipline members of its own bar . . .") (internal citations omitted).

> record. New Valley was the party. Walters was an affiant-witness, who happened also to be an attorney. His corporate office is sufficient to visit liability for sanctions upon New Valley, if Walters' conduct upon behalf of that party was in fact sanctionable; but there is no basis in the Rule for sanctioning Walters himself.
>
> . . .
>
> For comparable reasons I also decline to sanction Walters under § 1927 or the Court's inherent powers.

*Leventhal v. New Valley Corp.*, 148 F.R.D. 109, 112 (S.D.N.Y. 1993). *Accord In re VIII South Michigan Associates*, 175 B.R. 976, 984 (Bankr. N.D. Ill. 1994) (holding that the court lacked the inherent power to sanction a non-party litigation consultant who "helped to develop theories which the [parties] relied on in the litigation" and who "may well have suggested the shots" made by counsel of record). As the court explained in *VIII South Michigan Associates*:

> The decision in *Chambers*, if read broadly, might be used to support a holding that a court has the inherent authority to sanction any person or entity that is responsible for an abuse of the legal system. However, the court declines to read *Chambers* so broadly and instead concludes that *Chambers* should be limited to parties and their counsel [of record]. First, the only sanctions before the Supreme Court in *Chambers* were the sanctions imposed on *Chambers* himself in his capacity as a party. Second, throughout the opinion, the majority of the Court suggested that the inherent power should be limited to imposing sanctions on parties and their counsel [of record].

*Id*. at 983.

The inherent power identified in *Chambers* does not extend to non-party outside counsel who are not counsel of record before the district court (or even admitted to practice before that court), and who are not accused of violating any court order. While the district courts' power to sanction bad faith conduct may be inherent, it is not unbounded. Rather, the inherent power is limited to that necessary to control the proceedings before the court and to ensure compliance with its orders. As the Fifth Circuit explained in the decision affirmed in *Chambers*, "[t]o the extent that inherent power is seen as a product of necessity, it contains its own limits." *NASCO*, 894 F.2d at 702, *aff'd sub nom. Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991). Moreover, the Supreme Court has cautioned that inherent powers "must be exercised with restraint and discretion" both "[b]ecause of their very potency" and "[b]ecause they are 'shielded from direct democratic controls.'" *Chambers*, 501 U.S. at 45; *Roadway Express, Inc.*, 447 U.S. at 764. Quoting the Fifth Circuit, the Supreme Court also wrote in *Chambers* that the inherent power "is not a broad reservoir of power, ready at an imperial hand,

but a limited source; an implied power squeezed from the need to make the court function." *Chambers*, 501 U.S. at 45 (internal citations omitted). Accordingly, "[t]he threshold for the use of the inherent power sanction is high[,]" and "[s]uch powers may be exercised only if essential to preserve the authority of the court[.]" *Natural Gas Pipeline*, 86 F.3d at 467. The conduct of non-party attorneys who have not appeared as counsel of record before the district court simply does not implicate inherent powers – particularly where, as here, no violation of any court order is alleged and no sanctions were sought from counsel of record.[11]

In his Opinion denying Motivation's motion to sanction Appellees, Judge King also relied upon the district court's opinion in *Helmac Products Corp. v. Roth (Plastics) Corp.*, 150 F.R.D. 563 (E.D. Mich. 1993), to sustain the court's inherent power to sanction a non-party. *See* D.E. 568, at 53-54. Unlike the instant case, however, the narrow issue in *Helmac* was whether the inherent power identified in *Chambers* extends to the principal behind a party, who was the "real party in interest" in the litigation. Specifically, *Helmac* involved a motion to sanction an individual, who was both the principal stockholder and chief executive officer of the corporate party, for destroying documents subject to discovery. *See Helmac*, 150 F.R.D. at 564. Finding that the individual respondent in *Helmac* was the "real party interest," the district court reasoned that the power to sanction extended

---

[11] Indeed, even where the inherent power to sanction conduct does exist, appellate decisions following *Chambers* have recognized that the sanction chosen must employ "'the least possible power adequate to the end proposed[,]'" and that "[i]f there is a reasonable probability that a lesser sanction will have the desired effect, the court must try the less restrictive measure first." *See, e.g., Natural Gas Pipeline Co. of Am. v. Energy Gathering*, 86 F.3d 464, 467 (5th Cir. 1996) (quoting and citing *Spallone v. United States*, 493 U.S. 265, 280 (1990)). Plainly, the "least restrictive measure" of curbing bad faith in litigation (when it occurs) is to sanction counsel of record, which is the "gate keeper" with the ultimate responsibility to refrain from taking positions or filing papers that such counsel does not stand behind, and which cannot avoid responsibility for his or her actions by simply "following orders." *See, e.g., Long v. Quantex Res., Inc.*, 108 F.R.D. 416 (S.D.N.Y. 1985) (holding, for sanctions purposes, that counsel of record, and not out-of-state counsel, is accountable for the conduct of the litigation, even if out-of-state counsel is primarily responsible for the preparation of the suit papers), *aff'd*, 888 F.2d 1376 (2d Cir. 1989); *see also In re De Lorean Motor Co. Litig.*, 59 B.R. 329, 339 (E.D. Mich. 1986) (instructing that there is no "just following orders" defense and that "accountability already lies with the signer, even if it means informing a superior that the proposed pleading is either factually unsound or not substantiated by the existing state of the law"). If counsel of record is directed by a client or its outside attorneys to act in a manner that counsel of record believes to be improper, counsel of record can and should refuse to do so. And, if counsel of record fails or refuses to act appropriately, there is ample power to preserve the court's authority through the inherent power to sanction counsel of record – which power indisputably exists under *Chambers*.

to the respondent because "the individual is as much involved in the litigation as any party would be, and his participation in these events is tantamount to a direct snubbing of the Court's authority by that individual." *Id* at 568. That holding has no relevance to outside counsel for a party, even if they have a financial interest in the outcome of the case because of their fee arrangement. *See United States v. Henry*, 2013 U.S. Dist. LEXIS 133148, *110 (E.D. Va. Sept. 13, 2013) (observing that the exercise of inherent power should be limited to persons or entities who are "(1) parties, (2) subject to a court order, or, (3) real parties in interest"); *In re VIII S. Mich. Assocs.*, 175 B.R. 976, 984 (Bankr. N.D. Ill. 1994) (same) (internal citations omitted). *See also Adell Broad. Corp. v. Ehrich*, 2012 Mich. App. LEXIS 229 (Mich. Ct. App. Feb. 14, 2012) (affirming imposition of sanctions on non-party based on determination that he was the "real party in interest" where he was "the president and director" of the offending parties and had "controlled the companies and filed the complaint on behalf of the companies").

Only one decision of any the U.S. Courts of Appeals has cited *Helmac* for the proposition that inherent power can reach a non-party, and that decision involved the violation of an injunction – a very different situation clearly covered by *Chambers. See Marshak v. Treadwell*, 595 F.3d 478 (3d Cir. 2009). Additionally, district courts within this circuit have claimed inherent power to sanction the principal of a party[12] but none have claimed the power to sanction outside counsel. Here, Judge King did not find (and Motivation did not claim) that Appellees were the "real party in interest."

---

[12] *See ANZ Advanced Techs., LLC*, 2012 U.S. Dist. LEXIS 29534, at *29 ("highest ranking officers"); *Feldman v. Davidson*, 2009 U.S. Dist. LEXIS 36921, at *6-7 (S.D. Fla. April 13, 2009) (individual who held a "power of attorney" to act for the parties before the Court, and used that power to cause various actions that were the subject of the sanctions motion); *Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, 259 F.R.D. 568, 587-90 (M.D. Fla. 2009) (all "non-parties" subjected to sanctions were counsel of record in the case or counsel who violated a specific discovery order) ), *aff'd* 2009 WL 5606058 (M.D. Fla. November 16, 2009); *Pafumi v. Davidson*, 2008 U.S. Dist. LEXIS 67036, at *7-9 (S.D. Fla. Sept. 3, 2008) (non-party subject to sanctions signed the filings giving rise to sanctions – which were filed *pro se* – and did not contest the Court's authority to sanction him); *Mastercard Int'l, Inc. v. Ishak*, 2004 U.S. Dist. LEXIS 951, at *12-13 (S.D. Fla. Feb. 23, 2004) (involved sanctioning an actual party, and nobody else). The district court herein also relied on *Helmac* to conclude that Miscovich should be sanctioned even though he was a non-party. (D.E. 445 at 20 n.19). Like the principal stockholder and chief executive officer in *Helmac*, Miscovich was the "real party in interest" because he was JTR's sole Managing Member and the holder of a controlling membership interest.

15

In his Opinion denying Motivation's motion for sanctions, Judge King also relied upon *Universal Oil Products Co. v. Root Refining Co.*, 328 U.S. 575 (1946) ("*Universal*") to support his assertion of power to sanction non-parties for "fraud on the court." *See* D.E. 568, at 51-52. *Universal* not only fails to support Judge King's assertion of power, but it reveals the error of his doing so (and of his million dollar award to Motivation's counsel). The brief decision in *Universal* holds only that the district courts possess the authority to appoint *amici* to advocate that a judgment should be set aside based on a fraud on the court. *See Universal*, 328 U.S. at 580-81 (specifically identifying the narrow ground for the decision). The pertinent language, which is helpful to Appellees here, is that (i) persons could be brought before the district court "by appropriate means," and (ii) "the usual safeguards of adversary proceedings must be observed." *Id*. at 580.[13]

While Appellees are second to none in their condemnation of any false testimony in any case, its occurrence does not provide a legal warrant for an inquisition of the knowledge or participation of outside counsel and other non-parties. If the rule were otherwise, every case of the rejection of a party's testimony by a fact-finder would present an issue of attempted "fraud on the court" calling for a similar inquisition as this case into "what the attorney knew and when did he know it."[14]

---

[13] The Supreme Court also held that (i) the "cost of the proceedings" (in that case, the costs of a master) could be assessed against the party that had obtained the fraudulent judgment, but that (ii) the attorneys who were appointed by the court to seek relief from the judgment were not entitled to have their fees paid by the guilty party. *See id*. at 580-81. *See also Crowe v. Smith*, 151 F.3d 217 (5th Cir 1998) (finding sanctions proceeding was in the nature of a criminal contempt proceeding, and reversing grant of monetary sanctions where, among other things, the district court allowed the proceedings to be "prosecuted" by a lawyer for a client with a financial interest in the outcome).

[14] Although the district court found that Miscovich and Elchlepp committed perjury and verified false pleadings, a "fraud on the court" does not occur simply because a witness commits perjury or a party asserts a false claim. *See Travelers Indemnity Co. v. Gore,* 761 F. 2d 1549, 1551-52 (11th Cir. 1985) (perjury insufficient for fraud on the court). Rather, a "fraud on the court" requires "a corruption of the judicial process itself" through "such flagrant abuses as bribing a judge, employing counsel to exert improper influence on the court, and jury tampering." *Gen. Med., P.C. v. Horizon/CMS Health Care Corp*., 475 Fed. Appx. 65, 71 (6th Cir. April 10, 2012) (internal citations omitted). The elements of a "fraud on the court" also require that the fraud "in fact deceives the court." *Herring v. United States*, 424 F.3d 384, 386 (3rd Cir. 2005) (internal citations omitted); *see also Gen. Med*., 475 Fed. Appx. at 71. Neither of these things occurred herein – not even by Miscovich. Moreover, as in *Universal*, the remedy for a true "fraud on the court" is to set aside a judgment that was fraudulently obtained, and not to sanction a non-party. *Accord Chambers*, 501 U.S. at 44 (discussing inherent power of courts to set aside its judgment upon proof it was procured by fraud).

Consistent with the foregoing, federal courts have recognized less than a handful of situations in which the inherent power may reach a non-party (other than a "real party in interest"):

- The inherent power may extend to a non-party that filed an unsuccessful motion to intervene in the proceedings before the court. *See, e.g.*, *Moten v. Bricklayers, Masons & Plasterers Int'l Union of Am.*, 543 F.2d 224 (D.C. Cir. 1976) (sanctioning a non-party who unsuccessfully sought to become a party);

- The inherent power may extend to a court reporter or court personnel who interfere with the court's performance of its judicial function. *See SECO Nev., Inc. v. McMordie*, 884 F.2d 476, 477-78, n.2 (9th Cir. 1989) (sanctioning court reporter for "repeated and flagrant failures to meet court-imposed deadlines" that caused "severe prejudice to both the parties and the court");

- The inherent power may extend to a non-party that violates an injunction. *See, e.g.*, *Marshak*, 595 F.3d at 478; and

- This court has affirmed the imposition of sanctions upon a non-party witness for bad faith discovery abuse. *See Sciarretta v. Lincoln Nat'l Life Ins. Co.*, 778 F.3d 1205 (11th Cir. 2015).[15]

Plainly, none of those situations is present here, and Judge King's assertion of inherent power to sanction Appellees extends *Chambers* and its progeny beyond their breaking point.

## III. THE DISTRICT COURT LACKED PERSONAL JURISDICTION OVER APPELLEES, WHO WERE NEVER SERVED WITH LEGALLY VALID PROCESS

Chief Judge Moore ruled that (i) Appellees had not submitted themselves to the court's jurisdiction, and (ii) Motivation failed to serve Appellees with legally valid process. *See* D.E. 333. *See also* D.E. 445, at 3. Chief Judge Moore also has found it would be "unfair" to drag Appellees into this matter after discovery and other proceedings were completed without Appellees' involvement. D.E. 373, at 112:24 to 113:9 (observing it would be "unfair to Mr. Silverstein to have to come in at such a late date"). Motivation thereafter requested that Judge King issue the OSC; Appellees moved to quash the OSC; and Judge King denied the motion. *See* D.E. 488 (Order Denying Motion). As shown below, Judge King erred, as a matter of law in doing so.

---

[15] In so doing, the Court based its decision on the fact that the sanctions had been imposed for the non-party's bad faith in its capacity as a witness in the proceedings in the district court (which is not involved herein). Moreover, the sanction sustained by the Court was limited to requiring the non-party to "cover" a separate fee award that had been imposed on the party for whose benefit the sanctions were awarded. As the Court explained on page 1214 of its Opinion:

The district court did not require Imperial to pay Lincoln's own fees, but only those of the Cotton trust that were shifted to Lincoln under Florida law as a result of the judgment against Lincoln. In other words, because of its misconduct Imperial was required to pay the fees of the party that had to prevail in order for Imperial to recover on its loans.

Rule 4.1 of the Federal Rules of Civil Procedure provides that process "other than a summons under Rule 4 . . . may be served anywhere within the territorial limits of the state where the district court is located and, if authorized by a federal statute, beyond those limits." Fed. R. Civ. P. 4.1(a). As such, this Court has instructed that "Rule 4 addresses only service of the summons[,]" and "[Rule 4.1] governs service of process other than a summons or subpoena." *United States v. Elmes*, 532 F.3d 1138, 1144 (11th Cir. 2008). The OSC is neither a summons nor a subpoena. Rather, the OSC is an order directing non-parties to respond to Motivation's private motion for sanctions. As such, Rule 4.1(a) governed service of the OSC. *See, e.g.*, *Fidelity Nat'l Fin., Inc. v. Friedman*, 2010 U.S. Dist. LEXIS 35851, at *18-19 (D. Ariz. Mar. 12, 2010) ("Because the process here is an OSC and not a summons, the court must look to Rule 4.1(a).").

Rule 4.1(a) limits *where* service may be made. In the absence of a specific federal statute allowing for broader service of the relevant type of process, service is expressly limited to "the state where the district court is located" – which is the state of Florida in this instance. No statute operated to broaden that reach. Thus, service of the OSC on Appellees in Delaware was invalid and did not permit Judge King to exercise jurisdiction over Appelleees. *Accord* Hon. William E. Schwarzer et al., Federal Civil Procedure Before Trial §13:247 (2007) (noting, in discussion of orders to show cause for violations of preliminary injunctions, that "[t]he party sought to be held in contempt is entitled to notice of the [Order to Show Cause]. The order must be served in the state in which the district court is located or within 100 miles from the courthouse in which it was issued.").

Judge King held that the OSC was validly served on Appellees simply because they received actual notice. *See* D.E. 488, at 3. In essence, Judge King reasoned that service of legally valid process is unnecessary when the district court considers an OSC based on the court's "inherent power." Aside from the fact that Judge King was wrong to believe that he had "inherent authority" to sanctions Appellees in the first instance (as shown in Argument II above), Judge King erred in concluding that the mere existence of such power dispenses with the need for legally valid process.

"[W]hen it is sought to charge a person with contempt who was not a party to the original action and thus not already within the jurisdiction of the court, he must be served with process as in

any other civil action." *McGuire v. Sigma Coatings, Inc.*, 48 F.3d 902, 907 (5th Cir. 1995) (citing 11A Wright & Miller, *Federal Practice & Procedure* § 2960 at 589); *accord Comverse, Inc. v. Am. Telecomms., Inc. Chile S.A.*, 2009 WL 46446, at *2 n.4 (S.D.N.Y. Feb. 24, 2009) (absent evidence of proper service, the court is "[w]ithout personal jurisdiction" and cannot "hold them in contempt[ ]"). '"Service of process is the mechanism by which the court [actually] acquires' the power to enforce a judgment against the defendant's person or property. In other words, service of process is the means by which a court asserts its jurisdiction over the person." *SEC v. Ross*, 504 F.3d 1130, 1137-38 (9th Cir. 2007) (internal citations omitted). "[I]n the absence of proper service of process, the district court has no power to render any judgment against the defendant's person or property unless the defendant has consented to jurisdiction or waived the lack of process." *Id.* at 1138-39. There is no exception to these fundamental rules where the district court seeks to flex its "inherent power" to investigate an alleged fraud on the court. *Accord Universal Oil*, 328 U.S. at 580 (instructing that a district court can bring persons before it only "by appropriate means" and that "the usual safeguards of adversary proceedings must be observed" when investigating an alleged fraud on the court).

Properly applying the foregoing legal principles, the court in *Fidelity Nat'l Fin., Inc. v. Friedman*, 2010 U.S. Dist. LEXIS 35851 (D. Ariz. Mar. 12, 2010), held that it lacked personal jurisdiction over non-parties because the applicant for relief ("Fidelity") "did not serve the OSC in compliance with Rule 4.1[.]" *Id.* at *22. In that case, Fidelity moved for an order directing non-parties to show cause why they should not be sanctioned under the court's inherent power. *See id.* at *20. Fidelity provided the non-parties with actual notice of the OSC, but did not cause it to be validly served pursuant to Rule 4.1. The court thereafter granted the respondent's motion to dismiss for lack of personal jurisdiction, reasoning that "[t]he familiar 'minimum contacts' test . . . coupled with statutory authorization , provides a *basis* for an exercise of jurisdiction," but "service of process is the *mechanism* by which the court actually acquires the power to enforce a judgment against the defendant's person or property." *Id.* at *13 (internal citations omitted)*. The court further explained that "service of process is a distinct and separate concept from the court's personal jurisdiction[,]" and noted that the two distinct concepts are "often conflated" – such as by Judge King here. *Id.*

Like the respondent in *Fidelity*, Appellees were never served with legally valid process. Thus, while Appellees did not engage in any sanctionable conduct, Judge King's authority to consider that issue simply did not exist. This Court should, therefore, vacate all Judge King's various rulings following the issuance of the OSC, without reaching the merits of Motivation's appeal. *See*, *e.g.*, *Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind*, 841 F.2d 646, 649 (5th Cir. 1988) (a judgment rendered in the absence of personal jurisdiction is void and must be set aside).

## CONCLUSION

Motivation is not a defendant that claims to have been wrongfully sued by JTR (much less by Appellees). Nor is Motivation a plaintiff that claims that JTR (much less Appellees) wrongfully defended against a viable complaint brought by Motivation. Rather, Motivation is an intermeddler in the *in rem* action below, which first asserted a legally frivolous and factually implausible claim that was dismissed by the Court (albeit without prejudice) and later conceded that it had no ownership claim to the *Res* – and thereby lacked standing to participate in the *in rem* action below.

It also is undisputed that Appellees (i) were not parties in the district court (or the "real parties in interest"), (ii) were not counsel of record to any party in the district court, and (iii) were not accused of violating any order of the district court. Accordingly, the district court lacked jurisdiction to sanction Appellees.

The district court also lacked personal jurisdiction over Appellees because they (i) were never served with legally valid process, (ii) timely contested the sufficiency of process, and (iii) "specially appeared" without waiving these defenses.

Under settled law, any one of the foregoing defects in the proceedings below is sufficient to render all proceedings involving Appellees a nullity (and Motivation's lack of standing renders all proceedings following the district court's 2013 Final Order a nullity). Accordingly, Appellees respectfully pray that this Court will grant Appellees' motion to dismiss Motivation's appeal, and vacate the district court's rulings that post-date the district court's Final Order *nunc pro tunc*.

Respectfully submitted,

ADAMS AND REESE LLP
John T. Rogerson, III
Florida Bar No. 832839
john.rogerson@arlaw.com
501 Riverside Avenue, 7th Floor
Jacksonville, FL 32202
Telephone:  (904) 355-1700
Facsimile:   (904) 355-1797

COFFEY BURLINGTON, P.L.

By:  Jeffrey B. Crockett\
    Jeffrey B. Crockett
    Florida Bar No. 347401
    jcrockett@coffeyburlington.com
    David J. Zack
    Florida Bar No. 641685
    2601 South Bayshore Drive
    Penthouse
    Miami, Florida  33133
    Telephone:  (305) 858-2900
    Facsimile:  (305) 858-5261

*Counsel for Young Conaway Stargatt &*
*Taylor, LLP  and Bruce L. Silverstein, Esq.*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that true and correct copy of the foregoing was served by Notice of Electronic Filing generated by CM/ECF, on November 24, 2015, on all counsel or parties of record on the Service List below.

Arthur E. Lewis, Jr., Esq.
Marlow V. White, Esq.
LEWIS & WHITE, PLC
222 W. Georgia Street
P.O. Box 1050
Tallahassee, FL  32301
mvw@lewisandwhite.com

*Counsel for Appellant Motivation, Inc.*

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION

"IN ADMIRALTY"

JTR ENTERPRISES, LLC,

                Plaintiff,

vs.                                   CASE NO. 4:11-CV-10074-JLK

AN UNKNOWN QUANTITY etc.,

                *In Rem* Defendant,

_____/

## JTR'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO MOTIVATION'S MOTION FOR SANCTIONS (D.E. 123)

Plaintiff, JTR Enterprises, LLC ("JTR"), by and through its undersigned counsel and pursuant to Local Rule 7.1, hereby submits its Response and Memorandum of Law in Opposition to Motivation, Inc.'s, Motion for Sanctions (D.E. 123), and states:

## I.      INTRODUCTION

*A.*    *Preliminary Statement.*

JTR lawfully and commendably has enlisted the aid of this Court to determine the ownership of tens of thousands of emeralds that JTR's founder, Jay Miscovich, discovered in International Waters in the Gulf of Mexico of a point located at coordinates 24°57.79" North Latitude and 81°55.54" West Longitude (the "Discovery Site"). In its Verified Claim, JTR alleged nothing more than that Jay discovered the emeralds at the Discovery Site. JTR made no claim as to the origin, original ownership, or value of the emeralds – all of which are issues that JTR continues to investigate.[1]

---

[1]    A detailed and somewhat lengthy discussion of the facts supporting the legitimacy of JTR's claim appears in the Affidavit of Bruce L. Silverstein, Esquire (the "Silverstein Affidavit"), which is submitted in support of JTR's

JTR should be awarded its attorneys' fees and expenses incurred in responding to Motivation's frivolous motion.

**B.**     ***Procedural Background***

For a full discussion of the procedural background pertinent to Motivation's Motion for Sanctions, JTR respectfully refers the Court to pages 1 through 6 of JTR's Response in Opposition to Motivation's Motion to Compel (D.E. 135) and paragraphs 34 through 70 of the Silverstein Affidavit.  The most pertinent procedural background for present purposes is as follows:

On February 7, 2012, the Court granting JTR's motion to stay discovery, pending the Court's determination of whether Motivation's claim was legally viable.   (D.E. 69).  On June 18, 2012, the Court lifted its stay of discovery.   (D.E. 92).  On July 17, 2012, the Court issued a Scheduling Order setting a discovery deadline of December 5, 2012. (D.E. 100).     On August 7, 2012, the Court entered an Order requiring JTR, as substitute custodian, to provide Motivation's expert, Manuel Marcial, access to the instant emeralds by August 29, 2012.  (D.E. 117).  The Court also ordered Kim Fisher to appear for deposition on August 21, 2012, which was prior to the August 29, 2012 deadline for the inspection.[3]  (D.E. 116).  Despite the fact that Motivation had delayed Kim Fisher's deposition,[4] JTR voluntarily provided Mr. Marcial with access to the emeralds before the scheduled deposition and he inspected them on August 14, 2012.

Several days prior to the inspection, Motivation's public relations representative, Joe Sweeney, had told Jay Miscovich (while transporting the Citibank tranche of emeralds) on a flight from Ft. Lauderdale to Key West, that Kim Fisher had filed the lawsuit because

---

[3]   Based on Motivation's counsel's agreement with JTR's counsel at the August 14, 2012 inspection that the instant emeralds were not from the *Atocha* or *Margarita*, JTR canceled Mr. Fisher's August 21, 2012 deposition, as JTR then thought a joint stipulation of dismissal of Motivation's claim would be forthcoming and any further discovery efforts and litigation between the parties would be unnecessary.

[4]   Kim Fisher's deposition was postponed so that he could take a trip to Brazil for alternative holistic medical treatment for knee pain.

3

JANSSEN & SIRACUSA, P.A.
120 South Olive Avenue, Suite 504 * West Palm Beach, FL 33401
Telephone (561) 420-0583 * Facsimile (561) 420-0576

Motivation's investors had brought JTR's find to his attention after reading about it in the newspaper and thought JTR's find might be the missing *Atocha* emeralds that they had been searching for, and that Kim did not believe the emeralds were from the *Atocha* and was looking for a "graceful way out" of the lawsuit and as soon as Motivation's emerald expert, Manuel Marcial, confirmed JTR's emeralds were not from the *Atocha,* Motivation would withdraw its claim.[5]  *See* Affidavit of Jay Miscovich (copy attached as ***Exhibit "A"***).

Expectedly, on August 15, 2012, Mr. Marcial issued his report finding the instant emeralds were not from the *Atocha* or *Margarita.*  (D.E. 118-1).  Accordingly, on August 17, 2012, Motivation moved to dismiss its own Claim, but requested the Court reserve jurisdiction for a period of 60 days to consider a motion for sanctions.[6]  (D.E. 118-1).  On August 20, 2012 (within minutes of JTR's emailing of its Notice of Cancellation of Kim Fisher's deposition), Motivation filed a Secondary Report by Mr. Marcial, in which he raised a number of new issues, including what he believes to be the "possible" use of Krazy Glue on three matrix specimens and his putative appraisal of the total find, which he claims to be less than $50,000.  (D.E. 119-1).  Mr. Marcial's "findings" stand in stark contrast with prior evaluations and analysis of the Salvaged material by, among others, the Smithsonian Institute, experts engaged by CBS News / 60 MINUTES, Fred Leighton Jewelers, Sotheby's, and various other persons who have examined the emeralds and who are unaffiliated with JTR.

On August 20, 2012, JTR filed a response to Motivation's motion to voluntarily dismiss its claim.  (D.E. 120).  JTR did not oppose Motivation's voluntary dismissal of its claim, but noted any motion for sanctions by Motivation would itself, be sanctionable.  (D.E. 120 at 2).  JTR further

---

[5]   Mr. Sweeney confirmed the same information to the undersigned the morning of Mr. Marcial's inspection.

[6]   Motivation's counsel, Buster White told the undersigned that Motivation was seeking sanctions instead of simply withdrawing because it had spent close to $300,000 in attorney's fees on the claim and that Motivation felt it had some duty to "police" the treasure business.

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION
**IN ADMIRALTY**

JTR ENTERPRISES, LLC,
        Plaintiff,

vs.                                CASE NO. 4:11-CV-10074-JLK

AN UNKNOWN QUANTITY, etc.

        *In Rem* Defendant.

**SPECIALLY APPEARING NON-PARTIES YOUNG CONAWAY STARGATT &
TAYLOR, LLP'S AND BRUCE L. SILVERSTEIN, ESQ.'S JOINT (I) MOTION
TO QUASH SERVICE OF PROCESS, AND (II) RESPONSE AND
MEMORANDUM OF LAW IN OPPOSITION TO MOTIVATION, INC.'S
<u>AMENDED MOTION FOR SANCTIONS</u>**

Non-parties, Young Conaway Stargatt & Taylor, LLP ("YCST") and Bruce L.

Silverstein, Esq. ("Silverstein"), by and through their counsel, specially appear to move to quash

service of process on them and challenge the Court's personal jurisdiction over them. Further, as

directed by the Court's Order to Show Cause ("OSC") (D.E. 451), YCST and Silverstein hereby

jointly file their Response and Memorandum of Law in Opposition to Motivation's Amended

Motion for Sanctions Seeking Entry of Orders Directed to Paul D. Sullivan, Bruce L. Silverstein

and Young Conaway Stargatt & Taylor, LLP, Requiring Each of Them to Show Cause As to

Why They Should Not be Sanctioned for Bad Faith Litigation and Other Relief ("Sanctions

Motion") (D.E. 407).[1] Also being filed herewith is the Affidavit of Bruce L. Silverstein, Esquire

(the "Silverstein Affidavit"),[2] attached as <u>Exhibit A</u>, which sets forth the material facts pertinent

---

[1] The Court already has rejected Motivation's claim that Respondents' prior appearances in this matter waived their defenses to this Court's lack of jurisdiction over them. (D.E. 333). As discussed below, Respondents (i) continue to assert that the Court lacks jurisdiction over them, and (ii) further assert that the OSC has not been served on them through valid process. Subject to *and without waiving* these defenses, Respondents are complying with the Court's OSC in order to avoid any argument that they have disregarded the Court's Order.

[2] The Silverstein Aff'd is incorporated herein by reference. Respondents also rely on and incorporate by reference: (i) the Affidavit of Bruce L. Silverstein, Esq., dated Oct. 9, 2012 (with all exhibits, D.E. 142-21 through 142-48) (the "10/9/12 Silverstein Aff'd"); (ii) the Affidavit of

acting as a "virtual *qui tam* relator," *see, e.g.*, D.E. 292, ¶ 1, should be stricken from the record because "there are no facts before this Court that would indicate that Motivation is actually working on behalf of a government entity with its expressed consent." (D.E. 360). Thus, Motivation simply lacks standing to seek sanctions against Respondents (or Sullivan for that matter), and Motivation identifies no legal authority, and Respondents are unaware of any legal authority, that supports Motivation's standing to pursue sanctions here.

### E.   Motivation Approaches the Court With Unclean Hands

Without regard to the merit (or lack thereof) of Motivation's claim for sanctions, the Court should refuse to award sanctions in favor of Motivation because it has unclean hands in this matter. Indeed, courts consistently "have refused to invoke their inherent authority to impose sanctions where the party requesting sanctions has unclean hands."[41]

Here, there is ample evidence that Motivation has unclean hands. First and foremost, Motivation voluntarily injected itself into the Admiralty Action by filing its *verified* claim alleging that the emeralds Jay had discovered were cargo from the *Atocha*, which had floated in a barrel until the barrel broke up and deposited the emeralds at the Discovery Site. (D.E. 10, ¶ 15).

---

[41] *Thomas v. Schwab*, 2012 U.S. Dist. LEXIS 177080, *4 (E.D. Mich. Dec. 14, 2012) ("Both parties have a form of 'unclean hands,' and the Court will not use its inherent authority to reward one party over the other." (citing *S. Shore Ranches, LLC v. Lakelands Co., LLC*, 2010 U.S. Dist. LEXIS 71047, *16 (E.D. Cal. Jun. 18, 2010))); *Black v. Schwartz*, 2012 U.S. Dist. LEXIS 132524, *12-13 (E.D.N.Y. Sept. 17, 2012) (declining to award defendants sanctions for several reasons, including "blatant mischaracterizations" made by defendants and the Court's inability to ascertain how much defendants spent on defending the discontinued portion of the case versus the amount spent of defending the malpractice claim against them (citing *Schlaifer Nance & Co., Inc. v. Est. of Warhol*, 194 F.3d 323, 341 (2d Cir. 1999), for the proposition that "[a]lthough . . . we need not address whether such unclean hands may preclude the imposition of sanctions, we observe that a court considering sanctions can and should consider the equities involved before rendering a decision")); *see also Associated Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 36 (2d Cir. 1992) (reversing district court's granting of Rule 11 motion for sanctions and noting that "[s]ome of [defendant's] defenses are more ingenious than ingenuous and compel us to caution that [parties] who live in glass pleadings ought not to throw Rule 11 stones."); *see also Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) (the principle of unclean hands forecloses the possibility of equitable relief to a party who has done wrong in the context of the dispute, regardless of the impropriety of the other party's behavior).

Motivation made those allegations despite that its claim to the emeralds was (i) legally untenable based on the Fifth Circuit's ruling in *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 569 F.2d 330, 335-336 (5th Cir. 1978), and (ii) factually implausible given that the Discovery Site is forty (40) miles from the *Atocha* wreck-site and thirty (30) miles from the outer-most bound of the debris trail from the *Atocha*.  By Motivation's own counsel's words, the stated purpose of filing the verified claim was that "Motivation needed to file a protective claim . . . to be safe from a charge of neglect by investors; then we could get with you and resolve any due diligence concerns."[42]  Simply put, Motivation concocted the "floating barrel" theory, not to make an honest claim to the emeralds, but to inject itself into this matter to serve as the self-appointed "Treasure Police."[43]

Other examples of Motivation's bad-faith tactics throughout the course of its involvement in this matter include the following:

- Suggesting to Sullivan that the parties should skip the inspection of the emeralds and "just say that JTR's emeralds were from the *Atocha*" and market them together as *Atocha* emeralds.  (Sullivan Aff'd (D.E. 302-6), ¶ 7) (A-88).[44]

- After repeatedly refusing requests for criteria for inspecting the emeralds, Motivation filed the Original Sanctions Motion, which was primarily based on JTR's alleged "resistance to facilitating an inspection" and engaging "in dilatory litigation and obstructive behavior," (Original Sanctions Motion (D.E. 123), ¶¶ 10, 20).  In its motion, Motivation conveniently failed to mention JTR's efforts to reach a compromise on the inspection issue and the fact that the Court had entered an order staying discovery (D.E. 69).

---

[42]   White letter to Horan (10/20/11) (A-24).

[43]   Silverstein Aff'd, ¶¶ 40, 211.  Respondents do not mean to suggest that Motivation is precluded from taking appropriate actions if Motivation believes that someone is engaged in fraudulent "treasure hunting" activities.  Plainly, Motivation has the same right as any other citizen to report its beliefs to the appropriate investigative or prosecutorial authorities, and to request appropriate assistance.  Motivation does not, however, have the right to act as a self-appointed Private Attorney General (or, as Motivation's counsel calls it, the "Treasure Police"), much less to assert legally frivolous and factually fanciful Verified pleadings for the fraudulent purpose of obtaining discovery through the civil justice system.

[44]   Respondents rely on and incorporate the Sullivan Aff'd by reference.

- Despite having what it believed to be sufficient evidence to establish that Jay committed a fraud on the Court, Motivation embarked on an extensive discovery expedition aimed at reaching "deep pockets" that could pay its attorneys.

- Asserting in numerous pleadings, including the Sanctions Motion, that Silverstein "called the shots" and controlled the litigation, notwithstanding the facts that Record Counsel filed all papers on behalf of JTR and Horan unequivocally testified that "[t]he ultimate final decisions rested with me." (Horan Oct. 2, 2013 Dep. Tr. at 154:9 – 155:7) (A-133).

- Improperly informing witnesses they could avoid criminal prosecution if they cooperated with Motivation's efforts in the Admiralty Action (*See, e.g.*, Sweeney email to Holloway, Lewis, Morgan, and others (6/3/13)) (A-146).[45] Indeed, Siracusa was present "by telephone or in person, when MOTIVATION's attorney, Hugh Morgan represented to witnesses, Steve Elchlepp and Stacey Wolf, just before he took their depositions, that MOTIVATION was working with federal law enforcement authorities and that this was their 'last chance' to 'come clean' and suggested he could somehow help them avoid prosecution if they told the truth."[46]

- Alleging in the Sanctions Motion that the fraud was known to Silverstein by the fall of 2011 (Mot. at 6) when Motivation's own internal communications reflect Motivation's understanding that neither Horan nor Silverstein knew of any fraud at that time. (Holloway email to White and Lewis (9/6/13)) (A-132).

- Despite knowing in February 2013 that Motivation would need to file a motion for an order to show cause to seek sanctions against Respondents, Motivation did not file such a motion until November 19, 2013 (D.E. 315), which was after the discovery deadline, thus unfairly prejudicing Respondents as they were precluded from taking discovery of Motivation (or any other party or non-party).

- Contacting witnesses under false pretenses during its discovery efforts. (*See, e.g.,* Sweeney email to Lewis, White, Morgan, and Holloway (4/16/13, 9:30) (stating that the manager of the Eagles Club had called Sweeney and "believes I am an

---

[45] Sweeney wrote: "Have a seat – this is a good one. . . . I told Steve that as a fellow Sailor, I felt obliged to call and let him know that he was fast becoming the main patsy in the emerald case – and I could prove it to him with tape and transcripts that the FBI just gave us. I could feel his butt pucker over the phone. I asked him if he had ever been to a Federal prison. . . . **I told him to relax, think about what prison life will be like (no girls, no kids, no beer), and he had to [sic] chance to get out in front of this. I told him that we could probably help him with the FBI if he just asked.**" (emphasis added) (A-146).

[46] *See* JTR's Motion to Strike Motivation's References Contained in its Filings to Itself as Having Been "Appointed" a "Virtual *Qui Tam* Relator" and Supporting Memorandum of Law (D.E. 306) ("Motion to Strike") at 1-2, fn 1; *see also* Steve Elchlepp June 20, 2013 Dep. Tr. at 4-5 (Motivation's counsel represented to Steve on the record that Motivation would not seek sanctions against him if he cooperated and "we'll tell [the FBI] that you are cooperating.") (A-128).

investigator for the District Court (don't ask)") (A-119); (Sweeney email to Holloway, Lewis, Morgan (6/3/13) (stating that he called Steve's place of employment and "told his boss that I was an old friend of Steve's from the Navy visiting KW and to pass my number along if he has a chance") (A-146).[47]

- Harassing Silverstein by sending him emails with vindictive commentary that are indicative of the dealings Respondents have had with Motivation and its representatives.  (*See* Sweeney email to Silverstein (6/10/14) (A-141); Sweeney email to Silverstein (6/11/14) (A-142); Sweeney email to Silverstein (6/12/14, 10:12) (A-143); and Sweeney email to Silverstein (6/12/14, 3:23) (A-144).

- Attempting to have the Delaware Bar institute a disciplinary proceeding against Silverstein in the hopes of gaining an improper litigation advantage.

Perhaps the most telling example of Motivation's bad-faith litigation tactics is its underhanded efforts just prior to the Sanctions Trial to force persons such as Janssen, Siracusa, Horan, Sullivan, and others to sign the "settlement proposal" containing statements of "fact" designed to aid Motivation's efforts to sanction Respondents in exchange for Motivation's agreement to refrain from pursuing sanctions against them.  (D.E. 384).[48]  In essence, Motivation was telling JTR, Janssen, Siracusa, Davis, Livingston, Sullivan, Scott, Horan, and Kincannon that Motivation believed they are innocent of any wrongdoing and that Motivation was willing to sign the Proposal so stating, but that Motivation would seek sanctions against those persons if they refused to sign an agreement that pointed the finger at Jay, Steve, and Silverstein.  Either (1) Motivation believed the facts to which it was willing to stipulate (in which case Motivation had no non-frivolous bases for seeking sanctions against JTR, Sullivan, J&S, and others), or (2) Motivation was willing to sign a false stipulation for the purpose of bolstering its sanctions

---

[47] As Siracusa represented to the Court:  "On November 5, 2012, the undersigned also received a call from Jay Miscovich's former secretary, in which she stated that she had been recently contacted by Joe Sweeney (MOTIVATION's in-house paralegal) and that Mr. Sweeney had informed her that **he was working with federal law enforcement, that "she was on the top of the list", and that she needed to give her sworn statement to him.**"  (D.E. 306 at 2, n.1) (emphasis added).

[48]  *See also* (Lewis email to Janssen and Siracusa (12/2/13, 3:19) (forwarding draft proposal) (A-135); (Lewis email to Janssen and Siracusa (12/3/13, 9:27) (noting that "we will treat each [] signatory that is unable or unwilling to execute the document as fair game in the trial.") (A-135).

motion against Jay, Steve, and Silverstein.  That sort of unethical behavior is emblematic of Motivation's actions throughout the course of the Admiralty Action.

Based on the foregoing, Motivation does not deserve any award in this matter, regardless of the Court's findings concerning the conduct of Respondents.[49]

## CONCLUSION

The factual record before the Court demonstrates that Respondents have not engaged in any sanctionable conduct.  Motivation's attempt to paint Respondents as having participated in a fraud on this Court fails to establish by any standard, let alone the clear and convincing standard required, the facts necessary to sanction a non-party.  Relying on conclusory allegations and innuendo, Motivation attempts to reach what it calls "deep pockets" regardless of the adverse effects its baseless allegations will have on Respondents.  Thus, even if the Court had personal jurisdiction over Respondents, and the Federal Rules of Civil Procedure provided for a way to validly serve process on Respondents, the Court should deny Motivation's request for sanctions against Respondents.  Based on the jurisdictional defects of the Sanctions Motion, as well as established limitations on inherent authority to sanction non-parties under the circumstances alleged here, the Court should decline to further consider Motivation's baseless allegations. Respondents, therefore, respectfully request that the Court enter an order denying Motivation's Sanctions Motion.

---

[49]  In any event, even if it were assumed (*arguendo*) that there were some basis for Sanctioning Respondents for JTR's conduct in the Admiralty Action, any sanctions actually imposed on Respondents would need to be limited to the same four month time period for which JTR has been sanctioned.  (D.E. 445).  Moreover, Motivation does not, and cannot, point to any harm it suffered between December 2, 2011, and April 18, 2012.  As Judge Moore explained, after JTR disclosed the results of its investigations on April 18, 2012, "JTR, the Court, and Motivation were working from the same set of facts.  ***Thus, when Motivation soon thereafter filed its Amended Claim, Motivation made an informed decision to stay in the case.***"  (D.E. 445, ¶ 65) (emphasis added).

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION
"IN ADMIRALTY"

JTR ENTERPRISES, LLC,

          Plaintiff,

vs.

AN UNKNOWN QUANTITY, etc.,                    CASE NO. 4:11-CV-10074-JLK

          *In Rem* Defendant,

vs.

MOTIVATION, INC.,

          Claimant.

_____/

## NON-PARTY PAUL SULLIVAN'S MOTION FOR
## SANCTIONS AGAINST MOTIVATION, INC. AND ITS COUNSEL

Non-Party, Paul D. Sullivan, specially appears to move for an award of sanctions against

Motivation, Inc. ("Motivation" or "Claimant") and its counsel, Eugene Lewis of Lewis & White,

PLC ("Counsel"), for Mr. Sullivan's reasonable attorney's fees incurred in defending against

Motivation's Amended Motion for Sanctions ("Amended Motion") [D.E. 407].  In the Amended

Motion, Motivation asserted that Mr. Sullivan participated in the alleged bad faith conduct of

JTR Enterprises, LLC ("JTR"), and that he substantially participated and controlled the litigation

of JTR's claim in admiralty before this Court.  At the time Motivation filed the Amended

Motion, and throughout its prosecution, Motivation and Counsel knew that Motivation's claim

was without basis in law or fact.  Motivation filed the Amended Motion knowing no evidence

existed to support its assertion that Mr. Sullivan (1) substantially participated in the litigation of

JTR's admiralty claim; or (2) participated in JTR's alleged bad faith conduct.  In fact, Motivation

filed its frivolous Amended Motion for an improper purpose:  to get at Mr. Sullivan's "deep

## II.    MOTIVATION ENGAGED IN BAD FAITH CONDUCT WARRANTING SANCTIONS

### A.    Motivation Acted in Bad Faith When It Sought Sanctions Without Basis In Law or Fact.

Motivation acted in bad faith by knowingly, or at least recklessly, seeking sanctions based on a frivolous claim.  As a threshold matter, Motivation faced an incredibly challenging standard to prevail on a motion for sanctions against a non-party such as Mr. Sullivan.  Aside from the necessity of proving his alleged bad faith, Motivation also had to show that Mr. Sullivan had a substantial interest in the outcome of the litigation and that he substantially participated in the proceedings in which he interfered.  *See* [D.E. 457 at 5-6] (citing case law at length).

Motivation's brazen, improper decision to seek sanctions against Mr. Sullivan in light of this burdensome standard is particularly egregious because, as Motivation and Counsel knew, not only was there no evidence to support the Amended Motion, but the evidence in fact directly contradicted the allegations.  *See generally* [D.E. 457 at 6-17].

As the Court noted in its order dismissing Motivation's claim, only two of Motivation's witnesses at the hearing even mentioned Mr. Sullivan, and they testified that:

> [Mr. Sullivan] had nothing to do with the fraud committed on the Court, that he did not control the litigation or direct the filings of any pleadings in this case, that he labored only to seek the truth concerning the origin of the emeralds, and that upon learning of the testimony of the Jupiter jeweler, Mr. Rodriguez, he was one of those that insisted that these facts be brought to the Court's attention as soon as possible.

---

rules are not substitutes for the inherent power.") (quoting *Chambers*, 501 U.S. at 46-47, 49); *Thomas*, 293 F.3d 1306 & n. 32 (affirming district court's sanctions award under its inherent authority while noting that section 1927 and Rule 11 were other "possible avenues for imposing sanctions" against the same conduct); *cf. Amlong*, 500 F.3d at 1239 ("If the sanctions were permissible under § 1927, then they were proper, and there is no need to examine whether the sanctions were also permissible under the court's inherent powers.").

*Id.* at 3.  This testimony was fatal to Motivation's claim against Mr. Sullivan.  And Motivation was well aware of what the witnesses' testimony would be long before they were called to the stand.  First, they were *Motivation's* witnesses.  Second, both witnesses submitted declarations months before the hearing, offering the same testimony that they gave at the hearing.  *See* Declarations of David Horan and John Siracusa, attached as Exs. E and F, respectively, to Sullivan's first Response to the Amended Motion for Sanctions [D.E. 437].

Motivation's attempt to overcome the testimony of its own (and only) witnesses consisted solely of argument that Mr. Sullivan participated in a fraud because he was copied on a handful of emails where JTR's counsel expressed concerns about JTR's conduct.  The Court easily recognized the frivolity of this argument, finding that Motivation had presented "*[n]o evidence*" that Mr. Sullivan met either of the two prongs justifying sanctions on a non-party.  *See* D.E. 457 at 3 (emphasis added).

Because of the complete lack of evidence supporting Motivation's claim, sanctions are appropriate.  *See Manhattan Const. Co. v. Place Properties LP*, 559 Fed.Appx. 856 (11th Cir. 2014) ("[S]anctions premised on factually groundless allegations are appropriate when 'plaintiffs offered *no* evidence to support their allegations.'") (quoting *Davis v. Carl*, 906 F.2d 533, 536 (11th Cir. 1990).

**B.  Motivation and Counsel Acted in Bad Faith When They Made Misrepresentations to the Court in Support of the Amended Motion**

Motivation and Counsel knowingly, or at least recklessly, made various misrepresentations to the Court in support of the frivolous Amended Motion.  Because Motivation's filings are riddled with misrepresentations, Mr. Sullivan incorporates by reference his prior pleadings detailing those misrepresentations.  *See* [D.E. 457] at 8-11; [D.E. 482] at 3-6.  Two such misrepresentations, however, bear special mention here.

In Motivation's first Reply Memorandum in support of its Amended Motion for Sanctions,[6] Motivation specifically asserted that "Sullivan and Silverstein made multiple edits which kept Horan from filing" the Third Status Report with the Court. [D.E. 440] at 7. Mr. Sullivan established that this was a false statement, because he had no role in drafting the Third Status Report. [D.E. 457] at 8. Caught red-handed, Motivation *admitted* that it misrepresented the evidence to the Court: "Admittedly, Motivation's assertions regarding JTR's delay in filing the Third Status Report were poorly worded (though not fabricated)." [D.E. 481] at 4. But this was no issue of "poor wording." It was a deliberate misrepresentation. Motivation knew full well that Mr. Sullivan did not participate in the drafting of any court documents, but it represented to the Court that he did.

Motivation repeatedly made another particularly egregious misrepresentation by asserting that, based on an email Mr. Sullivan drafted, Mr. Sullivan prevented disclosure of the Matco and Chemir reports showing that some of the emeralds had been treated with a modern epoxy. [D.E. 467] at 5. To appreciate the nature of the misrepresentation, Motivation's argument is quoted below:

> Sullivan then wrote an email to the JTR group explaining that "[a]fter reading everyone's emails I think we should not be sending any more information to the court at least until we've discussed it as a group. I agree with Bruce, Mark and Scott [no mention of Jay] that nothing further should be sent to the Court." [Sullivan email, (Ex. D. DH EMAILS 66)] Siracusa filed the reports anyway, explaining in an email to Sullivan that "if we had to admit to the Judge that we had not given the court all the reports we have, then that would be a credibility blow for our side .... We do not want this judge to think we are trying to cover

---

[6] The parties each filed two sets of briefs relating to the Amended Motion. Mr. Sullivan filed a Response to the Amended Motion for Sanctions [D.E. 437] and Motivation filed a Reply [D.E. 440] before this Court issued its Order to Show Cause, which directed Mr. Sullivan to respond to the Amended Motion. Pursuant to that Order, Mr. Sullivan filed a Renewed Response to the Amended Motion for Sanctions [D.E. 457], and Motivation filed a Reply [D.E. 467].

anything up." [Siracusa email, (Ex. D. DH EMAILS 65)] As these emails illustrate, Sullivan was involved in the decision-making process. In any event, Siracusa refused to follow Sullivan's instructions because he did not want to be implicated in an apparent cover-up.

*Id.* at 5-6 (citations and bracketing in original). *See also* [D.E. 481] at 5.

This was a blatant misrepresentation. When Mr. Sullivan sent that email, the Matco and Chemir reports *had already been filed* with the Court. Mr. Sullivan's statement concerned a discussion about whether to also file an appraisal that had been conducted. In his email, Mr. Sullivan was agreeing with the others who suggested not filing the appraisal. There can be no doubt that Motivation's assertion was a misrepresentation, and not simply a negligent mistake because, in order to twist the meaning of the email, Motivation omitted the first sentence from their argument. The email actually reads, as follows:

Hey guys, *I see that we have already filed* the Matco and Chemir reports and I know we owe the court an inventory (but I don't believe an appraisal). After reading everyone's emails I think we should not be sending any more information to the court at least until we have discussed it as a group. I agree with Bruce, Mark and Scott that nothing further should be sent to the court.

[D.E. 467], Ex. D at 66 (emphasis added). The mischaracterization and misrepresentation of evidence occurred throughout Motivation's filings in support of its Amended Motion.

Motivation's and Counsel's deliberate, or at the very least reckless, conduct in making repeated and significant misrepresentations to this Court is tantamount to bad faith, justifying an award of attorney's fees as sanctions in this case. *See Oliva v. NBTY, Inc.*, 583 Fed.Appx. 877 (11th Cir. 2014) ("By filing a frivolous motion based on statements that he knew or should have known (by checking his own records) were false, [the attorney] obstructed the litigation and grossly deviated from the conduct of a reasonable attorney.") (citing *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239-40 (11th Cir. 2006)).

CASE NO. 4:11-CV-10074-JLK

**C.   The "Deep Pocket" Emails Show That Motivation and Counsel Asserted a Claim Against Mr. Sullivan in Bad Faith**

The "Deep Pocket" Emails (*see, supra,* pages 2-3) establish that Motivation and Counsel filed their frivolous Amended Motion for Sanctions against Mr. Sullivan for an improper purpose, *i.e.*, solely because he happened to be blessed with "deep pockets." *See Amlong & Amlong, P.A.*, 500 F.3d at 1241 (while courts apply an objective standard in determining whether an attorney acted in bad faith, "the attorney's subjective state of mind is frequently an important piece of the calculus, because a given act is more likely to fall outside the bounds of acceptable conduct and therefore be 'unreasonabl[e] and vexatious[]' if it is done with a malicious purpose or intent").[7]

Placed in this context, Motivation and Counsel acted in bad faith in pursuing a meritless sanctions motion for that improper purpose, all with knowledge of, or at least reckless disregard to, the lack of evidentiary support. *See Peer*, 571 Fed.Appx. at 844-45 (affirming sanctions awards where sanctions would have been substantively proper under Rule 11); Fed.R.Civ.P. 11(b)(1) (a pleading must not be presented "for any improper purpose"); Fed.R.Civ.P. 11(b)(2) (a pleading's factual contentions must have evidentiary support).

**CONCLUSION**

Counsel, on behalf of Motivation, filed a frivolous sanctions motion against Mr. Sullivan to recover costs from someone with "deep pockets." Motivation and Counsel undertook this single-minded pursuit with knowledge of, or at least with reckless disregard to, the complete lack of evidentiary support for their motion. Indeed, after giving Motivation a lengthy opportunity to

---

[7] While the Eleventh Circuit so held in its discussion of section 1927 sanctions, its commonsensical holding equally applies to sanctions under the Court's inherent power. *See, e.g., Peer*, 571 Fed.Appx. at 844-45.

# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION
**IN ADMIRALTY**

JTR ENTERPRISES, LLC,
        Plaintiff,

vs.                       CASE NO. 4:11-CV-10074-JLK

AN UNKNOWN QUANTITY, etc.

       *In Rem* Defendant.
_____/

**SPECIALLY APPEARING NON-PARTY BRUCE L. SILVERSTEIN'S NOTICE OF
FILING HIS PROPOSED FINDINGS OF FACT AND CONCUSIONS OF LAW**

       Pursuant to the Court's Order of December 16, 2014, Respondent Bruce L. Silverstein
hereby submits with this Notice of Filing his proposed Findings and Fact and Conclusions of
Law.

Respectfully submitted,

.                     Kendall B. Coffey, FBN 259681
                      David J. Zack, FBN 641685
                      COFFEY BURLINGTON, P.L.
                      2601 South Bayshore Drive, PH 1
                      Miami, Florida  33133
                      Tel.  305-858-2900
                      Fax.  305-858-5261

By:  **/s/ David J. Zack_____**
        David J. Zack
        kcoffey@burlington.com
        dzack@coffeyburlington.com
        vmontejo@coffeyburlington.com
        service@coffeyburlington.com
        *Counsel for Bruce L. Silverstein, Esq.*

### Motivation Lacks Standing

265.    Motivation lacks standing to seek sanctions from Mr. Silverstein.  Motivation is not a defendant who claims to have been wrongfully sued by JTR, much less by Silverstein.  Nor is Motivation a plaintiff who claims that JTR, much less Mr. Silverstein, wrongfully defended against a viable complaint brought by Motivation.  Rather, Motivation asserted a legally and factually baseless claims in the Admiralty Action and has suffered no injury.  Notably, Motivation identifies no legal authority supporting Motivation's standing to pursue sanctions here.

### Motivation Has Unclean Hands.

266.    The Court denies the Amended Motion for Sanctions for the additional reason that Motivation has itself engaged in bad faith conduct.

267.    Courts may decline to impose sanctions where the moving party has unclean hands.  In *Associated Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 36 (2d Cir. 1992) the court reversed an award for sanctions under Rule 11 and noted that "[s]ome of [defendant's] defenses are more ingenious than ingenuous and compel us to caution that [parties] who live in glass pleadings ought not to throw Rule 11 stones."  In *Thomas v. Schwab*, 2012 U.S. Dist. LEXIS 177080, *4 (E.D. Mich. Dec. 14, 2012) the court noted that "[b]oth parties have a form of 'unclean hands,' and the Court will not use its inherent authority to reward one party over the other." (citing *S. Shore Ranches, LLC v. Lakelands Co., LLC*, 2010 U.S. Dist. LEXIS 71047, *16 (E.D. Cal. Jun. 18, 2010))).  Likewise, in *Black v. Schwartz*, 2012 U.S. Dist. LEXIS 132524, *12-13 (E.D.N.Y. Sept. 17, 2012), the court declined to award defendants sanctions for several reasons, including "blatant mischaracterizations" made by defendants and the Court's inability to ascertain how much defendants spent on defending the discontinued portion of the case versus

the amount spent of defending the malpractice claim against them.  *See also Schlaifer Nance & Co., Inc. v. Est. of Warhol*, 194 F.3d 323, 341 (2d Cir. 1999) ("[a]lthough . . . we need not address whether such unclean hands may preclude the imposition of sanctions, we observe that a court considering sanctions can and should consider the equities involved before rendering a decision")

268.    Mr. Silverstein argues that these sanctions proceedings are a shameless grab for money.  He argues that Motivation and the New York Investors could not monetize the emeralds, so they have attempted to monetize these sanctions proceedings.  He notes as well that the New York Investors, represented by the same attorneys, have brought a separate RICO action seeking to monetize alleged wrongdoing asserted against Mr. Silverstein here.  *AZALP, LLC v. Silverstein, et al.*, Case No. 4:14-cv-10079-JEM.  Mr. Silverstein further argues that Motivation engaged in misconduct in pursuit of so-called "deep pockets" should bar its recovery in this sanctions proceeding.

269.    The Court finds that Motivation and its counsel have engaged in bad faith conduct that bars recovery for sanctions.

270.    Motivation filed two verified claims offering stories with no basis in fact, *i.e.*, that the gemstones either floated in a barrel or were stolen from the colonial era Atocha site. Motivation pressed these theories even after the Third Status Report was filed, disclosing the test results involving modern epoxy.

271.    Motivation's agent suggested to Mr. Sullivan that the parties should skip the inspection of the emeralds and say that JTR's emeralds were from the *Atocha* and market them together as *Atocha* emeralds.  (10/9/12 Silverstein Aff'd, ¶ 49 (M3); 8/28/14 Silverstein Aff'd, ¶ 45 (M8)).

272.    Later, attorney Lewis explicitly claimed that Motivation was seeking sanctions against Mr. Silverstein because he has a deep pocket.  (YCST 191).

273.    Lewis acknowledged that Mr. Silverstein was not aware of the fraud when he was retained by Miscovich, and Holloway indicated that it was "pushing an inference too far" to argue that the epoxy findings showed Mr. Silverstein's participation in the fraud.

274.    Nevertheless, Motivation attempted to coerce Janssen, Siracusa, Horan, Sullivan, and others to sign a false Stipulation, containing numerous "facts" designed to aid Motivation's efforts to sanction Mr. Silverstein and YCST in exchange for Motivation's agreement to refrain from pursuing sanctions against them.  (Lewis email to Janssen and Siracusa (12/2/13)) (M2-37). In essence, Motivation was telling JTR, Janssen, Siracusa, Davis, Livingston, Sullivan, Horan, and others that Motivation believed they are innocent of any wrongdoing and that Motivation was willing to sign the stipulation so stating, but that Motivation would seek sanctions against those persons if they refused to sign an agreement that pointed the finger at Mr. Silverstein. How could Motivation stipulate to facts it believed were untrue   To the contrary, Motivations further conduct reveals that it was acting in bad faith in its settlement activities.

275.    Lewis wrote to his colleagues that an indictment is a powerful tool and that they should use it to their advantage:  an indictment "is a powerful tool . . . [s]o let's use it to the fullest and collect before they go broke . . . ." (YCST 191).

276.    An agent of Motivation informed Elchlepp he might avoid both civil and criminal liability if he cooperated with Motivation's efforts in the Admiralty Action.  (Sweeney email to Steve (12/3/13)) (M2-39).

277.    Lewis or White called Siracusa and informed him they knew he owned a house in Key West.  (11/20/14 Tr. at 298:12-23).

278.     This conduct appears even more threatening, given that Lewis later told Siracusa that he should settle or risk indictment.  (11/20/14 Tr. at 297: 16–298: 4;11/20/14 Tr. at 297: 16–298: 4).

279.     As testified by Siracusa, Lewis "suggested that he was concerned for myself [Siracusa], for the welfare of my law partner Joe [Janssen] and his wife Christie, that if we didn't settle, we would be in serious trouble." (*Id.* at 300: 5-13)  Motivation did not offer any evidence contradicting this testimony.  But this is no "he said/he said" because Lewis blatantly made similar threats in writing.

280.     On November 4, 2013, Lewis, copying Buster White, wrote to Siracusa and told him that a grand jury indictment would be devastating to Siracusa personally and that no bank would lend to him.   Lewis wrote, "[t]here needs to be a way to exit this fraud on the court and continuing expense and leave the real culprits hanging."  (YCST 275)   Lewis warned Siracusa to "understand the jeopardy you and Joe [Janssen] and Christy [Janssen] are in" and that "Buster and I have tried to keep you guys out of harm's way  . . ."  *Id.* Lewis continued,

>        An indictment is nothing more that "probable cause" that a crime has been committed and can be overcome at trial; but it is expensive and takes a toll on everyone around you.  The problem is, of course, that the American public does not view our system that way.  Indictment = Guilty. Talk to your banker about that.  Read "attempted aiding and abetting" and 18 USC § 2 and think it through with what you know.  Do not let anyone with other agendas put you in the trick back.

Underlining his point, Lewis closed the email with "[h]opes this helps us resolve the matter soon." (*Id.*)

281.     The Court finds that Motivation has unclean hands and cannot obtain sanctions against Mr. Silverstein.   Motivation brought baseless proposed claims and proposed marketing the emeralds as from the Atocha. Motivation's admission indicate

that Mr. Silverstein was being pursued solely because he supposedly has a deep pocket, and it offered a stipulation of innocence to obtain a settlement.  Finally, the premeditated use of the "powerful tool" of the threat of indictment to encourage settlement forecloses Motivation's ability to assert a sanctions claim in this Court

For the foregoing reasons, IT IS ORDERED that the Amend Motion for Sanctions is DISMISSED WITH PREJUDICE and is otherwise DENIED.

# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION
**IN ADMIRALTY**

JTR ENTERPRISES, LLC,
      Plaintiff,

vs.                        CASE NO. 4:11-CV-10074-JLK

AN UNKNOWN QUANTITY, etc.

      *In Rem* Defendant.

vs.

MOTIVATION, INC.,

      Claimant.
_____/

**SPECIALLY APPEARING NON-PARTY BRUCE L. SILVERSTEIN, ESQ.'S POST-SANCTIONS TRIAL MEMORANDUM OF LAW IN OPPOSITION TO MOTIVATION, INC.'S AMENDED MOTION FOR SANCTIONS**

As directed by the Court (D.E. 541), specially appearing non-party Bruce L. Silverstein, Esq., by and through his counsel, hereby files his Post-Sanctions Trial Memorandum of Law in Opposition to Motivation's Amended Motion for Sanctions ("Amended Sanctions Motion") (D.E. 407).[1]  In opposition to the Amended Sanctions Motion, Mr. Silverstein respectfully states as follows:

---

[1] Mr. Silverstein expressly reserves, and incorporates herein by reference, all arguments and defenses previously asserted in this action (Case No. 4:11-CV-10074-JLK) (the "Admiralty Action"), including, without limitation: (i) the "inherent authority" of a district court to sanction parties under *Chambers* does not extend to non-party outside counsel such as Mr. Silverstein (*see* D.E. 459 at 15–22); (ii) the Court lacks personal jurisdiction over Mr. Silverstein (*see id.* at 22–26; *see also* D.E. 478); (iii) the Order to Show Cause was not validly served on Mr. Silverstein (*see* D.E. 478); and (iv) the lack of procedural due process given that the quasi-criminal nature of the sanctions proceeding required that Mr. Silverstein be provided a definite statement of the charges prior to the commencement of the proceeding, the right to discovery, and the right to a jury trial (*see* D.E. 484 at 1–8).

percent interest in JTR were both insubstantial according to the *Helmac* standard, and sanctions against Mr. Silverstein, a non-party, are not warranted here.

### E. MOTIVATION LACKS STANDING TO SEEK SANCTIONS AGAINST MR. SILVERSTEIN

Additionally, Motivation lacks standing to seek sanctions from Mr. Silverstein. Motivation is not a defendant who claims to have been wrongfully sued by JTR (much less by Silverstein). Nor is Motivation a plaintiff who claims that JTR (much less Mr. Silverstein) wrongfully defended against a viable complaint brought by Motivation. Rather, Motivation is an intermeddler in the Admiralty Action, which first asserted a legally baseless and factually frivolous claim that was dismissed by the Court (albeit without prejudice) and later asserted a fabricated claim of stolen emeralds in order to get around the patent legal defect of its initial claim of a floating barrel from the Seventeenth Century. Moreover, Judge Moore ordered that Motivation's claims that it was acting as a "virtual *qui tam* relator," *see, e.g.*, D.E. 292, ¶ 1, should be stricken from the record because "there are no facts before this Court that would indicate that Motivation is actually working on behalf of a government entity with its expressed consent." (D.E. 360). Thus, Motivation simply lacks standing to seek sanctions against Mr. Silverstein, and Motivation identifies no legal authority, and Mr. Silverstein is unaware of any legal authority that supports Motivation's standing to pursue sanctions here.

### F. MOTIVATION APPROACHES THE COURT WITH UNCLEAN HANDS

Without regard to the merit (or lack thereof) of Motivation's claim for sanctions, the Court should refuse to award sanctions in favor of Motivation because it has unclean hands in

this matter.[44]   Indeed, courts consistently "have refused to invoke their inherent authority to impose sanctions where the party requesting sanctions has unclean hands."[45]

Here, there is ample evidence that Motivation has unclean hands.  First and foremost, Motivation voluntarily injected itself into the Admiralty Action by filing its *verified* claim alleging that the emeralds Jay had discovered were cargo from the *Atocha*, which had floated in a barrel until the barrel broke up and deposited the emeralds at the Discovery Site.  (D.E. 10, ¶ 15).  Motivation made those allegations despite that its claim to the emeralds was (i) legally untenable based on the Fifth Circuit's ruling in *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 569 F.2d 330, 335-336 (5th Cir. 1978), and (ii) factually implausible given that the Discovery Site is forty (40) miles from the *Atocha* wreck-site and thirty (30) miles from the outer-most bound of the debris trail from the *Atocha*.   Simply put, Motivation

---

[44] Motivation has advanced no legal argument (valid or otherwise) in support of Motivation's naked assertion (*see* D.E. 480 at 19) that its own bad acts do not prevent Motivation from receiving a sanctions award.

[45] *Thomas v. Schwab*, No. 09-CV-13632, 2012 U.S. Dist. LEXIS 177080, *4 (E.D. Mich. Dec. 14, 2012) ("Both parties have a form of 'unclean hands,' and the Court will not use its inherent authority to reward one party over the other." (citing *S. Shore Ranches, LLC v. Lakelands Co., LLC*, No. 09-CV-105, 2010 U.S. Dist. LEXIS 70147, *16 (E.D. Cal. Jun. 18, 2010))); *Black v. Schwartz*, No. 09-CV-2271(JS)(GRB), 2012 U.S. Dist. LEXIS 132524, *12-13 (E.D.N.Y. Sept. 17, 2012) (declining to award defendants sanctions for several reasons, including "blatant mischaracterizations" made by defendants and the Court's inability to ascertain how much defendants spent on defending the discontinued portion of the case versus the amount spent of defending the malpractice claim against them (citing *Schlaifer Nance & Co., Inc. v. Est. of Warhol*, 194 F.3d 323, 341 (2d Cir. 1999), for the proposition that "[a]lthough . . . we need not address whether such unclean hands may preclude the imposition of sanctions, we observe that a court considering sanctions can and should consider the equities involved before rendering a decision")); *see also Associated Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 36 (2d Cir. 1992) (reversing district court's granting of Rule 11 motion for sanctions and noting that "[s]ome of [defendant's] defenses are more ingenious than ingenuous and compel us to caution that [parties] who live in glass pleadings ought not to throw Rule 11 stones."); *see also Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) (the principle of unclean hands forecloses the possibility of equitable relief to a party who has done wrong in the context of the dispute, regardless of the impropriety of the other party's behavior).

concocted the "floating barrel" theory, not to make an honest claim to the emeralds, but to inject itself into this matter to serve as the self-appointed "Treasure Police."[46]

Other examples of Motivation's bad-faith tactics throughout the course of its involvement in this matter include the following:

- Alleging in the Amended Sanctions Motion that the fraud was known to Silverstein by the fall of 2011 (Am. Sanctions Mot. at 6) when Motivation's own internal communications reflect Motivation's understanding that neither Horan nor Silverstein knew of any fraud at that time. (Holloway email to White and Lewis (4/17/13)) ("We have ample evidence that Jay has committed fraud and perjury, but I don't think we have any evidence that [Horan] or [Silverstein] were aware of the fraud (unless we infer knowledge f[ro]m the epoxy, but that m[ay] be pushing an inference to[o] far.") (YCST 190); *see also* 8/28/14 Silverstein Aff'd, ¶ 127 (M8).

- Suggesting to Mr. Sullivan that the parties should skip the inspection of the emeralds and say that JTR's emeralds were from the *Atocha* and market them together as *Atocha* emeralds. (10/9/12 Silverstein Aff'd, ¶ 49 (M3); 8/28/14 Silverstein Aff'd, ¶ 45 (M8)).

- Suggesting to Mr. Silverstein that ethics charges would be filed against him if Mr. Silverstein did not persuade Jay to back down to Motivation while at the same time Motivation's counsel acknowledged that Motivation never believed the emeralds were from the *Atocha* or *Santa Margarita*, and that Motivation had intervened in the Admiralty Action to fulfill its self-proclaimed role as "police [of] the treasure community." (12/6/13 Silverstein Aff'd, ¶ 47) (M7).

- Despite having what it believed to be sufficient evidence to establish that Jay committed a fraud on the Court (*see* Holloway email to White and Lewis (4/17/13)) (YCST 190), Motivation embarked on an extensive discovery expedition aimed at

---

[46] *See* 11/4/13 Silverstein Aff'd, ¶ 73 (M6); 8/28/14 Silverstein Aff'd, ¶¶ 40, 211 (M8). Mr. Silverstein does not mean to suggest that Motivation is precluded from taking appropriate actions if Motivation believes that someone is engaged in fraudulent "treasure hunting" activities. Plainly, Motivation has the same right as any other citizen to report its beliefs to the appropriate investigative or prosecutorial authorities, and to request appropriate assistance. Motivation does not, however, have the right to act as a self-appointed Private Attorney General (or, as Motivation's counsel calls it, the "Treasure Police"), much less to assert legally frivolous and factually fanciful verified pleadings for the purpose of obtaining discovery through the civil justice system.

reaching "deep pockets" that could pay its attorneys.  (Lewis email to Holloway, Morgan and others (4/20/13)) ("Friends, let us not forget the mission!!! Silverstein and his law firm, ie a deep pocket! Without that Buster and I are out of here . . . .") (YCST 191).

- Improperly suggesting witnesses could face indictments if they did not cooperate with Motivation's efforts in the Admiralty Action.  (Lewis email to Siracusa (11/4/13)) (YCST 275).[47]

- Improperly informing witnesses they might avoid both civil and criminal liability if they cooperated with Motivation's efforts in the Admiralty Action.  (Sweeney email to Steve (12/3/13)) (M2-39).

Perhaps the most telling example of Motivation's bad-faith litigation tactics is its underhanded efforts just prior to the January 2014 Sanctions Hearing to force persons such as Janssen, Siracusa, Horan, Mr. Sullivan, Davis, Livingston, and others to sign a false Stipulation containing statements of "fact" designed to aid Motivation's efforts to sanction Mr. Silverstein and YCST in exchange for Motivation's agreement to refrain from pursuing sanctions against them.  (Lewis email to Janssen and Siracusa (12/2/13)) (M2-37).  In essence, Motivation was telling JTR, Janssen, Siracusa, Davis, Livingston, Mr. Sullivan, Scott, Horan, and Kincannon that Motivation believed they are innocent of any wrongdoing and that Motivation was willing to sign the stipulation so stating, but that Motivation would seek sanctions against those persons if they refused to sign an agreement that pointed the finger at Mr. Silverstein.  Either (1) Motivation believed the facts to which it was willing to stipulate (in which case Motivation had

---

[47] *See also* Siracusa testimony, 11/20/14 Tr. at 297:16–298:4 ("[S]uggestions were made from Motivation's team that there was an FBI investigation ongoing in the case and that indictments would be looming or forthcoming and that I needed to either settle the case or withdraw or I might be indicted along with the rest of the group which I found very interesting because I have worked with the Federal Bureau of Investigation before and they typically do exactly what they want and don't tell anybody, especially in civil cases, you know, what the status of their investigations are or what they are planning to do, et cetera.  So to the extent that that was a threat, that occurred."); *id.* at 300:5–13 (testifying that Lewis "suggested that he was concerned for myself, for the welfare of my law partner Joe and his wife Christie, that if we didn't settle, we would be in serious trouble.").

no non-frivolous bases for seeking sanctions against JTR, Mr. Sullivan, J&S, and others), or (2) Motivation was willing to sign a false stipulation for the purpose of bolstering its sanctions motion against Mr. Silverstein.  That sort of unethical behavior is emblematic of Motivation's actions throughout the course of the Admiralty Action.

Based on the foregoing, Motivation does not deserve any award in this matter, regardless of the Court's findings concerning the conduct of Mr. Silverstein.

## III.    <u>CONCLUSION</u>

The factual record before the Court demonstrates that Mr. Silverstein has not engaged in any sanctionable conduct.  Motivation's attempt to paint Mr. Silverstein as having participated in a fraud on this Court fails to establish by any standard, let alone the clear and convincing standard required, the facts necessary to sanction a non-party.  Relying on conclusory allegations and innuendo, Motivation attempts to reach what it perceives to be Mr. Silverstein's "deep pockets" regardless of the adverse effects its baseless allegations will have on Mr. Silverstein (and his family).  Mr. Silverstein, therefore, respectfully requests that the Court enter an order denying Motivation's Amended Sanctions Motion.

Respectfully submitted,

Kendall B. Coffey, FBN 259681
David J. Zack, FBN 641685
COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive, Penthouse
Miami, Florida  33133
Tel.  305-858-2900
Fax.  305-858-5261

By: **/s/ David J. Zack**
David J. Zack
kcoffey@burlington.com
dzack@coffeyburlington.com
vmontejo@coffeyburlington.com
service@coffeyburlington.com
*Counsel for Bruce L. Silverstein, Esq.*