# UNITED STATES COURT OF APPEALS

## ELEVENTH CIRCUIT

MOTIVATION, INC.,

        Claimant/Appellant,                Appeal No.: 15-14132-D

                                                D.C. Case No.: 4:11-cv-10074

vs.

JTR ENTERPRISES, LLC,

        Plaintiff/Appellee.

_____/

## APPELLEES' RESPONSE TO COURT'S JURISDICTIONAL QUESTIONS

Through a letter from the Acting Clerk of the Court, dated November 25, 2015, the Court has requested that the parties to this Appeal "simultaneously advise the court in writing within fourteen (14) days from the date of this letter of their position regarding" certain Jurisdictional Questions raised by the Court, *sua sponte*. Appellees, YOUNG CONAWAY STARGATT & TAYLOR ("YCST") and BRUCE L. SILVERSTEIN ("Silverstein") (together "Appellees"), by their undersigned counsel, hereby respond to the Jurisdictional Questions posed by the Court.

We begin by quoting the Court's Jurisdictional Questions in their entirety:

## JURISDICTIONAL QUESTIONS

Please address under what theory Young Conaway Stargatt & Taylor LLP and Bruce L. Silverstein may appeal: (1) the March 10, 2014 order permitting discovery (Document 424); (2) The June 19, 2014 order entering judgment in favor of Motivation, Inc. against JTR Enterprises, LLC and the Estate of Jay Miscovich (Document 445); (3) the March 16, 2015 order denying Motivation, Inc.'s motion for sanctions against Bruce Silverstein (Document 568); and (4) the August 17, 2015 orders awarding costs and fees to Motivation (Documents 590 and 591). *See Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 333, 100 S. Ct. 1166, 1171, 63 L. Ed. 2d 427 (1980) (providing that "[o]rdinarily, only a party aggrieved by a judgment or order of a district court may exercise the statutory right to appeal therefrom."); *Agripost, Inc. v. Miami-Dade Cty., ex rel. Manager*, 195 F.3d 1225, 1230 (11th Cir. 1999) (noting that, generally, "the prevailing part does not have standing to appeal because it is assumed that the judgment has caused the party no injury," but also noting that "[a]n exception to this rule exists . . . when the prevailing party is prejudiced by the collateral estoppel effect of the district court's order.").

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, Appellees Young Conaway Stargatt & Taylor, LLP and Bruce L. Silverstein, Esq., hereby state the following individuals and entities with any known interest in the outcome of this appeal:

Kendall B. Coffey

Jeffrey B. Crockett

Stephen Elchlepp

Kim Fisher

John Gravante

David Horan

JTR Enterprises LLC

Hon. James L. King

Jay Miscovich

Hugh J. Morgan

Motivation Inc.

Hon. K. Michael Moore

Bruce L.. Silverstein

John Siracusa

Paul D. Sullivan

John E. Tuthill

Marlow V. White

Young Conaway Stargatt & Taylor, LLP

David J. Zack

# SUMMARY OF APPELLEES' RESPONSE

The primary appeal herein is taken by Appellant, Motivation, Inc. ("Motivation") from the district court's order denying Motivation's motion to sanction Appellees for allegedly committing a fraud on the court. *See* D.E. 568 (opinion and order denying sanctions as to Mr. Silverstein); *see also* D.E. 528 (granting equivalent of directed verdict to YCST and Paul Sullivan); D.E. 592 (opinion and order denying Motivation's motion for reconsideration).[1] As demonstrated herein, although Appellees are the prevailing party with respect to the ultimate question of whether they should be sanctioned, the district court issued various subsidiary and/or collateral rulings that Motivation and other parties affiliated with Motivation seek to use against Appellees through the doctrine of collateral estoppel and/or "law of the case." Accordingly, unless Motivation and others lack the right to utilize these rulings against Appellees to their prejudice, Appellees have standing to seek review of those findings through their cross-appeal pursuant to this Court's decision in *Agripost,* Inc., which is cited in the Court's Jurisdictional Questions.

As set forth in Appellees' Joint Motion to Dismiss Appeal (the "Joint Dismissal Motion"), which was filed in this Court on November 24, 2015, the district court lacked jurisdiction to address the merits of the sanctions motion giving rise to the appeal for three separate and independent reasons – namely: (i) Motivation lacked standing to participate in the district court action below, much less to seek sanctions from Appellees, (ii) the district court lacked the "inherent power" to sanction Appellees, who were not parties to the district court action, were not counsel of record to any such party, and were not accused of violating (and did not violate) any order of the district court, and (iii) the district court lacked personal jurisdiction over Appellees, who were never served with

---

[1] The proceedings below were irregular, as no pleading was filed against, or by, Appellees to institute or defend the claims raised by Motivation through its motion for sanctions, and no process was ever served on Appellees. The cited order represented the end of the judicial labor, although it was not a "judgment" under Fed. R. Civ. P. 68. *See, e.g.*, *Wells Properties v. Popkin*, 9 Cal. App. 4th 1053, 1055 (Cal. Ct. App. 1992) ("denial of a motion for sanctions is not a judgment"), *review denied*, 1992 Cal. LEXIS 6061 (Cal. Dec. 3, 1992); *Torres v. Tex. Dep't of Family & Protective Servs.*, 2004 Tex. App. LEXIS 6498, *4 (Tex. App – Houston July 22, 2004) ("A motion for sanctions is an application for an order, and an order on a motion for sanctions is not a judgment.") (citing *Jobe v. Lapidus*, 874 S.W.2d 764, 765-66 (Tex. App. – Dallas 1994, writ denied)); *accord Jobe v. Lapidus*, 874 S.W.2d 764, 765-66 (Tex. App. – Dallas 1994, writ denied) (explaining that "[a] motion is not at the same level as a pleading").

1

legally valid process in the action below. For these reasons, Motivation's appeal should be dismissed, and a number of the district court's rulings should be vacated. If the Court grants Appellees' Joint Dismissal Motion, there will be no reason to address the Jurisdictional Questions (or any other matter raised by Motivation's appeal or Appellees' cross-appeal), as the grant of the Joint Dismissal Motion will otherwise moot these proceedings.

In the event that Motivation's appeal were to proceed on the merits, Appellees will show that Motivation's appeal is frivolous, and that there is no colorable basis for Motivation to challenge the district court's well-reasoned denial of Motivation's motion for sanctions – with respect to which the standard of appellate review is abuse of discretion. *See, e.g., Sciarretta v. Lincoln Nat'l Life Ins. Co.*, 778 F.3d 1205, 1212 (11th Cir. 2015) ("We review a court's exercise of its inherent power to impose sanctions only for an abuse of discretion"); *Kornhauser v. Comm'r of Soc. Sec.*, 685 F.3d 1254, 1258 (11th Cir. 2012) ("We review the District Court's exercise of its inherent power to sanction counsel for abuse of discretion"); *Schiavo ex. rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005) (instructing that the abuse of discretion standard "recognizes there is a range of choice within which we will not reverse the district court even if we might have reached a different decision"); *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) ("When employing an abuse-of-discretion standard, we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard."); *see also Murray v. City of Columbus*, 534 Fed. Appx. 479, 485-86 (6th Cir. 2013) (affirming denial of sanctions, and explaining that "[b]ecause the court's inherent power to impose sanctions is discretionary, the court is not required to sanction a party or attorney even if it has determined that some wrongdoing has occurred") (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991)).

Although Appellees prevailed with respect to the ultimate question of whether they should be sanctioned, the district court made certain rulings in Documents 424, 445, 568, 590, and 591 (the "Questioned Orders") that Motivation and other parties affiliated with Motivation seek to use against Appellees (i) in connection with this appeal, (ii) in any remand that might occur, and (iii) in other litigation now pending before the district court in the matter of *AZALP LLC v. Silverstein*, Case No.

14-10079-CIV-Martinez-Goodman (S.D. Fl.) (the "AZALP Action"). While Appellees believe that the only ruling of the district court that is binding on Appellees is the court's ultimate ruling that Motivation failed to establish a basis for sanctions, Appellees have cross-appealed the Questioned Orders in order to protect against their use against Appellees. Accordingly, in order to avoid being prejudiced from the Questioned Orders, Appellants intend to show through their cross appeal that the Questioned Orders were issued in error, in pertinent respects, as proffered below.

As noted in the Court's Jurisdictional Questions, a prevailing party may appeal an order of a district court "when the prevailing party is prejudiced by the collateral estoppel effect of the district court's order." Jurisdictional Questions (quoting *Agripost, Inc. v. Miami-Dade Cty., ex rel. Manager*, 195 F.3d 1225, 1230 (11th Cir. 1999)). As shown herein, Appellees have standing to pursue their cross appeal of the Questioned Orders because Motivation and others (wrongly) seek to use the Questioned Orders against Appellees.

For the avoidance of doubt, Appellees do not intend to argue the rights of either JTR Enterprises, LLC ("JTR") or Jay Miscovich ("Miscovich") (or his estate, as he is deceased) in this appeal. Rather, Appellees challenge rulings in the Questioned Orders for the purpose of avoiding those rulings being wrongfully used against Appellees. Appellees have no interest in challenging the Questioned Orders so long as they cannot be used against Appellees to their prejudice. If, however, the Questioned Orders can be used against Appellees, then Appellees have the right to seek appellate review of the Questioned Orders.

**THE BACKGROUND OF THIS APPEAL**

The case underlying this appeal was tried in three stages. We examine that background below, as it is pertinent to an understanding of the Questioned Orders and the proper resolution of the Court's Jurisdictional Questions. We will also refer to the separate (but related) pending AZALP Action, which also is pertinent to the resolution of the Court's Jurisdictional Questions.

A. **Stage 1: The *In Rem* Claim; Trial; and Entry of a Final Order**

The underlying action from which this appeal arises was an *in rem* action commenced on September 6, 2010 by JTR, seeking a declaration of ownership and salvage rights as to "an unknown

quantity of Colombian Emeralds, Amethysts, and Quartz crystals" (the "*Res*") alleged to have been found in international waters in the Gulf of Mexico by JTR's Managing Member (Miscovich). Because the action was *in rem*, JTR did not sue any individual or entity. Moreover, JTR's complaint alleged little more than that Miscovich discovered the *Res* in a specified location within the Gulf of Mexico. JTR's complaint contained no allegations as to the origin or value of the *Res* – which remained to be investigated after title to the *Res* was established. *See generally* D.E. 1 (Complaint).

As shown in Appellees' Joint Dismissal Motion (and various filings in the district court), (i) Motivation wrongfully injected itself into the *in rem* action below with a factually implausible and legally frivolous claim of intervention that was dismissed by the court, and (ii) Motivation amended its dismissed claim to assert a concocted claim that Motivation formally disclaimed in a motion to voluntarily withdraw its putative claim in intervention on August 17, 2012. The *in rem* action thereafter proceeded without Motivation asserting any claim to the *Res*.[2]

Following a bench trial in December 2012, the district court (i) found the evidence in equipoise as to whether Miscovich found the *Res* or "salted" the discovery site, and (ii) entered a Final Order denying relief to JTR. *See* DE 199 (the "Final Order").

## B.     Stage 2: The First Sanctions Hearing

Nearly a year following the entry of the Final Order, the district court conducted a post-trial evidentiary hearing (the "First Sanctions Hearing") to determine whether JTR or Miscovich had committed a "fraud on the court." The sole "participants" in the First Sanctions Hearing were plaintiff-below, JTR, and non-party, Motivation.

Appellees (i) were not parties to the *in rem* action at any time, (ii) were not served with an order to Show Cause prior to the First Sanctions Hearing, (iii) did not appear at the First Sanctions Hearing, and (iv) were not represented by counsel at the First Sanctions Hearing. Moreover, prior to

---

[2]  As shown in Appellees' Joint Dismissal Motion, the record below reflects that Motivation's true purpose in seeking to intervene was (i) to serve as the self-anointed "Treasure Police," and (ii) to provide Motivation a forum to disparage a new business competitor. Without regard to Motivation's *bona fides* (or lack thereof), however, Motivation's concession that it lacked any ownership interest in the "*Res*" means that Motivation lacked standing to participate in the *in rem* proceeding (as shown in Argument I of Appellees' Joint Dismissal Motion).

the First Sanctions Hearing, the district court (Chief Judge K. Michael Moore) had affirmatively rejected a motion by Motivation to declare that Appellees were subject to personal jurisdiction in the *in rem* action. *See* D.E. 333. And, less than two weeks prior to the commencement of the First Sanctions Hearing, Motivation served Appellees in Delaware (where they reside) with a document that purported to be a "summons" compelling them to attend the First Sanctions Hearing. Motivation's putative summons (i) was not signed by the clerk, (ii) did not bear the court's seal, and (iii) was ineffective in Delaware, in any event, because Rule 4.1 of the Federal Rules of Civil Procedure does not provide for extra-territorial service of a summons to attend a sanctions hearing. Accordingly, Appellees filed an emergency motion for relief (D.E. 341), and the district court (Chief Judge Moore) entered an order quashing Motivation's putative summons, granting Appellees a protective order, and directing Motivation to show cause why it should not be sanctioned for its conduct. *See* D.E. 361. In support of his order, Chief Judge Moore explained that he previously had denied Motivation's motion to determine that Appellees were subject to personal jurisdiction, and that Motivation had wrongfully disregarded that ruling. Additionally, Judge Moore later elaborated at the First Sanctions Hearing that it would have been "unfair" to drag Appellees into this matter after discovery and other proceedings were completed without Appellees' involvement. D.E. 373, at 112:24 to 113:9 (observing it would be "unfair to Mr. Silverstein to have to come in at such a late date"); *see also id.* at 123:23 to 124:7 ("if they're not within the jurisdiction of the Court, if there is no way to enforce the sanction, then the District Court should not be in a position of just entering orders that it cannot execute on . . . .").

At that First Sanctions Hearing, a store owner testified that he had sold Miscovich some 80 pounds of emeralds in 2010, leading Chief Judge Moore to find that Miscovich committed a fraud on the Court from the day the *in rem* action was commenced through the day of Miscovich's death (a few months prior to the First Sanctions Hearing). *See* D.E. 445 at ¶¶ 70, 72 (the "Court's Findings and Conclusions"). Among other things, Chief Judge Moore found that Miscovich "was clearly the mastermind behind this whole scheme" and that Miscovich had "***managed to successfully convince his investors, lawyers, employees of the Smithsonian, appraisers, jewelers, family, friends, the***

*general public, and many others, including investigative reporters from CBS' 60 Minutes*, that he had discovered and recovered this treasure from the seafloor in early 2010." *Id*. at ¶¶ 66-67 (emphasis added).

By contrast, Chief Judge Moore declined to accept Motivation's contention that JTR had engaged in a fraud on the court or otherwise engaged in bad faith or vexatious litigation. Specifically, Chief Judge Moore identified Motivation's various contentions with respect to JTR as follows:

> Motivation contends that it is entitled to sanctions against JTR because this action was litigated "at all costs," even after a reasonable person would have known that the case was based on a fraud. . . . Motivation further contends that the underlying litigation could have been concluded in December 2011 if JTR had revealed expert reports that indicated that the Emeralds were coated with a modern epoxy, which would exclude the Emeralds coming from either the Atocha or the Margarita. . . . Finally, Motivation claims that, had JTR allowed Motivation to view the Emeralds immediately, Motivation would have quickly concluded, as it did when it finally viewed the Emeralds in August 2012, that the Emeralds did not come from its ships and it would have withdrawn its claim.

D.E. 445 at ¶ 6 (citations omitted).

Chief Judge Moore declined to accept or adopt any of the foregoing contentions advanced by Motivation, and declined to sanction JTR for anything beyond "Motivation's attorneys' fees and costs, for the period of time from December 2, 2011 to April 18, 2012." *Id*. at ¶ 61. As Chief Judge Moore explained:

> While Motivation entered the case in October 2011, the Court does not find that sanctions as of this date would be appropriate against JTR. While Motivation claims that it would have quickly exited the case, had they been allowed to inspect the Emeralds, there was a lot of distrust between JTR and Motivation. . . . The Court thus finds that the sanctionable conduct began when JTR withheld information from the Court, not when Motivation made the decision to enter the case. According to the testimony presented at the hearing, JTR did not learn about the epoxy until December 2011.

*Id.* at ¶ 62 n.16. Chief Judge Moore further determined that April 18, 2012, was an appropriate cut-off date for sanctions against JTR, reasoning that, after JTR disclosed the epoxy information on April 18, 2012, "JTR, the Court, and Motivation were working from the same set of facts. ***Thus, when Motivation soon thereafter filed its Amended Claim, Motivation made an informed decision to stay in the case.***" *Id.* at ¶ 65 (emphasis added).

Because Appellees were neither parties nor counsel of record for any party in the action, they (i) did not participate in the First Sanctions Hearing; (ii) had no ability to cross-examine any witnesses (at depositions or otherwise), request or subpoena documents, or otherwise participate in the proceedings (other than to object to subpoenas served on Appellees in the District of Delaware); and (iii) did not develop (or decline to develop) the record in a manner of their choosing.

## C.     Stage 3: The Second Sanctions Hearing

Following the First Sanctions Hearing, Motivation filed a motion for sanctions against Appellees, who were outside Delaware counsel to JTR and Miscovich, and who never appeared as counsel of record for JTR (or Miscovich) in the proceedings below. *See* DE 407. Motivation did not contend that Appellees knew of any fraud when they were retained to represent Miscovich and JTR in 2011, but argued that Appellees should not have continued to represent their clients when alleged "evidence of fraud" emerged in the *in rem* action. *See id*. at 6.  Motivation did not tell the Court what Motivation's internal emails revealed: that Motivation knew that there was no evidence of Appellees' knowing participation in any fraud, but that (i) Motivation targeted Appellees because they were seen as "a deep pocket," and (ii) Motivation was "rely[ing] on their desire to settle and not be dragged thru a messy highly publicized trial," *See generally* Appellees' Joint Dismissal Motion at 6-7 & n.6.

On July 25, 2014, the district court (now Judge James Lawrence King) entered an Order to Show Cause (the "OSC") (D.E. 451) directing Appellees (and Paul Sullivan) "to appear before the Court and show why they should not be sanctioned for their conduct in this case, as outlined in the Amended Motion for Sanctions."  Appellees filed a Motion to Quash the OSC, in which they raised the three issues that are now presented to this Court through Appellees' Joint Dismissal Motion. *See* D.E. 459.  Appellees also filed a motion to strike a pre-hearing filing by Motivation on the grounds that it violated Appellees' due process rights. *See* D.E. 484.  By separate orders dated October 30, 2014, Judge King (i) denied Appellees' Motion to Quash the OSC, (ii) denied Appellees' motion to strike, and (iii) directed that Appellees appear at an evidentiary hearing (the Second Sanctions Hearing) scheduled for less than three weeks later and without affording Appellees an opportunity to

7

take any discovery. *See* D.E. 488. Thereafter, Judge King conducted the Second Sanctions Hearing, which ultimately resulted in Judge King's decision to deny Motivation's motion for sanctions against Appellees.

## D.    The Sequel: The AZALP Action

On October 3, 2014, AZALP LLC and its putative assignors (collectively, "the New York Investors") – which share counsel with Motivation – commenced the AZALP Action, in which they asserted a number of frivolous causes of action against Appellees arising from many of the same allegations previously pursued (unsuccessfully) by Motivation in sanctions proceedings herein below. Appellees raised a number of meritorious grounds to dismiss the Complaint in the AZALP Action, and the district court entered an Order granting in part Appellees' Motion to Dismiss on some grounds, and reserving judgment on others. *See AZALP LLC v. Silverstein*, Case No. 14-10079-CIV-Martinez-Goodman (S.D. Fl. Aug. 17, 2015) (the "Dismissal Order," AZALP case, D.E. 58). The New York Investors thereafter filed an Amended Complaint, which suffers from the same flaws as the original Complaint, and which is now the subject of a pending motion to strike or dismiss (AZALP case, D.E. 61).

Important for present purposes, the Amended Complaint in the AZALP Action is replete with allegations respecting findings of the district court in the *in rem* action (including from the Questioned Orders) that the New York Investors seek to use against Appellees in the AZALP Action. *See* First Amended Complaint at ¶¶ 4, 6, 7, 60, 83, 92, 118, 154-156, and 181-183; *see also* AZALP's Response in Opposition to Motion to Dismiss the Amended Complaint, at 1-3. (The cited excerpts from the Amended Complaint and AZALP's brief are attached hereto as Exhibits 3 and 4). In addition, the Amended Complaint in the AZALP Action contains numerous allegations arising from privileged documents the New York Investors would not have received (from Motivation) but for the entry of the Questioned Orders, in particular D.E. 424. The New York Investors' filings illustrate the potential detriment to Appellees of the Questioned Orders, which the New York Investors seek (wrongfully) to use against Appellees in other proceedings.

# THE QUESTIONED ORDERS

This Court's Jurisdictional Questions identify five orders entered in the course of the three-stage sanction proceedings. The Questioned Orders and the defects therein Appellees seek to advance through their cross-appeals are as summarized below.

## A.   D.E. 424 (the "Miscovich Discovery Ruling")

The Miscovich Discovery Ruling was made *sua sponte*, and with no notice or opportunity to comment from Appellees. The Miscovich Discovery Ruling compelled JTR's former counsel of record in the action below, David P. Horan, Esq., to produce to Motivation all documents identified on a privilege log – all of which previously had been reviewed by the court *in camera* and determined to be protected from discovery by the attorney-client privilege or work-product doctrine, including attorney work product. D.E. 334 (Order denying motion to compel). Among the documents Mr. Horan was compelled to produce through the Miscovich Discovery Ruling were numerous materials that reflected Appellees' legal theories, opinions, and strategies as outside counsel to JTR, Miscovich and others – including privileged material from litigation and other matters in Delaware, involving the New York Investors, who are represented by the same counsel who represent Motivation in this appeal. Although Appellees were provided no notice or opportunity to defend against the Miscovich Discovery Ruling, the materials subject to the ruling were ordered to be produced for the express purpose of being used against Appellees at the Second Sanctions Hearing (and were provided by Motivation to the New York Investors for use against Appellees in the AZALP Action and otherwise).[3] Moreover, the Miscovich Discovery Ruling could collaterally harm Appellees by providing the New York Investors with an argument to pierce the attorney-client privilege and work-product protections applicable to Appellees in the AZALP Action. Appellees' bases for the challenge will include the jurisdictional and standing defects of the

_____

[3] It is undisputed that the district court made the Miscovich Discovery Ruling at a time when (i) all substantive proceedings involving JTR and Miscovich already were concluded, (ii) no motion to compel was pending, (iii) JTR was not represented by conflict-free counsel (and JTR's conflicted counsel did not even object to the Miscovich Discovery Ruling), and (iv) none of the other persons whose privileged and protected communications were ordered produced were before the court or represented by counsel before the court.

entire proceeding, the absence of notice and opportunity to be heard by Appellees, and the scope of applicability of the crime-fraud exception.[4]

**B.**       **D.E. 445 (the "Miscovich Sanctions Order")**

The Miscovich Sanctions Order provides the underlying factual predicate for the sanctions proceedings against Appellees (and for the Miscovich Discovery Ruling discussed above, which compelled the production of materials otherwise protected by the attorney-client privilege and work-product doctrine). Additionally, the New York Investors, who are represented by the same counsel who represent Motivation in this appeal, are seeking to use the findings set forth in the Miscovich Sanctions Order against Appellees (through the doctrine of offensive collateral estoppel) in the AZALP Action. The grounds on which Appellees would challenge certain of the findings would be (i) the jurisdictional and standing defects of the entire proceeding, (ii) the conflicts and the impossible position of JTR's counsel,[5] and (iii) clear legal error of certain of the findings themselves, in particular the holding that a party in a civil case has the obligation to advise the trial court and

---

[4] If Appellees' cross appeal of the Miscovich Discovery Ruling proceeds, it will be shown that the district court erred in compelling the production of Appellees' privileged materials (i) without providing Appellees (or any party to the proceedings) an opportunity to be heard on the issue, (ii) without considering whether the materials ordered produced by the Miscovich Discovery Ruling were sufficiently related to that attempted fraud to warrant invasion of the attorney-client privilege or work-product protection, and (iii) without considering whether reasonable conditions to the privileged materials' production were required to protect other persons (such as Appellees) whose privileged and otherwise protected communications were implicated. *See, e.g.*, *UMG Recording, Inc. v. Bertelsmann AG*, 479 F.3d 1078 (9th Cir. 2007). Again, and for the avoidance of doubt, Appellees make these arguments only to avoid the Miscovich Discovery Ruling being used against Appellees by Motivation or some other party. So long as the Miscovich Discovery Ruling cannot be used against Appellees, they have no interest in seeking appellate review of the ruling.

[5] Prior to the commencement of the First Sanctions Hearing, JTR's counsel of record had moved to withdraw from representing JTR, citing both (i) "irreconcilable differences between the undersigned attorneys and their client," and (ii) "a good faith belief that their further involvement in the post-trial discovery and sanctions hearing would be imprudent." D.E. 287, at 3. Nonetheless, the district court forced JTR's counsel of record to continue its representation over its objection to doing so. *See* D.E. 291. In a later filing (made after the First Sanctions Hearing, but before the district court issued the Miscovich Sanctions Order), JTR's counsel of record stated that they had "suspected" prior to the First Sanctions Hearing that Miscovich had given false testimony at the 2012 Trial (a fact that JTR's counsel of record did not previously reveal to the Court or Appellees). *See* D.E. 386, at 1-2. When this Court was later confronted with a motion to sanction JTR for pursuing an appeal of the Final Order, the Court declined to sanction JTR because, among other things, "JTR has not been represented in this matter by conflict-free counsel." *JTR Enterprises, LLC. v. Columbian Emeralds*, No. 13-10870, at 3 (11th Cir. March 21, 2014) (Order).

opposing counsel of potentially adverse findings by a consulting expert.[6]  Additionally, to the extent that Motivation or the New York Investors seek to hold Appellees liable for the "fraud on the court" the district court found to have been perpetrated by Miscovich (but not JTR nor Appellees), Appellees will show in their cross appeal that the district court's rulings against Mr. Miscovich were in error for a number of reasons.[7]

**C.      D.E. 568 (the "Sanctions Denial Order")**

Although the Sanctions Denial Order resulted in the denial of sanctions against Appellees, the Sanctions Denial Order contained subsidiary findings that Motivation seeks to use against Appellees on appeal (and any remand that might occur), and the New York Investors seek to use against Appellees in the AZALP Action.  These subsidiary findings were made following an evidentiary hearing that followed nearly two years of discovery by Motivation in proceedings in which Appellees were not parties and had no right to defend the discovery or take any discovery of their own.  These findings also were based upon testimony by two of JTR's former counsel of record – (i) one of which (John Siracusa) had made a deal with Motivation to assist in Motivation's efforts to obtain sanctions against Appellees in exchange for Motivation not pursuing sanctions and/or a

---

[6] If Appellees cross-appeal of the Miscovich Sanctions Order proceeds on the merits, Appellees will show that the district court erred, as a matter of law, in holding that JTR had an obligation to volunteer potentially adverse information to the court (i) within days of learning the information, (ii) before JTR had an adequate opportunity to investigate the information, and (iii) when JTR did volunteer the information to the court within four months of learning the information and well prior to asking the court to award JTR any affirmative relief on its claim with respect to which the information had any bearing.  Again, and for the avoidance of doubt, Appellees make this argument only to avoid the Miscovich Sanctions Order being used against Appellees by Motivation or some other party.  So long as the Miscovich Sanctions Order cannot be used against Appellees, they have no interest in seeking appellate review of the order.

[7] In opposing any effort to use the Miscovich Sanctions Order against them, Appellees will show that the Miscovich Sanctions Order was entered in error because (i) Miscovich was not a party to the *in rem* action; (ii) the district court did not issue an Order to Show Cause (or similar process) to Miscovich (or his estate) prior to the First Sanctions Hearing (or thereafter, for that matter); (iii) neither Miscovich (nor his estate) attended the First Sanctions Hearing; and (iv) neither Miscovich (nor his estate) were represented by counsel at the First Sanctions Hearing.  Moreover, prior to the First Sanctions Hearing (i) Miscovich had committed suicide, and (ii) JTR's counsel of record had moved to withdraw from representing JTR after being threatened with sanctions and criminal charges by representatives of Motivation.  Again, and for the avoidance of doubt, Appellees make these arguments only to avoid the Miscovich Sanctions Order being used against Appellees by Motivation or some other party.  So long as the Miscovich Sanctions Order cannot be used against Appellees, they have no interest in seeking appellate review of the order.

criminal complaint, and (ii) the other of which (David Horan) was counsel of record at the time JTR failed to make a disclosure to the court that Chief Judge Moore concluded should have been made, and who had a personal financial interest in avoiding a determination that he was responsible for the conduct of JTR's litigation activity. The grounds on which Appellees would challenge these subsidiary findings would include (i) the jurisdictional and standing defects set forth in Appellees' Joint Dismissal Motion; (ii) the absence of opportunity for discovery by Appellees, including into impeachment information regarding witnesses (such as threats and agreements made between Motivation and their counsel),[8] and (iii) other procedural irregularities.[9]

## D. D.E. 590 & 591 (the "Fee Awards")

These orders awarded Motivation (i) $173,708.09 in attorneys' fees and costs against JTR, and (ii) $1,204,726.90 in attorneys' fees and costs against the Estate of Jay Miscovich. Through its appeal of the court's denial of sanctions against Appellees, Motivation seeks to hold Appellees vicariously liable for the attorneys' fees and costs awarded to Motivation against JTR and the Estate of Jay Miscovich. In direct defense of Motivation's frivolous appeal, Appellees will show that there

---

[8] Disclosure of this type of information is mandated in the criminal context by cases such as *Brady v. Maryland,* 373 U.S. 83, 87 (1963) and *Giglio v. United States,* 405 U.S. 150, 154-55 (1972), but in the civil context must be obtained through discovery.

[9] Moreover, inasmuch as the Second Sanctions Hearing was akin to a criminal contempt proceeding (especially inasmuch as Motivation lacked standing to seek sanctions from Appellees, and the district court lacks the "inherent power" to sanction a non-party), Appellees were entitled to even more stringent due process protections available in a criminal contempt proceeding, such as (i) not having the sanctions proceeding "prosecuted" by attorneys with a financial interest in the outcome, (ii) the right to have the charges against them heard by a jury, and (iii) a requirement of proof beyond a reasonable doubt. *See, e.g., International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 831, 129 L. Ed. 2d 642, 114 S. Ct. 2552 (1994); *Cobell v. Norton*, 334 F.3d 1128 (D.C. Cir. 2003); *Crowe v. Smith*, 151 F.3d 217 (5th Cir 1998); *Mackler Productions, Inc. v. Cohen*, 146 F.3d 126 (2nd Cir. 1998); *Shepherd v. ABC*, 62 F.3d 1469 (D.C. Cir. 1995); *Pyramid Real Estate Services, LLC v. United States*, 95 Fed. Cl. 613, 618 (Fed. Cl. 2010) ("When determining whether to impose sanctions under their inherent authority, courts apply the same procedural requirements they would when considering sanctions for contempt."). Additionally, the court's subsidiary findings are not supported by the record – especially when it was Motivation's burden to establish these facts by clear and convincing evidence (if not a higher standard). And, as set forth in Appellees' Joint Motion to Dismiss the Appeal, the Second Sanctions Hearing was conducted by a court that lacked jurisdiction to do so. Again, and for the avoidance of doubt, Appellees make these arguments only to avoid any adverse findings in the Sanctions Denial Order being used against Appellees by Motivation or some other party. So long as the Sanctions Denial Order cannot be used against Appellees, they have no interest in seeking appellate review of any aspect of the order.

is no merit to Motivation's effort to hold Appellees liable for sanctions imposed on others. And, as will be shown through Appellees' cross-appeal, the Fee Awards were issued in error (and should not, therefore, be able to be used against Appellees even if there otherwise were a basis for doing so) because (i) the proceedings that gave rise to the entry of the Fee Awards were jurisdictionally and legally flawed for all of the reasons set forth in connection with the discussion of the Miscovich Sanctions Order, (ii) the district court made no assessment, whatsoever, of the ability of JTR or Miscovich to pay the Fee Awards; and (iii) the Fee Awards were made at a time when neither JTR nor the Estate of Jay Miscovich were represented by counsel. *See, e.g.*, *Martin v. Automobili Lamborghini Exclusive, Inc*., 307 F.3d 1332 (11th Cir. 2002) ("when exercising its discretion to sanction under its inherent power, a court must take into consideration the financial circumstances of the party being sanctioned**").**[10]

## APPELLEES' CROSS-APPEAL SEEKS TO AVOID COLLATERAL ESTOPPEL

A prevailing party may appeal an order of a district court "when the prevailing party is prejudiced by the collateral estoppel effect of the district court's order." Jurisdictional Questions (quoting *Agripost, Inc. v. Miami-Dade Cty., ex rel. Manager*, 195 F.3d 1225, 1230 (11th Cir. 1999)). *See also Picard v. Credit Solutions, Inc*., 564 F.3d 1249, 1255-56 (11th Cir. 2009) (same); *In re DES Litigation,* 7 F.3d 20, 23-25 (2nd Cir. 1993) ["*DES*"] (acknowledging that the potential for collateral estoppel effect of adverse rulings will support an appeal by an otherwise prevailing party).[11] The

---

[10]  Again, and for the avoidance of doubt, Appellees make these arguments only to avoid the Fee Awards being used against Appellees by Motivation or some other party. So long as the Fee Awards cannot be used against Appellees, they have no interest in seeking appellate review of the awards.

[11]  *See also Hodge v. Bluebeard's Castle, Inc*., 392 Fed. App'x. 965, 977 n.18 (3rd Cir. 2010) ("'when the prevailing party is aggrieved by the collateral estoppel effect of a district court's rulings' that party has standing to pursue an appeal of those rulings") (quoting *Dolenc v. Love*, 40 F.3d 656, 657 (3d Cir. 1994); *Klamath Strategic Inv. Fund v. United States*, 568 F.3d 537, 546 (5th Cir. 2009) ("In some situations, adverse collateral estoppel implications may show that a party is aggrieved by a particular ruling."); *Envtl. Prot. Info. Ctr., Inc. v. Pac. Lumber Co*., 257 F.3d 1071, 1076 (9th Cir. 2001) ("[T]he Supreme Court has recognized that a winning party will be considered aggrieved by a favorable judgment if future economic loss will result to the party on account of adverse collateral rulings. This route to prudential standing is powerful because it allows for review of the merits – if the parties retain a stake in the controversy satisfying Article III – of the adverse collateral order."); *EEOC v. Chicago Club*, 86 F.3d 1423, 1431 (7th Cir. Ill. 1996) ("A ruling or finding contained in a judgment may be sufficiently adverse if that finding may have preclusive effect in a subsequent proceedings.").

Supreme Court also has instructed that "[i]n an appropriate case, appeal may be permitted from an adverse ruling collateral to the merits at the behest of the party who has prevailed on the merits, so long as the party retains a stake in the appeal satisfying the requirements of Article III." *Deposit Guaranty Nat.Bank v. Roper,* 445 U.S. 326, 334 (1980). Moreover, in *DES*, the Second Circuit observed, as follows:

> The second exception to the rule prohibiting appeal by a prevailing party arises, in some circumstances, where a prevailing party can show that it is aggrieved by some aspect of the trial court's judgment or decree. *In Electrical Fittings Corp. v. Thomas & Betts Co*., 307 U.S. 241, 83 L. Ed. 1263, 59 S. Ct. 860 (1939), the District Court had entered a judgment for the defendant, finding that the defendant had not infringed the plaintiff's patent but also finding that the patent was valid. We dismissed the defendant's appeal, since the finding of validity did not support the decree and would not have estoppel effect. The Supreme Court reversed and held that we should have "entertained the appeal, not for the purpose of passing on the merits, but to direct the reformation of the decree." *Id*. at 242. Judge Learned Hand later explained the Supreme Court's terse decision as follows:

>> The Supreme Court did not differ with us in thinking that the finding [of validity] was immaterial, but nevertheless it directed us to strike it from the decree. The rationale of that decision was that the defendant was entitled to have it out because, although it was not an estoppel, it might create some presumptive prejudice against him.

*DES*, 7 F.3d at 25 (quoting *Harries v. Air King Products Co*., 183 F.2d 158, 161 (2d Cir. 1950)). *See also Conwill v. Greenberg Traurig, L.L.P.*, 448 Fed. App'x. 434, 436-37 (5th Cir. 2011) ("Courts have recognized a handful of situations in which a party may be sufficiently aggrieved by a favorable judgment to appeal it, such as where the judgment itself contains prejudicial language on issues immaterial to the disposition of the case, where collateral estoppel may harm the party in future proceedings, or where the party will suffer financial loss as a result of the judgment.").

Here, Motivation has sought (and continues to seek) to have rulings in the Questioned Orders applied adversely to Appellees. Indeed, Motivation's own "Civil Appeal Statement" – filed herein on September 30, 2015 – identifies the district court's refusal to give collateral estoppel effect to its prior rulings as an issue that Motivation disputes. Specifically, Motivation's Civil Appeal Statement states, as follows:

> (5) Whether the trial court erred in ruling that Silverstein, his firm Young Conaway Stargatt & Taylor and Sullivan were not in privity with JTR, and therefore, not bound by the court's previous findings.

*Id.* (Exhibit 1 hereto).[12]

More recently, in "Appellant Motivation's Reply to Appellees' Opposition to Motion for an Extension of Time to Respond to Motion to Dismiss" in this Court (filed on December 7, 2015), Motivation proffered the following assertions:

> In the proceedings below, Motivation uncovered what the district judge called a "massive fraud on the court " that the court found was "substantially controlled" by Bruce Silverstein and his firm, who acted as general counsel to the fraudulent enterprise, JTR Enterprises LLC (JTR"). [D.E. 568; p. 55] Though the district court found that JTR's fraud on the court was not "sanctionable conduct", the court sanctioned JTR for bad faith litigation practices that were engineered by Silverstein. Without reason, the court refused to sanction Silverstein for his central role in JTR's bad faith litigation practices.

*Id.* at 1-2. *See also id.* at 2 ("given that Silverstein and his firm substantially controlled the fraudulent litigation, the matter warrants serious consideration"). Thus, it is clear that Motivation seeks to use the Questioned Orders against Appellees.[13]

Additionally, and as discussed *supra* (under the heading "D. The Sequel: The AZALP Action"), the New York Investors – represented by the same counsel who represent Motivation in this appeal – are seeking to use rulings in the Questioned Orders against Appellees in the AZALP Action. For example, although Judge King ultimately denied Motivation's motion to sanction Mr. Silverstein, Judge King did find that Mr. Silverstein had a substantial interest in the outcome of the *in rem* action, and that Mr. Silverstein substantially participated in the action, even though he was

---

[12] Within days of receiving the Court's Jurisdictional Questions, Motivation filed an Amended Civil Appeal Statement, which deleted the quoted issue. (*See* Exhibit 2 hereto). But, this does not preclude Motivation from continuing to argue for an application of collateral estoppel in its frivolous quest to reverse the district court's denial of Motivation's motion to sanction Appellees.

[13] Motivation's latest filing also highlights the frivolity of its appeal, as the only alleged "factual" support for Motivation's assertions is lifted from Motivation's failed motion for reconsideration of the denial of its sanctions motion – thereby raising points to this Court which are both false and twice rejected by the district court below. One example is Motivation's false statement that "Silverstein admitted that prior to the filing of the fraudulent admiralty complaint he did not believe JTR's story and only hours after being advised specifically that JTR's account of events was false, Silverstein directed JTR's Florida counsel to file the admiralty case *because he thought the filing would help them raise money from investors*." *Id.* at 2 (emphasis by Motivation). This statement is (i) contrary to the record, (ii) contrary to the district court's findings, (iii) specifically rejected by the district court's denial of Motivation's motion for reconsideration (*see* D.E. 592), and (iv) cut from whole cloth. As shown in the discussion herein of the First Sanctions Hearing, *supra*, Motivation also misrepresents the record when it asserts that the district court found that JTR committed a fraud on the court or engaged in bad faith litigation practices. In fact, Chief Judge Moore not only declined to make such a finding, but he expressly rejected Motivation's urging that he do so.

neither a party nor counsel of record for any party. *See* Sanctions Denial Order at 54-55. The New York Investors now seek to use these findings against Appellees in the AZALP Action.

Appellees respectfully submit that any subsidiary findings in the Sanctions Denial Order cannot be used against Appellees because they were not critical or necessary to Judge King's ultimate ruling ***denying*** sanctions. *See Steed v. EverHome Mortgage Co.*, 308 F. App'x 364, 371-72 (11th Cir. 2009) (setting forth the elements of collateral estoppel). *See also DES*, 7 F.3d at 23 ("Relitigation of an issue in a second action is precluded only if 'the judgment in the prior action was dependent upon the determination made of the issue.'") (quoting 1B James W. Moore, et al., Moore's Federal Practice P 0.443[1], at 760 (2d ed. 1993)); *Klamath Strategic Inv. Fund*, 568 F.3d at 546 ("an interlocutory ruling will only have collateral estoppel effect in subsequent litigation if the ultimate judgment in the case was dependent upon the interlocutory ruling").

Additionally, Appellees lacked a fair opportunity to litigate the issues, as they did not participate in the discovery leading up to the sanctions hearing, and had no opportunity to depose JTR's counsel of record, who had made deals to help Motivation pursue sanctions from Mr. Silverstein in consideration of Motivation not seeking sanctions from them. *See, e.g.*, *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (where (as here) "[a] person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues," the nonparty preclusion sought by Motivation "runs up against the 'deep-rooted historic tradition that everyone should have his own day in court") (*quoting Richards v. Jefferson County*, 517 U.S. 793, 798 (1996)); *see also United States v. Shaygan*, 652 F.3d 1297, 1319 (11th Cir. 2011) (stating that attorneys charged with misconduct must be afforded due process and "[t]he record before us is unreliable because it was developed, after all, without affording either of them due process"); *EEOC v. Pemco Aeroplex, Inc.*, 383 F.3d 1280, 1286 (11th Cir. 2004).[14]

Moreover, there is no question that the district court's various rulings against Miscovich and JTR in connection with the First Sanctions Hearing were based on evidence presented at a hearing

---

[14] Collateral estoppel also cannot apply where, as here, the underlying orders were entered without jurisdiction, as raised by Appellees' Joint Dismissal Motion, which is now pending in this Court. *See Envtl. Prot. Info. Ctr., Inc., v. Pac. Lumber Co.*, 257 F.3d at 1076.

16

(i) in which Appellees were not parties, (ii) which Appellees did not attend, (iii) in which Appellees were not represented, and (iv) during which Appellees had no opportunity to defend themselves, such that they did not have a fair and full opportunity to litigate the issues raised. Indeed, the Miscovich Sanctions Order (D.E. 445) unequivocally states:

> The only Parties that the Court will deal with in this Order are JTR and Miscovich. . . . This Court found that Silverstein had not submitted himself to its jurisdiction and therefore, ***Silverstein was excluded from the hearing*** (D.E. 333).

D.E. 445 at 3, n. 3 (emphasis added). As such, there is no merit to the efforts of Motivation or the New York Investors to use rulings resulting from the First Sanctions Hearing against Appellees. *See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 329 (1971) ("Some litigants – those who never appeared in a prior action – may not be collaterally estopped without litigating the issue. They have never had a chance to present their evidence and arguments on the claim. Due process prohibits estopping them despite one or more existing adjudications of the identical issue which stand squarely against their position.").

This is particularly so inasmuch as the record further reflects that Motivation actually played an active role in preventing Appellees from playing a role in the defense of the proceedings that preceded the First Sanctions Hearing. Despite recognizing well in advance of the First Sanctions Hearing that Appellees were not parties and could only be made parties through service of an Order to Show Cause, Motivation deliberately waited until *after* conclusion of the First Sanctions Hearing to request such an order. *See* D.E. 407 (filed on February 28, 2014)[15] And, prior to the First Sanctions Hearing (against JTR), Motivation deliberately refrained from pursuing discovery of Appellees (even though Silverstein's purported actions formed a basis for the judgment against

---

[15] Soon after the conclusion of the December 2012 trial concerning title to the *Res*, Motivation recognized that it would need the Court to enter an order to show cause, which would need to be served through valid process, before Appellees, who were not part of the underlying case, could be subject to sanctions. *See* D.E. 517, at 10 (citing White email to Morgan and Fisher stating that "Silverstein did not make an appearance and neither Silverstein or the Young-Conaway firm are parties. Should we move for an order to show cause why they should not be subject to sanctions?"). Yet, Motivation delayed seeking such an order for ***more than nine months***, (*see* D.E. 315), during which time Motivation engaged in extensive discovery, conducting ten depositions and hiring a number of private investigators and putative experts – all in furtherance of its scheme to reach into Appellees' perceived "deep pockets" by conducting *ex parte* discovery without Appellees involvement or ability to defend or conduct discovery of their own in the action.

JTR), due to an admitted concern that Appellees would create a record that was unhelpful to Motivation – as discussed in Appellees' Joint Dismissal Motion and herein below.[16]

Based on the foregoing, Appellees argued prior to the Second Sanctions hearing for their own discovery rights, as follows:

> Before Motivation can proceed to call any witnesses, introduce any putative evidence, or rely, in any way, upon a record created at a time that [Appellees] were not parties to this matter, [Appellees] are entitled to a full panoply of fundamental due process rights. Having been haled into this Court for an evidentiary hearing, [Appellees] are entitled to, among other things, (i) a clear statement of the accusations made against them, (ii) the right to take discovery on an equal basis with their accuser, and (iii) the right to a jury trial depending on the scope and nature of potential sanctions.

D.E. 517 at 6 n.3 (citations omitted).

Appellees further argued:

> Before [Appellees] should be required to examine any of the numerous witnesses or address any of the putative 'evidence' proffered by Motivation, [Appellees] are entitled to take meaningful discovery – which has not occurred. Considering the short time between the Order setting the [Second] Sanctions Hearing and the hearing, and given [Appellees]'s lack of involvement in the discovery process, Motivation's counsel were asked to provide its proposed witness list and witness discovery prior to the date required by the Court. Motivation's counsel refused, stating that discovery was not necessary. In order to properly defend themselves, [Appellees] should have been entitled to receive document discovery and take the depositions of, among others, the following persons: (i) all witnesses from the Title/Finders Trial and Sanctions Trial, (ii) Motivation – including, but not limited to Kim Fisher, Sean Fisher, Joe Sweeney, and a corporate witness, (iii) All New York investors, including Dean Barr and Neil Ash, (iv) Jeffrey Post of the Smithsonian Institute, (v) anyone who was deposed by Motivation, (vi) Steve Elchlepp, Jr., (v) Scott Miscovich, (vi) Mark Davis and Michael Livingston, (viii) John Siracusa, Joseph Janssen, Christy Janssen, and David Horan, (ix) Peter Tobia, Scott Heimdal, and Anthony Santelli, (x) Antoinette Matlins, (xi) Kenneth Rose, Gerry Edwards, and Ed Krajewski, (xii) anyone who dove the discovery site, and (xii) Jorge Rodriguez.

D.E. 517 at 11 n.4.

Nonetheless, Judge King compelled Appellees to defend the Second Sanctions Hearing less than three-weeks after he first ruled that Appellees were required to appeal and defend against Motivation's motion for sanctions (*see* D.E. 488 – October 30, 2014 Order denying Appellees'

---

[16] As discussed in Appellees' Joint Dismissal Motion, Motivation made a calculated decision not to depose Appellees specifically so that the Court would not have the opportunity to hear Mr. Silverstein's side of the story at the First Sanctions Hearing. As Motivation's lead counsel at the First Sanctions Hearing wrote: "If you depose BS, he'll just get out his side of the story and the testimony will be admissible at trial." *See* Joint Dismissal Motion at 7 & n.6.

Motion to Quash, and setting evidentiary hearing for November 17, 2014, which was later continued to November 19, 2014), and without any discovery of their accusers or the witnesses with whom their accusers had "cut deals."

Under these circumstances, it would be inappropriate for Motivation, the New York Investors, or any other party to use any of the Questioned Orders against Appellees. Nonetheless, Motivation and the New York Investors continue to seek to do so. Accordingly, Appellees respectfully pray that the Court either (i) sustain Appellees' right to proceed with their cross appeal of the Questioned Orders, or (ii) make clear that the Questioned Orders cannot be used against Appellees. As the Second Circuit explained in *DES*:

> Though we decline to accord appellate standing because [Appellant] cannot avail itself of the collateral estoppel exception to the rule prohibiting appeal by a prevailing party, we note that our decision to decline appellate review of the District Court's order confirms the lack of any possible collateral estoppel effect arising from the District Court's interlocutory rulings. . . . Thus, whether or not other trial judges find Judge Weinstein's opinion a persuasive precedent, . . . they are not bound to apply it in any subsequent litigation against [Appellant].

*DES*, 7 F.3d at 24-25 (citations omitted). *See also Envtl. Prot. Info. Ctr., Inc.*, 257 F.3d at 1076 ("As collateral estoppel does not apply to an unappealable determination, simply holding a ruling unappealable eliminates any prospect of preclusion."); *McCafferty v. Centerior Serv. Co.*, 1999 U.S. App. LEXIS 19809 (6th Cir. Ohio Aug. 16, 1999)) ("[O]ur decision to decline appellate review confirms the lack of any possible collateral estoppel effect arising from the district court's ruling. Whether or not other trial judges find the district court's ruling a persuasive precedent, they are not bound to apply it in any subsequent litigation against the defendants.") (citing *DES*, 7 F.3d at 24-25).

Respectfully submitted,

ADAMS AND REESE LLP
John T. Rogerson, III
Florida Bar No. 832839
john.rogerson@arlaw.com
501 Riverside Avenue, 7th Floor
Jacksonville, FL 32202
Telephone:  (904) 355-1700
Facsimile:  (904) 355-1797

COFFEY BURLINGTON, P.L.

By: _/s/ Jeffrey B. Crockett_____
    Jeffrey B. Crockett
    Florida Bar No. 347401
    David J. Zack
    Florida Bar No. 641685
    2601 South Bayshore Drive, Penthouse
    Miami, Florida  33133
    Telephone:  (305) 858-2900
    Facsimile:  (305) 858-5261
    jcrockett@coffeyburlington.com
    dzack@coffeyburlington.com
    vmontejo@coffeyburlington.com
    service@coffeyburlington.com

*Counsel for Young Conaway Stargatt &*
*Taylor, LLP  and Bruce L. Silverstein, Esq.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true and correct copy of the foregoing was served by Notice of

Electronic Filing generated by CM/ECF, on December 9, 2015, on all counsel or parties of record

on Service List below.

### MOTIVATION, INC. V. JTR ENTPRISES, INC.
### CASE NO. 15-14132-D

### SERVICE LIST


Arthur E. Lewis, Jr., Esq.
Marlow V. White, Esq.
LEWIS & WHITE, PLC
222 W. Georgia Street
P.O. Box 1050
Tallahassee, FL 32301
mvw@lewisandwhite.com

*Counsel for Appellant Motivation, Inc.*


By: */s/*Jeffrey B. Crockett      

# EXHIBIT 1



U.S. COURT OF APPEALS
RECEIVED
CLERK
SEP 30 2015
ATLANTA, GA

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
**CORRECTED CIVIL APPEAL**
**STATEMENT**

*Please TYPE. Attach additional pages if necessary.*

11th Circuit Docket Number: **15-14132-D**

| Caption: | District and Division: Southern District of Florida; Key West |
|---|---|
| MOTIVATION, INC., | Name of Judge: **JAMES LAWRENCE KING** |
| | Nature of Suit: **ADMIRALTY; SANCTIONS** |
| VS. | Date Complaint Filed: **SEPTEMBER 6, 2011** |
| | District Court Docket Number: **4:11-cv-10074-JLK** |
| BRUCE L. SILVERSTEIN, PAUL D. SULLIVAN | Date Notice of Appeal Filed: **SEPTEMBER 14, 2015** |
| and YOUNG, CONAWAY, STARGATT & | ☐ Cross Appeal   ☐ Class Action |
| TAYLOR, LLP | Has this matter previously been before this court? |
| | ☒ Yes   ☐ No |
| | If Yes, provide |
| | (a) Caption: **JTR Enterprises v. Columbian etc.** |
| | (b) Citation: **N/A** |
| | (c) Docket Number: **13-10870** |

| | Attorney Name | Mailing Address | Telephone, Fax, and Email |
|---|---|---|---|
| For Appellant:<br>☐ Plaintiff<br>☐ Defendant<br>☒ Other (Specify) | Claimant's Attorneys<br>A. EUGENE LEWIS<br>MARLOW V. WHITE | 222 W. GEORGIA STREET<br>TALLAHASSEE FL 32301 | TEL. 850-425-5000<br>FAX 850-425-5004<br>lawlaw@polaris.net |
| For Appellee:<br>☐ Plaintiff<br>☐ Defendant<br>☒ Other (Specify) | Sanctions Defendants'<br>Attorneys<br>JOHN GRAVANTE<br>JOHN DORSEY<br>JOHN ROGERSON<br>DAVID ZACK | 25 W Flagler St Ste 800 -Miami, FL 33130<br>1000 North King St. Wilmington, DE19801<br>501 Riverside Ave Fl 7, Jax, FL 32202<br>2601 S Bayshore Dr PH-1, Miami, FL 33133 | |

*Please CIRCLE/CHECK/COMPLETE the items below and on page 2 that apply.*

| Jurisdiction | Nature of Judgment | Type of Order | Relief |
|---|---|---|---|
| ☒ Federal Question | ☒ Final Judgment,<br>28 USC 1291 | ☐ Dismissal/Jurisdiction   Default | Amount Sought by Plaintiff:<br>$_____ |
| ☐ Diversity | ☐ Interlocutory Order,<br>28 USC 1292(a)(1) | ☐ Judgment   Summary | Amount Sought by Defendant:<br>$_____ |
| ☐ US Plaintiff | | ☐ Judgment Judgment/Bench Trial | |
| ☐ US Defendant | ☐ Interlocutory Order Certified,<br>28 USC 1292(b) | ☒ Judgment/Jury Verdict | Awarded:<br>$_____<br>to _____ |
| | ☐ Interlocutory Order,<br>Qualified Immunity | ☐ Judgment/Directed Verdict/NOV | |
| | ☐ Final Agency Action (Review) | ☐ Injunction | Injunctions:<br>☐ TRO |
| | ☐ 54(b) | ☐ Other _____ | ☐ Preliminary   ☐ Granted<br>☐ Permanent   ☐ Denied |
| | | ☒ | |

**Page 2**                                              11th Circuit Docket Number: ___**15-14132-D**___

Based on your present knowledge:

(1)    Does this appeal involve a question of First Impression?    ☐Yes   ☒No
       What is the Issue you claim is one of First Impression?

(2)    Will the determination of this appeal turn on the interpretation or application of a particular case or statute?    ☐Yes   ☒No

       If Yes, provide
       (a)   Case Name/Statute
       (b)   Citation
       (c)   Docket Number if unreported

(3)    Is there any case now pending or about to be brought before this court or any other court or administrative agency that
       (a)   Arises from substantially the same case or controversy as this appeal?    ☒Yes   ☐No
       (b)   Involves an issue that is substantially the same, similar, or related to an issue in this appeal?    ☒Yes   ☐No

       If Yes, provide
       (a)   Case Name               AZALP LLC vs. Young Conaway Stargatt & Taylor, et al.
       (b)   Citation        Docket    N/A
       (c)   Number if unreported Court    4:14-cv-10079-JEM
       (d)   or Agency               Southern District of Florida; Miami

(4)    Will this appeal involve a conflict of law
       (a)   Within the Eleventh Circuit?    ☐Yes   ☒No
       (b)   Among circuits?    ☐Yes   ☒No

       If Yes, explain briefly:

(5)    Issues proposed to be raised on appeal, including jurisdictional challenges:
       See attached.

I CERTIFY THAT I SERVED THIS CIVIL APPEAL STATEMENT ON THE CLERK OF THE U.S. COURT OF APPEALS FOR THE ELEVENTH CIRCUIT AND

SERVED A COPY ON EACH PARTY OR THEIR COUNSEL OF RECORD, THIS___28th___ DAY OF_____September_____, ___2015___.

_____Marlow White_____          _____/s/ Marlow White_____
            NAME OF COUNSEL (Print)                              SIGNATURE OF COUNSEL

*Please ATTACH portion of district court, tax court, or agency record described in 11th Cir. R. 33-1(b): (a) judgments and orders appealed
from or sought to be reviewed; (b) any supporting opinion, findings of fact, and conclusions of law filed by the court or the agency, board,
commission, or officer; (c) any report and recommendation adopted by an order; (d) findings and conclusions of an administrative law judge
when appealing a court order reviewing an agency determination; (e) any agency docket sheet or record index.*

## ISSUES TO BE RAISED ON APPEAL

(1) Whether the trial court erred when it ruled [D.E. 445] that perpetration of a fraud on the court JTR Enterprises, LLC's ("JTR") was not sanctionable conduct.

(2) With respect to the trial court's order [D.E. 568] denying Motivation's sanctions claims against Bruce L. Silverstein:

(a) The court sanctioned JTR for engaging in bad faith litigation by failing to disclose evidence that the emeralds were coated with modern epoxy resins and by blocking an inspection of the emeralds. Did the trial court err by not sanctioning Silverstein for bad faith litigation where Silverstein was JTR's general counsel, the person who the court found to have "substantially controlled" the fraudulent litigation, and the person who specifically engineered the bad faith litigation practices?

(b) The court's order identified certain facts, but consistently avoided any mention of many un-contradicted facts that supported Motivation's motion for sanctions and undermined the court's decision not to hold key leaders of the fraud liable for sanctions. Motivation filed a Rule 52(b) motion seeking fact findings respecting all material facts and proposed 65 paragraphs of critical facts ignored by the court. Including threats to witnesses, even though all those facts were uncontradicted and many of those facts were based on Silverstein's own admissions and were corroborated by contemporaneous emails. The court denied the motion based on its understanding that none of the facts were supported by any credible evidence. Did the court err by failing to make findings of all material facts relevant to the sanctions issues in violation of Rule 52(a), by denying Motivation's Rule 52(b) motion [D.E. 592] seeking specific findings respecting the basis of its claims; and by concluding that the 65 paragraphs of facts were not supported by any credible evidence?

(c) Whether the trial court erred by not sanctioning Silverstein for his substantial control of this fraudulent litigation where he was aware of

overwhelming evidence that the case was fraudulent, he failed to perform any investigation of the fraud and he failed to timely bring the fraudulent conduct to the court's attention.

(3) The trial court dismissed Motivation's sanctions claims against Paul Sullivan [D.E. 528] on the basis that Motivation did not present and the record did not contain any evidence that Sullivan was involved in managing the fraudulent litigation or any evidence that Sullivan was willfully blind or had knowledge of the fraud. In fact, Motivation submitted substantial un-contradicted evidence that Sullivan was directly involved in extensive dealings with Miscovich concerning the treasure-find fraud and that as a member of JTR's advisory committee Sullivan was substantially engaged directly with JTR's trial counsel throughout the pertinent time period and the trial. Evidence of Sullivan's knowledge and involvement included: (a) his extensive discussions questioning JTR principal, Jay Miscovich, whether he had actually brought the alleged treasure-find emeralds rather than finding them on the sea floor as he had claimed, (b) JTR's general counsel repeatedly advised Florida counsel that Sullivan's approval was required for key litigation decisions, (c) JTR's trial counsel warned Sullivan that emeralds had been planted at the site, that a cannon ball was planted at the site, that Miscovich claimed falsely to have found a 20 pound bag of emeralds at the site, that Miscovich claimed falsely to have found coins at the site, and other facts making clear the fraudulent nature of this case. Did the trial court err when it dismissed Sullivan based on the mistaken conclusion that there was no evidence at all in the record that implicated Sullivan?

(4) The trial court dismissed Motivation's sanctions claims against Silverstein's firm, Young Conaway Stargatt and Taylor (YCST) [528], on the basis that there was no evidence at all in the record implicating YCST. In fact, the un-contradicted evidence showed that Silverstein was the attorney at the firm responsible for dealing with Miscovich in connection with his claim to have found the emerald treasure, that Silverstein was a member of the YCST firm's management committee, acted within the scope of his partnership in YCST while managing this fraudulent case and that YCST had secured a substantial financial interest in the outcome of this fraudulent litigation. Given these facts, did the trial court err in concluding there was no evidence in the record implicating YCST in the sanctions action?

(5) Whether the trial court erred in ruling that Silverstein, his firm Young Conaway Stargatt & Taylor and Sullivan were not in privity with JTR and, therefore, not bound by the court's previous findings.

# EXHIBIT 2

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
**CIVIL APPEAL STATEMENT**

*Please TYPE.   Attach additional pages if necessary.*

11th Circuit Docket Number: ___ **15-14132-D** ___

| Caption: | District and Division: Middle District of Florida; Key West |
|---|---|

Caption:

MOTIVATION, INC.,

vs.

BRUCE L. SILVERSTEIN, PAUL D. SULLIVAN
and YOUNG, CONAWAY, STARGATT &
TAYLOR, LLP

District and Division: Middle District of Florida; Key West
Name of Judge:        JAMES LAWRENCE KING
Nature of Suit:        ADMIRALTY; SANCTIONS
Date Complaint Filed:        SEPTEMBER 6, 2011
District Court Docket Number: 4:11-cv-10074-JLK
Date Notice of Appeal Filed:        SEPTEMBER 14, 2015
☐ Cross Appeal     ☐ Class Action

Has this matter previously been before this court?
☒ Yes   ☐ No
If Yes, provide
(a)     Caption:         JTR Enterprises v. Columbian etc.
(b)     Citation:        N/A
(c)     Docket Number: 13-10870

| | Attorney Name | Mailing Address | Telephone, Fax, and Email |
|---|---|---|---|
| For Appellant:<br>☐ Plaintiff<br>☐ Defendant<br>☒ Other (Specify) | Claimant's Attorneys<br>A. EUGENE LEWIS<br>MARLOW V. WHITE | 222 W. GEORGIA STREET<br>TALLAHASSEE FL 32301 | TEL. 850-425-5000<br>FAX 850-425-5004<br>lawlaw@polaris.net |
| For Appellee:<br>☐ Plaintiff<br>☐ Defendant<br>☒ Other (Specify) | Sanctions Defendants'<br>Attorneys | | |

*Please CIRCLE/CHECK/COMPLETE the items below and on page 2 that apply.*

| Jurisdiction | Nature of Judgment | Type of Order | Relief |
|---|---|---|---|
| ☒ Federal Question | ☒ Final Judgment,<br>28 USC 1291 | ☐ Dismissal/Jurisdiction     Default | Amount Sought by Plaintiff:<br>$_____ |
| ☐ Diversity | ☐ Interlocutory Order,<br>28 USC 1292(a)(1) | ☐ Judgment          Summary | Amount Sought by Defendant:<br>$_____ |
| ☐ US Plaintiff | ☐ Interlocutory Order Certified,<br>28 USC 1292(b) | ☐ Judgment  Judgment/Bench Trial | |
| ☐ US Defendant | ☐ Interlocutory Order,<br>Qualified Immunity | ☒ Judgment/Jury Verdict | Awarded:<br>$_____<br>to _____ |
| | ☐ Final Agency Action (Review) | ☐ Judgment/Directed Verdict/NOV | |
| | ☐ 54(b) | ☐ Injunction | Injunctions:<br>☐ TRO<br>☐ Preliminary   ☐ Granted<br>☐ Permanent   ☐ Denied |
| | | ☐ Other _____ | |
| | | ☒ | |

Based on your present knowledge:

(1)    Does this appeal involve a question of First Impression?   ☐ Yes  ☒ No
     What is the issue you claim is one of First Impression?

(2)    Will the determination of this appeal turn on the interpretation or application of a particular case or statute?   ☐ Yes  ☒ No

     If Yes, provide
     (a)  Case Name/Statute
     (b)  Citation
     (c)  Docket Number if unreported

(3)    Is there any case now pending or about to be brought before this court or any other court or administrative agency that
     (a)  Arises from substantially the same case or controversy as this appeal?   ☒ Yes  ☐ No
     (b)  Involves an issue that is substantially the same, similar, or related to an issue in this appeal?   ☒ Yes  ☐ No

     If Yes, provide
     (a)  Case Name              AZALP LLC vs. Young Conaway Stargatt & Taylor, et al.
     (b)  Citation        Docket    N/A
     (c)  Number if unreported  Court   4:14-cv-10079-JEM
     (d)  or Agency          Southern District of Florida; Miami

(4)    Will this appeal involve a conflict of law
     (a)  Within the Eleventh Circuit?  ☐ Yes  ☐ No
     (b)  Among circuits?  ☐ Yes  ☐ No

     If Yes, explain briefly:

(5)    Issues proposed to be raised on appeal, including jurisdictional challenges:

     See attached.

I CERTIFY THAT I SERVED THIS CIVIL APPEAL STATEMENT ON THE CLERK OF THE U.S. COURT OF APPEALS FOR THE ELEVENTH CIRCUIT AND

SERVED A COPY ON EACH PARTY OR THEIR COUNSEL OF RECORD, THIS  <u>28th</u>  DAY OF  <u>September</u> , <u>2015</u> .

| <u>Marlow White</u> | <u>/s/ Marlow White</u> |
|---|---|
| NAME OF COUNSEL (Print) | SIGNATURE OF COUNSEL |

*Please ATTACH portion of district court, tax court, or agency record described in 11th Cir. R. 33-1(b): (a) judgments and orders appealed from or sought to be reviewed; (b) any supporting opinion, findings of fact, and conclusions of law filed by the court or the agency, board, commission, or officer; (c) any report and recommendation adopted by an order; (d) findings and conclusions of an administrative law judge when appealing a court order reviewing an agency determination; (e) any agency docket sheet or record index.*

ISSUES TO BE RAISED ON APPEAL

(1) Whether the trial court erred when it ruled [D.E. 445] that perpetration of a fraud on the court JTR Enterprises, LLC's ("JTR") was not sanctionable conduct.

(2) With respect to the trial court's order [D.E. 568] denying Motivation's sanctions claims against Bruce L. Silverstein:

(a) The court sanctioned JTR for engaging in bad faith litigation by failing to disclose evidence that the emeralds were coated with modern epoxy resins and by blocking an inspection of the emeralds. Did the trial court err by not sanctioning Silverstein for bad faith litigation where Silverstein was JTR's general counsel, the person who the court found to have "substantially controlled" the fraudulent litigation, and the person who specifically engineered the bad faith litigation practices?

(b) The court's order identified certain facts, but consistently avoided any mention of many un-contradicted facts that supported Motivation's motion for sanctions and undermined the court's decision not to hold key leaders of the fraud liable for sanctions. Motivation filed a Rule 52(b) motion seeking fact findings respecting all material facts and proposed 65 paragraphs of critical facts ignored by the court. Including threats to witnesses, even though all those facts were uncontradicted and many of those facts were based on Silverstein's own admissions and were corroborated by contemporaneous emails. The court denied the motion based on its understanding that none of the facts were supported by any credible evidence. Did the court err by failing to make findings of all material facts relevant to the sanctions issues in violation of Rule 52(a), by denying Motivation's Rule 52(b) motion [D.E. 592] seeking specific findings respecting the basis of its claims; and by concluding that the 65 paragraphs of facts were not supported by any credible evidence?

(c) Whether the trial court erred by not sanctioning Silverstein for his substantial control of this fraudulent litigation where he was aware of

overwhelming evidence that the case was fraudulent, he failed to perform any investigation of the fraud and he failed to timely bring the fraudulent conduct to the court's attention.

(3) The trial court dismissed Motivation's sanctions claims against Paul Sullivan [D.E. 528] on the basis that Motivation did not present and the record did not contain any evidence that Sullivan was involved in managing the fraudulent litigation or any evidence that Sullivan was willfully blind or had knowledge of the fraud. In fact, Motivation submitted substantial un-contradicted evidence that Sullivan was directly involved in extensive dealings with Miscovich concerning the treasure-find fraud and that as a member of JTR's advisory committee Sullivan was substantially engaged directly with JTR's trial counsel throughout the pertinent time period and the trial. Evidence of Sullivan's knowledge and involvement included: (a) his extensive discussions questioning JTR principal, Jay Miscovich, whether he had actually brought the alleged treasure-find emeralds rather than finding them on the sea floor as he had claimed, (b) JTR's general counsel repeatedly advised Florida counsel that Sullivan's approval was required for key litigation decisions, (c) JTR's trial counsel warned Sullivan that emeralds had been planted at the site, that a cannon ball was planted at the site, that Miscovich claimed falsely to have found a 20 pound bag of emeralds at the site, that Miscovich claimed falsely to have found coins at the site, and other facts making clear the fraudulent nature of this case. Did the trial court err when it dismissed Sullivan based on the mistaken conclusion that there was no evidence at all in the record that implicated Sullivan?

(4) The trial court dismissed Motivation's sanctions claims against Silverstein's firm, Young Conaway Stargatt and Taylor (YCST) [528], on the basis that there was no evidence at all in the record implicating YCST. In fact, the un-contradicted evidence showed that Silverstein was the attorney at the firm responsible for dealing with Miscovich in connection with his claim to have found the emerald treasure, that Silverstein was a member of the YCST firm's management committee, acted within the scope of his partnership in YCST while managing this fraudulent case and that YCST had secured a substantial financial interest in the outcome of this fraudulent litigation. Given these facts, did the trial court err in concluding there was no evidence in the record implicating YCST in the sanctions action?

(5) Whether the trial court erred in ruling that Silverstein, his firm Young Conaway Stargatt & Taylor and Sullivan were not in privity with JTR and, therefore, not bound by the court's previous findings.

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION

| | | |
|---|---|---|
| **AZALP LLC,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | **CASE No. 4:14-cv-10079-JEM** |
| | ) | |
| **v.** | ) | |
| | ) | **FIRST AMENDED COMPLAINT** |
| **BRUCE L. SILVERSTEIN, YOUNG** | ) | |
| **CONAWAY STARGATT & TAYLOR, LLP** | ) | **JURY TRIAL DEMANDED** |
| **and P&B FINANCE, LLC,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

Plaintiff AZALP LLC, for itself and as assignee of the rights of DARN LLC, CLAWDB LLC, CEDARWOOD LLC, M VENTURES LLC and Dean Barr, as and for its Complaint against defendants Bruce L. Silverstein ("Silverstein"), Young Conaway Stargatt & Taylor, LLP ("YCST") and P&B Finance, LLC (collectively, "Defendants"), alleges and states as follows:

## SUMMARY OF THE CASE

1.      This action arises out of a massive fraud in which a self-described treasure hunter named Jay Miscovich and his co-conspirators (the "Miscovich Group") fabricated the discovery in the Gulf of Mexico of thousands of precious emeralds, supposedly originating from a 17th-century shipwreck, and worth as much as half a billion dollars.  Defendants Silverstein, YCST and P&B Finance, LLC ultimately joined the scheme as legal counsel, investors and equity owners, and used the Federal Court to perpetuate the fraud, conceal the truth and intimidate those who sought to discover and disclose the facts.

2.      Defendants had actual knowledge that Miscovich made false claims about the date he allegedly found the emeralds, false claims that he found coins at the alleged emerald site, false claims that he used a magnetometer to find the site, false claims that he paid a diver for a treasure map, false claims that he paid the diver for a release of salvage rights, and false claims that Proskauer Rose LLP, a New York law firm, prepared the release.  In addition, Defendants learned, among other things, that Miscovich gave perjured testimony about his alleged find in court proceedings; that Miscovich withheld emeralds in violation of a Court Order; that the emeralds were treated with modern epoxy resins; that Miscovich purchased emeralds in bulk from a dealer in Jupiter Florida; that Miscovich's accomplice, Stephen Elchlepp, threatened to injure or kill two witnesses; that attempts were made to injure or kill  those two witnesses soon after the threats were communicated to Defendants;  and that Miscovich threatened in writing to "blow [the] fucking head off" of a  lawyer investigating the fraud.   Further, Defendants knew that all the

1

Florida lawyers (from two law firms) who had acted as local counsel to JTR withdrew or attempted to withdraw as counsel because they concluded that JTR's case was fraudulent, and that Miscovich's brother and member of JTR, Scott Miscovich, concluded that the find was a fraud and reported the fraud to the FBI. Defendants were also aware that the federal judge presiding over JTR's case suggested in open court to the FBI and an Assistant United States Attorney that based on the evidence presented to the Court, it appeared that Silverstein may have committed obstruction of justice and acted as an accessory to criminal fraud. Notwithstanding knowledge of all of these and other facts showing beyond any doubt that the find and the case were fraudulent, Defendants continued to support and advance the fraud.

3.      The conspirators publicized their "tall tale" of ancient treasure to millions on "60 Minutes" ("The Trouble with Treasure") and used the promise of fabulous riches to extract money from the Plaintiffs. JTR Enterprises LLC ("JTR") was formed by YCST to raise money and to file an admiralty case in the United States District Court for the Southern District of Florida for the purpose of establishing a court-endorsed fraudulent treasure provenance for the emeralds (the "Admiralty Case"). For more than three years, JTR and its owners used the judicial system of the United States to perpetuate and conceal the fraud, and committed serial acts of perjury, obstruction of justice and other crimes. As the fraud began to come to light, Miscovich took his own life in October 2013, but his co-conspirators continued to perpetuate and conceal the fraud.

4.      At the conclusion of a court hearing in the Admiralty Case in January 2014, JTR's trial counsel finally admitted that the alleged find in the Gulf of Mexico was an outright fraud, and that "the scheme to defraud was to represent emeralds of a certain quality as having a higher quality based on their origin from an antique shipwreck." In later filings, JTR confessed that "[a]s an artifice of Mr. Miscovich's fraud, he sought the blessing of the District Court or its 'seal of

2

approval' and used JTR, and its various attorneys … to further this fraud through the filing of this admiralty claim." JTR acknowledged that this fraudulent scheme was "outrageous, inexcusable and indefensible."

5.     Defendants were the linchpin to Miscovich's fraudulent corporate and litigation strategy. Defendants joined the Miscovich Group's conspiracy with knowledge of its general purpose and scope. Defendants' acts in furtherance of the conspiracy included, *inter alia*, filing false affidavits and other false and misleading documents and statements with the court; proffering false and perjured testimony; personally vouching for the integrity and truthfulness of the Miscovich Group in affidavits and testimony; threatening at least seven witnesses (including Plaintiffs), who challenged the Miscovich's Group's story, with litigation and sanctions; acquiring undisclosed ownership interests in the fraudulent scheme; frustrating and preventing the recovery of Plaintiffs' funds by transferring all of the enterprise's assets to an entity formed by Defendants; waging a costly, year-long "scorched earth" litigation campaign to prevent or delay an independent examination of the alleged gemstones; actively withholding evidence of fraud, including evidence of modern chemical enhancements on the stones, from the Court; and continuing their strategy of bad faith litigation, threats and concealment of the truth on behalf of Miscovich Group long after it became evident to many – including JTR's own local Florida counsel -- that the entire enterprise was fraudulent.

6.     On or about May 27, 2014, the Hon. K. Michael Moore, United States District Judge for the Southern District of Florida, held that communications by Miscovich's and JTR's attorneys were not entitled to the protection of the attorney-client privilege because JTR's counsel was employed in furtherance of criminal or fraudulent conduct. This is known as the "crime-fraud" exception to the attorney-client privilege. Pursuant to the crime-fraud exception, many of

Defendants' formerly privileged communications have been released, and they form the basis for much of the present Complaint.

7.      By Decision and Order dated March 16, 2015, Judge James Lawrence King of the United States District Court for the Southern District of Florida found that Silverstein "substantially controlled JTR's actions in these proceedings." While declining to impose sanctions against Silverstein "based upon the limited nature of the proceedings," Judge King referred the matter to the United States Attorney and stated that his denial of sanctions "neither establishes [Silverstein's] innocence nor forecloses the possibility of future civil or criminal liability."

8.      As a result of Defendants' participation in the fraud, Plaintiff and Plaintiff's assignors (collectively, "Plaintiffs") not only were lulled into believing that the emerald find was legitimate, but were caused to incur millions of dollars in out-of-pocket expenses, legal fees, forensic costs and disbursements to protect their interests and to investigate, examine and ultimately uncover the fraud. Having joined a pre-existing conspiracy with knowledge of its intent and scope, Defendants are legally responsible not only for the damages sustained by Plaintiffs on and after the date Defendants joined the conspiracy, but for all damages incurred as a result of the conspiracy before Defendants joined it. Such damages are not less than $3.4 million, trebled under the Florida and Federal Racketeer Influenced and Corrupt Organizations Acts; plus punitive damages of not less than $10,200,000.

**THE PARTIES**

9.      Plaintiff AZALP LLC ("AZALP") is a limited liability company organized under the laws of the State of New York, with its principal place of business in New York. AZALP is the assignee of all rights, title and interest in the claims and causes of action of the following entities against Defendants herein, pursuant to a written, express Assignment of Claims dated July 21, 2014:

## IV.    Silverstein and YCST Acquire Undisclosed Interests in Miscovich's Enterprise, then Strip Away the Assets Securing Plaintiffs' Note

58.    Between the execution of the MOU on March 29, 2011 and the court hearing on August 19, 2011, Silverstein and YCST, in concert with Miscovich, secretly orchestrated a series of transactions designed to frustrate the purpose of the MOU, to enrich themselves, to render the Note worthless and to deprive Plaintiffs of the material benefits of the settlement.

59.    First, Silverstein took steps to ensure that he would personally benefit from the treasure scam. On or about July 27, 2011, YCST formed P&B for the purpose of taking an undisclosed equity interest in JTR, a newly formed entity.  The sole members of P&B were Silverstein and Sullivan. Upon information and belief, Silverstein ultimately used P&B to invest at least $80,000 of his own funds in JTR.

60.    Upon information and belief, Silverstein's acquisition of an ownership interest in JTR violated professional ethics rules prohibiting lawyers from taking a financial interest in the subject matter of ongoing litigation. In his order of March 16, 2015, Judge King ruled that "Mr. Silverstein's investment and equity interest in JTR, both personally and through his law firm, gave Mr. Silverstein a substantial interest in the outcome of the [Admiralty] litigation."

61.    On or about August 11, 2011, just days before the Delaware court hearing to approve the MOU settlement, YCST formed JTR.  The initial members of JTR were Miscovich, Scott Miscovich, Elchlepp, Greg Miscovich (the third and last Miscovich brother), Sullivan, David Paul Horan, Esq., P&B, Mike Vesley and Stephen Elchlepp, Sr.

62.    The registered agent for both JTR and P&B was YCST Services Corporation, located at the offices of YCST in Wilmington, Delaware.

Silverstein of all "material developments" and to consult with Silverstein with respect to "any material decisions" and filings.   Furthermore, Horan agreed to "seek specific authorization from Client's general counsel [*i.e.*, Silverstein] before filing any action, entering into any settlement negotiations or agreements or retaining any experts or additional counsel."

83.      Silverstein was Horan's primary contact with JTR. Throughout the Admiralty Case, Silverstein exercised his authority over all key litigation decisions and filings, including the filing of Status Reports with the Court.   Among other things, Silverstein drafted and extensively revised motion papers; insisted on reviewing, commenting on and consenting to all filings in the admiralty case; drafted, reviewed and edited Status Reports; approved communications with opposing counsel; and drafted responses to motions.   During the 2014 trial, JTR's Florida counsel, Horan, confirmed that there was "no doubt" Silverstein and his firm represented JTR and Miscovich in the litigation and that they were actively involved throughout the case. In his order of March 16, 2015, Judge King found that "the evidence overwhelmingly shows that Silverstein substantially controlled JTR's actions" in the Admiralty Case.

84.      Because Silverstein maintained day-to-day oversight and control of the Admiralty Case, JTR's Florida counsel repeatedly asked Silverstein to enter an appearance in the case *pro hac vice*.  On May 17, 2012, Florida counsel prepared an application for admission *pro hac vice* for Silverstein to endorse.   Perhaps mindful of counsel's duties of candor to the Court and Rule 11 obligations, Silverstein refused to enter an appearance in the case, claiming in a May 17, 2012 email that "I don't have time to study the [local] rules…."

85.       After JTR hired Horan, Horan warned Miscovich  and the entire JTR group that the government of Spain would likely intervene in the action and make a claim to the emeralds: "Spain will realize we have limited resources," Horan wrote on August 18, 2011, "and will use

21

personal expenses.  Upon information and belief, Defendants were searching the Kirby Site for shipwreck artifacts that they could attribute to the emerald site as evidence of a shipwreck.

90.     Silverstein knew that JTR was ignoring the alleged emerald site.  Silverstein's son, Nolan Silverstein ("Nolan"), lived with Miscovich and Elchlepp in Key West during the summer of 2011, ostensibly to assist with the salvage work at the emerald site.  However, there was no salvage activity being conducted at the alleged emerald site, and Nolan spent that summer on the streets of Key West, dressed like a banana and playing his guitar for loose change.  Upon information and belief, when Silverstein learned of the situation, he flew to Key West and saw for himself that no salvage activity was taking place.

### VII.     Guided by Silverstein, JTR Files a Fraudulent Admiralty Claim and Conceals Evidence from the Court

91.     On September 9, 2011, JTR filed the Admiralty Case, an *in rem* action seeking a "full and final" salvage award or, in the alternative, an award of title to the emeralds to JTR under the American Law of Finds.

92.     The standard procedure for admiralty cases is for the alleged salvors to bring the subject material into the custody of the court to establish *in rem* jurisdiction over the material. Despite assurances and representations to the Court that the emeralds would be brought into the jurisdiction of the Southern District of Florida, Defendants delayed doing so for a year.  The Court later called the Defendants' actions "a marked departure from this Court's prior and well-established procedures."

93.     One reason JTR did not submit all of the emeralds to the Court's jurisdiction, in violation of the Court's Substitute Custodian Order, was that JTR wanted to shield a portion of the emeralds from claims that could be asserted in the admiralty case.  In October 2011, after the filing of the admiralty case, Miscovich and Elchlepp showed Horan a large plastic bag containing 20

coated with epoxy. Unable to keep the laboratory test results secret any longer, Silverstein directed Horan to finally correct the false "Executive Summary" by filing a Third Status Report on April 18, 2012 — the Wednesday  before "60 Minutes" would air on Sunday evening.  The Third Status Report disclosed that the labs found epoxy on the emeralds.

118.　　By blocking Motivation's request to see the emeralds and leaving uncorrected JTR's false "Executive Summary," Silverstein had successfully kept secret for nearly *five months* the fact that the emeralds were coated with modern epoxy while he tried to have Motivation's claim dismissed and tried to raise more money from potential new sources for JTR.  Judge K. Michael Moore of the United States District Court for the Southern District of Florida later held that JTR wrongfully withheld the test results from the Court: "Ultimately, JTR had the information regarding the modern epoxy as of December 2, 2011.  However, JTR did not disclose this information to the Court until April 18, 2012."

119.　　On August 14, 2012, Motivation's emerald expert, Manuel J. Marcial ("Marcial"), with over 55 years of experience in the emerald business, examined the emeralds and concluded that they could not have come from the wrecks of the *Atocha* or the *Santa Margarita* because the emeralds were low quality (worth no more than $ 50,000) and showed no evidence of immersion in sea water. Marcial also noted that at least one of the specimens appeared to have been attached to a rock with "Krazy Glue," and the emeralds were obviously oily, indicating a modern enhancement (*e.g.,* epoxy). Silverstein, calling Marcial an "idiot," suggested that he should be sued for defamation.

120.　　True to its longstanding promise to withdraw its claim if an inspection revealed that the emeralds did not come from the *Atocha*, Motivation filed a motion to withdraw its claim three days later on August 17, 2012.

151.    As members of JTR's Advisory Board, Scott Miscovich and Sullivan informed Silverstein of their findings and their concerns. Silverstein was unmoved.

152.    Scott Miscovich, then worried that he may be aiding a fraudulent conspiracy, contacted Tobia by telephone in February 2013 and recorded the calls without Tobia's knowledge or consent.  Tobia confirmed that he had accompanied Miscovich on an emerald purchase in Jupiter, Florida, that Miscovich's claims were "phony baloney," and that Miscovich had purchased emeralds in bulk with money provided by Santelli.  Scott Miscovich advised Silverstein of the content of these recorded calls.  Again, Silverstein was undeterred. Later in 2013, Silverstein reviewed excerpts from Tobia's deposition in which he described trips to purchase emeralds and likened them to a "drug buy."  Silverstein did not investigate this either.

153.    Because he was convinced that JTR's alleged find was a fraud, Scott Miscovich withdrew from any further involvement with JTR, retained criminal counsel, contacted the FBI, and cooperated with the FBI's criminal investigation of JTR.  However, Silverstein continued supporting and aiding the fraudulent conspiracy.

## X.    The Court Rejects Miscovich's Allegations, and Schedules a Further Trial on Sanctions

154.    On January 25, 2013, Judge King issued his opinion following the December 2012 trial.  In the opinion, Judge King repeatedly questioned the credibility of Miscovich's testimony. For example, Judge King found "the story of Jay's acquisition of the purported treasure map suspicious to say the least," and the conflicting testimony of Elchlepp and Miscovich "lead the Court to, at the very least, question the reliability of Jay's account of the moment he first saw the stones." The Court noted that Baer, the marine archeologist, had interviewed Miscovich and been given an entirely different story about how Miscovich discovered the site with "two friends from Mexico" and brought up eighty pounds of stones on the first day. The Court also noted the

46

testimony of Marcial that some of the stones had been treated with 20th-century materials that would have disintegrated under water, and that the stones were worth only about $50,000.

155.    Judge King ruled that JTR had failed to prove any basis for admiralty jurisdiction and dismissed the case without making a salvage award or awarding title under the American Law of Finds. Judge King found that "The record is devoid of any evidence of any shipwreck, 16th Century Spanish Galleon, or any proof of abandonment by a prior owner. *The res has appeared seemingly out of thin air*…" (emphasis added)

156.    The Court concluded that "[t]here is just as much support for the theory that Jay and Steve [Elchlepp] planted the stones as there is for the assertion that they found them. The Court cannot simply accept the un-contradicted testimony of Jay and Steve that they followed a treasure map to the site, dove to the floor, and found the emeralds."

157.    The Court assessed court costs against Miscovich and Elchlepp, and ordered the stones returned to their custody (without color of title or authenticity) upon payment of such costs.

158.    Remarkably, Silverstein's reaction to the Court's findings just days later was to look for new ways to continue the scheme. He recommended forming a "new entity" to make a "new find…over the next week" in a new location and then file a "new claim." In an email dated January 29, 2013, Silverstein stated:

> A new entity needs to be created in which the JTR members all have essentially the same membership interests, which could file a new claim based on a new find (if there were one) that is made over the next week — and I don't mean the Luchenbach.  If Joe [Janssen] and/or John [Siracusa] were to dive the site and find something new, I would be willing to form a new entity with a Managing Member other than Jay — which preserves the existing economic interests of the members of JTR (including Jay), but with an appropriate increase for John and Joe (and Christy [Janssen's wife and law partner] and Eric [another investor]) — that could file a new claim if it were appropriate to do so.
>
> Aside from funds I have provided Jay and Steve to stay afloat, my firm is into this for $1.6 million attorneys' fees and expenses.  Accordingly, I am not inclined to

### XIII.   The Court Finds That "This Entire Case Is Premised on a Fraud."

181.     The Court found "by clear and convincing evidence, that a fraud has been committed upon this Court."  Specifically, the Court determined that (i) "JTR found out that the Emeralds had modern epoxy on them in December 2011…and failed to disclose this information to the Court until April 2012" and (ii) "this entire case is premised on a fraud."

182.     The Court explained:

> On the day that Miscovich filed the instant Complaint, September 6, 2011, Miscovich *knew* that he was committing a fraud upon the Court. Miscovich's filing of the Complaint and the continued litigation of this case was a "flagrant abuse of the judicial process," …and there is no starker example of bad faith. (emphasis and quotes in original)

183.     Regarding the lab results showing modern epoxy on the stones, the Court rejected any argument that JTR was excused from disclosing the results to the Court because JTR had shared the information with "60 Minutes:"

> The fact that JTR told *60 Minutes* in no way diminishes its obligation to the Court. In fact, it demonstrates that JTR knew something was going on and that these reports would have a substantial impact on the adjudication of the *res*. JTR was obligated at that point to make the Court aware of the information.

184.     Between March 29, 2011 and the date of filing of this Amended Complaint, as a result of Defendants' participation in JTR's and Miscovich's continuing fraud, perjury, and obstruction of justice, Plaintiffs have incurred professional fees and out-of-pocket expenses in excess of $1.8 million. This amount is separate, and in addition to, the funds in the amount of approximately $1.6 million initially contributed to Emerald Reef, Salvage Boat Leasing, GUTS and Miscovich by Plaintiffs.

### COUNT I
### (Conspiracy to Defraud)

185.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 184 above.

# EXHIBIT 4

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION

AZALP LLC,

      Plaintiff,

      v.

                                 CASE NO. 4:14-cv-10079-JEM

BRUCE L. SILVERSTEIN, YOUNG
CONAWAY STARGATT & TAYLOR, LLP,
and P&B FINANCE, LLC,

      Defendants.

**PLAINTIFF AZALP LLC'S RESPONSE IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION……………………………………………………………............1

I.    THE AMENDED COMPLAINT COMPLIES WITH THE COURT'S ORDER............. 4

    A.    The Amended Complaint Limits Defendants' Actions to the Period After March 29, 2011. ...................................................................................... 4

    B.    Defendants' Cases Do Not Support the Drastic Step of "Striking" the Amended Complaint. ............................................................................. 6

II.    PLAINTIFF'S CLAIMS ARE JUSTICIABLE AND THIS COURT HAS  SUBJECT MATTER JURISDICTION OVER THIS ACTION ......................................... 9

    A.    Plaintiff has Standing to Pursue the Claims in the Amended Complaint ............. 9

    B.    The Rooker-Feldman Doctrine Does Not Bar Any of the Allegations in the Amended Complaint. ..................................................................... 11

III.    THE RELEASE PROVISION IN THE DELAWARE SETTLEMENT DOES NOT BAR THIS ACTION BASED ON DEFENDANTS' POST-RELEASE ACTIVITIES . 14

IV.    THE AMENDED COMPLAINT STATES VALID CAUSES OF ACTION  AGAINST DEFENDANTS .................................................................................. 17

    A.    Plaintiff Has Pleaded a Claim for Conspiracy to Defraud (AC ¶¶ 185-193; Original Opp. pp. 11-17)...................................................................... 17

    B.    Plaintiff Has Pleaded a Claim for Aiding and Abetting (AC ¶¶ 194-200; Original Opp. pp. 31-32)...................................................................... 18

    C.    Plaintiff Has Pleaded a Claim for Negligent Misrepresentation (AC ¶¶ 224-231; Original Opp. pp. 32-34). .................................................... 18

    D.    Plaintiff Has Pleaded Claims Under Federal RICO, 18 U.S.C. § 1962(c) (including conspiracy to violate RICO) and Florida RICO, § 772.103 (AC ¶¶ 221-223, 232-259; Original Opp. pp. 34-46). ............................... 19

CONCLUSION……………………………………………………………………20

Plaintiff AZALP LLC ("AZALP" or "Plaintiff")[1] respectfully submits this memorandum of law in opposition to defendants Bruce L. Silverstein's ("Silverstein"), Young Conaway Stargatt & Taylor, LLP's ("YCST"), and P&B Finance, LLC's ("P&B") (collectively, "Defendants") Joint Motion to Strike or Dismiss the First Amended Complaint [Dkt. No. 61] ("Joint Motion").

## INTRODUCTION

In their motion, Defendants attempt to relitigate issues that have already been determined by this Court and to "strike" the Amended Complaint, even though it is fully compliant with this Court's August 17, 2015 Order.  We deal with each of their flawed arguments below. In addition, Plaintiff respectfully incorporates its opposition to Defendants' original motion to dismiss [Dkt. No. 40] ("Original Opp.").

Defendants' motion also attempts to minimize or obscure the findings of the Honorable James Lawrence King of the United States District Court for the Southern District of Florida in his Order of March 16, 2015 (annexed hereto as Exhibit A), which was issued after the filing of the Original Complaint and is now incorporated in the Amended Complaint ("AC" ¶ 7). Defendants claim the King Order vindicated Defendants and undercuts the allegations of the Amended Complaint.  See Joint Motion p. 15 n. 12.  The King Order states otherwise.

First, Judge King found that the Admiralty Action[2] filed and prosecuted on behalf of JTR Enterprises LLC ("JTR") was fraudulent and constituted "a criminal conspiracy against the United States District Court for the Southern District of Florida, which began with the filing of a

_____

[1] AZALP is a party in interest and is also the assignee of claims of DARN LLC, CLAWDB LLC, Cedarwood LLC, M Ventures LLC and Dean Barr pursuant to an Assignment of Claims dated July 21, 2014 (AC ¶ 9).
[2] All terms used herein shall have the same meaning as in the Original Opp.

completely fabricated admiralty case falsely alleging a fictitious discovery of lost treasure from an 18th century Spanish galleon."  King Order p. 2.

Second, Judge King held that Silverstein, "JTR's 'general outside counsel,'" controlled the fraudulent litigation. The Court found that "the evidence overwhelmingly shows that Silverstein substantially controlled JTR's actions in these proceedings…. [C]ountless emails from Silverstein to JTR's admiralty counsel demonstrate that he was substantially in control of this litigation."  King Order p. 55. The Court went on: "[f]rom forbidding the filing of various reports in this case, to drafting and revising pleadings and motions in this case, to participating in trial strategy discussions, Silverstein's control is plain." Id.

As this Court is aware, Defendants have sought dismissal of the Original Complaint and the Amended Complaint based, in large part, on the arguments that they merely served as outside counsel to JTR and had no meaningful involvement with, or control over, the fraudulent litigation (see, e.g., Silverstein and YCST's original Motion to Dismiss [Dkt. No. 27] ("Original Motion") p. 44).  Judge King's finding that Silverstein controlled the fraudulent litigation utterly refutes Defendants' arguments, and supports both (i) the allegations of the Amended Complaint regarding Silverstein's control over the enterprise and (ii) AZALP's arguments in its Original Opp. that Silverstein was in charge of the fraudulent litigation (see, e.g., AC ¶¶ 78, 83-85 and Original Opp. pp. 10, 42-44).  Such control is particularly relevant to the Amended Complaint's allegations of conspiracy, the Florida Racketeer Influenced and Corrupt Organization Act ("RICO"), and Federal RICO.

Third, Judge King found that "Mr. Silverstein's investment and equity interest in JTR, both personally and through his law firm, gave Mr. Silverstein a substantial interest in the outcome of the [Admiralty] Litigation" (King Order p. 54-55). This finding supports the

allegations of the Amended Complaint that Silverstein and YCST were not merely acting as outside counsel, but were principals of JTR with a financial stake in the claims asserted in the Admiralty Action.

Fourth, the King Order confirms -- quoting Silverstein's own testimony -- that the Delaware Action was concerned only with "a question of corporate governance and who was in charge of an entity, an alternative entity" and "there's been this amazing and valuable emerald find and people are fighting over who owns it" (King Order p. 17). This determination refutes Defendants' argument that the present case, alleging a fraudulent conspiracy to fake an emerald discovery and use the federal courts to perpetuate and monetize the fraud, is an improper attempt to revisit the corporate governance issues that were the subject of the Delaware Action and is barred by the Rooker-Feldman doctrine (see Joint Motion pp. 7-8).

Finally, Judge King was careful to observe that, despite finding that Silverstein and YCST were not subject to sanctions based upon the "limited nature of this proceeding," his determination "neither establishes Respondent's [Silverstein's] innocence nor forecloses the possibility of future civil or criminal liability" (King Order p. 57). Indeed, Judge King referred the entire matter to the United States Attorney for the Southern District of Florida (King Order p. 58). Thus, to the extent that Defendants argue that the avoidance of sanctions somehow precludes the claims asserted by AZALP in the Amended Complaint, Judge King has expressly disavowed any such intention or effect.

As we show below, the Amended Complaint complies with this Court's Order by removing allegations of Defendants' activities before the Effective Date and by seeking no relief that would affect the Delaware Settlement. At the same time, the Amended Complaint, like the