UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

JTR ENTERPRISES, LLC,

                Plaintiff/Appellee,

vs.                                   Appeal No. 15-14132-D

MOTIVATION, INC.,           *D. C. Case No. 4:11-CV-10074*

                Claimant/Appellant

_____/

**APPELLANT MOTIVATION'S RESPONSE TO**
**APPELLEES' MOTION TO DISMISS APPEAL**

Appellees' Motion to Dismiss is based on the erroneous notion that where this Court otherwise has subject matter jurisdiction of an appeal "permitted by law as of right" and perfected by a timely notice pursuant to *Fed.R.App.P.* 3, an appeal may be properly dismissed and briefing dispensed on a motion raising substantive issues and relying on record facts properly addressed in briefing on the merits.

Here, Appellees have not claimed that the orders challenged are not final, the appeal was premature, there is an appeal waiver, the notice of was untimely or the appeal is moot. *U.S. v. Rodriguez,* 751 F.3d 1244(11th Cir. 2014); *In re Daughtrey*, 2015 WL 1268324 (M.D. Fla. 2015); *In re Beverly Mfg,* 778 F.2d 666, 667(11th Cir. 1985). Even where courts ultimately determine they lack subject matter jurisdiction, the appellant has no standing, the appeal is moot, or notice is untimely, they typically "carry motions [to dismiss] with the case," and receive briefing on the merits before deciding the matter. *S.E.C. v Quest Energy Mfg.*, 768 F.3d 1106 (11th Cir. 2014)

(received briefing on merits and oral argument before deciding motion to dismiss); *Chafin v. Chafin*, 2013 WL 4018591 (11th Cir. March 6. 2013); *U.S. v. Prat*, 584 Fed. Appx. 921, 922 n.1 (11th Cir. 2014) (motion to dismiss denied and carried with case); *Deutsch v. Jordan*, 618 F.3d 1093,1096 (10th Cir. 2010)(deferred ruling on MTD for lack of jurisdiction until full briefing); *May v. Franklin County Bd.,* 59 Fed.Appx. 786, 789-90 (6th Cir. 2003) (denied MTD for lack of subject matter jurisdiction and directed parties "to address the jurisdictional issue in their briefs"). Other courts have explained their reluctance to dismiss appeals before briefing. *Custom Vehicles v Forest River, Inc.*, 464 F. 3d 725, 727 (7th Cir 2006) (motion calls on court to increase from three to four the number of judges who must "dig through the record and understand the legal issues"); *accord United States v. Fortner,* 455 F.3d 752 (7th Cir. 2006); *Howard v. Baumer*, 519 So.2d 679, 680 (Fla. 1st DCA 1988) (motion to dismiss appeal "is an improper motion in that it raises substantive arguments which are more appropriately raised in the answer brief"); *Slizyk v. Smilack*, 734 So.2d 1166, 1167 (Fla. 5th DCA 1999) ("We warn the parties that motions are not to be used to present arguments which should be addressed in the briefs").

Here, the Motion relies on characterizations of the evidence developed over multi-week trials in an extensive record not yet submitted to briefing on the merits. It would be inappropriate for a non-hearing panel to decide these substantive issues

based on the truncated motions procedure and the limited facts as highlighted by movants prior to full briefing on the merits. This is particularly true where, as here, the Appellees have made exaggerated claims as to the facts, omitted key facts underlying Appellant's challenge on appeal, irresponsibly alleged Appellant's participation in the proceeding below was "concocted," "factually implausible," "fraudulent" and "legally frivolous," and have sought to dismiss the appeal on the outlandish claim Appellant's valid and timely appeal is "frivolous." (Mot at 2-4)

A. <u>Standing</u>

Appellees take issue with the rulings of both C.J. Moore and Former C.J. King allowing Appellant to "intervene" in the first instance.[1] Assuming the Court determines they have standing to do so, Appellees may properly raise and brief those issues on the merits of the appeal. For reasons expressed above, they should not be permitted, however, to raise these arguments by motion and deprive Appellant of its right to a substantive review of the issues presented on appeal. Unlike the typical motion to dismiss premised on failure to perfect an appeal, mootness, untimeliness or other grounds directly implicating subject matter jurisdiction, Appellees' motion depends on a circuitous analysis requiring an assessment of disputed facts and multiple court findings and conclusions. Appellees first argue intervention was

---

[1] Appellees mischaracterize Motivation as an "intervener" in the admiralty case. Motivation is a claimant in that action "against" the *res* and, as such is an original party to the case.

inappropriate, then argue Motivation lacked standing, then that the lower court lacked subject matter jurisdiction to enter any rulings whatsoever, and finally that this Court lacks jurisdiction over the appeal. They claim "the entire sanctions proceeding was begun without jurisdiction, and therefore…all rulings of the district court should be vacated, and this appeal dismissed as a result." (Mot at 2). Their claims are meritless and dependent on outlandish characterizations of Appellant's motivations and intent. They assert, for instance, that after Motivation's first complaint was dismissed, "Motivation next filed an amended claim that posited, with no evidence whatsoever, *a concocted theory* of a possible theft of *Atocha* emeralds from Motivation." (Mot at 4). Given JTR's implausible claims to have simply found these emeralds on the ocean floor with no associated shipwreck, there is nothing concocted about the reasonable notion that the emeralds instead came from the *Atocha* or *Santa Margarita* where the known Colombia Muzo emerald recoveries have been made in the area over the last 30+ years. (Ex. A; pp. 103-108) Among the more preposterous pronouncements is the wholly unsubstantiated claim that Motivation's "true purpose" in intervening was to serve as the "self-anointed 'Treasure Police,' and to provide Motivation a forum to disparage a new business competitor." Mot at 3. It is ironic and ludicrous to suggest Motivation utilized this forum simply "to disparage a competitor" who, it turns out, purchased 80 pounds of emeralds from an emerald wholesaler, falsely claimed to purchase a treasure map at

a bar for $500 from a handyman who had worked for Miscovich in Pennsylvania, planted emeralds on the floor of the ocean, enlisted divers to "discover" the treasure on the sea floor – for a 60 Minutes documentary -- and filed an *in rem* proceeding to establish legal ownership. In other words, as the district court found, JTR committed a "massive fraud" on the court. (Ex. B; p.328) Apparently, Motivation chose an eminently disparage-able competitor to "disparage." As Kim Fisher testified, Motivation's suggestion there may have been foul play and that the treasure was more akin to a "theft" than a "find" was far from unwarranted. (Ex. C; pp.103-108) In any event, it is not the job of the trial courts to vet complaints for likely veracity and to quash those whose allegations they deem implausible. The amended claim was verified and included substantial, detailed information supporting the belief that some portion of the "find" was theft of Muzo emeralds from the *Atocha* or *Santa Margarita*. (Ex. E; pp. 1-7).[2] The private emails between counsel discussing their interest in identifying responsible parties who could compensate Motivation for the extensive expenses incurred in litigation over the massive fraud involving store

---

[2] As Motivation's counsel explained at the time, there had been multiple thefts of emerald's from the *Atocha* site in recent years, and after it filed its original claim Motivation received information from multiple sources indicating there had been a theft in this case. "We don't think testing is necessarily going to prove anything. If there are Chivor emeralds, they may or may not have been on the *Atocha...But the Muzo emeralds, we think there is a major theft."* Since we filed the [original] claim…there have been considerable…people calling and describing what they have heard, known or seen, and it leads Motivation to believe it needs to amend its…claim to assert alternatively." (Ex. D; p. 30). Moreover, without an inventory to show which of the emeralds were being selected for inspection, and without the opportunity to inspect *all* the emeralds, there was no way to rule out such a theft. *Id.*

bought emeralds, are neither relevant nor material to the issue of Motivation's standing. First, by the close of the first sanctions hearing in January 2014, it was known that Miscovich had committed suicide, his estate was insolvent and JTR's assets (the emeralds) had been seized by the FBI. In discussing a possible amended complaint to include other responsible parties, specifically Silverstein and Paul Sullivan, Judge Moore, having heard the same evidence Motivation and Lewis already knew, when discussing culpable parties involved in the bad faith litigation, acknowledged that in evaluating whether to proceed with another filing Motivation would have to determine "if there is a culpable individual out there *that can compensate you for your losses."* (Ex. F; pp.124-125). Second, Motivation's standing to file a claim derived neither from a desire to serve as the "treasure police" nor from an interest in disparaging a competitor, but from its ownership of salvage rights in the area of this suspicious "find," which turned out to be a massive hoax and a fraud on the court facilitated and controlled by Appellees. The district court found JTR engaged in bad faith litigation practices by concealing lab findings proving the emeralds were coated with modern resins. Appellant incurred extensive legal fees and costs in JTR's bogus litigation. The district court found that ***"the evidence overwhelmingly shows that [Appellee] Silverstein substantially controlled JTR's action in this litigation."*** (Ex. G; p.55). Silverstein was the YCST attorney responsible for overseeing the fraudulent JTR litigation. Given the court's

finding that JTR perpetrated a massive fraud on the court, and that a YCST attorney substantially controlled JTR's action in the in rem case, Appellees should not be heard to suggest there were insufficient grounds to support Appellant's claim in the action below. All that is needed in admiralty actions of his nature is a good faith belief that Motivation may have an interest in the emeralds. Third, while Appellees are quick to impugn Appellant as a "concocter" of theories and an intermeddler who "defrauded" the court and falsely disparaged a competitor, the record reflects that upon confirming that the emeralds were modern and therefore not possibly from their legitimate sites, and after finally being allowed to inspect the entire *res*, Motivation notified the court that it had no ownership interest in the *Res*, and moved to voluntarily dismiss its amended claim. (DE 118).[3] These are not the actions of a nefarious interloper intent on deceiving the Court, as Appellees irresponsibly allege. Finally, Judge King found that Motivation filed a proper claim. (DE 194). Appellees simply assert that "[t]he district court (per judge King) erred" in ruling on standing. They deride his ruling as one "indulging Motivation" and "accepting Motivation's invitation for an *inquisition*" on their knowledge of JTR's actions. (Mot at 2). In any event, the standing issue was the subject of intense briefing before the district court,

---

[3] Exercising its discretion on the matter, despite JTR's objections at the Nov 30, 2012 pre-trial conference, Judge King entered his December 12, 2012, order requiring Motivation to serve as an advocate so that the court would have the benefit of a contested hearing in an *in rem* matter. (Ex. H)

which after hearing the same arguments presented here ruled in favor of Motivation and against Appellees.

Appellees argue Motivation made "false allegations" that sustained standing at the dismissal stage that were later proven false by this record. (Mot at 10). They base this utterly unfounded claim on a faulty reading of the record. They claim Motivation falsely alleged in its amended complaint that it had a colorable claim to some ownership interest in the *Res,* when all the while it was pursuing a "bad faith" and "frivolous intervention" as a mere platform to "misuse the judicial system" and "to interfere with an in rem action brought by a competitor." (Mot at 10). Remarkably, they premise these scurrilous allegations on the sole ground that after finally confirming the "treasure" was comprised of modern emerald's which could not have come from their own 1600's shipwreck sites, Motivation properly filed its Motion to Voluntarily Dismiss, disclaiming any ownership interest in the find. *Id.* Appellees' arguments are disingenuous at best. They word their claim to misleadingly convey the notion that Motivation filed a "bad faith" and "frivolous" original complaint. They errantly reason that Motivation's announcement that it lacked an ownership claim in the *Res* constituted a "concession (less than two months after its initial complaint was dismissed) *that Motivation's amended complaint was factually unfounded." Id.* Appellee's claim is patently false. The fact that Motivation *later* determined its claim to the *Res* could not be sustained, by no

means supports Appellees' outrageous assertion that Motivation conceded its earlier claim was untrue. Appellees in effect argue that Motivations claim was frivolous because Motivation was gullible enough to believe JTR's fraudulent pleadings stating the emerald's were genuine sunken treasure. In his January 25, 2013,Order Judge King found that Motivation's claim was not frivolous and declined to alter his December 12, 2012 Order regarding Motivation's participation in the case. (DE 194; 199 p12). Given this record, the court's ruling denying Appellees' motion to quash the intervention ought not be overturned at the pre-briefing stage by a motions panel.

B. <u>District Court's Personal Jurisdiction over Appellees</u>

Appellees take issue with the district court's ruling on their Motion to Quash service of the Order to Show Cause (DE 451) issued by Judge King on July 25, 2014, claiming *the court lacked personal jurisdiction* over them in connection with Motivation's Amended Motion for Sanctions (DE407). Motivation responded with memoranda on the jurisdictional issues. (DE83, 474). In a well-reasoned and well-supported Order, Judge King addressed Appellees' jurisdictional claims:

> Respondents in essence assert that, because they were not named as parties in the underlying case and did not enter an appearance on this Court's docket, even if they are responsible for this fraud in that they in fact knew or were reckless or willfully blind in not knowing, this Court is powerless to do anything about it as long as they keep out of the State of Florida. But "courts do not sit for the idle ceremony of making orders and pronouncing judgments, the enforcement of which may be flouted, obstructed, and violated with impunity, with no power in the tribunal to punish the offender." *Waffenschmidt*

> *v. MacKay,* 763 F.2d 71 1, 716 (5th Cir. 1985). And though the court's exercise
> of personal jurisdiction over out-of-state nonparties in *Waffenschmidt* was in
> connection with contempt proceedings for violating an injunction issued under
> Fed. R. Civ. P. 65(d), in which actual notice is expressly sufficient, "Rule 65(d)
> [isl a codification rather than a limitation of courts' common-law powers, [and]
> cannot be read to restrict the inherent power of a court to protect its ability to
> render a binding judgment…Respondents were served with the Order to Show
> Cause and are on actual notice of these proceedings. This is al1 that due process
> requires, and the Court's exercise of personal jurisdiction over Respondents in
> connection with these proceedings does not offend that notion.

(DE 488: Order Denying Motions to Quash Service of Process). The district judge's

ruling should not be overturned on appeal, and in no event should be decided upon

by motion. *See Custom Vehicles,* 464 F.3d at 727; *Baumer*, 519 So.2d at 680.

Appellees claim that Judge King lacked the inherent power to sanction Appellees,

his every ruling should be vacated and the appeal should be dismissed. They reject

Judge King's reading of *Chambers v. NASCO*, 501 U.S. 32 (1991), and rely on their

own myopic interpretation, incorrectly claiming that decision was expressly limited

to counsel of record who violate explicit orders of the district court. (Mot at 11).  As

Judge King correctly observed, far from limiting the scope of the courts' sanction

authority, the case stands for the principle that courts have the inherent power to

sanction all who practice frauds upon them whether before or outside their presence.

It is precisely when the authority to sanction pursuant to Rule or statute is

*unavailable* that the courts' inherent powers may be invoked to sanction bad faith

conduct amounting to fraud on the court:

  The imposition of sanctions in this instance transcends a court's equitable

power concerning relations between the parties and reaches a court's inherent power to police itself…When there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. *But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.*

*Chambers*, at 46, 50. As Judge King noted, the district court had "already found a fraud to have been committed upon the Court and had already exercised its inherent power to sanction the conduct of Plaintiff JTR and non-party Jay Miscovich for their roles in the fraud." (DE 488 at 2). Where, as here, "the Court 'finds that fraud has been practiced upon it, or that the very temple of justice has been defiled,' it may invoke its inherent powers against those responsible for the defiling. *Id.* at 2, *quoting Chambers*, 501 U.S at 46. As Appellant pointed out in its pre-trial brief, as officers of the court, Appellees "were required to exercise professional ethics when acting as JTR's general counsel and directing this litigation on behalf of JTR." (Ex. I) *See Pumphrey v. K.W. Thompson Tool Co.,* 62 F. 3d 1128 (9th Cir. 1995) ("one species of fraud upon the court occurs when an 'officer of the court' perpetrates fraud affecting the ability of the court or jury to impartially judge a case"). Judge King's ruling underscores the impropriety in allowing counsel to avoid culpability by remaining outside the arena and lobbing grenades into the field of litigation.

The district court cases Appellees rely on are inapposite. *Leventhal v. New Valley Corp*., 148 F.R.D. 109, 112 (S.D. N.Y. 1993) and *In re VIII South Michigan Associates,* 175 B.R. 976, 984 (Bankr. N.D. Ill 1994). *Leventhal* dealt with an affiant

witness "who happened to be an attorney." *Id.* The bankruptcy court in *VIII South* held only that the Court in *Chambers* "did not contemplate application of the inherent authority to impose sanctions for bad faith litigation conduct to *a non-party expert witness* who has not appeared before the court and has not violated a court order." 175 B.R. at 983. Appellees were far from mere witnesses. YCST had a 5% equity interest in the JTR emerald site. Silverstein was a member of YCST, formed JTR and served as its counsel, through P&B Finance with Paul Sullivan owned a 1.5% equity interest in JTR. According to the court, Silverstein "substantially controlled JTR's action in this litigation," which the court found to be "a massive fraud on the court." (Ex. G p. 55; Ex. J pp. 327-328). As Judge King's order underscores, attorneys cannot escape liability for directing fraudulent by simply controlling it from afar.

As to the district court's authority to sanction them, Appellees make a final, equally untenable argument that the finding of a fraud on the court was purely a matter of the court facing a witness' false testimony. From this erroneous notion, they reason that "every case of the reception of a party's testimony by a fact finder would present an issue of attempted 'fraud on the court' calling for a similar inquisition as this case into 'what the attorney knew and when did he know it.'" (Mot at 16). The claim is ridiculous. The abuses below are far more pervasive and severe than a single witnesses' false testimony. The entire admiralty action was tainted with

rampant and untenable fraud from start to finish. And this wasn't garden-variety fraud. This was fraud on the court that went to the heart of the judicial system in a suit whose very purpose was to secure the imprimatur of the U.S. courts to the claimants' ownership of precious stones purportedly found on the ocean floor.

    C.  <u>Service of Process</u>

Appellees again challenge J. King's Order (DE 488) denying their Motion to Quash Service of the OSC (DE 459), this time reframing their argument to claim service did not comport with *Fed.R.Civ.P.* 4.1(a). This is the identical argument they unsuccessfully made to Judge King. (DE 488 p1) ("The basis of each Respondent's Motion is that service of the Order was not made in compliance with *Fed.R.Civ.P.* 4.1(a)"). As Judge King's order explained, "because of the alleged defective service, each Respondent claims that this court lacks personal jurisdiction over them in connection with Claimant Motivation's Amended Motion for Sanctions (DE 407)."*Id.* Judge King continued:

> To ensure Respondents received actual notice of these proceedings and of the Court's requirement that Respondents respond to the Amended Motion for Sanctions, the Court directed the United States Marshal to serve a copy of the Order to Show Cause upon each Respondent, Specifically, the Court directed that Sullivan be served at his address in Hawaii, and the Silverstein and YCST each be served at their address in Delaware.

*Id.* at 2. Appellees do not claim to have never been served pursuant to the court's directive to the U.S. Marshals. (They received service, responded to the sanctions motion and appeared with counsel in the hearing on the motion.). Instead, they argue

they were not served in strict accordance with Rule 4. Appellees, however, have overlooking a key feature of the proceeding. As discussed in *Chambers* and underscored by Judge King's Order, the sanctions proceeding against Appellees derived neither from statute nor rule, but from the court's inherent power to sanction attorneys who facilitate frauds upon it. As Judge King explained, while Rule 4.1(a) "codifies due process and service considerations in the usual case, *this is not the usual case and the Rule 'cannot be read to restrict the inherent power of' this Court to sanction bad-faith litigation conduct."* (Ex. K; p.3). Appellees protest Judge King's ruling, complaining that though they were served, that service was "not legally valid" because they were not in Florida at the time. They focus on the hole rather than the donut. As Judge King stressed, Appellees were indeed "served with the Order to Show Cause and [were] *on actual notice* of these proceedings." *Id.* "This is all that due process requires. And the Court's exercise of personal jurisdiction over Respondents in connection with these proceedings does not offend that notion." *Id.* Relying on a district court case addressing an OSC, Appellees claim they were never "legally served" and the court never obtained jurisdiction over them. *See*, *Fidelity Nat'l Fin., Inc. v. Friedman*, 2010 U.S. Dist. LEXIS 35851 (D. Ariz. Mar. 12, 2010). The *Fidelity* case is neither controlling nor apposite. As an unpublished district court decision from Arizona, *Fidelity* is not controlling. In any event, the case is distinguishable. First, the respondents in *Fidelity* were non-lawyer,

non-parties having no possible role in the underlying litigation. By contrast, Appellees served as JTR's lawyers, and Silverstein "substantially controlled JTR's action in the litigation." Second, there were substantial issues concerning actual service in *Fidelity,* including uncertainty as to whether "the OSC itself" was served (as opposed to Fidelity's motion or a summons). The "focus [was] upon whether Fidelity properly served the [movant] Trust with the OSC itself." *Id.* at *18. Third, far from the personal service here, Fidelity argued service was accomplished "by overnight delivery" only. Finally, in *Fidelity* "there [was] no dispute that *neither* of the [respondents] were served with the OSC by a United States Marshal or special appointee." *Id.* By contrast, there was no dispute here that *both* Appellees *were* served with the OSC by a U.S. Marshal.*Id.* at *21. Appellees' reliance on cases reciting the general importance of "proper service" of injunctions does nothing to advance their argument that personal service by the Marshal on each Appellee was sufficient, where the court had already found a fraud had been practiced on it and "invoke[d] its inherent powers against those responsible for the defiling." *Id.* at 2. [4]

_____

[4] There is another component to Silverstein's involvement with the Florida case that goes beyond his control of the litigation. Four witnesses testified that they had been threatened or intimidated by Silverstein if they testified for Motivation in the Southern District proceeding. (Ex. F; pp. 112-114, 124-129, 142). The district court noted that as to Silverstein, there was "evidence of conduct that might fall under the obstruction of justice provisions…there were a number of witnesses who testified [they] felt intimidated or threatened or that other witnesses were threatened by testifying or by having suits filed against them. There…is [also] a criminal provision [at] Title 18 United States Code, 3, accessory after the fact." Counsel for JTR

D. Motivation's Appeal is Not Frivolous as Appellees Irresponsibly Allege

Ironically, though the court found that YCST lawyer Silverstein substantially controlled the claimants' actions in the patently fraudulent litigation, Appellees' motion abounds in outrageous accusations, claiming Appellant's actions below *and on appeal* are based on "concocted," "factually implausible," "fraudulent" and "legally frivolous" claims. An underlying theme of Appellees' motion is the claim that Motivation's appeal is no more than a frivolous challenge to the Court's fact finding on the sanctions issue. Motions to dismiss appeals on such grounds are inappropriate unless the Court can determine from a cursory examination of the record that the issues on appeal are wholly meritless. *McClain*, 416 So.2d at 1211. Here, a cursory examination shows just the opposite. After the first sanctions hearing, Judge Moore found "by clear and convincing evidence that a fraud has been committed on this court" and that "the artifice of the fraud was to use the District Court to grant the imprimatur…or seal of approval that…these are antique emeralds." (Ex. L; pp. 14-16). As Judge King observed "a massive fraud [had] been perpetrated on the court" by JTR via the litigation, and "the evidence *overwhelmingly showed*" Appellee Silverstein "substantially controlled JTR's action in that litigation." (Ex. G p. 55). These judicial findings, coupled with the court's

---

responded "Well, not being a criminal lawyer it is very difficult for me to say whether he crossed the line or not." Ex. L, pp. 142-146.

decision *not* to impose sanctions on those substantially controlling the litigation, are alone sufficient to refute Appellees' incendiary claim that Motivation's appeal is frivolous.

In light of the "overwhelming evidence" showing Appellees' complicity in the fraudulent litigation, Appellant has a right to appellate review of the court's ultimate determination not to sanction Appellees for their role in the litigation that served as the artifice for the "massive fraud." The record is replete with evidence of the Appellees' complicity in that fraud. These facts are set out in Appellant's Proposed Findings and in its 52(b) Motion. (Exhibits M and N). While the court's order on sanctions includes extensive facts cited by Silverstein to explain his actions, it inexplicitly omits highly relevant facts identified by Motivation. For example, the court (1) detailed the reasons Silverstein claimed to initially believe JTR's claim in early 2011, but omitted Silverstein's admission that by August 2011 he doubted the truth of the claim and counseled that the admiralty case not be framed on an assumption the claim was actually true, (2) noted Silverstein was comforted by trial counsel Horan vouching for the legitimacy of the site after early dives, but omitted that Horan eventually realized the emeralds were planted there and so advised Silverstein (3) repeated Silverstein's claim he was comforted by Horan putting the 20-pound group in the *res*, but omitted that in December 2011 Horan advised Silverstein the 20-pound group should *not* have been placed there because emeralds

were *not* found at the site, and (4) recited Silverstein's argument that disclosing the epoxy to CBS showed Silverstein was not trying to conceal it, but omitted that JTR had to disclose it to CBS to get funding for testing, that the disclosure was required by JTR's contract with CBS, and that the contract's nondisclosure provision delayed or prevented CBS from publically disclosing it.

YCST had a 5% interest in the emerald find that, according to Silverstein, was "thought to be worth many millions of dollars at a minimum." (Ex. O, p.16-17; Ex. P, p.191). In June 2011, Silverstein, through YCST, formed J&S Keys, and negotiated an "Exploration Agreement" permitting it to salvage the site. (Ex. O. pp. 38-40). In July 2011, Silverstein, through YCST, formed P&B Finance to make personal investments in the emerald find, after which he invested $80,000 into the venture. *Id.* Silverstein, through YCST, *formed JTR* to salvage the site, and own and market the emeralds. Ex. O p 33, 42). By August 2010, Silverstein "doubted whether an admiralty claim should be filed" and "that [his client] had discovered emeralds."(Ex. O, pp. 30-31) Even though Silverstein knew he needed more information to determine whether an admiralty filing would be fraudulent, he wrote an email that very evening recommending that Horan file the admiralty action. (Ex. O, p. 1). At the very time he urged the filing in admiralty, Silverstein had "reason to believe that the claims of his client could possibly be untruthful." (Ex. P, p. 176). Nonetheless in the email to Horan urging the filing, Silverstein explained that "the

filing, combined with the expected press coverage (including 60 Minutes) *will produce legitimate investors with meaningful investments*…." *Id*. In December 2011, after Silverstein and Horan learned labs discovered modern resins on the emeralds, Horan again "raised with [Silverstein] concerns about the legitimacy of this 20-pound group." (Ex. O, p.113). Horan asked Silverstein to talk with his clients to determine whether they had made "false claims to the federal court" and "salted" the site. (Ex. O, p. 111). Silverstein was aware that Horan continued to question the origin of the 20-pound group for over a year and withdrew as counsel for JTR, in part because of concerns stemming from this issue. (Ex. O, p. 150). Silverstein (and Sullivan as the chairman of the "advisory" board of JTR), were actively involved in the management of this fraudulent litigation for 29 months. Even after Mr. Miscovich committed suicide, the fraud continued under the management of Silverstein and his firm and Sullivan. After Sullivan was made aware that Rodriguez was prepared to testify that he sold the emeralds to Miscovich in 2010, Sullivan took the stand for two days and defended Silverstein and JTR's action with no mention of the Rodriguez evidence. Only after Motivation forced the attendance of Rodriguez was the truth revealed on the fraud. If Rodriguez had taken the Fifth as Elchlepp had, the record would have been circumstantial with Sullivan attempting to create substantial doubt as to Motivation's claims and the truth of the finds.

In its 52(b) Motion and Proposed Findings, Appellant identified over two-dozen significant events which were or should have been known to Silverstein and his Firm; they demonstrated beyond question that the case was fraudulent from inception to end. Appellant submits that its appeal is in no way frivolous and that the Court should decline to entertain Appellees' bid to preempt briefing and prevent a full airing of the substantial issues surrounding the lower court's failure to sanction those who it found to have "substantially controlled JTR's action in this litigation."[5]

Finally, Appellees' Motion to Dismiss argues the merits not on procedural grounds using 12-point typeface, not 14-point, contrary to the requirements of FRAP 27(d)(1)(E) and 32(a)(5)(A). In *Custom Vehicles, Inc. v. Forest River, Inc.*, 464 F.3 725, 727 (7th Cir. 2006), the court sanctioned an appellant for its motion to strike portions of the appellee's brief on the merits which added a judge "who must dig through the record and understand the legal issues…." The court, as a sanction, reduced the number of pages allowed for the appellant's reply brief for the "equivalently absurd, time-wasting motion" using Fed.R.App.P. 2 as authority. *Id*. At 728. This case is Appellee counsel's 11th appearance in this Court since 2010.

---

[5] The only "frivolous" filing in this litigation was JTR's appeal of Judge King's January 25, 2013, order; it was dismissed by this Court as "frivolous" under its March 21, 2014, mandate. (Doc.435) Silverstein had a hand in drafting that frivolous appeal together with other filings in the bad faith litigation. (Ex. F, p. 126-29)

**Certificate of Interested Persons and Corporate Disclosure Statement**

The undersigned attorney for Appellant Motivation, Inc., certifies that the attached list identifies those persons with an interest in the outcome of the appeal:

<u>District Judges</u>:

King, James Lawrence

Moore, K. Michael

Torres, Edwin, Magistrate Judge

<u>Attorneys of Record</u>:

Coffey, Kenneth, Miami

Dorsey, John T., Wilmington, Delaware

Josefsberg, Robert C., Miami

Gravante, John III, Miami

Lewis, A. Eugene, Tallahassee

McLeod, Aaaron G., Jacksonville

Rogerson, John T. III, Jacksonville

Rosenthal, Stephen F., Miami

White, Marlow V., Tallahassee

Zack, David J., Miami

<u>Other Persons</u>:

Abt, Taffi Fisher, Sebastian, Florida

Fisher, Kim H. Fisher, Key West

Fisher, Juanita L., Key West

Silverstein, Bruce L., Wilmington, Delaware

Sukhia, Kenneth W., Tallahassee

Sullivan, Paul D., Kailua, Hawaii

Corporations (None Trading Publically)

Coffey Burlington, P. L., Miami

JTR Enterprises, LLC, Delaware

Lewis & White, P. L. C., Tallahassee

Podhurst Orseck, P. A., Miami

Young, Conaway, Stargatt & Taylor, LLP, Wilmington

* * *

Respectfully submitted,

/s/ Marlow White
MARLOW V. WHITE
Florida Bar Member 275417
A. EUGENE LEWIS
Florida Bar Member 94810
LEWIS & WHITE, P.L.C.
222 W. Georgia Street
Tallahassee, Florida 32301
Vox: (850) 425-5000
Fax:  (850) 425-5004
Email: mvw@lewisandwhite.com
Email2: lawlaw@polaris.net
ATTORNEYS FOR APPELLANT