UNITED STATES COURT OF APPEAL
FOR THE ELEVENTH CIRCUIT

_____

CASE NO. 15-14132-D

_____

MOTIVATION, INC.

Claimant/Appellant,

vs.

JTR ENTERPRISES, LLC,

Plaintiff/Appellee.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA, MIAMI DIVISION
CASE NO. 4:11-CIV-10074

REPLY IN SUPPORT OF APPELLEES' JOINT MOTION TO DISMISS APPEAL

John T. Rogerson, III (FBN: 832839)    Jeffrey B. Crockett (FBN: 347401)
john.rogerson@arlaw.com                jcrockett@coffeyburlington.com
ADAMS AND REESE LLP                    COFFEY BURLINGTON, P.L.
501 Riverside Avenue, 7th Floor        David J. Zack (FBN: 641685)
Jacksonville, FL 32202                 2601 South Bayshore Drive, Penthouse
Telephone:  (904) 355-1700             Miami, Florida  33133
Facsimile:  (904) 355-1797             Telephone:  (305) 858-2900
                                       Facsimile:  (305) 858-5261


          *Counsel for Young Conaway Stargatt & Taylor, LLP*
                *and Bruce L. Silverstein, Esq.*

**CERRTIFICATE OF INTERESTED PERSONS**
**AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, Appellees Young Conaway Stargatt & Taylor, LLP and Bruce L. Silverstein, Esq., hereby state the following individuals and entities with any known interest in the outcome of this appeal:

Kendall B. Coffey

Jeffrey B. Crockett

Stephen Elchlepp

Kim Fisher

John Gravante

David Horan

JTR Enterprises LLC

Hon. James L. King

Jay Miscovich

Hugh J. Morgan

Motivation Inc.

Hon. K. Michael Moore

Bruce L.. Silverstein

John Siracusa

Paul D. Sullivan

John E. Tuthill

Marlow V. White

Young Conaway Stargatt & Taylor, LLP

David J. Zack

<u>**PRELIMNARY STATEMENT**</u>

The time has come to put an end to Motivation's impertinent and scandalous harassment and defamation of Appellees, who are a respected Delaware law firm and one of its senior partners.[1]

After the district court provided Motivation with every possible opportunity to make out a case for sanctioning Appellees, Motivation failed to do so, leading the court to conclude in a 58-page Opinion:

> After nearly twelve days of taking evidence, including the testimony of eight witnesses and thousands of pages of documentary evidence, Motivation has been unable to present any evidence that Silverstein had actual knowledge of Jay [Miscovich]'s scheme to commit a fraud upon the Court prior to that scheme being revealed on January 13, 2014, the first day of the sanctions hearing in front of Judge Moore.

D.E. 568, at 55-56.

Motivation responded with a frivolous motion for reconsideration (*see* D.E. 573), which resulted in a further opinion reaffirming the denial of Motivation's motion for sanctions, in which the district court wrote:

> The Court has thoroughly reviewed the 67 additional findings of fact Motivation would have the Court make, just as it thoroughly reviewed Motivation's and Respondent's Proposed Findings of Fact submitted at the close of the trial on Motivation's Amended Motion for Sanctions. The Court finds that much of these proposed findings simply repeat findings already proposed by Motivation and rejected by the Court as not supported by the record or credible witness testimony when it entered its Opinion and Order Denying Sanctions.

D.E. 592, at 2.

---

[1] Throughout Mr. Silverstein's nearly 29-year career as a member in good standing of the Delaware Bar, he has conducted himself with integrity and honesty, earning the respect of judges and attorneys. Far from being sanctioned, Mr. Silverstein has been honored as "a distinguished member" of the Bar by an appointment to serve as Special Master by former Chancellor (now Chief Justice) Strine. *See* D.E. 461-15, Tab 127, at 10-14. *See also* D.E. 484, Exh. A (Affidavit of former Chancellor Chandler), D.E. 484, Exh. B (Affidavit of Gregory Varallo, Esq); D.E. 544, at 213-17, 285-87 (excerpts from transcript of testimony at Second Sanctions Hearing). (These materials are attached hereto as Exhibits 1, 2, 3 and 4). *See also SICPA Holdings, S.A. v. Optical Coating Lab., Inc.*, 1996 Del. Ch. LEXIS 137 (Del. Ch. Oct. 10, 1996) (Report in another matter in which Mr. Silverstein was appointed as Special Master by former Chancellor Allen).

Appellees' Joint Motion to Dismiss Appeal (the "Dismissal Motion")
presents three separate and independent bases for dismissing Motivation's
appeal (and for vacating the entirety of the sanctions proceedings below)
– namely, (i) Motivation lacked standing in the district court, (ii) the
district court lacked the "inherent power" to sanction Appellees, and
(iii) Appellees were not served with legally valid process. Motivation
does not deny that the Court's finding of any one of these defects in
Motivation's appeal would preclude consideration of the merits of that
appeal.[2] Nonetheless, Motivation expends substantial energy seeking to
persuade the Court to defer ruling on the Dismissal Motion until
Motivation has an opportunity to brief the merits of the very issues the
Dismissal Motion establishes that the Court is precluded from considering.
*See* Appellant Motivation's Response to Appellees' Motion to Dismiss Appeal
(the "Opposition"), at 1-3, 10, 16-20 (hereinafter cited as "Opp. at __").

If this Court should indulge Motivation's request to defer ruling on
the Dismissal Motion, Apppelees will show that Motivation's appeal is

---

[2] *See*, *e.g.*, *Boyd v. Homes of Legend, Inc.*, 188 F. 3d 1294, 1298-99 (11th
Cir. 1999) (if district court lacks jurisdiction, appeal court has
jurisdiction only to reverse for lack of jurisdiction below); *Reynolds v.
Butts*, 312 F.3d 1247 (11th Cir. 2003) (per curiam) (dismissing appeal for
want of jurisdiction based on lack of standing to seek the relief that was
denied below); *Drummond Coal Co. v. Watt*, 735 F.2d 469 (11th Cir. 1984)
(declining to address merits of plaintiff's appeal, and granting
defendant's cross-appeal challenging jurisdiction of trial court to hear
matter in first instance); *Palomar Pomerado Health Sys. v. Belshe*, 180
F.3d 1104, 1108 (9th Cir 1999) ("Because [Appellant] lacks standing, the
federal courts are without jurisdiction over this action"), *cert denied*,
2000 U.S. LEXIS 117 (Jan. 10, 2000); *J.P. Morgan Chase Bank, N.A. v. Del
Mar Props., L.P.*, 443 S.W.3d 455, 459 (Tex. App. 2014) ("If the trial
court lacked jurisdiction, then an appellate court only has jurisdiction
to set the judgment aside and dismiss the cause.") (quotation omitted);
*Holliday v. State*, 2013 Ark. 47 (Ark 2013) (per curiam) ("Where the
[trial] court lacks jurisdiction, the appellate court also lacks
jurisdiction."); *Bartlett Grain Co., L.P. v. Kansas Corp. Comm'n*, 256 P.3d
867, 872 (Kan. 2011) ("Because the district court lacked jurisdiction,
this court did not acquire jurisdiction over the subject matter on
appeal."); *Auburn Med. Ctr. v. Ala. State Health Planning & Dev. Agency*,
848 So. 2d 269 (Ala. Civ. App. 2003) (dismissing appeal based on lower
court's lack of jurisdiction on account of claimant's lack of standing).

without merit for many reasons – not the least of which is the high bar of the "abuse of discretion" standard governing Motivation's appeal.[3] As shown below, however, the Dismissal Motion is ripe for adjudication, and there is no just reason to delay the dismissal of Motivation's appeal.

## ARGUMENT

## I.   THE DISMISSAL MOTION IS RIPE FOR DECISION

Motivation does not seriously contest the substantial legal arguments made in the Dismissal Motion. Instead, hoping to live to fight another day, Motivation urges the Court to defer consideration of the Dismissal Motion pending review of the underlying merit of the district court's denial of Motivation's motion for sanctions. Motivation's position runs contrary to sound jurisprudence and is animated by Motivation's desire to "poison the well" with false accusations that were rejected by the district court, but which Motivation intends to reargue to this Court despite the settled "abuse of discretion" standard on appeal.[4] Because the

---

[3]  *See* Appellees' Response to Court's Jurisdictional Questions, at 2 (attached hereto as Exhibit 5).

[4]  Unsurprisingly, Motivation already has commenced its effort to "poison the well." For example, in footnote 4 of the Opposition, Motivation asserts that Appellee Silverstein "threatened or intimidated" four witnesses – a finding twice rejected by the trial court. *See* D.E. 568, 592. The same is true of the Motivation's various assertions on pages 17 through 20 of the Opposition – all of which are allegations Motivation failed to prove in the trial court. Motivation's lack of accuracy (to be kind) is further illustrated by its repeated assertion that Chief Judge Moore found that JTR committed a fraud on the court, Opp. at 5, 7, 9, when, in fact, Chief Judge Moore twice rejected Motivation's contention and found that only Miscovich (and not JTR) committed a fraud on the court, and declined to sanction JTR for anything other than failing to make a specific disclosure to the court over a brief, four month period during which JTR was investigating the veracity and significance of the information, and after which JTR volunteered the information in a Status Report. *See* D.E. 445, at 17-20 (Findings of Fact and Conclusions of Law), D.E. 450 (Order denying Motivation's Motion for Reconsideration). With respect to the fraud on the court Chief Judge Moore found Miscovich to have committed, the fact is that JTR (along with its investors) was as much a victim as anyone else Miscovich may have deceived. Put simply, there is no merit to Motivation's scandalous assertions, and they do not provide a basis for denying the Dismissal Motion, in any event.

Court lacks jurisdiction to consider the merits of Motivation's appeal for the reasons set forth in the Dismissal Motion, it would result in an extreme waste of judicial and litigant resources to defer consideration of the Dismissal Motion until Motivation's underlying appeal and Appellees' cross-appeals are fully briefed and presented for a decision on the merits. Moreover, Motivation's avowed intent of continuing to slander Appellees through the appellate process makes it especially appropriate to resolve the Dismissal Motion now, as "the very fact that [an] attorney was charged could bring upon him the sting of disrepute."[5] Prompt resolution of the Dismissal Motion will curtail the collateral damage to Appellees' reputation Motivation has caused, and continues to cause, through its ongoing efforts to reach into Appellees' perceived "deep pockets."

For obvious reasons of judicial economy, where valid grounds for dismissal of an appeal are raised, a dismissal motion should be considered prior to any consideration of the merits – especially where, as here, the dismissal motion is based on jurisdictional issues that preclude consideration of the merits.[6] Otherwise, the Federal Rules of Appellate

---

[5] *NASCO, Inc. v. Calcasieu Television & Radio* 124 F.R.D. 120, 142 (W.D. La. 1989), *aff'd*, 894 F.2d 696 (5th Cir. 1990), *aff'd sub nom. Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991). *See also Tesco Corp. v. Nat'l Oilwell Varco, L.P.*, 804 F.3d 1367, 2015 U.S. App. LEXIS 18903, at *31 (9th Cir. 2015) ("We agree that statements made in a judicial opinion can harm the reputation of attorneys, and that an attorney's reputation is one of his or her most valuable assets.").

[6] *See*, *e.g.*, *Wane v. Loan Corp.*, 613 Fed. Appx. 879, 880 (11th Cir. 2015) (noting prior grant of motion to dismiss the main appeal for lack of jurisdiction); *Reynolds*, 312 F.3d 1247 (granting motion to dismiss appeal for want of jurisdiction); *Kaplan Indus. v. Oaktree Capital Mgmt., L.P.*, 2011 U.S. App. LEXIS 24631 (11th Cir. Nov. 10, 2011) (same); *Agility DGS Logistics Servs., Co.*, 2011 U.S. App. LEXIS 16519 (11th Cir. July 12, 2011) (same); Klay v. All Defendants, 477 Fed. Appx. 543 (11th Cir. June 16, 2010) (same); *see also Green Edge Enters., LLC v. Rubber Mulch Etc., LLC*, 2012 U.S. App. LEXIS 1793 (Fed. Cir. Jan. 30, 2012) (staying main appeal pending resolution of motion to dismiss for lack of jurisdiction); *United States v. Bevill*, 508 Fed. Appx. 333, 335 (5th Cir. 2013) (granting motion to dismiss prior to submission of appellee's answering brief in main appeal); *Newpark Shipbuilding & Repair, Inc. v. M/V Trinton Brute*, 2

Procedure would not provide for the dismissal of an appeal through a motion, but would relegate all such issues to being decided exclusively through a cross-appeal on the merits. Indeed, it is precisely that jurisprudential policy that led this Court to raise its own Jurisdictional Questions in this matter – so that threshold issues can be resolved and, if appropriate, narrow or eliminate further work that might unnecessarily occur addressing issues that are not properly before this Court.[7]

In an effort to avoid prompt resolution of the Dismissal Motion, Motivation *erroneously* claims that Courts of Appeal faced with dismissal motions "typically" defer ruling on the motion pending consideration of the merits of the underlying appeal. *See* Opp. at 1. In support of this assertion, Motivation identifies five decisions in which that allegedly occurred and another four decisions that Motivation *erroneously* claims to express disfavor for dismissal motions. In fact, however, only three of the decisions identified by Motivation actually "carried" a dismissal motion based on lack of jurisdiction with the merits of the underlying appeal,[8] and none of the decisions cited by Motivation expresses any

---

F.3d 572 (5th Cir. 1993) (per curiam) (granting motion to dismiss appeal from *in rem* action based on lack of jurisdiction).

[7] Here, the grant of the Dismissal Motion would not only avoid the need for the Court to wade through Motivation's appeal, but it also would moot the Court's own Jurisdictional Questions and the balance of Appellees' cross-appeal that challenges rulings below other than the denial of Appellees' Motion to Quash the OSC. Incidentally, Motivation's Opposition provides further evidence of the propriety of Appellees' cross-appeal of the various rulings from the First Sanctions Hearing (which are the subject of the Court's Jurisdictional Questions), as more than 630 pages of the 715-page Appendix to Motivation's Opposition is the transcript of the First Sanctions Hearing – which Motivation makes the centerpiece of its appeal against Appellees, even though they were not parties to that hearing, did not appear therein through counsel, and were not entitled to take discovery in connection therewith.

[8] The Court did not "carry" or "defer" the dismissal motion pending briefing on the merits in *Chafin v. Chafin*, 2013 WL 4018591 (11th Cir. March 6. 2013). Rather, the dismissal motion was granted before merits briefing was concluded, and was considered while merits briefing proceeded

disfavor of dismissal motions (nor of their early resolution).[9] As reflected by the Court's handling of its own Jurisdictional Questions in this and other appeals, there is no reason for the Court to defer consideration of threshold jurisdictional issues, and every reason to expedite their consideration and resolution.

Motivation also seeks to avoid prompt resolution of the Dismissal Motion by arguing that it "relies on characterizations of the evidence developed over multi-week trials in an extensive record not yet submitted to briefing on the merits." Opp. at 2. Again, however, Motivation is wrong. On this record, there are no material facts in dispute with respect to any of the legal issues raised by the Dismissal Motion.[10]

---

only because there was no motion to stay that briefing. *U.S. v. Prat*, 584 Fed. Appx. 921, 922 n.1 (11th Cir. 2014), did not involve a dismissal motion based on lack of jurisdiction. Rather, the motion was based on an argument that the appellant had "waived" his right to appeal through a plea agreement – which could not be separated from the merits of the underlying appeal. Although the Court did "carry the motion with the case" in *S.E.C. v Quest Energy Mfg.*, 768 F.3d 1106 (11th Cir. 2014), the Court later granted the dismissal motion without addressing the merits.

[9] *Custom Vehicles v Forest River, Inc.*, 464 F. 3d 725, 727 (7th Cir 2006) and *Slizyk v. Smilack*, 734 So.2d 1166, 1167 (Fla. 5th DCA 1999), involved **motions to strike** portions of the opposing party's briefs, and *United States v. Fortner*, 455 F.3d 752 (7th Cir. 2006), involved a **motion for summary affirmance**. *Howard v. Baumer*, 519 So.2d 679, 680 (Fla. 1st DCA 1988), involved five untimely motions filed the day before the answering brief on the merits was due, and the Court affirmatively acknowledged that a timely motion to dismiss would have been appropriate.

[10] Motivation also is mistaken in arguing that the Dismissal Motion is based on the frivolity of Motivation's appeal. *See* Opp. at 16-20. While Motivation's appeal is, in fact, frivolous (as evidenced by Motivation's exclusive reliance upon facts twice rejected by the finder of fact), the Dismissal Motion is based entirely on a handful of undisputed facts, which do not include the frivolity of Motivation's appeal. Motivation is equally mistaken in arguing that the Dismissal Motion is based on Motivation's own bad faith in meddling in the *in rem* action below and in seeking to extort a settlement from Appellees. *See* Opp. at 3-9. While the record below provides ample basis for concluding that Motivation has, in fact, acted (and continues to act) with unclean hands and in bad faith, the Dismissal Motion does not depend upon these facts, in any way, for its success.

## II. <u>MOTIVATION LACKED STANDING TO PARTICIPATE IN THE IN REM ACTION BELOW</u>

Motivation's lack of standing is based entirely on Motivation's concession that it had no ownership interest in the *Res* – a concession Motivation made before it even filed a motion for sanctions. Moreover, Motivation does not dispute that (i) a valid claim of ownership in the *Res* is necessary to establish standing to participate as claimant in an *in rem* action, and (ii) pursuant to *Lujan* and its progeny, a claimant has the burden to both plead and ultimately prove the validity of its claim of standing. *See* Dismissal Motion at 8-10.[11]

By way of analogy, a stranger to someone whose property is seized in a drug bust would have standing to participate in an *in rem* forfeiture action only if the stranger alleged and ultimately proved that the *Res* actually belonged to the stranger. Pursuant to *Lujan* and its progeny, the stranger would lack standing to participate in the *in rem* action if the *Res* did not, in fact, belong to the stranger – even if the stranger honestly believed otherwise when he asserted his claim to the *Res*. The same is true here. Motivation would have had standing to participate as a claimant in JTR's *in rem* action if Motivation had a valid claim of ownership of the *Res*. Because Motivation conceded that it lacked such a valid claim, Motivation lacked standing to participate as a claimant below

---

[11]  Motivation falsely asserts that "both C.J. Moore and Former C.J. King allow[ed] [Motivation] to 'intervene'" in the action below. Opp. at 3. In fact, Motivation never "moved" to intervene, and no order ever was entered allowing Motivation to do so – as evidenced by Motivation's failure to cite any support for its false assertion. Despite Motivation's conceded lack of any valid claim of ownership of the *Res*, Judge King did permit Motivation to participate at the trial of JTR's *in rem* claim as a friend of the court (but not as a claimant). *See* Opp., Exh. Q (D.E. 194). Accordingly, Motivation would be ineligible to obtain an award of sanctions to recover the attorneys' fees incurred in serving in that role, even if it were assumed (arguendo) that Motivation otherwise had standing to claim an ownership interest in the *Res* prior to conceding a lack of such an interest three months prior to the trial of JTR's *in rem* claim. *See* Dismissal Motion at 16 & n.13 (discussing *Universal Oil Products Co. v. Root Refining Co.*, 328 U.S. 575 (1946)).

– without regard to whether Motivation's putative claim was made in good faith (or fraudulently) before Motivation conceded its invalidity.

Because Motivation lacked standing to participate in the *in rem* action below, it similarly lacked standing (or any other jurisprudential basis) to seek sanctions from any party (much less from a non-party, such as Appellees). *See Reynolds*, 312 F.3d 1247 (dismissing appeal of trial court's denial of a non-party movant's motion for contempt based on the appellee's demonstration that the non-party movant lacked standing to seek enforcement of order allegedly violated in the first instance).[12]

## III.  **THE DISTRICT COURT LACKED THE "INHERENT POWER" TO SANCTION APPELLEES**

The district court's lack of "inherent power" to sanction Appellees is premised entirely upon the following undisputed facts: (i) Appellees were not parties (or the real parties in interest) in the district court, (ii) Appellees were not counsel of record to any parties, and (iii) Appellees were not charged with violating any order of the court.

In seeking to sustain the inherent power to sanction Appellees, Motivation (like Judge King in his brief order denying Appellees' Motion

_____

[12]  Moreover, Motivation acknowledged the invalidity of its amended claim of ownership of the *Res* in August of 2012, which was less than two months after the district court dismissed Motivation's original claim for failure to state a claim in June of 2012 (and more than three months prior to the trial of JTR's *in rem* claim in December of 2012). Yet, Motivation seeks sanctions for a period of more than 3 1/2 years – covering October 2011 through February 2015 (*i.e.*, 2 1/2 years after Motivation conceded that it lacked a valid claim of ownership of the *Res*). As such, Motivation would lack a colorable claim for the extensive sanctions it seeks, even if it were assumed (*arguendo*) that Motivation had some jurisprudential basis to do so for the brief period of time it claims to have asserted a legally viable claim of ownership. Moreover, while Motivation seeks to persuade the Court of the genuineness of its alleged concern about a possible "theft" of *Atocha* emeralds – which is the putative claim Motivation asserted after its original claim was rejected by the district court – it is noteworthy that Motivation made no mention of any alleged theft in its original claim. Surely, if Motivation truly believed that the *Res* had been stolen from Motivation, the alleged theft would have been the central basis for Motivation's original claim, instead of the contrived and fraudulent "barrel" theory that Motivation sought to float past the court.

to Quash the OSC) relies exclusively upon *Chambers*. *See* Opp. at 10-13.[13]
Appellees already have shown that *Chambers* does not support Motivation's
effort herein (*see* Dismissal Motion at 11-17), and are content to rely on
that showing in this Reply. In the end, Motivation does not identify a
single decision in the history of federal jurisprudence where any court
has held that it has the "inherent power" to sanction a lawyer who was not
a party (or the real party in interest), not counsel of record for a
party, and not accused of violating a court order.

Because the district court lacked "inherent power" to sanction
Appellees, the district court lacked jurisdiction to issue the OSC and
conduct the sanctions proceedings, in the first instance, and the entire
proceeding below should be vacated.[14]

IV.  **APPELLEES HAVE NOT BEEN SERVED WITH LEGALLY VALID PROCESS**

Finally, the lack of legally valid service of process upon Appellees
is based entirely upon the undisputed facts that (i) the OSC was served on
Appellees in Delaware, and not within 100 miles of Florida, as required by
Rule 4.1(a) of the Federal Rules of Civil Procedure, and (ii) Appellees

---

[13]  In addition to *Chambers*, Motivation cites *Pumphrey v. K.W. Thompson Tool Co.*, 62 F. 3d 1128 (9th Cir. 1995) – without explaining how it helps Motivation's cause. In fact, *Pumphrey* simply stands for the non-controversial proposition that a judgment can be set aside for fraud on the court if the fraud is perpetrated by a party's general counsel – which is consistent with the court's analysis in *Leventhal v. New Valley Corp.*, 148 F.R.D. 109, 112 (S.D. N.Y. 1993) (discussed on pages 12-13 of the Dismissal Motion), which also holds that an attorney, who is not counsel of record, cannot be sanctioned pursuant to Rule 11, Section 1927 or the court's inherent power. *Pumphrey* does not support Motivation's misguided quest to obtain sanctions from non-parties who were neither counsel of record for a party nor charged with violating an order of the court.

[14]  Motivation mistakenly views the district court's lack of "inherent power" as going to the court's "personal jurisdiction" over Appellees. *See* Opp. at 9. In fact, the lack of inherent power to sanction Appellees goes to the heart of the district court's subject matter jurisdiction to issue the OSC. *See*, *e.g.*, *United States v. Williams*, 790 F.3d 1059 (10th Cir. 2015), *cert denied*, 2015 U.S. LEXIS 7749 (U.S. Dec. 7, 2015) (reversing district court's grant of relief based on fraud on the court in matter where there was no "inherent power" to grant such relief, and ordering dismissal of action for lack of subject matter jurisdiction).

timely challenged the lack of valid service and declined to voluntarily waive that challenge. In its response, Motivation has not identified a single decision where any court has held that a non-party's actual notice of an OSC is a legally viable substitute for valid service of process in such circumstances.

**CONCLUSION**

Appellees respectfully urge the Court to grant the Dismissal Motion and put an end to this "peculiar and misguided case." *See Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 801 (7th Cir. 2013).[15]

Respectfully submitted,

ADAMS AND REESE LLP
John T. Rogerson, III
Florida Bar No. 832839
john.rogerson@arlaw.com
501 Riverside Avenue, 7th Floor
Jacksonville, FL 32202
Telephone:  (904) 355-1700
Facsimile:  (904) 355-1797

COFFEY BURLINGTON, P.L.

By: Jeffrey B. Crockett
    Jeffrey B. Crockett
    Florida Bar No. 347401
    jcrockett@coffeyburlington.com
    David J. Zack
    Florida Bar No. 641685
    2601 South Bayshore Drive
    Penthouse
    Miami, Florida  33133
    Telephone:  (305) 858-2900
    Facsimile:  (305) 858-5261

*Counsel for Young Conaway Stargatt & Taylor, LLP*
*and Bruce L. Silverstein, Esq.*

---

[15] In the final paragraph of its Opposition, Motivation complains that the Dismissal Motion was prepared using 12-point proportionately spaced typeface. This was a regrettable mistake on Appellees' part, and Appellees are prepared (if the court wishes) to resubmit the Dismissal Motion using a monospaced typeface that does not contain more than 10.5 characters per inch – as permitted by Rule 32(a)(5)(B), and was done with this Reply. If the Dismissal Motion were converted to such a typeface without deleting any of its existing content, the Dismissal Motion would be just a few lines more than 23 pages in length, and would require a brief enlargement of Rule 27(d)(2)'s page limits. (*See* Exhibit 6 hereto). Appellees also have prepared an alternative version of the Dismissal Motion, which uses a monospaced face that satisfies Rule 32(a)(5)(B), omits a sufficient amount of words to fit within the 20-page limit, and could be substituted for the Dismissal Motion with the Court's permission. (*See* Exhibit 7 hereto).

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that true and correct copy of the foregoing was

served by Notice of Electronic Filing generated by CM/ECF, on December 21,

2015 on all counsel or parties of record on the Service List below.

Arthur E. Lewis, Jr., Esq.
Marlow V. White, Esq.
LEWIS & WHITE, PLC
222 W. Georgia Street
P.O. Box 1050
Tallahassee, FL  32301
mvw@lewisandwhite.com

*Counsel for Appellant Motivation,*
*Inc.*

# EXHIBIT 1

**REPLY IN SUPPORT OF MOTION TO DISMISS**

# **TAB 127**

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

LANGDALE INTERNATIONAL RESOURCE LLC,   :
                                :
     Plaintiff,                  :
                                :
       v                    :
                                :
ARYE BEREST and MINING & MINERAL     :
OPPORTUNITY LTD.,              :
                                :
     Defendant/Cross-claim Plaintiff  :
     and Defendant.              :
-------------------------------------: Civil Action
MINING & MINERAL OPPORTUNITY LTD. and : No. 8070-CS
LANGDALE INTERNATIONAL RESOURCE LTD., :
                                :
     Counterclaim Plaintiff and     :
     Additional Plaintiff to        :
     Counterclaim,             :
                                :
       v                    :
                                :
LANGDALE INTERNATIONAL RESOURCE LLC   :
and RENE SIJMONSBERGEN,         :
                                :
     Counterclaim Defendant and     :
     Additional Defendant to        :
     Counterclaim/Cross-claim Defendant:

```
                      - - -
            Chancery Courtroom No. 12A
            New Castle County Courthouse
            500 North King Street
            Wilmington, Delaware
            Monday, June 10, 2013
            12:00 noon
                      - - -
BEFORE:  HON. LEO E. STRINE, JR., Chancellor.
                      - - -
```

<u>CONFERENCE</u>

------------------------------------------------------------

CHANCERY COURT REPORTERS
500 North King Street - Suite 11400
Wilmington, Delaware 19801
(302) 255-0521

2

```
 1   APPEARANCES:

 2        BLAKE K. ROHRBACHER, ESQ.
          KEVIN M. GALLAGHER, ESQ.
 3        J. SCOTT PRITCHARD, ESQ.
          Richards, Layton & Finger, P.A.
 4          for Langdale International Resource LLC
              and Rene Sijmonsbergen
 5
          PATRICIA A. WINSTON, ESQ.
 6        Morris James LLP
                  -and-
 7        W. MARK BENNETT, ESQ..
          of the Texas Bar
 8        Strasburger & Price, LLP
            for Arye Berest, Mining & Mineral
 9            Opportunity Ltd., and Langdale
              International Resource Ltd.
10
11                        - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
```

CHANCERY COURT REPORTERS

10

1          MR. BENNETT:  No, Your Honor.

2          THE COURT:  Okay.  Thank you,

3     Mr. Bennett.

4          Well, here's what we're going to do.

5     You are going to go and you are going to meet by phone

6     or in person with a distinguished member of our bar,

7     Bruce Silverstein.  If he is willing to do it, I am

8     going to appoint him to be whatever one of our various

9     statutory terms is appropriate, and I'll allow him to

10    pick.

11         What I mean by that is you've got

12    receivers, you've got custodians, you've got trustees.

13    He could be custodian and receiver/trustee, the

14    broadest possible powers to immediately -- because the

15    company is without leadership right now; right?

16         MR. BENNETT:  Correct, Your Honor.

17         THE COURT:  One of the things he's

18    going to -- then the bank accounts are going to be

19    turned over to his control.  The assets are going to

20    be turned over to his control.

21         I am also going to empower him as a

22    Special Master of the Court to also report on his view

23    of how the case should come out, including the

24    possibility that the entities -- if what you all have

11

```
1   created is, to use a term more common on the other
2   side of the ocean, so shambolic, such an utter
3   corporate governance catastrophe, that it is not
4   possible to accurately assess who should own what
5   shares in the management company, as I'll call it,
6   because it's not even possible to determine which
7   company is supposed to be the management company, that
8   nothing was ever done properly, everything was based
9   on constantly shifting coalitions, and that the real
10  parties in interest who were sold shares that have
11  never been properly authorized or issued in a Delaware
12  entity should be the object, the real object of the
13  Court's fiduciary concern, that what should be done
14  about this is essentially dissolve it and pay those
15  people first in line, and treat the 1500 or whatever
16  it is as simply part of the equity of the company.
17                  Now, I may have to make a
18  determination about who owns that, but it might be
19  aided by some neutral finding.  The reality is that
20  the gambit for all the clients in the room was to make
21  money off of being a manager.  Why anyone would pay
22  any of you to manage anything is something that is not
23  apparent, based on this record.
24                  I'm assuming that everybody is pretty
```

CHANCERY COURT REPORTERS

12

1    talented and has had some successes in other endeavors

2    before they came together in this mess.  I don't think

3    this will feature in Mr. Berest's or

4    Mr. Sijmonsbergen's resume.

5              So, essentially, I'm granting the

6    motion for relief based on the breach of the

7    confidentiality order.  That was -- I've seen no

8    justification for what was done.  And I gave

9    Mr. Berest and his confrere the full opportunity to

10   come and explain what they did in plausible terms.

11   Their failure to explain leaves the only rational

12   inference to be that they misused the discovery

13   process in this Court to exert improper non-litigation

14   pressure on an adversary.  We can't have that.

15   Untrustworthy.

16             And they've now -- they chose to

17   remove themselves.  So as a result of removing

18   themselves, the Court has to do something to fill the

19   gap.  I'm not going to put Mr. Sijmonsbergen in there

20   because, as I said, I'm not sure at this point that I

21   can assess accurately whether either side is fit to be

22   a fiduciary.  And that's without -- I'm not trying to

23   cast any aspersions on anybody's character, although I

24   would say the recent stuff with discovery, that's just

CHANCERY COURT REPORTERS

13

1    very troubling, and we just cannot have that.

2                    But it's also just in terms of the

3    folks who paddled this canoe, you know, into a

4    cul-de-sac in the pond and got it mired in the lily

5    pads till it can't get out are not folks I'm "hep" to

6    give more authority to.  Someone like Mr. Silverstein

7    is extremely gifted.  He is tough.  He has experience

8    in this room.

9                    Also, my commitment to everybody that

10   I appoint in this role is it's not for free.  The

11   company will pay, obviously.  So one of the things we

12   have to figure out about the bank accounts is making

13   sure -- folks like Mr. Silverstein do this as much as

14   a public service as anything, but they should be paid.

15                   What I mean by that is I have no doubt

16   that he will not try to milk this to turn it into his

17   most lucrative payday.  By the way, his most lucrative

18   paydays have been extremely big, doing successful

19   plaintiff's side work.  So I don't think he -- it's

20   not like it's something he needs.  But it requires

21   someone tough, skilled and experienced to find a way

22   out of this.

23                   I'm also expecting he will find that

24   there is a real mine.  Why do I say that?  Because

CHANCERY COURT REPORTERS

14

1    when people act like this, it always makes you worry

2    that there is not.  And I hope to gosh he'll put that

3    to rest.  If there is a real mine with real value,

4    then the simplest way may well be to have some orderly

5    liquidation, market the interest owned by the

6    underlying company, and whack up the proceeds with the

7    determination of who owns what.

8                 Because I don't know whether you all

9    still on each side have visions of management fee

10   sugarplums running through your head or not, but I

11   would expect if the two of you can't get along on

12   anything else, you would be good enough lawyers and

13   have enough common sense to realize that the primary

14   concern of your clients ought to be the people who put

15   in real money and not a management fee.  Because I

16   can't even imagine what they think of everybody.

17                 And one of the things you might want

18   to do is if things are this goofy, if you two can't

19   put your personality problems aside, maybe you ought

20   to find some senior lawyers who can.

21                 And part of why I'm picking somebody

22   like this -- and if he can't do it, I'm going to pick

23   somebody equally tough minded -- he's just as tough as

24   either one of you.

CHANCERY COURT REPORTERS

# EXHIBIT 2

**REPLY IN SUPPORT OF MOTION TO DISMISS**

# **EXHIBIT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION
**IN ADMIRALTY**

JTR ENTERPRISES, LLC,
      Plaintiff,

vs.                            CASE NO. 4:11-CV-10074-JLK

AN UNKNOWN QUANTITY, etc.

      *In Rem* Defendant.
_____/


## <u>AFFIDAVIT OF WILLIAM B. CHANDLER III</u>


    **William B. Chandler III**, being duly sworn according to law, does hereby depose and

state as follows:

    1.      My name is William B. Chandler III.  I am a member of the law firm Wilson

Sonsini Goodrich & Rosati, P.C., which I joined on June 18, 2011, with my office located at 222

Delaware Avenue, Suite 800, Wilmington, Delaware 19801.  I am admitted to the bar of the

Supreme Court of the State of Delaware.  Before joining Wilson Sonsini Goodrich & Rosati, I

served as Chancellor, or chief judge, of the Court of Chancery of the State of Delaware from

1997 until June 17, 2011, and I was a Vice Chancellor on that Court from 1989 through 1997.

Before my tenure on the Court of Chancery, I served as Resident Judge of the Superior Court of

the State of Delaware from 1985 to 1989.  Earlier in my career, I worked in private practice with

a Delaware law firm, served as Legal Counsel to the Governor of Delaware, and taught as an

Assistant Professor at the University of Alabama School of Law.  I have also taught corporate

law courses as an Adjunct Professor at law schools at Washington University, Seattle University,

Ohio State University, the University of Georgia, Vanderbilt University, the University of

Nevada, Las Vegas, and the University of Chicago.  Except where otherwise stated, the facts contained in this affidavit are based on my personal knowledge and, if called to testify, I could and would testify competently to such facts.

2.      During my 26-year judicial career, I presided over hundreds of cases, mostly involving matters of Delaware corporate and contract law.  Members of the Delaware bar who practice corporate law and who actively litigate such matters in the Delaware Court of Chancery and the Supreme Court comprise a relatively small group of attorneys.  As a consequence, these lawyers are "repeat players" who appear regularly before the Chancellors and Justices.

3.      Accordingly, there were numerous occasions when I presided over hearings and trials in which Bruce Silverstein, as well as other attorneys in his law firm (Young Conaway Stargatt & Taylor), appeared as counsel for a particular party - either the stockholder plaintiff, the corporate defendant, or a nominal defendant (such as the corporation in a derivative action).  In every instance, Mr. Silverstein impressed me as a talented and extremely capable attorney who consistently met or exceeded the highest standards of the legal profession.  Mr. Silverstein invariably displayed not only technical expertise as a corporate litigator, but he also exhibited the highest levels of professionalism, courtesy, and candor as an officer of the court.

4.      To cite just two examples, Mr. Silverstein appeared as lead counsel for the stockholder plaintiff in *In re Best Lock Corp. Stockholder Litig.*, 845 A.2d 1057 (Del. Ch. 2001) and as lead defense counsel in *In re Hanover Direct Stockholders Litig.*, 2010 WL 3959399 (Del. Ch. Sept. 24, 2010).  These cases are representative of the types of complex, corporate litigation that the Delaware Court of Chancery regularly adjudicates.  The Court of Chancery's reputation and its ability to handle such cases smoothly and expeditiously depends on the quality and character of the attorneys that regularly practice before it.  In these proceedings, and in every

other proceeding before me in which he participated, Mr. Silverstein was always a diligent and well-prepared advocate who invariably displayed the utmost respect, courtesy, and candor towards the Court and towards opposing counsel. At all times, I found him to be a zealous advocate for his clients, but one in whose representations to the Court I had every confidence.

5.    Finally, I have no social or community connections of any kind with Mr. Silverstein or his family.  Our association is strictly on a professional basis.  I did serve, however, as a reference for Mr. Silverstein when his name was proposed as a candidate for appointment to the Court of Chancery in 1997.

*William B. Chandler III*

William B. Chandler III

STATE OF WILMINGTON

                                    SS.

COUNTY OF NEW CASTLE

This 30th day of September, 2014, personally appeared before me, a Notary Public for the State of Delaware, New Castle County, William B. Chandler III, who, by me first being sworn, deposed and said that the facts set forth in the foregoing affidavit are true and correct to the best of his knowledge and belief.

Notary Public

My commission expires on _____NA_____

Ian R. Liston (DE I.D. No. 5507)
Delaware Attorney with power
to act as notary public per
29 Del. C. § 4332 (a)(3)

# EXHIBIT 3

**REPLY IN SUPPORT OF MOTION TO DISMISS**

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION
**IN ADMIRALTY**

JTR ENTERPRISES, LLC,
        Plaintiff,

vs.                               CASE NO. 4:11-CV-10074-JLK

AN UNKNOWN QUANTITY, etc.

       *In Rem* Defendant.
_____/

## AFFIDAVIT OF GREGORY V. VARALLO, ESQUIRE

**Gregory V. Varallo**, being duly sworn according to law, does hereby depose and state as follows:

1.     My name is Gregory V. Varallo. I am a member in good standing of the Delaware Bar and am a director and the Executive Vice President of the law firm of Richards, Layton & Finger, PA, located at One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, where I have been employed continuously since September, 1983. Except where otherwise stated, the facts contained in this affidavit are based on my personal knowledge and, if called to testify, I could and would testify competently to such facts.

2.     I am providing this affidavit in support of Bruce Silverstein's response to the Order to Show Cause issued by this Court on July 25, 2014 which requires Mr. Silverstein to respond to the allegations made against him by Motivation, Inc. in connection with JTR Enterprises, LLC v. An Unknown Quantity, etc., Case No. 11-CV-10074-JLK currently pending before this Court. I have read the allegations contained in Motivation's Amended Motion for

Sanction directed against Mr. Silverstein and his firm, Young Conaway Stargatt & Taylor, among others.  I am not related to Mr. Silverstein nor do I have a personal relationship with him other than that formed as a result of our work together as attorneys at the Delaware Bar.

3.      I have no knowledge of the facts and circumstances surrounding the specific matter currently before this Court.  I do, however, have knowledge of Mr. Silverstein's reputation within the Delaware legal community. Also, having litigated with and against Mr. Silverstein in matters over many years, and having participated in various Delaware Bar activities with him, I have formed my own impressions of him as a lawyer and a person.

4.      Specifically, over the course of my career, I have litigated against Mr. Silverstein in a number of matters including, *Frontier Oil Corp. v. Holly Corp., C.A. No. 20502 (Del. Ch. Apr. 29, 2005),* where I served as lead trial counsel for plaintiff and Mr. Silverstein and his team represented certain of the defendants.  Over the course of a long and hard fought case I had the opportunity to observe Bruce's work, work ethic, and integrity and found him to be a person of high integrity and ethics who conducted himself consistently with the best traditions of our Bar.

5.      In addition, I have had the opportunity to serve as co-counsel with Mr. Silverstein in cases.  More recently, I represented the Board of Directors of Morton's in litigation arising from the sale of the Company and Mr. Silverstein represented the buyer.  My interactions with Mr. Silverstein in this more recent matter did nothing whatsoever to change my high regard for his skill and high integrity.

6.      In each of these cases, as well as others we have worked on over the years, Mr. Silverstein has proven to be a formidable opponent and a tough litigator.  While his approach to litigation is typically aggressive, I can state unequivocally that I have never found him to be

untruthful or disrespectful.  Indeed, in the matters in which we have interacted, he has always lived up to the ideal of an honest member of the Delaware Bar.

7.      Mr. Silverstein and I have also participated in various Delaware Bar activities. Recently, at the request of the Chief Justice of the State, the Honorable Leo Strine, Jr., Mr. Silverstein and I have been tasked with collaborating as part of a small task force to draft a new, cutting edge arbitration statute for the State.  As one of only a handful of members of this task force, convened by the highest judicial officer in the State and charged with developing an important new statute for the State after its initial attempt at judicially annexed arbitration was enjoined, Mr. Silverstein has continued to exhibit the highest ethics and devoted his time to the project entirely without compensation or the expectation thereof.  Indeed, my understanding is that Mr. Silverstein is often sought out to participate in these activities as a respected member of the Delaware Bar.

8.      I have also, on occasion, had the opportunity to discuss Mr. Silverstein with other members of the Delaware Bench and Bar.  Again, while it is generally agreed that Mr. Silverstein has a very aggressive litigation approach, I have never heard anyone express a view that he acted improperly, dishonestly or unethically.  Indeed, Mr. Silverstein has a reputation within the legal community as a highly competent and ethical lawyer.

9.      In sum, I view Mr. Silverstein as a highly reputable, trustworthy and ethical person and lawyer.  In the litigation "trenches" and in the more general work of the Bar, Bruce is known to me to be a person on who's word I can (and do) depend without question.

FURTHER AFFIANT SAYETH NOT.

_____
Gregory V. Varallo

STATE OF WILMINGTON

              SS.

COUNTY OF NEW CASTLE

This 25th day of August, 2014, personally appeared before me, a Notary Public for the

State of Delaware, New Castle County, Gregory V. Varallo, who, by me first being sworn,

deposed and said that the facts set forth in the foregoing affidavit are true and correct to the best

of his knowledge and belief.

_____
Notary Public

My commission expires on _____

PAULA McWHORTER
My Comm. Expires Nov. 2, 2014
Notary Public - State of Delaware

# EXHIBIT 4

**REPLY IN SUPPORT OF MOTION TO DISMISS**

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2
                       CASE NO. 11-10074-CIV-KING
 3
    JRT ENTERPRISES, LLC,
 4                                      Key West, Florida
            vs.
 5                                      November 20, 2014
    COLUMBIAN EMERALDS,
 6
            vs.
 7
    CLAWB, LLC (Intervenor)
 8
    MOTIVATION, INC. (Claimant)
 9
    HUGH J. MORGAN (Claimant)
10
    PAUL D. SULLIVAN (Material Witness)
11  ------------------------------------------------------------

12                    SANCTIONS HEARING – DAY 2
                 BEFORE THE HONORABLE JAMES LAWRENCE KING
13                   UNITED STATES DISTRICT JUDGE

14  APPEARANCES:

15  FOR MOTIVATION:        John E. Holloway, Esquire
                           Troutman, Sanders, LLP
16                         222 Central Park Avenue
                           Suite 2000
17                         Virginia Beach, Virginia 23462

18                         Arthur Eugene Lewis, Jr., Esquire
                           Marlow V. White, Jr., Esquire
19                         Lewis & White, PLC
                           222 West Georgia Street
20                         Tallahassee, Florida 32301

21

22

23

24

25
```

1    testified as follows:

2          THE COURTROOM DEPUTY:  Please state your name and

3    spell your last name for the record.  You can be seated

4          THE WITNESS:  My name is William B. Chandler, spelled

5    C-H-A-N-D-L-E-R.

6          THE COURTROOM DEPUTY:  Thank you.

7                        DIRECT EXAMINATION

8    BY MR. ZACK:

9    Q    Chancellor Chandler, please tell us about your

10   professional background.

11   A    Thank you for the respect of calling me Chancellor

12   Chandler, but I'm no longer a chancellor.  I am retired from

13   the court of chancellery.  You should be comfortable calling me

14   by name.

15        After I graduated from law school, I was a law clerk for a

16   federal judge in Bloomington, Delaware, Chief Judge Latcham of

17   the Federal District Court in Delaware.

18        Following that I went back to law school and got an LLM

19   from Yale.

20        From there I taught as an assistant professor of law at

21   the University of Alabama for two years.  Then I was legal

22   counsel to Governor Dupont in Delaware for two years, followed

23   by an associate position at Morris, Nichols, Arsht & Tunnell, a

24   law firm in Delaware.

25        I was appointed to the Delaware Superior Court in 1985.  I

```
 1    served on that court until 1989 when I was appointed to the
 2    Delaware Court of Chancellery.  I served on that Court for 22
 3    years until 2011.  I served both as a vice chancellor of that
 4    court, and from 1997 until 2011, I was the chancellor or chief
 5    judge of the Court of Chancellery.
 6         I retired in 2011 from the court and joined as a partner
 7    to the law firm Wilson, Sonsini, Goodrich & Rosati, which is
 8    where I practice law today.
 9             THE COURT:  Mr. Zack, excuse me.  Could we -- is it
10    possible to adjust the volume on the witness speaking?  Is that
11    possible, please?  I followed the chancellor's testimony, but
12    it would help if it was a little bit louder.  Thank you,
13    Marshal, if you can.
14    BY MR. ZACK:
15    Q    Chancellor Chandler, have you ever presided over a case
16    with Bruce Silverstein as a lawyer?
17    A    Yes, I have.
18    Q    Could you give us a little background on that?
19             THE COURT:  Excuse me one more time.  Pardon me, and I
20    will let you finish.  This is only being given, of course, with
21    reference to, as I understand it, Mr. Silverstein's good record
22    and good professional record.  I assume that you are assuring
23    me that he is going to testify.  Obviously if he's not a
24    witness in this case, there is no need for this testimony I
25    presume.  But is that where we are?
```

```
 1              I mean, normally I know we are taking the chancellor

 2    out of turn to accommodate everybody, and that's fine.  But you

 3    do expect that he is going to be a witness so that this is

 4    otherwise relevant?

 5              MR. COFFEY:  Yes, Your Honor.  In a respondent's case,

 6    Mr. Silverstein would testify unless he's called --

 7              THE COURT:  That's fine.  I just wanted to see where

 8    we were.  It's one thing to take a fact witness out of

 9    sequence, but a primary or principally character witness would

10    only follow the testimony of a witness.

11              Mr. Zack, thank you.  I will attempt not to interrupt

12    your direct.  Go ahead.

13    BY MR. ZACK:

14    Q    Chancellor, would you tell us a little bit about the cases

15    you presided over where Bruce Silverstein appeared as a

16    attorney?

17    A    Yes.  Mr. Silverstein and his firm appeared in the court

18    of chancellery on numerous occasions, not just one or several,

19    but on numerous occasions in matters before me.  The court of

20    chancellery is a court that is known and specializes in

21    corporate and contract litigation.  And Mr. Silverstein

22    regularly appeared in all sorts of matters both as counsel to

23    the plaintiffs in stockholder litigation, but more typically as

24    counsel for the defense, the corporation usually, in matters

25    ranging from scheduling hearings to preliminary injunction
```

 1    hearings to full-blown trials and post-trial proceedings.

 2    Q    Did you find Mr. Silverstein a capable attorney?

 3    A    Yes, on every occasion, I found him to be very well

 4    prepared, a very skilled advocate who was a zealous advocate

 5    for his client who represented him to the highest standards of

 6    the Delaware Bar.  He was a very capable attorney on his feet

 7    in the courtroom, very knowledgeable about Delaware corporate

 8    law, and I always had confidence that when Mr. Silverstein

 9    appeared in front of me, I was getting someone who was

10    trustworthy, honest, and prepared and always a thoughtful

11    advocate for his client.

12    Q    Did you find him to be professional?

13    A    Yes.  As is typical of lawyers who appear in chancellery,

14    the lawyers who appear before the chancellors are what I call

15    repeat players.  They are repeatedly coming before the same

16    judges.

17         There are only five of us who served on the court of

18    chancellery and we see the same lawyers over and over.  So

19    their reputation and their credibility and their

20    professionalism is something that they have to protect and is

21    something that we all depend upon and expect from them.  I was

22    never ever disappointed in the conduct of Mr. Silverstein in

23    that regard.

24    Q    Thank you, Chancellor.

25         MR. ZACK:  No further questions, Your Honor.

```
 1              THE COURT:  Mr. Holloway?

 2              MR. HOLLOWAY:  No questions, Your Honor.

 3              THE COURT:  Mr. Josefsberg?  Anyone else?

 4              MR. GRAVANTE:  We have no further questions, Your

 5    Honor.

 6              THE COURT:  All right.  Thank you.  Thank you.  May

 7    the Chancellor be excused at this point in time?

 8              MR. COFFEY:  Yes, Your Honor.

 9              THE COURT:  Okay.  Fine.

10         Thank you, sir, for appearing here if you can hear

11    this.  I'm not aware of how this new technology works too well.

12    Can the witness hear what I am saying?

13              THE WITNESS:  Yes, I can, Your Honor.

14              THE COURT:  You can.  Well, thank you, sir, for being

15    with us.  I hope you are enjoying the new chapter in your life.

16    You are very young to be doing that, but good luck you to.

17    Thank you.

18              THE WITNESS:  Thank you, Your Honor.

19              THE COURT:  All right.  Mr. Holloway, do you want to

20    call your next witness, please.

21              MR. HOLLOWAY:  Your Honor, we will call John Siracusa.

22              THE COURTROOM DEPUTY:  Remain standing.  Please raise

23    your right hand.

24                        JOHN SIRACUSA

25    Having been first duly sworn on oath, was examined and
```

```
 1    take Mr. Gregory Varallo out of turn as we have the video

 2    conference set up for him.

 3            THE COURT:  Any objection?

 4            MR. HOLLOWAY:  No objection, Your Honor.

 5            THE COURT:  All right.  Proceed.

 6            THE COURTROOM DEPUTY:  Will you please stand and raise

 7    your right hand.

 8                          GREG VARALLO

 9    Having been first duly sworn on oath, was examined and

10    testified as follows:

11            THE COURTROOM DEPUTY:  Please state your name and

12    spell your last name for the record.

13            THE WITNESS:  My name is Greg Varallo, spelled

14    V-A-R-A-L-L-O.

15            THE COURTROOM DEPUTY:  Thank you.

16                       DIRECT EXAMINATION

17    BY MR. ZACK:

18    Q    Mr. Varallo, thank you for appearing today.  Please tell

19    us your professional background.

20    A    Sure.  I also want to thank Your Honor for allowing me to

21    participate remotely.  I appreciate it very much.

22         I'm an attorney.  I practice in Wilmington, Delaware.  I

23    have been admitted to the bar since March of 1984.  I began

24    practicing in 1983 with the firm of Richards, Layton & Finger

25    where I still practice law.
```

1    Q    How do you know Mr. Silverstein?

2    A    I know Mr. Silverstein through many years of association

3    at the bar.  I have worked with and against him in any number

4    of cases, and it turns out we both do a lot of work in merger

5    and acquisition litigation.

6    Q    Have you appeared in cases against him?

7    A    I have on several occasions.

8    Q    And have you been on the same side as Mr. Silverstein?

9    A    I have been fortunate enough to be on the same side as

10   well.

11   Q    Has Mr. Silverstein exhibited professionalism?

12   A    Consistently in my view.  I have had a number of cases

13   with Bruce and I have never had anything but the highest regard

14   for his professionalism.

15   Q    Did he practice ethically?

16   A    To the best of my ability to tell you that, yes, sir.

17   This is a small town with a small bar.  There are only a couple

18   of dozen of us who do what Bruce and I do here in Wilmington.

19        And to be perfectly frank, Bruce is a guy who is known to

20   be someone whose word you can depend upon.  When he gives you

21   his word, he keeps it.  You don't need to confirm it in writing

22   or emails.  At least from my observation, he's always been a

23   person who has practiced with the highest ethics and

24   responsibility.

25   Q    Have you worked on any bar activity or other such

```
 1   activities with Mr. Silverstein?
 2   A     We have, indeed.  Both Bruce and I are currently appointed
 3   to a task force by the chief justice of our state.  We are
 4   working together to develop what we hope to be cutting edge
 5   legislation in the arbitration area.  And there are, I believe,
 6   a total of five of us on this working group, and Bruce is the
 7   representative from his firm on this group.
 8             MR. ZACK:  Thank you, Your Honor.  We have no further
 9   questions.
10             MR. HOLLOWAY:  We have no questions, Your Honor.
11             THE COURT:  Thank you.  May Mr. Varallo be excused?
12             MR. ZACK:  Yes, Your Honor.
13             THE COURT:  Thank you, sir.  You may step down.  Next
14   witness.
15             MR. ZACK:  Your Honor, we would like to recall to the
16   stand Mr. Siracusa.
17                    CROSS EXAMINATION (resumed)
18   BY MR. ZACK:
19   Q     Mr. Siracusa, as you will recall, when we broke, we had
20   just displayed Exhibit 163, the joint pretrial stipulation, and
21   I would like to turn your attention, please, to page 5
22   paragraph 7 and 8.
23   A     Yes.
24   Q     Now, the trial you had with Judge King in December 2012,
25   did it have as an issue in the trial the origin of the salvage
```

```
 1            Then, Mr. Josefsberg, we will hear from you.  And then

 2    we will go the same route.  So we should finish this in the

 3    middle of the afternoon.  At that point one way or the other,

 4    we will take, depending on the ruling, take more evidence or

 5    not, whatever may be indicated.  Thank you very much.

 6            (Thereupon, the hearing adjourned at 5:03 p.m.)

 7                              - - -

 8                    C E R T I F I C A T E

 9

10            I hereby certify that the foregoing is an

11    accurate transcription of the proceedings in the

12    above-entitled matter.

13

14

15    12/10/14             s/ Tammy Nestor
                           Tammy Nestor, RMR
16                         Official Court Reporter
                           299 East Broward Boulevard
17                         Fort Lauderdale, Florida 33301
                           tammy_nestor@flsd.uscourts.gov
18

19

20

21

22

23

24

25
```

# EXHIBIT 5

**REPLY IN SUPPORT OF MOTION TO DISMISS**

## UNITED STATES COURT OF APPEALS

## ELEVENTH CIRCUIT

MOTIVATION, INC.,

                Claimant/Appellant,                   Appeal No.: 15-14132-D

                                                    D.C. Case No.: 4:11-cv-10074

       vs.

JTR ENTERPRISES, LLC,

                Plaintiff/Appellee.

_____/

## APPELLEES' RESPONSE TO COURT'S JURISDICTIONAL QUESTIONS

Through a letter from the Acting Clerk of the Court, dated November 25, 2015, the Court has requested that the parties to this Appeal "simultaneously advise the court in writing within fourteen (14) days from the date of this letter of their position regarding" certain Jurisdictional Questions raised by the Court, *sua sponte*.  Appellees, YOUNG CONAWAY STARGATT & TAYLOR ("YCST") and BRUCE L. SILVERSTEIN ("Silverstein") (together "Appellees"), by their undersigned counsel, hereby respond to the Jurisdictional Questions posed by the Court.

We begin by quoting the Court's Jurisdictional Questions in their entirety:

## JURISDICTIONAL QUESTIONS

Please address under what theory Young Conaway Stargatt & Taylor LLP and Bruce L. Silverstein may appeal: (1) the March 10, 2014 order permitting discovery (Document 424); (2) The June 19, 2014 order entering judgment in favor of Motivation, Inc. against JTR Enterprises, LLC and the Estate of Jay Miscovich (Document 445); (3) the March 16, 2015 order denying Motivation, Inc.'s motion for sanctions against Bruce Silverstein (Document 568); and (4) the August 17, 2015 orders awarding costs and fees to Motivation (Documents 590 and 591).  *See Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 333, 100 S. Ct. 1166, 1171, 63 L. Ed. 2d 427 (1980) (providing that "[o]rdinarily, only a party aggrieved by a judgment or order of a district court may exercise the statutory right to appeal therefrom."); *Agripost, Inc. v. Miami-Dade Cty., ex rel. Manager*, 195 F.3d 1225, 1230 (11th Cir. 1999) (noting that, generally, "the prevailing part does not have standing to appeal because it is assumed that the judgment has caused the party no injury," but also noting that "[a]n exception to this rule exists . . . when the prevailing party is prejudiced by the collateral estoppel effect of the district court's order.").

Case No. 15-14132-D
Motivation, Inc. v. JTR Enterprises, LLC

**CERTIFICATE OF INTERESTED PERSONS**
**AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, Appellees Young Conaway Stargatt & Taylor, LLP and Bruce L. Silverstein, Esq., hereby state the following individuals and entities with any known interest in the outcome of this appeal:


Kendall B. Coffey

Jeffrey B. Crockett

Stephen Elchlepp

Kim Fisher

John Gravante

David Horan

JTR Enterprises LLC

Hon. James L. King

Jay Miscovich

Hugh J. Morgan

Motivation Inc.

Hon. K. Michael Moore

Bruce L.. Silverstein

John Siracusa

Paul D. Sullivan

John E. Tuthill

Marlow V. White

Young Conaway Stargatt & Taylor, LLP

David J. Zack

## SUMMARY OF APPELLEES' RESPONSE

The primary appeal herein is taken by Appellant, Motivation, Inc. ("Motivation") from the district court's order denying Motivation's motion to sanction Appellees for allegedly committing a fraud on the court. *See* D.E. 568 (opinion and order denying sanctions as to Mr. Silverstein); *see also* D.E. 528 (granting equivalent of directed verdict to YCST and Paul Sullivan); D.E. 592 (opinion and order denying Motivation's motion for reconsideration).[1]  As demonstrated herein, although Appellees are the prevailing party with respect to the ultimate question of whether they should be sanctioned, the district court issued various subsidiary and/or collateral rulings that Motivation and other parties affiliated with Motivation seek to use against Appellees through the doctrine of collateral estoppel and/or "law of the case."  Accordingly, unless Motivation and others lack the right to utilize these rulings against Appellees to their prejudice, Appellees have standing to seek review of those findings through their cross-appeal pursuant to this Court's decision in *Agripost,* Inc., which is cited in the Court's Jurisdictional Questions.

As set forth in Appellees' Joint Motion to Dismiss Appeal (the "Joint Dismissal Motion"), which was filed in this Court on November 24, 2015, the district court lacked jurisdiction to address the merits of the sanctions motion giving rise to the appeal for three separate and independent reasons – namely: (i) Motivation lacked standing to participate in the district court action below, much less to seek sanctions from Appellees, (ii) the district court lacked the "inherent power" to sanction Appellees, who were not parties to the district court action, were not counsel of record to any such party, and were not accused of violating (and did not violate) any order of the district court, and (iii) the district court lacked personal jurisdiction over Appellees, who were never served with

---

[1]  The proceedings below were irregular, as no pleading was filed against, or by, Appellees to institute or defend the claims raised by Motivation through its motion for sanctions, and no process was ever served on Appellees.  The cited order represented the end of the judicial labor, although it was not a "judgment" under Fed. R. Civ. P. 68.  *See, e.g.*, *Wells Properties v. Popkin*, 9 Cal. App. 4th 1053, 1055 (Cal. Ct. App. 1992) ("denial of a motion for sanctions is not a judgment"), *review denied*, 1992 Cal. LEXIS 6061 (Cal. Dec. 3, 1992); *Torres v. Tex. Dep't of Family & Protective Servs.*, 2004 Tex. App. LEXIS 6498, *4 (Tex. App – Houston July 22, 2004) ("A motion for sanctions is an application for an order, and an order on a motion for sanctions is not a judgment.") (citing *Jobe v. Lapidus*, 874 S.W.2d 764, 765-66 (Tex. App. – Dallas 1994, writ denied)); *accord Jobe v. Lapidus*, 874 S.W.2d 764, 765-66 (Tex. App. – Dallas 1994, writ denied) (explaining that "[a] motion is not at the same level as a pleading").

legally valid process in the action below. For these reasons, Motivation's appeal should be dismissed, and a number of the district court's rulings should be vacated. If the Court grants Appellees' Joint Dismissal Motion, there will be no reason to address the Jurisdictional Questions (or any other matter raised by Motivation's appeal or Appellees' cross-appeal), as the grant of the Joint Dismissal Motion will otherwise moot these proceedings.

In the event that Motivation's appeal were to proceed on the merits, Appellees will show that Motivation's appeal is frivolous, and that there is no colorable basis for Motivation to challenge the district court's well-reasoned denial of Motivation's motion for sanctions – with respect to which the standard of appellate review is abuse of discretion. *See, e.g.*, *Sciarretta v. Lincoln Nat'l Life Ins. Co.*, 778 F.3d 1205, 1212 (11th Cir. 2015) ("We review a court's exercise of its inherent power to impose sanctions only for an abuse of discretion"); *Kornhauser v. Comm'r of Soc. Sec.*, 685 F.3d 1254, 1258 (11th Cir. 2012) ("We review the District Court's exercise of its inherent power to sanction counsel for abuse of discretion"); *Schiavo ex. rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005) (instructing that the abuse of discretion standard "recognizes there is a range of choice within which we will not reverse the district court even if we might have reached a different decision"); *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) ("When employing an abuse-of-discretion standard, we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard."); *see also Murray v. City of Columbus*, 534 Fed. Appx. 479, 485-86 (6th Cir. 2013) (affirming denial of sanctions, and explaining that "[b]ecause the court's inherent power to impose sanctions is discretionary, the court is not required to sanction a party or attorney even if it has determined that some wrongdoing has occurred") (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991)).

Although Appellees prevailed with respect to the ultimate question of whether they should be sanctioned, the district court made certain rulings in Documents 424, 445, 568, 590, and 591 (the "Questioned Orders") that Motivation and other parties affiliated with Motivation seek to use against Appellees (i) in connection with this appeal, (ii) in any remand that might occur, and (iii) in other litigation now pending before the district court in the matter of *AZALP LLC v. Silverstein*, Case No.

14-10079-CIV-Martinez-Goodman (S.D. Fl.) (the "AZALP Action"). While Appellees believe that the only ruling of the district court that is binding on Appellees is the court's ultimate ruling that Motivation failed to establish a basis for sanctions, Appellees have cross-appealed the Questioned Orders in order to protect against their use against Appellees. Accordingly, in order to avoid being prejudiced from the Questioned Orders, Appellants intend to show through their cross appeal that the Questioned Orders were issued in error, in pertinent respects, as proffered below.

As noted in the Court's Jurisdictional Questions, a prevailing party may appeal an order of a district court "when the prevailing party is prejudiced by the collateral estoppel effect of the district court's order." Jurisdictional Questions (quoting *Agripost, Inc. v. Miami-Dade Cty., ex rel. Manager*, 195 F.3d 1225, 1230 (11th Cir. 1999)). As shown herein, Appellees have standing to pursue their cross appeal of the Questioned Orders because Motivation and others (wrongly) seek to use the Questioned Orders against Appellees.

For the avoidance of doubt, Appellees do not intend to argue the rights of either JTR Enterprises, LLC ("JTR") or Jay Miscovich ("Miscovich") (or his estate, as he is deceased) in this appeal. Rather, Appellees challenge rulings in the Questioned Orders for the purpose of avoiding those rulings being wrongfully used against Appellees. Appellees have no interest in challenging the Questioned Orders so long as they cannot be used against Appellees to their prejudice. If, however, the Questioned Orders can be used against Appellees, then Appellees have the right to seek appellate review of the Questioned Orders.

## THE BACKGROUND OF THIS APPEAL

The case underlying this appeal was tried in three stages. We examine that background below, as it is pertinent to an understanding of the Questioned Orders and the proper resolution of the Court's Jurisdictional Questions. We will also refer to the separate (but related) pending AZALP Action, which also is pertinent to the resolution of the Court's Jurisdictional Questions.

### A.    Stage 1: The *In Rem* Claim; Trial; and Entry of a Final Order

The underlying action from which this appeal arises was an *in rem* action commenced on September 6, 2010 by JTR, seeking a declaration of ownership and salvage rights as to "an unknown

quantity of Colombian Emeralds, Amethysts, and Quartz crystals" (the "*Res*") alleged to have been found in international waters in the Gulf of Mexico by JTR's Managing Member (Miscovich). Because the action was *in rem*, JTR did not sue any individual or entity. Moreover, JTR's complaint alleged little more than that Miscovich discovered the *Res* in a specified location within the Gulf of Mexico. JTR's complaint contained no allegations as to the origin or value of the *Res* – which remained to be investigated after title to the *Res* was established. *See generally* D.E. 1 (Complaint).

As shown in Appellees' Joint Dismissal Motion (and various filings in the district court), (i) Motivation wrongfully injected itself into the *in rem* action below with a factually implausible and legally frivolous claim of intervention that was dismissed by the court, and (ii) Motivation amended its dismissed claim to assert a concocted claim that Motivation formally disclaimed in a motion to voluntarily withdraw its putative claim in intervention on August 17, 2012. The *in rem* action thereafter proceeded without Motivation asserting any claim to the *Res*.[2]

Following a bench trial in December 2012, the district court (i) found the evidence in equipoise as to whether Miscovich found the *Res* or "salted" the discovery site, and (ii) entered a Final Order denying relief to JTR. *See* DE 199 (the "Final Order").

**B.    Stage 2: The First Sanctions Hearing**

Nearly a year following the entry of the Final Order, the district court conducted a post-trial evidentiary hearing (the "First Sanctions Hearing") to determine whether JTR or Miscovich had committed a "fraud on the court." The sole "participants" in the First Sanctions Hearing were plaintiff-below, JTR, and non-party, Motivation.

Appellees (i) were not parties to the *in rem* action at any time, (ii) were not served with an order to Show Cause prior to the First Sanctions Hearing, (iii) did not appear at the First Sanctions Hearing, and (iv) were not represented by counsel at the First Sanctions Hearing. Moreover, prior to

---

[2]  As shown in Appellees' Joint Dismissal Motion, the record below reflects that Motivation's true purpose in seeking to intervene was (i) to serve as the self-anointed "Treasure Police," and (ii) to provide Motivation a forum to disparage a new business competitor. Without regard to Motivation's *bona fides* (or lack thereof), however, Motivation's concession that it lacked any ownership interest in the "*Res*" means that Motivation lacked standing to participate in the *in rem* proceeding (as shown in Argument I of Appellees' Joint Dismissal Motion).

4

the First Sanctions Hearing, the district court (Chief Judge K. Michael Moore) had affirmatively rejected a motion by Motivation to declare that Appellees were subject to personal jurisdiction in the *in rem* action. *See* D.E. 333. And, less than two weeks prior to the commencement of the First Sanctions Hearing, Motivation served Appellees in Delaware (where they reside) with a document that purported to be a "summons" compelling them to attend the First Sanctions Hearing. Motivation's putative summons (i) was not signed by the clerk, (ii) did not bear the court's seal, and (iii) was ineffective in Delaware, in any event, because Rule 4.1 of the Federal Rules of Civil Procedure does not provide for extra-territorial service of a summons to attend a sanctions hearing. Accordingly, Appellees filed an emergency motion for relief (D.E. 341), and the district court (Chief Judge Moore) entered an order quashing Motivation's putative summons, granting Appellees a protective order, and directing Motivation to show cause why it should not be sanctioned for its conduct. *See* D.E. 361. In support of his order, Chief Judge Moore explained that he previously had denied Motivation's motion to determine that Appellees were subject to personal jurisdiction, and that Motivation had wrongfully disregarded that ruling. Additionally, Judge Moore later elaborated at the First Sanctions Hearing that it would have been "unfair" to drag Appellees into this matter after discovery and other proceedings were completed without Appellees' involvement. D.E. 373, at 112:24 to 113:9 (observing it would be "unfair to Mr. Silverstein to have to come in at such a late date"); *see also id.* at 123:23 to 124:7 ("if they're not within the jurisdiction of the Court, if there is no way to enforce the sanction, then the District Court should not be in a position of just entering orders that it cannot execute on . . . .").

At that First Sanctions Hearing, a store owner testified that he had sold Miscovich some 80 pounds of emeralds in 2010, leading Chief Judge Moore to find that Miscovich committed a fraud on the Court from the day the *in rem* action was commenced through the day of Miscovich's death (a few months prior to the First Sanctions Hearing). *See* D.E. 445 at ¶¶ 70, 72 (the "Court's Findings and Conclusions"). Among other things, Chief Judge Moore found that Miscovich "was clearly the mastermind behind this whole scheme" and that Miscovich had "***managed to successfully convince his investors, lawyers, employees of the Smithsonian, appraisers, jewelers, family, friends, the***

*general public, and many others, including investigative reporters from CBS' 60 Minutes*, that he had discovered and recovered this treasure from the seafloor in early 2010." *Id*. at ¶¶ 66-67 (emphasis added).

By contrast, Chief Judge Moore declined to accept Motivation's contention that JTR had engaged in a fraud on the court or otherwise engaged in bad faith or vexatious litigation. Specifically, Chief Judge Moore identified Motivation's various contentions with respect to JTR as follows:

> Motivation contends that it is entitled to sanctions against JTR because this action was litigated "at all costs," even after a reasonable person would have known that the case was based on a fraud. . . . Motivation further contends that the underlying litigation could have been concluded in December 2011 if JTR had revealed expert reports that indicated that the Emeralds were coated with a modern epoxy, which would exclude the Emeralds coming from either the Atocha or the Margarita. . . . Finally, Motivation claims that, had JTR allowed Motivation to view the Emeralds immediately, Motivation would have quickly concluded, as it did when it finally viewed the Emeralds in August 2012, that the Emeralds did not come from its ships and it would have withdrawn its claim.

D.E. 445 at ¶ 6 (citations omitted).

Chief Judge Moore declined to accept or adopt any of the foregoing contentions advanced by Motivation, and declined to sanction JTR for anything beyond "Motivation's attorneys' fees and costs, for the period of time from December 2, 2011 to April 18, 2012." *Id*. at ¶ 61. As Chief Judge Moore explained:

> While Motivation entered the case in October 2011, the Court does not find that sanctions as of this date would be appropriate against JTR. While Motivation claims that it would have quickly exited the case, had they been allowed to inspect the Emeralds, there was a lot of distrust between JTR and Motivation. . . . The Court thus finds that the sanctionable conduct began when JTR withheld information from the Court, not when Motivation made the decision to enter the case. According to the testimony presented at the hearing, JTR did not learn about the epoxy until December 2011.

*Id.* at ¶ 62 n.16. Chief Judge Moore further determined that April 18, 2012, was an appropriate cut-off date for sanctions against JTR, reasoning that, after JTR disclosed the epoxy information on April 18, 2012, "JTR, the Court, and Motivation were working from the same set of facts. **Thus, when Motivation soon thereafter filed its Amended Claim, Motivation made an informed decision to stay in the case.**" *Id.* at ¶ 65 (emphasis added).

6

Because Appellees were neither parties nor counsel of record for any party in the action, they (i) did not participate in the First Sanctions Hearing; (ii) had no ability to cross-examine any witnesses (at depositions or otherwise), request or subpoena documents, or otherwise participate in the proceedings (other than to object to subpoenas served on Appellees in the District of Delaware); and (iii) did not develop (or decline to develop) the record in a manner of their choosing.

## C.    **Stage 3: The Second Sanctions Hearing**

Following the First Sanctions Hearing, Motivation filed a motion for sanctions against Appellees, who were outside Delaware counsel to JTR and Miscovich, and who never appeared as counsel of record for JTR (or Miscovich) in the proceedings below. *See* DE 407. Motivation did not contend that Appellees knew of any fraud when they were retained to represent Miscovich and JTR in 2011, but argued that Appellees should not have continued to represent their clients when alleged "evidence of fraud" emerged in the *in rem* action. *See id.* at 6.  Motivation did not tell the Court what Motivation's internal emails revealed: that Motivation knew that there was no evidence of Appellees' knowing participation in any fraud, but that (i) Motivation targeted Appellees because they were seen as "a deep pocket," and (ii) Motivation was "rely[ing] on their desire to settle and not be dragged thru a messy highly publicized trial," *See generally* Appellees' Joint Dismissal Motion at 6-7 & n.6.

On July 25, 2014, the district court (now Judge James Lawrence King) entered an Order to Show Cause (the "OSC") (D.E. 451) directing Appellees (and Paul Sullivan) "to appear before the Court and show why they should not be sanctioned for their conduct in this case, as outlined in the Amended Motion for Sanctions."  Appellees filed a Motion to Quash the OSC, in which they raised the three issues that are now presented to this Court through Appellees' Joint Dismissal Motion. *See* D.E. 459.  Appellees also filed a motion to strike a pre-hearing filing by Motivation on the grounds that it violated Appellees' due process rights. *See* D.E. 484.  By separate orders dated October 30, 2014, Judge King (i) denied Appellees' Motion to Quash the OSC, (ii) denied Appellees' motion to strike, and (iii) directed that Appellees appear at an evidentiary hearing (the Second Sanctions Hearing) scheduled for less than three weeks later and without affording Appellees an opportunity to

take any discovery. *See* D.E. 488. Thereafter, Judge King conducted the Second Sanctions Hearing, which ultimately resulted in Judge King's decision to deny Motivation's motion for sanctions against Appellees.

**D.**     **The Sequel: The AZALP Action**

On October 3, 2014, AZALP LLC and its putative assignors (collectively, "the New York Investors") – which share counsel with Motivation – commenced the AZALP Action, in which they asserted a number of frivolous causes of action against Appellees arising from many of the same allegations previously pursued (unsuccessfully) by Motivation in sanctions proceedings herein below. Appellees raised a number of meritorious grounds to dismiss the Complaint in the AZALP Action, and the district court entered an Order granting in part Appellees' Motion to Dismiss on some grounds, and reserving judgment on others. *See AZALP LLC v. Silverstein*, Case No. 14-10079-CIV-Martinez-Goodman (S.D. Fl. Aug. 17, 2015) (the "Dismissal Order," AZALP case, D.E. 58). The New York Investors thereafter filed an Amended Complaint, which suffers from the same flaws as the original Complaint, and which is now the subject of a pending motion to strike or dismiss (AZALP case, D.E. 61).

Important for present purposes, the Amended Complaint in the AZALP Action is replete with allegations respecting findings of the district court in the *in rem* action (including from the Questioned Orders) that the New York Investors seek to use against Appellees in the AZALP Action. *See* First Amended Complaint at ¶¶ 4, 6, 7, 60, 83, 92, 118, 154-156, and 181-183; *see also* AZALP's Response in Opposition to Motion to Dismiss the Amended Complaint, at 1-3. (The cited excerpts from the Amended Complaint and AZALP's brief are attached hereto as Exhibits 3 and 4). In addition, the Amended Complaint in the AZALP Action contains numerous allegations arising from privileged documents the New York Investors would not have received (from Motivation) but for the entry of the Questioned Orders, in particular D.E. 424. The New York Investors' filings illustrate the potential detriment to Appellees of the Questioned Orders, which the New York Investors seek (wrongfully) to use against Appellees in other proceedings.

## THE QUESTIONED ORDERS

This Court's Jurisdictional Questions identify five orders entered in the course of the three-stage sanction proceedings. The Questioned Orders and the defects therein Appellees seek to advance through their cross-appeals are as summarized below.

## A.  D.E. 424 (the "Miscovich Discovery Ruling")

The Miscovich Discovery Ruling was made *sua sponte*, and with no notice or opportunity to comment from Appellees. The Miscovich Discovery Ruling compelled JTR's former counsel of record in the action below, David P. Horan, Esq., to produce to Motivation all documents identified on a privilege log – all of which previously had been reviewed by the court *in camera* and determined to be protected from discovery by the attorney-client privilege or work-product doctrine, including attorney work product. D.E. 334 (Order denying motion to compel). Among the documents Mr. Horan was compelled to produce through the Miscovich Discovery Ruling were numerous materials that reflected Appellees' legal theories, opinions, and strategies as outside counsel to JTR, Miscovich and others – including privileged material from litigation and other matters in Delaware, involving the New York Investors, who are represented by the same counsel who represent Motivation in this appeal. Although Appellees were provided no notice or opportunity to defend against the Miscovich Discovery Ruling, the materials subject to the ruling were ordered to be produced for the express purpose of being used against Appellees at the Second Sanctions Hearing (and were provided by Motivation to the New York Investors for use against Appellees in the AZALP Action and otherwise).[3] Moreover, the Miscovich Discovery Ruling could collaterally harm Appellees by providing the New York Investors with an argument to pierce the attorney-client privilege and work-product protections applicable to Appellees in the AZALP Action. Appellees' bases for the challenge will include the jurisdictional and standing defects of the

---

[3] It is undisputed that the district court made the Miscovich Discovery Ruling at a time when (i) all substantive proceedings involving JTR and Miscovich already were concluded, (ii) no motion to compel was pending, (iii) JTR was not represented by conflict-free counsel (and JTR's conflicted counsel did not even object to the Miscovich Discovery Ruling), and (iv) none of the other persons whose privileged and protected communications were ordered produced were before the court or represented by counsel before the court.

entire proceeding, the absence of notice and opportunity to be heard by Appellees, and the scope of applicability of the crime-fraud exception.[4]

**B.**    **D.E. 445 (the "Miscovich Sanctions Order")**

The Miscovich Sanctions Order provides the underlying factual predicate for the sanctions proceedings against Appellees (and for the Miscovich Discovery Ruling discussed above, which compelled the production of materials otherwise protected by the attorney-client privilege and work-product doctrine). Additionally, the New York Investors, who are represented by the same counsel who represent Motivation in this appeal, are seeking to use the findings set forth in the Miscovich Sanctions Order against Appellees (through the doctrine of offensive collateral estoppel) in the AZALP Action. The grounds on which Appellees would challenge certain of the findings would be (i) the jurisdictional and standing defects of the entire proceeding, (ii) the conflicts and the impossible position of JTR's counsel,[5] and (iii) clear legal error of certain of the findings themselves, in particular the holding that a party in a civil case has the obligation to advise the trial court and

---

[4] If Appellees' cross appeal of the Miscovich Discovery Ruling proceeds, it will be shown that the district court erred in compelling the production of Appellees' privileged materials (i) without providing Appellees (or any party to the proceedings) an opportunity to be heard on the issue, (ii) without considering whether the materials ordered produced by the Miscovich Discovery Ruling were sufficiently related to that attempted fraud to warrant invasion of the attorney-client privilege or work-product protection, and (iii) without considering whether reasonable conditions to the privileged materials' production were required to protect other persons (such as Appellees) whose privileged and otherwise protected communications were implicated. *See, e.g.*, *UMG Recording, Inc. v. Bertelsmann AG*, 479 F.3d 1078 (9th Cir. 2007). Again, and for the avoidance of doubt, Appellees make these arguments only to avoid the Miscovich Discovery Ruling being used against Appellees by Motivation or some other party. So long as the Miscovich Discovery Ruling cannot be used against Appellees, they have no interest in seeking appellate review of the ruling.

[5] Prior to the commencement of the First Sanctions Hearing, JTR's counsel of record had moved to withdraw from representing JTR, citing both (i) "irreconcilable differences between the undersigned attorneys and their client," and (ii) "a good faith belief that their further involvement in the post-trial discovery and sanctions hearing would be imprudent." D.E. 287, at 3. Nonetheless, the district court forced JTR's counsel of record to continue its representation over its objection to doing so. *See* D.E. 291. In a later filing (made after the First Sanctions Hearing, but before the district court issued the Miscovich Sanctions Order), JTR's counsel of record stated that they had "suspected" prior to the First Sanctions Hearing that Miscovich had given false testimony at the 2012 Trial (a fact that JTR's counsel of record did not previously reveal to the Court or Appellees). *See* D.E. 386, at 1-2. When this Court was later confronted with a motion to sanction JTR for pursuing an appeal of the Final Order, the Court declined to sanction JTR because, among other things, "JTR has not been represented in this matter by conflict-free counsel." *JTR Enterprises, LLC. v. Columbian Emeralds*, No. 13-10870, at 3 (11th Cir. March 21, 2014) (Order).

opposing counsel of potentially adverse findings by a consulting expert.[6]  Additionally, to the extent

that Motivation or the New York Investors seek to hold Appellees liable for the "fraud on the court"

the district court found to have been perpetrated by Miscovich (but not JTR nor Appellees),

Appellees will show in their cross appeal that the district court's rulings against Mr. Miscovich were

in error for a number of reasons.[7]

## C.    D.E. 568 (the "Sanctions Denial Order")

Although the Sanctions Denial Order resulted in the denial of sanctions against Appellees,

the Sanctions Denial Order contained subsidiary findings that Motivation seeks to use against

Appellees on appeal (and any remand that might occur), and the New York Investors seek to use

against Appellees in the AZALP Action.  These subsidiary findings were made following an

evidentiary hearing that followed nearly two years of discovery by Motivation in proceedings in

which Appellees were not parties and had no right to defend the discovery or take any discovery of

their own.  These findings also were based upon testimony by two of JTR's former counsel of record

– (i) one of which (John Siracusa) had made a deal with Motivation to assist in Motivation's efforts

to obtain sanctions against Appellees in exchange for Motivation not pursuing sanctions and/or a

---

[6]  If Appellees cross-appeal of the Miscovich Sanctions Order proceeds on the merits, Appellees will show that the district court erred, as a matter of law, in holding that JTR had an obligation to volunteer potentially adverse information to the court (i) within days of learning the information, (ii) before JTR had an adequate opportunity to investigate the information, and (iii) when JTR did volunteer the information to the court within four months of learning the information and well prior to asking the court to award JTR any affirmative relief on its claim with respect to which the information had any bearing.  Again, and for the avoidance of doubt, Appellees make this argument only to avoid the Miscovich Sanctions Order being used against Appellees by Motivation or some other party.  So long as the Miscovich Sanctions Order cannot be used against Appellees, they have no interest in seeking appellate review of the order.

[7]  In opposing any effort to use the Miscovich Sanctions Order against them, Appellees will show that the Miscovich Sanctions Order was entered in error because (i) Miscovich was not a party to the *in rem* action; (ii) the district court did not issue an Order to Show Cause (or similar process) to Miscovich (or his estate) prior to the First Sanctions Hearing (or thereafter, for that matter); (iii) neither Miscovich (nor his estate) attended the First Sanctions Hearing; and (iv) neither Miscovich (nor his estate) were represented by counsel at the First Sanctions Hearing.  Moreover, prior to the First Sanctions Hearing (i) Miscovich had committed suicide, and (ii) JTR's counsel of record had moved to withdraw from representing JTR after being threatened with sanctions and criminal charges by representatives of Motivation.  Again, and for the avoidance of doubt, Appellees make these arguments only to avoid the Miscovich Sanctions Order being used against Appellees by Motivation or some other party.  So long as the Miscovich Sanctions Order cannot be used against Appellees, they have no interest in seeking appellate review of the order.

criminal complaint, and (ii) the other of which (David Horan) was counsel of record at the time JTR

failed to make a disclosure to the court that Chief Judge Moore concluded should have been made,

and who had a personal financial interest in avoiding a determination that he was responsible for the

conduct of JTR's litigation activity.  The grounds on which Appellees would challenge these

subsidiary findings would include (i) the jurisdictional and standing defects set forth in Appellees'

Joint Dismissal Motion; (ii) the absence of opportunity for discovery by Appellees, including into

impeachment information regarding witnesses (such as threats and agreements made between

Motivation and their counsel),[8] and (iii) other procedural irregularities.[9]

## D.  <u>D.E. 590 & 591 (the "Fee Awards")</u>

These orders awarded Motivation (i) $173,708.09 in attorneys' fees and costs against JTR,

and (ii) $1,204,726.90 in attorneys' fees and costs against the Estate of Jay Miscovich.  Through its

appeal of the court's denial of sanctions against Appellees, Motivation seeks to hold Appellees

vicariously liable for the attorneys' fees and costs awarded to Motivation against JTR and the Estate

of Jay Miscovich.  In direct defense of Motivation's frivolous appeal, Appellees will show that there

---

[8] Disclosure of this type of information is mandated in the criminal context by cases such as *Brady v. Maryland,* 373 U.S. 83, 87 (1963) and *Giglio v. United States,* 405 U.S. 150, 154-55 (1972), but in the civil context must be obtained through discovery.

[9] Moreover, inasmuch as the Second Sanctions Hearing was akin to a criminal contempt proceeding (especially inasmuch as Motivation lacked standing to seek sanctions from Appellees, and the district court lacks the "inherent power" to sanction a non-party), Appellees were entitled to even more stringent due process protections available in a criminal contempt proceeding, such as (i) not having the sanctions proceeding "prosecuted" by attorneys with a financial interest in the outcome, (ii) the right to have the charges against them heard by a jury, and (iii) a requirement of proof beyond a reasonable doubt.  *See, e.g., International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 831, 129 L. Ed. 2d 642, 114 S. Ct. 2552 (1994); *Cobell v. Norton*, 334 F.3d 1128 (D.C. Cir. 2003); *Crowe v. Smith*, 151 F.3d 217 (5th Cir 1998); *Mackler Productions, Inc. v. Cohen*, 146 F.3d 126 (2nd Cir. 1998); *Shepherd v. ABC*, 62 F.3d 1469 (D.C. Cir. 1995); *Pyramid Real Estate Services, LLC v. United States*, 95 Fed. Cl. 613, 618 (Fed. Cl. 2010) ("When determining whether to impose sanctions under their inherent authority, courts apply the same procedural requirements they would when considering sanctions for contempt.").  Additionally, the court's subsidiary findings are not supported by the record – especially when it was Motivation's burden to establish these facts by clear and convincing evidence (if not a higher standard).  And, as set forth in Appellees' Joint Motion to Dismiss the Appeal, the Second Sanctions Hearing was conducted by a court that lacked jurisdiction to do so.  Again, and for the avoidance of doubt, Appellees make these arguments only to avoid any adverse findings in the Sanctions Denial Order being used against Appellees by Motivation or some other party.  So long as the Sanctions Denial Order cannot be used against Appellees, they have no interest in seeking appellate review of any aspect of the order.

is no merit to Motivation's effort to hold Appellees liable for sanctions imposed on others.  And, as will be shown through Appellees' cross-appeal, the Fee Awards were issued in error (and should not, therefore, be able to be used against Appellees even if there otherwise were a basis for doing so) because (i) the proceedings that gave rise to the entry of the Fee Awards were jurisdictionally and legally flawed for all of the reasons set forth in connection with the discussion of the Miscovich Sanctions Order, (ii) the district court made no assessment, whatsoever, of the ability of JTR or Miscovich to pay the Fee Awards; and (iii) the Fee Awards were made at a time when neither JTR nor the Estate of Jay Miscovich were represented by counsel.  *See, e.g., Martin v. Automobili Lamborghini Exclusive, Inc.,* 307 F.3d 1332 (11th Cir. 2002) ("when exercising its discretion to sanction under its inherent power, a court must take into consideration the financial circumstances of the party being sanctioned**").**[10]

## APPELLEES' CROSS-APPEAL SEEKS TO AVOID COLLATERAL ESTOPPEL

A prevailing party may appeal an order of a district court "when the prevailing party is prejudiced by the collateral estoppel effect of the district court's order."  Jurisdictional Questions (quoting *Agripost, Inc. v. Miami-Dade Cty., ex rel. Manager,* 195 F.3d 1225, 1230 (11th Cir. 1999)). *See also Picard v. Credit Solutions, Inc.,* 564 F.3d 1249, 1255-56 (11th Cir. 2009) (same); *In re DES Litigation,* 7 F.3d 20, 23-25 (2nd Cir. 1993) ["*DES*"] (acknowledging that the potential for collateral estoppel effect of adverse rulings will support an appeal by an otherwise prevailing party).[11]  The

---

[10]  Again, and for the avoidance of doubt, Appellees make these arguments only to avoid the Fee Awards being used against Appellees by Motivation or some other party.  So long as the Fee Awards cannot be used against Appellees, they have no interest in seeking appellate review of the awards.

[11]  *See also Hodge v. Bluebeard's Castle, Inc.,* 392 Fed. App'x. 965, 977 n.18 (3rd Cir. 2010) ("'when the prevailing party is aggrieved by the collateral estoppel effect of a district court's rulings' that party has standing to pursue an appeal of those rulings") (quoting *Dolenc v. Love,* 40 F.3d 656, 657 (3d Cir. 1994); *Klamath Strategic Inv. Fund v. United States,* 568 F.3d 537, 546 (5th Cir. 2009) ("In some situations, adverse collateral estoppel implications may show that a party is aggrieved by a particular ruling."); *Envtl. Prot. Info. Ctr., Inc. v. Pac. Lumber Co.,* 257 F.3d 1071, 1076 (9th Cir. 2001) ("[T]he Supreme Court has recognized that a winning party will be considered aggrieved by a favorable judgment if future economic loss will result to the party on account of adverse collateral rulings. This route to prudential standing is powerful because it allows for review of the merits – if the parties retain a stake in the controversy satisfying Article III – of the adverse collateral order."); *EEOC v. Chicago Club,* 86 F.3d 1423, 1431 (7th Cir. Ill. 1996) ("A ruling or finding contained in a judgment may be sufficiently adverse if that finding may have preclusive effect in a subsequent proceedings.").

Supreme Court also has instructed that "[i]n an appropriate case, appeal may be permitted from an adverse ruling collateral to the merits at the behest of the party who has prevailed on the merits, so long as the party retains a stake in the appeal satisfying the requirements of Article III." *Deposit Guaranty Nat.Bank v. Roper,* 445 U.S. 326, 334 (1980). Moreover, in *DES*, the Second Circuit observed, as follows:

> The second exception to the rule prohibiting appeal by a prevailing party arises, in some circumstances, where a prevailing party can show that it is aggrieved by some aspect of the trial court's judgment or decree. *In Electrical Fittings Corp. v. Thomas & Betts Co.*, 307 U.S. 241, 83 L. Ed. 1263, 59 S. Ct. 860 (1939), the District Court had entered a judgment for the defendant, finding that the defendant had not infringed the plaintiff's patent but also finding that the patent was valid. We dismissed the defendant's appeal, since the finding of validity did not support the decree and would not have estoppel effect. The Supreme Court reversed and held that we should have "entertained the appeal, not for the purpose of passing on the merits, but to direct the reformation of the decree." *Id.* at 242. Judge Learned Hand later explained the Supreme Court's terse decision as follows:
>
>> The Supreme Court did not differ with us in thinking that the finding [of validity] was immaterial, but nevertheless it directed us to strike it from the decree. The rationale of that decision was that the defendant was entitled to have it out because, although it was not an estoppel, it might create some presumptive prejudice against him.

*DES*, 7 F.3d at 25 (quoting *Harries v. Air King Products Co.*, 183 F.2d 158, 161 (2d Cir. 1950)). *See also Conwill v. Greenberg Traurig, L.L.P.*, 448 Fed. App'x. 434, 436-37 (5th Cir. 2011) ("Courts have recognized a handful of situations in which a party may be sufficiently aggrieved by a favorable judgment to appeal it, such as where the judgment itself contains prejudicial language on issues immaterial to the disposition of the case, where collateral estoppel may harm the party in future proceedings, or where the party will suffer financial loss as a result of the judgment.").

Here, Motivation has sought (and continues to seek) to have rulings in the Questioned Orders applied adversely to Appellees. Indeed, Motivation's own "Civil Appeal Statement" – filed herein on September 30, 2015 – identifies the district court's refusal to give collateral estoppel effect to its prior rulings as an issue that Motivation disputes. Specifically, Motivation's Civil Appeal Statement states, as follows:

> (5) Whether the trial court erred in ruling that Silverstein, his firm Young Conaway Stargatt & Taylor and Sullivan were not in privity with JTR, and therefore, not bound by the court's previous findings.

14

*Id.* (Exhibit 1 hereto).[12]

More recently, in "Appellant Motivation's Reply to Appellees' Opposition to Motion for an Extension of Time to Respond to Motion to Dismiss" in this Court (filed on December 7, 2015), Motivation proffered the following assertions:

> In the proceedings below, Motivation uncovered what the district judge called a "massive fraud on the court" that the court found was "substantially controlled" by Bruce Silverstein and his firm, who acted as general counsel to the fraudulent enterprise, JTR Enterprises LLC (JTR"). [D.E. 568; p. 55] Though the district court found that JTR's fraud on the court was not "sanctionable conduct", the court sanctioned JTR for bad faith litigation practices that were engineered by Silverstein. Without reason, the court refused to sanction Silverstein for his central role in JTR's bad faith litigation practices.

*Id.* at 1-2. *See also id.* at 2 ("given that Silverstein and his firm substantially controlled the fraudulent litigation, the matter warrants serious consideration"). Thus, it is clear that Motivation seeks to use the Questioned Orders against Appellees.[13]

Additionally, and as discussed *supra* (under the heading "D. The Sequel: The AZALP Action"), the New York Investors – represented by the same counsel who represent Motivation in this appeal – are seeking to use rulings in the Questioned Orders against Appellees in the AZALP Action. For example, although Judge King ultimately denied Motivation's motion to sanction Mr. Silverstein, Judge King did find that Mr. Silverstein had a substantial interest in the outcome of the *in rem* action, and that Mr. Silverstein substantially participated in the action, even though he was

---

[12] Within days of receiving the Court's Jurisdictional Questions, Motivation filed an Amended Civil Appeal Statement, which deleted the quoted issue. (*See* Exhibit 2 hereto). But, this does not preclude Motivation from continuing to argue for an application of collateral estoppel in its frivolous quest to reverse the district court's denial of Motivation's motion to sanction Appellees.

[13] Motivation's latest filing also highlights the frivolity of its appeal, as the only alleged "factual" support for Motivation's assertions is lifted from Motivation's failed motion for reconsideration of the denial of its sanctions motion – thereby raising points to this Court which are both false and twice rejected by the district court below. One example is Motivation's false statement that "Silverstein admitted that prior to the filing of the fraudulent admiralty complaint he did not believe JTR's story and only hours after being advised specifically that JTR's account of events was false, Silverstein directed JTR's Florida counsel to file the admiralty case *because he thought the filing would help them raise money from investors*." *Id.* at 2 (emphasis by Motivation). This statement is (i) contrary to the record, (ii) contrary to the district court's findings, (iii) specifically rejected by the district court's denial of Motivation's motion for reconsideration (*see* D.E. 592), and (iv) cut from whole cloth. As shown in the discussion herein of the First Sanctions Hearing, *supra*, Motivation also misrepresents the record when it asserts that the district court found that JTR committed a fraud on the court or engaged in bad faith litigation practices. In fact, Chief Judge Moore not only declined to make such a finding, but he expressly rejected Motivation's urging that he do so.

neither a party nor counsel of record for any party.  *See* Sanctions Denial Order at 54-55.  The New York Investors now seek to use these findings against Appellees in the AZALP Action.

Appellees respectfully submit that any subsidiary findings in the Sanctions Denial Order cannot be used against Appellees because they were not critical or necessary to Judge King's ultimate ruling ***denying*** sanctions.  *See Steed v. EverHome Mortgage Co.*, 308 F. App'x 364, 371-72 (11th Cir. 2009) (setting forth the elements of collateral estoppel).  *See also DES*, 7 F.3d at 23 ("Relitigation of an issue in a second action is precluded only if 'the judgment in the prior action was dependent upon the determination made of the issue.'") (quoting 1B James W. Moore, et al., Moore's Federal Practice P 0.443[1], at 760 (2d ed. 1993)); *Klamath Strategic Inv. Fund*, 568 F.3d at 546 ("an interlocutory ruling will only have collateral estoppel effect in subsequent litigation if the ultimate judgment in the case was dependent upon the interlocutory ruling").

Additionally, Appellees lacked a fair opportunity to litigate the issues, as they did not participate in the discovery leading up to the sanctions hearing, and had no opportunity to depose JTR's counsel of record, who had made deals to help Motivation pursue sanctions from Mr. Silverstein in consideration of Motivation not seeking sanctions from them.  *See*, *e.g.*, *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (where (as here) "[a] person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues," the nonparty preclusion sought by Motivation "runs up against the 'deep-rooted historic tradition that everyone should have his own day in court") (*quoting Richards v. Jefferson County*, 517 U.S. 793, 798 (1996)); *see also United States v. Shaygan*, 652 F.3d 1297, 1319 (11th Cir. 2011) (stating that attorneys charged with misconduct must be afforded due process and "[t]he record before us is unreliable because it was developed, after all, without affording either of them due process"); *EEOC v. Pemco Aeroplex, Inc.*, 383 F.3d 1280, 1286 (11th Cir. 2004).[14]

Moreover, there is no question that the district court's various rulings against Miscovich and JTR in connection with the First Sanctions Hearing were based on evidence presented at a hearing

---

[14]  Collateral estoppel also cannot apply where, as here, the underlying orders were entered without jurisdiction, as raised by Appellees' Joint Dismissal Motion, which is now pending in this Court. *See Envtl. Prot. Info. Ctr., Inc. v. Pac. Lumber Co.*, 257 F.3d at 1076.

(i) in which Appellees were not parties, (ii) which Appellees did not attend, (iii) in which Appellees were not represented, and (iv) during which Appellees had no opportunity to defend themselves, such that they did not have a fair and full opportunity to litigate the issues raised. Indeed, the Miscovich Sanctions Order (D.E. 445) unequivocally states:

> The only Parties that the Court will deal with in this Order are JTR and Miscovich. . . . This Court found that Silverstein had not submitted himself to its jurisdiction and therefore, *Silverstein was excluded from the hearing* (D.E. 333).

D.E. 445 at 3, n. 3 (emphasis added). As such, there is no merit to the efforts of Motivation or the New York Investors to use rulings resulting from the First Sanctions Hearing against Appellees. *See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 329 (1971) ("Some litigants – those who never appeared in a prior action – may not be collaterally estopped without litigating the issue. They have never had a chance to present their evidence and arguments on the claim. Due process prohibits estopping them despite one or more existing adjudications of the identical issue which stand squarely against their position.").

This is particularly so inasmuch as the record further reflects that Motivation actually played an active role in preventing Appellees from playing a role in the defense of the proceedings that preceded the First Sanctions Hearing. Despite recognizing well in advance of the First Sanctions Hearing that Appellees were not parties and could only be made parties through service of an Order to Show Cause, Motivation deliberately waited until *after* conclusion of the First Sanctions Hearing to request such an order. *See* D.E. 407 (filed on February 28, 2014)[15] And, prior to the First Sanctions Hearing (against JTR), Motivation deliberately refrained from pursuing discovery of Appellees (even though Silverstein's purported actions formed a basis for the judgment against

---

[15] Soon after the conclusion of the December 2012 trial concerning title to the *Res*, Motivation recognized that it would need the Court to enter an order to show cause, which would need to be served through valid process, before Appellees, who were not part of the underlying case, could be subject to sanctions. *See* D.E. 517, at 10 (citing White email to Morgan and Fisher stating that "Silverstein did not make an appearance and neither Silverstein or the Young-Conaway firm are parties. Should we move for an order to show cause why they should not be subject to sanctions?"). Yet, Motivation delayed seeking such an order for *more than nine months*, (*see* D.E. 315), during which time Motivation engaged in extensive discovery, conducting ten depositions and hiring a number of private investigators and putative experts – all in furtherance of its scheme to reach into Appellees' perceived "deep pockets" by conducting *ex parte* discovery without Appellees involvement or ability to defend or conduct discovery of their own in the action.

JTR), due to an admitted concern that Appellees would create a record that was unhelpful to

Motivation – as discussed in Appellees' Joint Dismissal Motion and herein below.[16]

Based on the foregoing, Appellees argued prior to the Second Sanctions hearing for their own

discovery rights, as follows:

> Before Motivation can proceed to call any witnesses, introduce any putative
> evidence, or rely, in any way, upon a record created at a time that [Appellees] were
> not parties to this matter, [Appellees] are entitled to a full panoply of fundamental
> due process rights.  Having been haled into this Court for an evidentiary hearing,
> [Appellees] are entitled to, among other things, (i) a clear statement of the
> accusations made against them, (ii) the right to take discovery on an equal basis with
> their accuser, and (iii) the right to a jury trial depending on the scope and nature of
> potential sanctions.

D.E. 517 at 6 n.3 (citations omitted).

> Appellees further argued:

> Before [Appellees] should be required to examine any of the numerous witnesses or
> address any of the putative 'evidence' proffered by Motivation, [Appellees] are
> entitled to take meaningful discovery – which has not occurred.  Considering the
> short time between the Order setting the [Second] Sanctions Hearing and the hearing,
> and given [Appellees]'s lack of involvement in the discovery process, Motivation's
> counsel were asked to provide its proposed witness list and witness discovery prior to
> the date required by the Court.  Motivation's counsel refused, stating that discovery
> was not necessary.  In order to properly defend themselves, [Appellees] should have
> been entitled to receive document discovery and take the depositions of, among
> others, the following persons: (i) all witnesses from the Title/Finders Trial and
> Sanctions Trial, (ii) Motivation – including, but not limited to Kim Fisher, Sean
> Fisher, Joe Sweeney, and a corporate witness, (iii) All New York investors, including
> Dean Barr and Neil Ash, (iv) Jeffrey Post of the Smithsonian Institute, (v) anyone
> who was deposed by Motivation, (vi) Steve Elchlepp, Jr., (v) Scott Miscovich,
> (vi) Mark Davis and Michael Livingston, (viii) John Siracusa, Joseph Janssen,
> Christy Janssen, and David Horan, (ix) Peter Tobia, Scott Heimdal, and Anthony
> Santelli, (x) Antoinette Matlins, (xi) Kenneth Rose, Gerry Edwards, and Ed
> Krajewski, (xii) anyone who dove the discovery site, and (xii) Jorge Rodriguez.

D.E. 517 at 11 n.4.

Nonetheless, Judge King compelled Appellees to defend the Second Sanctions Hearing less

than three-weeks after he first ruled that Appellees were required to appeal and defend against

Motivation's motion for sanctions (*see* D.E. 488 – October 30, 2014 Order denying Appellees'

---

[16] As discussed in Appellees' Joint Dismissal Motion, Motivation made a calculated decision not to
depose Appellees specifically so that the Court would not have the opportunity to hear Mr.
Silverstein's side of the story at the First Sanctions Hearing.  As Motivation's lead counsel at the
First Sanctions Hearing wrote: "If you depose BS, he'll just get out his side of the story and the
testimony will be admissible at trial."  *See* Joint Dismissal Motion at 7 & n.6.

Motion to Quash, and setting evidentiary hearing for November 17, 2014, which was later continued to November 19, 2014), and without any discovery of their accusers or the witnesses with whom their accusers had "cut deals."

Under these circumstances, it would be inappropriate for Motivation, the New York Investors, or any other party to use any of the Questioned Orders against Appellees. Nonetheless, Motivation and the New York Investors continue to seek to do so. Accordingly, Appellees respectfully pray that the Court either (i) sustain Appellees' right to proceed with their cross appeal of the Questioned Orders, or (ii) make clear that the Questioned Orders cannot be used against Appellees. As the Second Circuit explained in *DES*:

> Though we decline to accord appellate standing because [Appellant] cannot avail itself of the collateral estoppel exception to the rule prohibiting appeal by a prevailing party, we note that our decision to decline appellate review of the District Court's order confirms the lack of any possible collateral estoppel effect arising from the District Court's interlocutory rulings. . . . Thus, whether or not other trial judges find Judge Weinstein's opinion a persuasive precedent, . . . they are not bound to apply it in any subsequent litigation against [Appellant].

*DES*, 7 F.3d at 24-25 (citations omitted). *See also Envtl. Prot. Info. Ctr., Inc.*, 257 F.3d at 1076 ("As collateral estoppel does not apply to an unappealable determination, simply holding a ruling unappealable eliminates any prospect of preclusion."); *McCafferty v. Centerior Serv. Co.*, 1999 U.S. App. LEXIS 19809 (6th Cir. Ohio Aug. 16, 1999)) ("[O]ur decision to decline appellate review confirms the lack of any possible collateral estoppel effect arising from the district court's ruling. Whether or not other trial judges find the district court's ruling a persuasive precedent, they are not bound to apply it in any subsequent litigation against the defendants.") (citing *DES*, 7 F.3d at 24-25).

19

Respectfully submitted,

ADAMS AND REESE LLP
John T. Rogerson, III
Florida Bar No. 832839
john.rogerson@arlaw.com
501 Riverside Avenue, 7th Floor
Jacksonville, FL 32202
Telephone:  (904) 355-1700
Facsimile:  (904) 355-1797

COFFEY BURLINGTON, P.L.

By:  /s/ Jeffrey B. Crockett
       Jeffrey B. Crockett
       Florida Bar No. 347401
       David J. Zack
       Florida Bar No. 641685
       2601 South Bayshore Drive, Penthouse
       Miami, Florida  33133
       Telephone:  (305) 858-2900
       Facsimile:  (305) 858-5261
       jcrockett@coffeyburlington.com
       dzack@coffeyburlington.com
       vmontejo@coffeyburlington.com
       service@coffeyburlington.com

*Counsel for Young Conaway Stargatt &*
*Taylor, LLP  and Bruce L. Silverstein, Esq.*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that true and correct copy of the foregoing was served by Notice of

Electronic Filing generated by CM/ECF, on December  9, 2015, on all counsel or parties of record

on Service List below.

**MOTIVATION, INC. V. JTR ENTPRISES, INC.**
**CASE NO. 15-14132-D**

**<u>SERVICE LIST</u>**

Arthur E. Lewis, Jr., Esq.
Marlow V. White, Esq.
LEWIS & WHITE, PLC
222 W. Georgia Street
P.O. Box 1050
Tallahassee, FL  32301
mvw@lewisandwhite.com

*Counsel for Appellant Motivation, Inc.*

By:  */s/*Jeffrey B. Crockett _____

# EXHIBIT 1



U.S. COURT OF APPEALS
RECEIVED
CLERK

SEP 30 2015

ATLANTA, GA

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
**CORRECTED CIVIL APPEAL**
**STATEMENT**

*Please TYPE. Attach additional pages if necessary.*          11th Circuit Docket Number: _____ **15-14132-D**

| Caption: | District and Division: Southern District of Florida; Key West |
|---|---|
| MOTIVATION, INC., | Name of Judge: **JAMES LAWRENCE KING** |
| | Nature of Suit: **ADMIRALTY; SANCTIONS** |
| VS. | Date Complaint Filed: **SEPTEMBER 6, 2011** |
| | District Court Docket Number: **4:11-cv-10074-JLK** |
| BRUCE L. SILVERSTEIN, PAUL D. SULLIVAN | Date Notice of Appeal Filed: **SEPTEMBER 14, 2015** |
| and YOUNG, CONAWAY, STARGATT & | ☐Cross Appeal  ☐Class Action |
| TAYLOR, LLP | Has this matter previously been before this court? |
| | ☒Yes  ☐No |
| | If Yes, provide |
| | (a) Caption: JTR Enterprises v. Columbian etc. |
| | (b) Citation: N/A |
| | (c) Docket Number: 13-10870 |

| | Attorney Name | Mailing Address | Telephone, Fax, and Email |
|---|---|---|---|
| **For Appellant:**<br>☐ Plaintiff<br>☐ Defendant<br>☒ Other (Specify) | Claimant's Attorneys<br>A. EUGENE LEWIS<br>MARLOW V. WHITE | 222 W. GEORGIA STREET<br>TALLAHASSEE FL 32301 | TEL. 850-425-5000<br>FAX 850-425-5004<br>lawlaw@polaris.net |
| **For Appellee:**<br>☐ Plaintiff<br>☐ Defendant<br>☒ Other (Specify) | Sanctions Defendants'<br>Attorneys<br>JOHN GRAVANTE<br>JOHN DORSEY<br>JOHN ROGERSON<br>DAVID ZACK | 25 W Flagler St Ste 800 -Miami, FL 33130<br>1000 North King St. Wilmington, DE19801<br>501 Riverside Ave Fl 7, Jax, FL 32202<br>2601 S Bayshore Dr PH-1, Miami, FL 33133 | |

*Please CIRCLE/CHECK/COMPLETE the items below and on page 2 that apply.*

| Jurisdiction | Nature of Judgment | Type of Order | Relief |
|---|---|---|---|
| ☒ Federal Question | ☒ Final Judgment, 28 USC 1291 | ☐ Dismissal/Jurisdiction  Default | Amount Sought by Plaintiff:<br>$_____ |
| ☐ Diversity | ☐ Interlocutory Order, 28 USC 1292(a)(1) | ☐ Judgment  Summary | Amount Sought by Defendant:<br>$_____ |
| ☐ US Plaintiff | | ☐ Judgment Judgment/Bench Trial | |
| ☐ US Defendant | ☐ Interlocutory Order Certified, 28 USC 1292(b) | ☒ Judgment/Jury Verdict | Awarded:<br>$_____<br>to _____ |
| | ☐ Interlocutory Order, Qualified Immunity | ☐ Judgment/Directed Verdict/NOV | |
| | ☐ Final Agency Action (Review) | ☐ Injunction | Injunctions:<br>☐ TRO<br>☐ Preliminary  ☐ Granted<br>☐ Permanent  ☐ Denied |
| | ☐ 54(b) | ☐ Other _____ | |
| | | ☒ | |

Page 2                                                    11th Circuit Docket Number: __**15-14132-D**__

---

Based on your present knowledge:

(1)  Does this appeal involve a question of First Impression?  ☐Yes  ☒No
     What is the issue you claim is one of First Impression?

(2)  Will the determination of this appeal turn on the interpretation or application of a particular case or statute?  ☐Yes  ☒No

     If Yes, provide
     (a)  Case Name/Statute
     (b)  Citation
     (c)  Docket Number if unreported

(3)  Is there any case now pending or about to be brought before this court or any other court or administrative agency that
     (a)  Arises from substantially the same case or controversy as this appeal?  ☒Yes  ☐No
     (b)  Involves an issue that is substantially the same, similar, or related to an issue in this appeal?  ☒Yes  ☐No

     If Yes, provide
     (a)  Case Name                    AZALP LLC vs. Young Conaway Stargatt & Taylor, et al.
     (b)  Citation          Docket     N/A
     (c)  Number if unreported Court    4:14-cv-10079-JEM
     (d)  or Agency                     Southern District of Florida; Miami

(4)  Will this appeal involve a conflict of law
     (a)  Within the Eleventh Circuit?  ☐Yes  ☒No
     (b)  Among circuits?  ☐Yes  ☒No

     If Yes, explain briefly:

(5)  Issues proposed to be raised on appeal, including jurisdictional challenges:
     See attached.

---

I CERTIFY THAT I SERVED THIS CIVIL APPEAL STATEMENT ON THE CLERK OF THE U.S. COURT OF APPEALS FOR THE ELEVENTH CIRCUIT AND

SERVED A COPY ON EACH PARTY OR THEIR COUNSEL OF RECORD, THIS __28th__ DAY OF __September__, __2015__.

| __Marlow White__ | __/s/ Marlow White__ |
|:---:|:---:|
| NAME OF COUNSEL (Print) | SIGNATURE OF COUNSEL |

*Please ATTACH portion of district court, tax court, or agency record described in 11th Cir. R. 33-1(b): (a) judgments and orders appealed from or sought to be reviewed; (b) any supporting opinion, findings of fact, and conclusions of law filed by the court or the agency, board, commission, or officer; (c) any report and recommendation adopted by an order; (d) findings and conclusions of an administrative law judge when appealing a court order reviewing an agency determination; (e) any agency docket sheet or record index.*

## ISSUES TO BE RAISED ON APPEAL

(1) Whether the trial court erred when it ruled [D.E. 445] that perpetration of a fraud on the court JTR Enterprises, LLC's ("JTR") was not sanctionable conduct.

(2) With respect to the trial court's order [D.E. 568] denying Motivation's sanctions claims against Bruce L. Silverstein:

(a) The court sanctioned JTR for engaging in bad faith litigation by failing to disclose evidence that the emeralds were coated with modern epoxy resins and by blocking an inspection of the emeralds. Did the trial court err by not sanctioning Silverstein for bad faith litigation where Silverstein was JTR's general counsel, the person who the court found to have "substantially controlled" the fraudulent litigation, and the person who specifically engineered the bad faith litigation practices?

(b) The court's order identified certain facts, but consistently avoided any mention of many un-contradicted facts that supported Motivation's motion for sanctions and undermined the court's decision not to hold key leaders of the fraud liable for sanctions. Motivation filed a Rule 52(b) motion seeking fact findings respecting all material facts and proposed 65 paragraphs of critical facts ignored by the court. Including threats to witnesses, even though all those facts were uncontradicted and many of those facts were based on Silverstein's own admissions and were corroborated by contemporaneous emails. The court denied the motion based on its understanding that none of the facts were supported by any credible evidence. Did the court err by failing to make findings of all material facts relevant to the sanctions issues in violation of Rule 52(a), by denying Motivation's Rule 52(b) motion [D.E. 592] seeking specific findings respecting the basis of its claims; and by concluding that the 65 paragraphs of facts were not supported by any credible evidence?

(c) Whether the trial court erred by not sanctioning Silverstein for his substantial control of this fraudulent litigation where he was aware of

overwhelming evidence that the case was fraudulent, he failed to perform any investigation of the fraud and he failed to timely bring the fraudulent conduct to the court's attention.

(3) The trial court dismissed Motivation's sanctions claims against Paul Sullivan [D.E. 528] on the basis that Motivation did not present and the record did not contain any evidence that Sullivan was involved in managing the fraudulent litigation or any evidence that Sullivan was willfully blind or had knowledge of the fraud. In fact, Motivation submitted substantial un-contradicted evidence that Sullivan was directly involved in extensive dealings with Miscovich concerning the treasure-find fraud and that as a member of JTR's advisory committee Sullivan was substantially engaged directly with JTR's trial counsel throughout the pertinent time period and the trial. Evidence of Sullivan's knowledge and involvement included: (a) his extensive discussions questioning JTR principal, Jay Miscovich, whether he had actually brought the alleged treasure-find emeralds rather than finding them on the sea floor as he had claimed, (b) JTR's general counsel repeatedly advised Florida counsel that Sullivan's approval was required for key litigation decisions, (c) JTR's trial counsel warned Sullivan that emeralds had been planted at the site, that a cannon ball was planted at the site, that Miscovich claimed falsely to have found a 20 pound bag of emeralds at the site, that Miscovich claimed falsely to have found coins at the site, and other facts making clear the fraudulent nature of this case. Did the trial court err when it dismissed Sullivan based on the mistaken conclusion that there was no evidence at all in the record that implicated Sullivan?

(4) The trial court dismissed Motivation's sanctions claims against Silverstein's firm, Young Conaway Stargatt and Taylor (YCST) [528], on the basis that there was no evidence at all in the record implicating YCST. In fact, the un-contradicted evidence showed that Silverstein was the attorney at the firm responsible for dealing with Miscovich in connection with his claim to have found the emerald treasure, that Silverstein was a member of the YCST firm's management committee, acted within the scope of his partnership in YCST while managing this fraudulent case and that YCST had secured a substantial financial interest in the outcome of this fraudulent litigation. Given these facts, did the trial court err in concluding there was no evidence in the record implicating YCST in the sanctions action?

(5) Whether the trial court erred in ruling that Silverstein, his firm Young Conaway Stargatt & Taylor and Sullivan were not in privity with JTR and, therefore, not bound by the court's previous findings.

# EXHIBIT 2

Rev. 2/11

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
**CIVIL APPEAL STATEMENT**

*Please TYPE.  Attach additional pages if necessary.*

11th Circuit Docket Number: **15-14132-D**

| Caption: | | District and Division: Middle District of Florida; Key West |
|---|---|---|
| | | Name of Judge:     JAMES LAWRENCE KING |
| MOTIVATION, INC., | | Nature of Suit:     ADMIRALTY; SANCTIONS |

Caption:

MOTIVATION, INC.,

vs.

BRUCE L. SILVERSTEIN, PAUL D. SULLIVAN
and YOUNG, CONAWAY, STARGATT &
TAYLOR, LLP

District and Division: Middle District of Florida; Key West
Name of Judge:     JAMES LAWRENCE KING
Nature of Suit:     ADMIRALTY; SANCTIONS
Date Complaint Filed:     SEPTEMBER 6, 2011
District Court Docket Number: 4:11-cv-10074-JLK
Date Notice of Appeal Filed:     SEPTEMBER 14, 2015
☐ Cross Appeal    ☐ Class Action
Has this matter previously been before this court?
☒ Yes    ☐ No
If Yes, provide
(a)    Caption:     JTR Enterprises v. Columbian etc.
(b)    Citation:     N/A
(c)    Docket Number: 13-10870

| | Attorney Name | Mailing Address | Telephone, Fax, and Email |
|---|---|---|---|
| For Appellant:<br>☐ Plaintiff<br>☐ Defendant<br>☒ Other (Specify) | Claimant's Attorneys<br>A. EUGENE LEWIS<br>MARLOW V. WHITE | 222 W. GEORGIA STREET<br>TALLAHASSEE FL 32301 | TEL. 850-425-5000<br>FAX 850-425-5004<br>lawlaw@polaris.net |
| For Appellee:<br>☐ Plaintiff<br>☐ Defendant<br>☒ Other (Specify) | Sanctions Defendants'<br>Attorneys | | |

*Please CIRCLE/CHECK/COMPLETE the items below and on page 2 that apply.*

| Jurisdiction | Nature of Judgment | Type of Order | Relief |
|---|---|---|---|
| ☒ Federal Question | ☒ Final Judgment,<br>28 USC 1291 | ☐ Dismissal/Jurisdiction    Default | Amount Sought by Plaintiff:<br>$_____ |
| ☐ Diversity | | ☐ Judgment      Summary | |
| ☐ US Plaintiff | ☐ Interlocutory Order,<br>28 USC 1292(a)(1) | ☐ Judgment Judgment/Bench Trial | Amount Sought by Defendant:<br>$_____ |
| ☐ US Defendant | ☐ Interlocutory Order Certified,<br>28 USC 1292(b) | ☒ Judgment/Jury Verdict | Awarded:<br>$_____ |
| | ☐ Interlocutory Order,<br>Qualified Immunity | ☐ Judgment/Directed Verdict/NOV | to _____ |
| | | ☐ Injunction | Injunctions:<br>☐ TRO |
| | ☐ Final Agency Action (Review) | ☐ Other _____ | ☐ Preliminary   ☐ Granted |
| | ☐ 54(b) | ☒ | ☐ Permanent    ☐ Denied |

Page 2                                           11th Circuit Docket Number: _____ 15-14132-D _____

Based on your present knowledge:

(1)    Does this appeal involve a question of First Impression?    ☐ Yes  ☒ No
       What is the issue you claim is one of First Impression?

(2)    Will the determination of this appeal turn on the interpretation or application of a particular case or statute?    ☐ Yes  ☒ No

       If Yes, provide
       (a)   Case Name/Statute
       (b)   Citation
       (c)   Docket Number if unreported

(3)    Is there any case now pending or about to be brought before this court or any other court or administrative agency that
       (a)   Arises from substantially the same case or controversy as this appeal?    ☒ Yes  ☐ No
       (b)   Involves an issue that is substantially the same, similar, or related to an issue in this appeal?    ☒ Yes  ☐ No

       If Yes, provide
       (a)   Case Name                         AZALP LLC vs. Young Conaway Stargatt & Taylor, et al.
       (b)   Citation              Docket      N/A
       (c)   Number if unreported  Court       4:14-cv-10079-JEM
       (d)   or Agency                         Southern District of Florida; Miami

(4)    Will this appeal involve a conflict of law
       (a)   Within the Eleventh Circuit?    ☐ Yes  ☐ No
       (b)   Among circuits?                 ☐ Yes  ☐ No

       If Yes, explain briefly:

(5)    Issues proposed to be raised on appeal, including jurisdictional challenges:

       See attached.

I CERTIFY THAT I SERVED THIS CIVIL APPEAL STATEMENT ON THE CLERK OF THE U.S. COURT OF APPEALS FOR THE ELEVENTH CIRCUIT AND

SERVED A COPY ON EACH PARTY OR THEIR COUNSEL OF RECORD, THIS _____ 28th _____ DAY OF _____ September _____ , _____ 2015 _____ .

_____                    _____
        Marlow White                                        /s/ Marlow White
     NAME OF COUNSEL (Print)                            SIGNATURE OF COUNSEL

*Please ATTACH portion of district court, tax court, or agency record described in 11th Cir. R. 33-1(b): (a) judgments and orders appealed from or sought to be reviewed; (b) any supporting opinion, findings of fact, and conclusions of law filed by the court or the agency, board, commission, or officer; (c) any report and recommendation adopted by an order; (d) findings and conclusions of an administrative law judge when appealing a court order reviewing an agency determination; (e) any agency docket sheet or record index.*

ISSUES TO BE RAISED ON APPEAL

(1) Whether the trial court erred when it ruled [D.E. 445] that perpetration of a fraud on the court JTR Enterprises, LLC's ("JTR") was not sanctionable conduct.

(2) With respect to the trial court's order [D.E. 568] denying Motivation's sanctions claims against Bruce L. Silverstein:

(a) The court sanctioned JTR for engaging in bad faith litigation by failing to disclose evidence that the emeralds were coated with modern epoxy resins and by blocking an inspection of the emeralds.  Did the trial court err by not sanctioning Silverstein for bad faith litigation where Silverstein was JTR's general counsel, the person who the court found to have "substantially controlled" the fraudulent litigation, and the person who specifically engineered the bad faith litigation practices?

(b) The court's order identified certain facts, but consistently avoided any mention of many un-contradicted facts that supported Motivation's motion for sanctions and undermined the court's decision not to hold key leaders of the fraud liable for sanctions.  Motivation filed a Rule 52(b) motion seeking fact findings respecting all material facts and proposed 65 paragraphs of critical facts ignored by the court. Including threats to witnesses, even though all those facts were uncontradicted and many of those facts were based on Silverstein's own admissions and were corroborated by contemporaneous emails.  The court denied the motion based on its understanding that none of the facts were supported by any credible evidence.  Did the court err by failing to make findings of all material facts relevant to the sanctions issues in violation of Rule 52(a), by denying Motivation's Rule 52(b) motion [D.E. 592] seeking specific findings respecting the basis of its claims; and by concluding that the 65 paragraphs of facts were not supported by any credible evidence?

(c) Whether the trial court erred by not sanctioning Silverstein for his substantial control of this fraudulent litigation where he was aware of

overwhelming evidence that the case was fraudulent, he failed to perform any investigation of the fraud and he failed to timely bring the fraudulent conduct to the court's attention.

(3) The trial court dismissed Motivation's sanctions claims against Paul Sullivan [D.E. 528] on the basis that Motivation did not present and the record did not contain any evidence that Sullivan was involved in managing the fraudulent litigation or any evidence that Sullivan was willfully blind or had knowledge of the fraud.  In fact, Motivation submitted substantial un-contradicted evidence that Sullivan was directly involved in extensive dealings with Miscovich concerning the treasure-find fraud and that as a member of JTR's advisory committee Sullivan was substantially engaged directly with JTR's trial counsel throughout the pertinent time period and the trial.  Evidence of Sullivan's knowledge and involvement included: (a) his extensive discussions questioning JTR principal, Jay Miscovich, whether he had actually brought the alleged treasure-find emeralds rather than finding them on the sea floor as he had claimed, (b) JTR's general counsel repeatedly advised Florida counsel that Sullivan's approval was required for key litigation decisions, (c) JTR's trial counsel warned Sullivan that emeralds had been planted at the site, that a cannon ball was planted at the site, that Miscovich claimed falsely to have found a 20 pound bag of emeralds at the site, that Miscovich claimed falsely to have found coins at the site, and other facts making clear the fraudulent nature of this case.  Did the trial court err when it dismissed Sullivan based on the mistaken conclusion that there was no evidence at all in the record that implicated Sullivan?

(4) The trial court dismissed Motivation's sanctions claims against Silverstein's firm, Young Conaway Stargatt and Taylor (YCST) [528], on the basis that there was no evidence at all in the record implicating YCST.   In fact, the un-contradicted evidence showed that Silverstein was the attorney at the firm responsible for dealing with Miscovich in connection with his claim to have found the emerald treasure, that Silverstein was a member of the YCST firm's management committee, acted within the scope of his partnership in YCST while managing this fraudulent case and that YCST had secured a substantial financial interest in the outcome of this fraudulent litigation.  Given these facts, did the trial court err in concluding there was no evidence in the record implicating YCST in the sanctions action?

(5) Whether the trial court erred in ruling that Silverstein, his firm Young Conaway Stargatt & Taylor and Sullivan were not in privity with JTR and, therefore, not bound by the court's previous findings.

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**KEY WEST DIVISION**

| | | |
|---|---|---|
| **AZALP LLC,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | **CASE No. 4:14-cv-10079-JEM** |
| | ) | |
| **v.** | ) | |
| | ) | **FIRST AMENDED COMPLAINT** |
| **BRUCE L. SILVERSTEIN, YOUNG** | ) | |
| **CONAWAY STARGATT & TAYLOR, LLP** | ) | **JURY TRIAL DEMANDED** |
| **and P&B FINANCE, LLC,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

Plaintiff AZALP LLC, for itself and as assignee of the rights of DARN LLC, CLAWDB LLC, CEDARWOOD LLC, M VENTURES LLC and Dean Barr, as and for its Complaint against defendants Bruce L. Silverstein ("Silverstein"), Young Conaway Stargatt & Taylor, LLP ("YCST") and P&B Finance, LLC (collectively, "Defendants"), alleges and states as follows:

## SUMMARY OF THE CASE

1.      This action arises out of a massive fraud in which a self-described treasure hunter named Jay Miscovich and his co-conspirators (the "Miscovich Group") fabricated the discovery in the Gulf of Mexico of thousands of precious emeralds, supposedly originating from a 17th-century shipwreck, and worth as much as half a billion dollars.  Defendants Silverstein, YCST and P&B Finance, LLC ultimately joined the scheme as legal counsel, investors and equity owners, and used the Federal Court to perpetuate the fraud, conceal the truth and intimidate those who sought to discover and disclose the facts.

2.      Defendants had actual knowledge that Miscovich made false claims about the date he allegedly found the emeralds, false claims that he found coins at the alleged emerald site, false claims that he used a magnetometer to find the site, false claims that he paid a diver for a treasure map, false claims that he paid the diver for a release of salvage rights, and false claims that Proskauer Rose LLP, a New York law firm, prepared the release.  In addition, Defendants learned, among other things, that Miscovich gave perjured testimony about his alleged find in court proceedings; that Miscovich withheld emeralds in violation of a Court Order; that the emeralds were treated with modern epoxy resins; that Miscovich purchased emeralds in bulk from a dealer in Jupiter Florida; that Miscovich's accomplice, Stephen Elchlepp, threatened to injure or kill two witnesses; that attempts were made to injure or kill  those two witnesses soon after the threats were communicated to Defendants;  and that Miscovich threatened in writing to "blow [the] fucking head off" of a  lawyer investigating the fraud.   Further, Defendants knew that all the

1

Florida lawyers (from two law firms) who had acted as local counsel to JTR withdrew or attempted to withdraw as counsel because they concluded that JTR's case was fraudulent, and that Miscovich's brother and member of JTR, Scott Miscovich, concluded that the find was a fraud and reported the fraud to the FBI.  Defendants were also aware that the federal judge presiding over JTR's case suggested in open court to the FBI and an Assistant United States Attorney that based on the evidence presented to the Court, it appeared that Silverstein may have committed obstruction of justice and acted as an accessory to criminal fraud.  Notwithstanding knowledge of all of these and other facts showing beyond any doubt that the find and the case were fraudulent, Defendants continued to support and advance the fraud.

3.      The conspirators publicized their "tall tale" of ancient treasure to millions on "60 Minutes" ("The Trouble with Treasure") and used the promise of fabulous riches to extract money from the Plaintiffs.  JTR Enterprises LLC ("JTR") was formed by YCST to raise money and to file an admiralty case in the United States District Court for the Southern District of Florida for the purpose of establishing a court-endorsed fraudulent treasure provenance for the emeralds (the "Admiralty Case").  For more than three years, JTR and its owners used the judicial system of the United States to perpetuate and conceal the fraud, and committed serial acts of perjury, obstruction of justice and other crimes.   As the fraud began to come to light, Miscovich took his own life in October 2013, but his co-conspirators continued to perpetuate and conceal the fraud.

4.      At the conclusion of a court hearing in the Admiralty Case in January 2014, JTR's trial counsel finally admitted that the alleged find in the Gulf of Mexico was an outright fraud, and that "the scheme to defraud was to represent emeralds of a certain quality as having a higher quality based on their origin from an antique shipwreck." In later filings, JTR confessed that "[a]s an artifice of Mr. Miscovich's fraud, he sought the blessing of the District Court or its 'seal of

approval' and used JTR, and its various attorneys … to further this fraud through the filing of this admiralty claim."  JTR acknowledged that this fraudulent scheme was "outrageous, inexcusable and indefensible."

5.      Defendants were the linchpin to Miscovich's fraudulent corporate and litigation strategy.  Defendants joined the Miscovich Group's conspiracy with knowledge of its general purpose and scope.  Defendants' acts in furtherance of the conspiracy included, *inter alia*, filing false affidavits and other false and misleading documents and statements with the court; proffering false and perjured testimony; personally vouching for the integrity and truthfulness of the Miscovich Group in affidavits and testimony; threatening at least seven witnesses (including Plaintiffs), who challenged the Miscovich's Group's story, with litigation and sanctions; acquiring undisclosed ownership interests in the fraudulent scheme; frustrating and preventing the recovery of Plaintiffs' funds by transferring all of the enterprise's assets to an entity formed by Defendants; waging a costly, year-long "scorched earth" litigation campaign to prevent or delay an independent examination of the alleged gemstones; actively withholding evidence of fraud, including evidence of modern chemical enhancements on the stones, from the Court; and continuing their strategy of bad faith litigation, threats and concealment of the truth on behalf of Miscovich Group long after it became evident to many – including JTR's own local Florida counsel -- that the entire enterprise was fraudulent.

6.      On or about May 27, 2014, the Hon. K. Michael Moore, United States District Judge for the Southern District of Florida, held that communications by Miscovich's and JTR's attorneys were not entitled to the protection of the attorney-client privilege because JTR's counsel was employed in furtherance of criminal or fraudulent conduct.  This is known as the "crime-fraud" exception to the attorney-client privilege.  Pursuant to the crime-fraud exception, many of

Defendants' formerly privileged communications have been released, and they form the basis for much of the present Complaint.

7.       By Decision and Order dated March 16, 2015, Judge James Lawrence King of the United States District Court for the Southern District of Florida found that Silverstein "substantially controlled JTR's actions in these proceedings."  While declining to impose sanctions against Silverstein "based upon the limited nature of the proceedings," Judge King referred the matter to the United States Attorney and stated that his denial of sanctions "neither establishes [Silverstein's] innocence nor forecloses the possibility of future civil or criminal liability."

8.       As a result of Defendants' participation in the fraud, Plaintiff and Plaintiff's assignors (collectively, "Plaintiffs") not only were lulled into believing that the emerald find was legitimate, but were caused to incur millions of dollars in out-of-pocket expenses, legal fees, forensic costs and disbursements to protect their interests and to investigate, examine and ultimately uncover the fraud.  Having joined a pre-existing conspiracy with knowledge of its intent and scope, Defendants are legally responsible not only for the damages sustained by Plaintiffs on and after the date Defendants joined the conspiracy, but for all damages incurred as a result of the conspiracy before Defendants joined it. Such damages are not less than $3.4 million, trebled under the Florida and Federal Racketeer Influenced and Corrupt Organizations Acts; plus punitive damages of not less than $10,200,000.

**THE PARTIES**

9.       Plaintiff AZALP LLC ("AZALP") is a limited liability company organized under the laws of the State of New York, with its principal place of business in New York.  AZALP is the assignee of all rights, title and interest in the claims and causes of action of the following entities against Defendants herein, pursuant to a written, express Assignment of Claims dated July 21, 2014:

**IV.** **Silverstein and YCST Acquire Undisclosed Interests in Miscovich's Enterprise, then Strip Away the Assets Securing Plaintiffs' Note**

58.     Between the execution of the MOU on March 29, 2011 and the court hearing on August 19, 2011, Silverstein and YCST, in concert with Miscovich, secretly orchestrated a series of transactions designed to frustrate the purpose of the MOU, to enrich themselves, to render the Note worthless and to deprive Plaintiffs of the material benefits of the settlement.

59.     First, Silverstein took steps to ensure that he would personally benefit from the treasure scam. On or about July 27, 2011, YCST formed P&B for the purpose of taking an undisclosed equity interest in JTR, a newly formed entity.  The sole members of P&B were Silverstein and Sullivan. Upon information and belief, Silverstein ultimately used P&B to invest at least $80,000 of his own funds in JTR.

60.     Upon information and belief, Silverstein's acquisition of an ownership interest in JTR violated professional ethics rules prohibiting lawyers from taking a financial interest in the subject matter of ongoing litigation. In his order of March 16, 2015, Judge King ruled that "Mr. Silverstein's investment and equity interest in JTR, both personally and through his law firm, gave Mr. Silverstein a substantial interest in the outcome of the [Admiralty] litigation."

61.     On or about August 11, 2011, just days before the Delaware court hearing to approve the MOU settlement, YCST formed JTR.  The initial members of JTR were Miscovich, Scott Miscovich, Elchlepp, Greg Miscovich (the third and last Miscovich brother), Sullivan, David Paul Horan, Esq., P&B, Mike Vesley and Stephen Elchlepp, Sr.

62.     The registered agent for both JTR and P&B was YCST Services Corporation, located at the offices of YCST in Wilmington, Delaware.

Silverstein of all "material developments" and to consult with Silverstein with respect to "any material decisions" and filings. Furthermore, Horan agreed to "seek specific authorization from Client's general counsel [*i.e.*, Silverstein] before filing any action, entering into any settlement negotiations or agreements or retaining any experts or additional counsel."

83.    Silverstein was Horan's primary contact with JTR. Throughout the Admiralty Case, Silverstein exercised his authority over all key litigation decisions and filings, including the filing of Status Reports with the Court. Among other things, Silverstein drafted and extensively revised motion papers; insisted on reviewing, commenting on and consenting to all filings in the admiralty case; drafted, reviewed and edited Status Reports; approved communications with opposing counsel; and drafted responses to motions. During the 2014 trial, JTR's Florida counsel, Horan, confirmed that there was "no doubt" Silverstein and his firm represented JTR and Miscovich in the litigation and that they were actively involved throughout the case. In his order of March 16, 2015, Judge King found that "the evidence overwhelmingly shows that Silverstein substantially controlled JTR's actions" in the Admiralty Case.

84.    Because Silverstein maintained day-to-day oversight and control of the Admiralty Case, JTR's Florida counsel repeatedly asked Silverstein to enter an appearance in the case *pro hac vice*. On May 17, 2012, Florida counsel prepared an application for admission *pro hac vice* for Silverstein to endorse. Perhaps mindful of counsel's duties of candor to the Court and Rule 11 obligations, Silverstein refused to enter an appearance in the case, claiming in a May 17, 2012 email that "I don't have time to study the [local] rules…."

85.    After JTR hired Horan, Horan warned Miscovich and the entire JTR group that the government of Spain would likely intervene in the action and make a claim to the emeralds: "Spain will realize we have limited resources," Horan wrote on August 18, 2011, "and will use

personal expenses.  Upon information and belief, Defendants were searching the Kirby Site for shipwreck artifacts that they could attribute to the emerald site as evidence of a shipwreck.

90.       Silverstein knew that JTR was ignoring the alleged emerald site.  Silverstein's son, Nolan Silverstein ("Nolan"), lived with Miscovich and Elchlepp in Key West during the summer of 2011, ostensibly to assist with the salvage work at the emerald site.  However, there was no salvage activity being conducted at the alleged emerald site, and Nolan spent that summer on the streets of Key West, dressed like a banana and playing his guitar for loose change.  Upon information and belief, when Silverstein learned of the situation, he flew to Key West and saw for himself that no salvage activity was taking place.

### VII.    Guided by Silverstein, JTR Files a Fraudulent Admiralty Claim and Conceals Evidence from the Court

91.       On September 9, 2011, JTR filed the Admiralty Case, an *in rem* action seeking a "full and final" salvage award or, in the alternative, an award of title to the emeralds to JTR under the American Law of Finds.

92.       The standard procedure for admiralty cases is for the alleged salvors to bring the subject material into the custody of the court to establish *in rem* jurisdiction over the material.  Despite assurances and representations to the Court that the emeralds would be brought into the jurisdiction of the Southern District of Florida, Defendants delayed doing so for a year.  The Court later called the Defendants' actions "a marked departure from this Court's prior and well-established procedures."

93.       One reason JTR did not submit all of the emeralds to the Court's jurisdiction, in violation of the Court's Substitute Custodian Order, was that JTR wanted to shield a portion of the emeralds from claims that could be asserted in the admiralty case.  In October 2011, after the filing of the admiralty case, Miscovich and Elchlepp showed Horan a large plastic bag containing 20

23

coated with epoxy. Unable to keep the laboratory test results secret any longer, Silverstein directed Horan to finally correct the false "Executive Summary" by filing a Third Status Report on April 18, 2012 — the Wednesday before "60 Minutes" would air on Sunday evening.  The Third Status Report disclosed that the labs found epoxy on the emeralds.

118.    By blocking Motivation's request to see the emeralds and leaving uncorrected JTR's false "Executive Summary," Silverstein had successfully kept secret for nearly *five months* the fact that the emeralds were coated with modern epoxy while he tried to have Motivation's claim dismissed and tried to raise more money from potential new sources for JTR.  Judge K. Michael Moore of the United States District Court for the Southern District of Florida later held that JTR wrongfully withheld the test results from the Court: "Ultimately, JTR had the information regarding the modern epoxy as of December 2, 2011.  However, JTR did not disclose this information to the Court until April 18, 2012."

119.    On August 14, 2012, Motivation's emerald expert, Manuel J. Marcial ("Marcial"), with over 55 years of experience in the emerald business, examined the emeralds and concluded that they could not have come from the wrecks of the *Atocha* or the *Santa Margarita* because the emeralds were low quality (worth no more than $ 50,000) and showed no evidence of immersion in sea water. Marcial also noted that at least one of the specimens appeared to have been attached to a rock with "Krazy Glue," and the emeralds were obviously oily, indicating a modern enhancement (*e.g.,* epoxy). Silverstein, calling Marcial an "idiot," suggested that he should be sued for defamation.

120.    True to its longstanding promise to withdraw its claim if an inspection revealed that the emeralds did not come from the *Atocha*, Motivation filed a motion to withdraw its claim three days later on August 17, 2012.

151.     As members of JTR's Advisory Board, Scott Miscovich and Sullivan informed Silverstein of their findings and their concerns. Silverstein was unmoved.

152.     Scott Miscovich, then worried that he may be aiding a fraudulent conspiracy, contacted Tobia by telephone in February 2013 and recorded the calls without Tobia's knowledge or consent.  Tobia confirmed that he had accompanied Miscovich on an emerald purchase in Jupiter, Florida, that Miscovich's claims were "phony baloney," and that Miscovich had purchased emeralds in bulk with money provided by Santelli.  Scott Miscovich advised Silverstein of the content of these recorded calls.  Again, Silverstein was undeterred. Later in 2013, Silverstein reviewed excerpts from Tobia's deposition in which he described trips to purchase emeralds and likened them to a "drug buy."  Silverstein did not investigate this either.

153.     Because he was convinced that JTR's alleged find was a fraud, Scott Miscovich withdrew from any further involvement with JTR, retained criminal counsel, contacted the FBI, and cooperated with the FBI's criminal investigation of JTR.  However, Silverstein continued supporting and aiding the fraudulent conspiracy.

## X.     The Court Rejects Miscovich's Allegations, and Schedules a Further Trial on Sanctions

154.     On January 25, 2013, Judge King issued his opinion following the December 2012 trial.  In the opinion, Judge King repeatedly questioned the credibility of Miscovich's testimony. For example, Judge King found "the story of Jay's acquisition of the purported treasure map suspicious to say the least," and the conflicting testimony of Elchlepp and Miscovich "lead the Court to, at the very least, question the reliability of Jay's account of the moment he first saw the stones." The Court noted that Baer, the marine archeologist, had interviewed Miscovich and been given an entirely different story about how Miscovich discovered the site with "two friends from Mexico" and brought up eighty pounds of stones on the first day. The Court also noted the

46

testimony of Marcial that some of the stones had been treated with 20th-century materials that would have disintegrated under water, and that the stones were worth only about $50,000.

155.     Judge King ruled that JTR had failed to prove any basis for admiralty jurisdiction and dismissed the case without making a salvage award or awarding title under the American Law of Finds. Judge King found that "The record is devoid of any evidence of any shipwreck, 16th Century Spanish Galleon, or any proof of abandonment by a prior owner. *The res has appeared seemingly out of thin air…*" (emphasis added)

156.     The Court concluded that "[t]here is just as much support for the theory that Jay and Steve [Elchlepp] planted the stones as there is for the assertion that they found them. The Court cannot simply accept the un-contradicted testimony of Jay and Steve that they followed a treasure map to the site, dove to the floor, and found the emeralds."

157.     The Court assessed court costs against Miscovich and Elchlepp, and ordered the stones returned to their custody (without color of title or authenticity) upon payment of such costs.

158.     Remarkably, Silverstein's reaction to the Court's findings just days later was to look for new ways to continue the scheme. He recommended forming a "new entity" to make a "new find…over the next week" in a new location and then file a "new claim." In an email dated January 29, 2013, Silverstein stated:

> A new entity needs to be created in which the JTR members all have essentially the same membership interests, which could file a new claim based on a new find (if there were one) that is made over the next week — and I don't mean the Luchenbach.  If Joe [Janssen] and/or John [Siracusa] were to dive the site and find something new, I would be willing to form a new entity with a Managing Member other than Jay — which preserves the existing economic interests of the members of JTR (including Jay), but with an appropriate increase for John and Joe (and Christy [Janssen's wife and law partner] and Eric [another investor]) — that could file a new claim if it were appropriate to do so.
>
> Aside from funds I have provided Jay and Steve to stay afloat, my firm is into this for $1.6 million attorneys' fees and expenses.  Accordingly, I am not inclined to

### XIII.   The Court Finds That "This Entire Case Is Premised on a Fraud."

181.      The Court found "by clear and convincing evidence, that a fraud has been committed upon this Court."  Specifically, the Court determined that (i) "JTR found out that the Emeralds had modern epoxy on them in December 2011…and failed to disclose this information to the Court until April 2012" and (ii) "this entire case is premised on a fraud."

182.      The Court explained:

> On the day that Miscovich filed the instant Complaint, September 6, 2011, Miscovich *knew* that he was committing a fraud upon the Court. Miscovich's filing of the Complaint and the continued litigation of this case was a "flagrant abuse of the judicial process," …and there is no starker example of bad faith. (emphasis and quotes in original)

183.      Regarding the lab results showing modern epoxy on the stones, the Court rejected any argument that JTR was excused from disclosing the results to the Court because JTR had shared the information with "60 Minutes:"

> The fact that JTR told *60 Minutes* in no way diminishes its obligation to the Court. In fact, it demonstrates that JTR knew something was going on and that these reports would have a substantial impact on the adjudication of the *res*. JTR was obligated at that point to make the Court aware of the information.

184.      Between March 29, 2011 and the date of filing of this Amended Complaint, as a result of Defendants' participation in JTR's and Miscovich's continuing fraud, perjury, and obstruction of justice, Plaintiffs have incurred professional fees and out-of-pocket expenses in excess of $1.8 million. This amount is separate, and in addition to, the funds in the amount of approximately $1.6 million initially contributed to Emerald Reef, Salvage Boat Leasing, GUTS and Miscovich by Plaintiffs.

### COUNT I
### (Conspiracy to Defraud)

185.      Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 184 above.

# EXHIBIT 4

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION

AZALP LLC,

       Plaintiff,

       v.

                                          CASE NO. 4:14-cv-10079-JEM

BRUCE L. SILVERSTEIN, YOUNG
CONAWAY STARGATT & TAYLOR, LLP,
and P&B FINANCE, LLC,

       Defendants.

**PLAINTIFF AZALP LLC'S RESPONSE IN OPPOSITION TO DEFENDANTS'**
**<u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION……………………………………………………………............1

I. THE AMENDED COMPLAINT COMPLIES WITH THE COURT'S ORDER..........… 4

    A. The Amended Complaint Limits Defendants' Actions to the Period After March 29, 2011. ........................................................................................ 4

    B. Defendants' Cases Do Not Support the Drastic Step of "Striking" the Amended Complaint. ................................................................................ 6

II. PLAINTIFF'S CLAIMS ARE JUSTICIABLE AND THIS COURT HAS  SUBJECT MATTER JURISDICTION OVER THIS ACTION ......................................... 9

    A. Plaintiff has Standing to Pursue the Claims in the Amended Complaint ............. 9

    B. The Rooker-Feldman Doctrine Does Not Bar Any of the Allegations in the Amended Complaint. ............................................................................. 11

III. THE RELEASE PROVISION IN THE DELAWARE SETTLEMENT DOES NOT BAR THIS ACTION BASED ON DEFENDANTS' POST-RELEASE ACTIVITIES . 14

IV. THE AMENDED COMPLAINT STATES VALID CAUSES OF ACTION  AGAINST DEFENDANTS ................................................................................... 17

    A. Plaintiff Has Pleaded a Claim for Conspiracy to Defraud (AC ¶¶ 185-193; Original Opp. pp. 11-17). ......................................................... 17

    B. Plaintiff Has Pleaded a Claim for Aiding and Abetting (AC ¶¶ 194-200; Original Opp. pp. 31-32). .................................................... 18

    C. Plaintiff Has Pleaded a Claim for Negligent Misrepresentation (AC ¶¶ 224-231; Original Opp. pp. 32-34). ........................................... 18

    D. Plaintiff Has Pleaded Claims Under Federal RICO, 18 U.S.C. § 1962(c) (including conspiracy to violate RICO) and Florida RICO, § 772.103 (AC ¶¶ 221-223, 232-259; Original Opp. pp. 34-46). ................................ 19

CONCLUSION……………………………………………………………………20

Plaintiff AZALP LLC ("AZALP" or "Plaintiff")[1] respectfully submits this memorandum of law in opposition to defendants Bruce L. Silverstein's ("Silverstein"), Young Conaway Stargatt & Taylor, LLP's ("YCST"), and P&B Finance, LLC's ("P&B") (collectively, "Defendants") Joint Motion to Strike or Dismiss the First Amended Complaint [Dkt. No. 61] ("Joint Motion").

## INTRODUCTION

In their motion, Defendants attempt to relitigate issues that have already been determined by this Court and to "strike" the Amended Complaint, even though it is fully compliant with this Court's August 17, 2015 Order.  We deal with each of their flawed arguments below. In addition, Plaintiff respectfully incorporates its opposition to Defendants' original motion to dismiss [Dkt. No. 40] ("Original Opp.").

Defendants' motion also attempts to minimize or obscure the findings of the Honorable James Lawrence King of the United States District Court for the Southern District of Florida in his Order of March 16, 2015 (annexed hereto as Exhibit A), which was issued after the filing of the Original Complaint and is now incorporated in the Amended Complaint ("AC" ¶ 7). Defendants claim the King Order vindicated Defendants and undercuts the allegations of the Amended Complaint.  See Joint Motion p. 15 n. 12.  The King Order states otherwise.

First, Judge King found that the Admiralty Action[2] filed and prosecuted on behalf of JTR Enterprises LLC ("JTR") was fraudulent and constituted "a criminal conspiracy against the United States District Court for the Southern District of Florida, which began with the filing of a

_____

[1] AZALP is a party in interest and is also the assignee of claims of DARN LLC, CLAWDB LLC, Cedarwood LLC, M Ventures LLC and Dean Barr pursuant to an Assignment of Claims dated July 21, 2014 (AC ¶ 9).
[2] All terms used herein shall have the same meaning as in the Original Opp.

completely fabricated admiralty case falsely alleging a fictitious discovery of lost treasure from an 18th century Spanish galleon."  King Order p. 2.

Second, Judge King held that Silverstein, "JTR's 'general outside counsel,'" controlled the fraudulent litigation. The Court found that "the evidence overwhelmingly shows that Silverstein substantially controlled JTR's actions in these proceedings…. [C]ountless emails from Silverstein to JTR's admiralty counsel demonstrate that he was substantially in control of this litigation."  King Order p. 55. The Court went on: "[f]rom forbidding the filing of various reports in this case, to drafting and revising pleadings and motions in this case, to participating in trial strategy discussions, Silverstein's control is plain." Id.

As this Court is aware, Defendants have sought dismissal of the Original Complaint and the Amended Complaint based, in large part, on the arguments that they merely served as outside counsel to JTR and had no meaningful involvement with, or control over, the fraudulent litigation (see, e.g., Silverstein and YCST's original Motion to Dismiss [Dkt. No. 27] ("Original Motion") p. 44).  Judge King's finding that Silverstein controlled the fraudulent litigation utterly refutes Defendants' arguments, and supports both (i) the allegations of the Amended Complaint regarding Silverstein's control over the enterprise and (ii) AZALP's arguments in its Original Opp. that Silverstein was in charge of the fraudulent litigation (see, e.g., AC ¶¶ 78, 83-85 and Original Opp. pp. 10, 42-44).  Such control is particularly relevant to the Amended Complaint's allegations of conspiracy, the Florida Racketeer Influenced and Corrupt Organization Act ("RICO"), and Federal RICO.

Third, Judge King found that "Mr. Silverstein's investment and equity interest in JTR, both personally and through his law firm, gave Mr. Silverstein a substantial interest in the outcome of the [Admiralty] Litigation" (King Order p. 54-55). This finding supports the

allegations of the Amended Complaint that Silverstein and YCST were not merely acting as outside counsel, but were principals of JTR with a financial stake in the claims asserted in the Admiralty Action.

Fourth, the King Order confirms -- quoting Silverstein's own testimony -- that the Delaware Action was concerned only with "a question of corporate governance and who was in charge of an entity, an alternative entity" and "there's been this amazing and valuable emerald find and people are fighting over who owns it" (King Order p. 17). This determination refutes Defendants' argument that the present case, alleging a fraudulent conspiracy to fake an emerald discovery and use the federal courts to perpetuate and monetize the fraud, is an improper attempt to revisit the corporate governance issues that were the subject of the Delaware Action and is barred by the Rooker-Feldman doctrine (see Joint Motion pp. 7-8).

Finally, Judge King was careful to observe that, despite finding that Silverstein and YCST were not subject to sanctions based upon the "limited nature of this proceeding," his determination "neither establishes Respondent's [Silverstein's] innocence nor forecloses the possibility of future civil or criminal liability" (King Order p. 57).  Indeed, Judge King referred the entire matter to the United States Attorney for the Southern District of Florida (King Order p. 58). Thus, to the extent that Defendants argue that the avoidance of sanctions somehow precludes the claims asserted by AZALP in the Amended Complaint, Judge King has expressly disavowed any such intention or effect.

As we show below, the Amended Complaint complies with this Court's Order by removing allegations of Defendants' activities before the Effective Date and by seeking no relief that would affect the Delaware Settlement. At the same time, the Amended Complaint, like the

3

# EXHIBIT 6

**REPLY IN SUPPORT OF MOTION TO DISMISS**

UNITED STATES COURT OF APPEAL
FOR THE ELEVENTH CIRCUIT

_____

CASE NO. 15-14132-D

_____

MOTIVATION, INC.

Claimant/Appellant,
vs.

JTR ENTERPRISES, LLC,

Plaintiff/Appellee.

_____

On appeal from the United States District Court for
the Southern District of Florida, Miami Division
Case No. 4:11-Civ-10074

---

**APPELLEES' JOINT MOTION TO DISMISS APPEAL**

---

John T. Rogerson, III (FBN: 832839)   Jeffrey B. Crockett (FBN: 347401)
john.rogerson@arlaw.com               jcrockett@coffeyburlington.com
ADAMS AND REESE LLP                   COFFEY BURLINGTON, P.L.
501 Riverside Avenue, 7th Floor       David J. Zack (FBN: 641685)
Jacksonville, FL 32202                2601 South Bayshore Drive, Penthouse
Telephone:  (904) 355-1700            Miami, Florida  33133
Facsimile:  (904) 355-1797            Telephone:  (305) 858-2900
                                      Facsimile:  (305) 858-5261


*Counsel for Young Conaway Stargatt & Taylor, LLP and Bruce L. Silverstein,
Esq.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, Appellees Young Conaway Stargatt & Taylor, LLP and Bruce L. Silverstein, Esq., hereby state the following individuals and entities with any known interest in the outcome of this appeal:

Kendall B. Coffey

Jeffrey B. Crockett

Stephen Elchlepp

Kim Fisher

John Gravante

David Horan

JTR Enterprises LLC

Hon. James L. King

Jay Miscovich

Hugh J. Morgan

Motivation Inc.

Hon. K. Michael Moore

Bruce L.. Silverstein

John Siracusa

Paul D. Sullivan

John E. Tuthill

Marlow V. White

Young Conaway Stargatt & Taylor, LLP

David J. Zack

Appellees, Young Conaway Stargatt & Taylor, LLP ("YCST") and Bruce Silverstein ("Silverstein"), hereby move to dismiss the appeal of Motivation, Inc. ("Motivation") from the denial of its motion for sanctions against YCST and Silverstein (together, "Appellees"). Notwithstanding the district court's proper denial of Motivation's motion (on the merits), the district court lacked jurisdiction to entertain the motion in the first instance. As such, Motivation's appeal should be dismissed for lack of jurisdiction and the sanctions proceedings below should be vacated.

This case arises from an *in rem* action filed in 2010 by JTR Enterprises, LLC ("JTR"), seeking a declaration of ownership and salvage rights as to "an unknown quantity of Colombian Emeralds, Amethysts, and Quartz crystals" (the "*Res*") alleged to have been found in international waters in the Gulf of Mexico by JTR's Managing Member, Jay Miscovich ("Miscovich"). Following a bench trial in December 2012, the trial court found the evidence in equipoise as to whether Miscovich found the *Res* or "salted" the discovery site, and entered a Final Order, on January 25, 2013, by which the court denied JTR any relief. *See* DE 199 (the "Final Order").

Nearly a year following the entry of the Final Order, at a post-trial evidentiary hearing on sanctions against Miscovich and JTR (the "First Sanctions Hearing"), a Colombian store owner testified that he had sold Miscovich some 80 pounds of emeralds in 2010, leading the district court to find that "by purchasing the emeralds and then 'finding them' at the bottom of the ocean, Miscovich engaged in a fraud to vastly increase their value as purported 'sunken treasure.'" DE 445 at 2-3. The district court further found that "Miscovich managed to successfully convince his investors, lawyers, employees of the Smithsonian, appraisers, jewelers, family, friends, the general public, and many others, including investigative reporters from CBS' 60 Minutes, that he had discovered and recovered this treasure from the seafloor in early 2010." *Id*. at 19.

Following the First Sanctions Hearing, Motivation filed a motion for sanctions against Appellees, who were outside counsel to JTR and Miscovich.

1

*See* DE 407. Motivation did not contend that Appellees knew of any fraud when they were retained to represent Miscovich and JTR in 2011, but argued that Appellees should not have continued to represent their clients when alleged "evidence of fraud" emerged in the *in rem* action. *See id*. at 6. Motivation did not tell the Court what Motivation's internal emails revealed: that Motivation knew that there was no evidence of Appellees' knowing participation in any fraud, but that (i) Motivation targeted Appellees because they were seen as "a deep pocket," and (ii) Motivation was "rely[ing] on their desire to settle and not be dragged thru a messy highly publicized trial" *See* DE 559 at 47, 49; DE 459 at 11-13.

The trial court, Hon. James Lawrence King, accepted Motivation's invitation for an inquisition of Appellees' knowledge of their clients' actions by an order to show cause (the "OSC") (DE 451), and rejected Appellees' challenges to subject matter and personal jurisdiction (DE 459). Following a thirteen day evidentiary hearing in November and December of 2014, Appellees prevailed on the merits.[1] Through this appeal, Appellant Motivation frivolously challenges that fact-finding. This motion argues that the entire sanctions proceeding was begun without jurisdiction, and therefore, that all rulings of the district court should be vacated, and this appeal dismissed as a result. *See*, *e.g.*, *Boyd v. Homes of Legend, Inc.,* 188 F. 3d 1294, 1298 (11th Cir. 1999) (internal citations omitted) (when district court lacked jurisdiction, this Court has jurisdiction only to correct error in entertaining the suit).

## SUMMARY OF ARGUMENT

In the district court, Motivation sought the unprecedented relief of securing an award of sanctions in favor of a non-party with no standing

---

[1] Appellees contested the district court's jurisdiction to sanction them, but Judge King overruled those threshold objections, and compelled Appellees to show cause why they should not be sanctioned without even affording them an opportunity to take discovery. *See* D.E. 488. Thereafter, Judge King conducted a lengthy evidentiary hearing, which ultimately resulted in determination that there was no factual basis to sanction Appellees. *See* D.E. 528 (granting equivalent of directed verdict to YCST and Sullivan); D.E. 568 (opinion and order denying sanctions as to Silverstein); D.E. 592 (opinion and order denying Motivation's motion for reconsideration).

against non-parties who were not counsel of record and who were non-residents of the State of Florida and not served with legally valid process. The district court (per Judge King) erred in indulging Motivation.

At its core, the adversarial system of civil jurisprudence pits one or more plaintiffs against one or more defendants. In appropriate circumstances, a non-party is permitted to intervene. To do so, however, the intervenor must have standing – which Motivation lacked in this matter (as shown in Argument I, *infra*). Absent standing, a putative intervenor cannot invoke the limited jurisdiction of the federal courts – including on appeal. Nor can a district court reach outside of the proceedings before it, and sanction a party's outside attorneys, who were not counsel of record before the district court and not charged with violating an order of the court (as shown in Argument II, *infra*). This is particularly the case where, as here, the non-party Appellees have not been brought before the district court through any legally valid process (as shown in Argument III, *infra*).

### MOTIVATION'S IMPROPER ROLE IN THE PROCEEDINGS BELOW

As shown below, (i) Motivation wrongfully injected itself into the *in rem* proceeding with a factually implausible and legally frivolous claim of intervention that was dismissed by the court, and (ii) Motivation amended its dismissed claim to assert a concocted claim that Motivation later disclaimed. The record below reflects that Motivation's true purpose in seeking to intervene was (i) to serve as the self-anointed "Treasure Police," and (ii) to provide Motivation a forum to disparage a new business competitor.[2] Without regard to Motivation's *bona fides* (or lack thereof), however, Motivation's concession that it lacked any ownership interest in the "*Res*"

---

[2] For a more detailed discussion of the record of Motivation's true motivation for injecting itself into the *in rem* action below, *see* D.E. 142, at 3-4 & nn.5-6 (JTR's Opposition to Motivation's Motion for Sanctions); D.E. 459, at 36-40 (Appellees' Motion to Quash and Opposition to Amended Motion for Sanctions), pertinent excerpts of which are attached as Exhibits 1 and 2, respectively.

means that Motivation lacked standing to participate in the *in rem* proceeding (as shown in Argument I, *infra*).[3]

The proceeding below was an *in rem* action to declare title to the *Res* of the action. Because the action was *in rem*, JTR did not sue any individual or entity. Moreover, JTR's complaint alleged little more than that Miscovich discovered the *Res* in a specified location within the Gulf of Mexico (the "Salvage Site"), while exploring the area with Steve Elchlepp, Jr. ("Elchlepp"). The complaint contained no allegations as to the origin or value of the *Res* – which remained to be investigated after title to the *Res* was established. *See* D.E. 1 (Complaint).

Motivation claims to be a successor to Treasure Salvors, Inc. ("Treasure Salvors"), which was granted certain rights to certain cargo on two Spanish Galleons (the "*Atocha*" and "*Margarita*") that sank in the Atlantic Ocean in the 17th Century. Motivation injected itself into the *in rem* action on a theory that was, itself, a "fraud." Specifically, Motivation claimed that the *Res* had been cargo on the *Atocha*, which had floated in a barrel against prevailing currents to the Salvage Site that was many miles away from the *Atocha* wreck site. *See* D.E. 10 (Complaint in Intervention). Motivation's claim was not only implausible (and contrary to the laws of physics), but it was fraudulently based on a 1976 district court order that had been vacated, in pertinent part, on appeal.[4] Based on the foregoing, JTR successfully moved to dismiss Motivation's complaint in intervention. *See* D.E. 92.

---

[3] After conceding that it had no valid claim to the *Res* – and thereby lacked standing in the *in rem* action – Motivation sought to pass itself off as a "*qui tam relator*." The court struck Motivation's references to being a *qui tam relator* from the record because "there are no facts before this Court that would indicate that Motivation is actually working on behalf of a government entity with its expressed consent." D.E. 360. Motivation did not appeal this ruling, and is bound thereby.

[4] Specifically, Motivation claimed that a district court order, dated February 19, 1976 (the "1976 Order"), had awarded Treasure Salvors ownership "as against the world of the *Atocha* and *Margarita* shipwrecks and their cargo and scatter 'wherever the same may be found.'" In fact, the Fifth Circuit (which then included Florida) limited the scope of the 1976 Order on appeal, stating:

> In affirming the District Court, we do not approve that portion of its [1976] order which may be construed as a holding that Plaintiffs have

4

Motivation next filed an amended claim that posited, with no evidence whatsoever, a concocted theory of a possible theft of *Atocha* emeralds from Motivation. Less than two months later, however, Motivation conceded that it lacked any ownership interest in the *Res*, and moved to voluntarily dismiss its amended claim. *See* D.E. 118 (Motion to Voluntarily Dismiss Claim).

The *in rem* action thereafter proceeded without Motivation asserting any claim to the *Res*.

## MISCOVICH AND ELCHLEPP

Neither Miscovich nor Elchlepp were parties to the *in rem* action below. Nonetheless, **after** Motivation conceded that it had no ownership interest in the *Res*, Motivation moved the district court to sanction Miscovich and Elchlepp for "fraud on the court." Despite the entry of the Final Order denying JTR any relief on January 25, 2013, Judge King **thereafter** allowed Motivation to conduct substantial discovery in support of its sanctions motion, and ultimately entered an order on August 17, 2015 directing Miscovich's estate to pay Motivation's counsel in excess of $1 million (consisting mainly of fees allegedly earned pursuing sanctions after the Final Order was entered). *See* D.E. 591. Miscovich was deceased when Judge King entered that order; neither Miscovich nor his estate were represented in the proceedings below; and Miscovich's estate lacks the financial capacity to appeal the sanctions award – which was prosecuted by Motivation's counsel and granted *in abstentia* and without even a friend of the court to present a

---

exclusive title to, and the right to immediate and sole possession of, the vessel and cargo as to other claimants, if any there be, who are not parties or privies to this litigation.

*Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel,* 569 F. 2d 330, 335 (5th Cir. 1978). In a subsequent opinion, the Fifth Circuit directed the district court to "make a fresh and complete record" respecting Treasure Salvors' claim. *Id.* at 571. On remand, the district court denied Treasure Salvors any rights beyond a specific "Injunctive Area." *See Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel,* 546 F. Supp. 919 (S.D. Fl. 1991). It is undisputed that the Injunctive Area ends more than 25 nautical miles away from the Salvage Site. As such, Motivation's claim of potential ownership of the *Res* was legally frivolous and based on a misrepresentation of the status of the 1976 Order from the outset – even if it were assumed (*arguendo*) that the implausible factual underpinning of the putative claim was physically possible.

defense. By contrast, when this Court was confronted with a motion to sanction JTR for pursuing an appeal of the Final Order, the Court declined to sanction JTR because, among other things, "JTR has not been represented in this matter by conflict-free counsel." *JTR Enterprises, LLC. v. Columbian Emeralds*, No. 13-10870, at 3 (11th Cir. March 21, 2014) (Order).[5] *See also Crowe v. Smith*, 151 F.3d 217 (5th Cir 1998) (reversing monetary sanctions awarded without the full panoply of due process protections, and where proceedings were prosecuted by counsel with a financial interest in the outcome of the proceedings).

**CHIEF JUDGE MOORE RECOGNIZED THE COURT'S LACK OF JURISDICTION OVER APPELLEES, BUT MOTIVATION THEREAFTER MISLED JUDGE KING INTO ALLOWING MOTIVATION TO PURSUE SANCTIONS AGAINST APPELLEES**

At the First Sanctions Hearing (in which Appellees were neither present nor represented) Motivation asked the district court (then Hon. K. Michael Moore) to entertain sanctions against Appellees – who had been outside counsel for JTR, had made no appearance in the *in rem* action resolved a year earlier, and had not participated in the post-Final Order discovery Judge King permitted Motivation to pursue. Chief Judge Moore held that Appellees had not submitted themselves to the court's jurisdiction, and that Motivation had failed to serve Appellees with legally valid process. *See* D.E. 333. *See also* D.E. 445, at 3. Chief Judge Moore also reasoned that it would be "unfair" to drag Appellees into this matter after discovery and other proceedings were completed without Appellees' involvement. D.E. 373, at

---

[5] Judge King also entered an order directing JTR to pay Motivation's counsel just under $175,000. *See* D.E. 590. That Order was entered at a time when JTR had **no** counsel, and was based on an earlier ruling that JTR should have made immediate disclosure of certain information that would, if true, have cast doubt on the validity of JTR's claim, and held that JTR should be sanctioned for the relatively brief time during which JTR delayed disclosure to the court. *See JTR Enterprises, LLC v. An Unknown Quantity, Etc.*, Case No. 11-cv-10074-KMM, at ¶¶ 61-65 (June 19, 2014). That prior ruling also was made when JTR was not represented by conflict-free counsel. Additionally, that ruling was not supported by any cited authority, and will be challenged by Appellees if this appeal proceeds on the merits. With all due respect to the district court, there is no applicable statute, rule of court, or common law precept that required JTR to voluntarily disclose "potentially" adverse information at a time when JTR was still investigating the information – which are the indisputable facts during the four months prior to JTR's voluntary disclosure of the information at issue.

112:24 to 113:9 (observing it would be "unfair to Mr. Silverstein to have to come in at such a late date"); *see also id.* at 123:23 to 124:7 ("if they're not within the jurisdiction of the Court, if there is no way to enforce the sanction, then the District Court should not be in a position of just entering orders that it cannot execute on . . . .").

Following the First Sanctions Hearing, Motivation persuaded Judge King to issue an Order to Show Cause why Appellees should not be sanctioned for Miscovich's actions (as found by Chief Judge Moore). Numerous documents Motivation withheld from the court reflect that Motivation set its sights on Appellees with full knowledge of the lack of any evidence that Appellees were aware of any fraud, and solely to reach into what Motivation called "deep pockets." For example:

- On February 15, 2013, Motivation's counsel, Gene Lewis ("Lewis"), wrote: "[g]oal for all of us is money judgment against deep pockets" – "#1 Silverstein and firm." D.E. 459, Exh. 112.
- On February 19, 2013, Lewis wrote: "we don't need to be spending a lot of time on these guys except as to how to nail Scott, the firm and Bruce and last resort Sullivan." Motivation's President responded "We need to rely on their desire to settle and not be dragged thru a messy highly publicized trial." *Id.*, Exh. 113.
- On April 9, 2013, Lewis wrote: "All we are after is deep pocket who can pay Kim, us, Hugh and John's folks. [The FBI] has the fraud nailed for Judge King vindication so let's get consensus on how we can wind this down with a solvent judgment debtor(s) in our sights." *Id.*, Exh. 117.
- On April 20, 2013, Lewis wrote: "Friends, let us not forget the mission!!! Silverstein and his law firm, ie a deep pocket! Without that Buster and I are out of here." *Id.*, Exh. 121.

In accordance with its cynical strategy, Motivation refrained from seeking sanctions from JTR's counsel of record, David P. Horan ("Horan"), because Motivation believed that Judge King "liked" Horan. As Motivation's counsel wrote on April 16, 2013:

> Buster and all, ***thinking of politics*** here as well as legal positions. You all know my feelings about Horan nonetheless we have a larger issue than him at stake – winning against Silverstein and his firm. As Hugh [Morgan] knows from being "inside the tent" at the courthouse ***Judge King*** may be disappointed but ***still likes Horan***. Look how quick he let him off the hook. So, we need to open, in my view, with letting him out on this Motion. D.E. 459, Exh. 118 (emphasis added).

The next day, Motivation's lead counsel at the sanctions hearing against Appellees wrote:

> We have ample evidence that [Miscovich] has committed fraud and perjury, but *I don't think we have any evidence that [Horan] or [Silverstein] were aware of the fraud* (unless we infer knowledge f[ro]m the epoxy, but that m[ay] be pushing an inference to[o] far). D.E. 459, Exh. 120 (emphasis added).

The record shows that Motivation used the discovery process allegedly directed at JTR to investigate, at leisure, their potential claims against Appellees as "deep pockets" – all while Appellees were non-parties with no rights to participate in that discovery process:

- On May 17, 2013, Lewis wrote: "Judge King has no notion that our problem is not an award of fees and costs but of how Kim, and us, and John's clients get paid—a solvent creditor-Silverstein's FIRM." D.E. 459, Exh. 123.

- On May 24, 2013, another of Motivation's lawyers, Hugh Morgan ("Morgan"), wrote: "We could go to trial with what we have and are going to get in the immediate future but what we don't have at this time are the deep pockets. That is probably going to take more time." *Id.*, Exh. 125.

- On July 1, 2013, Lewis expressed his hope that a deposition of JTR's counsel of record would give Motivation some evidence to go with in regard to its real "target"—YCST: "even if he can corral Silverstein we won't have the real deep pocket until we get his firm understanding they are the target . . . ." *Id.*, Exh. 129.

In this abuse of due process, Motivation even made a calculated decision to *not* depose Appellee Silverstein, so as to avoid the presentation of a full record to the district court at the First Sanctions Hearing. As Motivation's lead counsel at the sanctions hearing against Appellees advised Motivation's other counsel: "If you depose BS, he'll just get out his side of the story and the testimony will be admissible at trial." D.E. 459, Exh. 131.[6]

Although Appellees ultimately prevailed on the merits of Motivation's motion for sanctions, Appellees should never have been subjected to a sanctions hearing that was (i) "prosecuted" by a party lacking standing to

---

[6] For a more detailed discussion of the record of Motivation's bad faith pursuit of sanctions against Appellees, *see* D.E. 459, at 36-40 (Appellees' Motion to Quash and Opposition to Amended Motion for Sanctions); D.E. 555, at 7-11 (Non-Party Paul Sullivan's Motion for Sanctions); D.E. 559, at 77-81 (Non-Party Silverstein's Proposed Findings of Fact and Conclusions of Law); D.E. 561, at 79-83 (Non-Party Silverstein's Post-Sanctions Hearing Brief). For the Court's convenience, pertinent excerpts of D.E. 459, 555, 559, and 561and their pertinent attachments are attached hereto as Exhibits 2, 3, 4 and 5, respectively.

complain of Appellees' actions, (ii) conducted by a court that lacked the power to sanction Appellees, and (iii) inherently unfair to Appellees who were never served with any legally valid process and not parties to the extensive discovery and other proceedings that preceded the sanctions hearing. This is particularly troubling inasmuch as "the very fact that [an] attorney was charged could bring upon him the sting of disrepute." *NASCO, Inc. v. Calcasieu Television & Radio*, 124 F.R.D. 120, 142 (W.D. La. 1989), *aff'd*, 894 F.2d 696 (5th Cir. 1990), *aff'd sub nom. Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).

<u>**ARGUMENT**</u>

**I. MOTIVATION LACKED STANDING TO SEEK SANCTIONS BELOW AND, <u>THEREFORE, LACKS STANDING TO APPEAL THE DENIAL OF SANCTIONS</u>**

In the district court, Appellees challenged Motivation's standing to seek sanctions from Appellees in three separate filings. *See* D.E. 459, at 4, 35-36; D.E. 559, at 77; D.E. 561, at 79. Judge King ruled on the merits of Motivation's motion for sanctions without addressing Appellees' challenge to Motivation's standing. *See* D.E. 488 (Judge King's order denying Appellees' Motion to Quash, which nowhere addresses Motivation's standing); D.E. 568 (Judge King's opinion and order denying Motivation's Motion for Sanctions, which nowhere addresses Motivation's standing). This court's consideration of Appellees' challenge to Motivation's standing is *de novo*. *See*, *e.g.*, *Elend v. Basham*, 471 F.3d 1199, 1204 (11th Cir. 2006) (internal citations omitted). As shown below, Appellees' challenge to Motivation's standing was well founded.

"Standing is crucial. The Supreme Court has called it 'perhaps the most important of [the jurisdictional] doctrines.'" *ACLU of Fla. v. Dixie County*, 690 F.3d 1244, 1249 (11th Cir. 2012) (quoting *Allen v. Wright*, 468 U.S. 737, 750, (1984)). As such, the federal courts are "under an independent obligation" to examine standing. *United States v. Hays*, 515 U.S. 737, 742 (1995) (quoting *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 230-231, (1990)). *See also United States v. Edwards*, 728 F.3d 1286, 1291 (11th Cir. 2013) (quoting *Hays*, 515 U.S. at 742). Moreover, if a litigant lacks standing to press a

9

claim in the district court, this Court lacks jurisdiction to address the underlying merits of the litigant's claim. *See*, *e.g.*, *Kelly v. Harris,* 331 F.3d 817 (11th Cir. 2003).[7]

It is settled law that "intervenors who wish to prosecute an appeal on their own must separately fulfill the injury, causation, and redressability requirements of Article III." *Sierra Club v. Babbitt*, 995 F.2d 571, 574 (5th Cir. 1993) (internal citations omitted). Moreover, where an intervenor was the only party litigating the matter in the district court, the intervenor must have had independent standing to litigate the matter in the first instance. See *United States v. One-Sixth Share, Etc.*, 326 F.3d 36, 40-41 (1st Cir. 2003) (internal citations omitted). Where, as here, a matter is commenced as an *in rem* proceeding, the person or entity that initiates the suit is the plaintiff, and the "property subject to forfeiture is the defendant." *One-Sixth Share*, 326 F.3d at 40.[8] Other persons or entities may intervene as "claimants" in the *in rem* proceeding only if they have a colorable claim of ownership interest in the *res*. As the Fifth Circuit has instructed "the claimant must come forth with some evidence of his ownership interest in order to establish standing," and "a bare assertion of ownership of the *res*, without more, is inadequate to prove an ownership interest sufficient to establish standing." *United States v. $38,570 U.S. Currency*, 950 F.2d 1108, 1112 (5th Cir. 1992). Moreover, the Ninth Circuit has explained that a claimant ultimately "has the burden of establishing, by a preponderance of the evidence, that he has an interest in the property . . ." in order to have standing to intervene in an *in rem* proceeding. *United States*

---

[7] *See also Palomar Pomerado Health Sys. v. Belshe*, 180 F.3d 1104 (9th Cir. 1999) (dismissing appeal and vacating the district court's ruling based on plaintiff's lack of standing in district court), *cert denied*, 2000 U.S. LEXIS 117 (Jan. 10, 2000); *Auburn Med. Ctr. v. Ala. State Health Planning & Dev. Agency*, 848 So. 2d 269, 272 (Ala. Civ. App. 2003) (dismissing appeal based on the appellant's lack of standing in the lower court).

[8] *One-Sixth Share* was a civil forfeiture action, and not an admiralty action. As the court explained in *One-Sixth Share*, however, "[b]y virtue of the roots of *in rem* jurisdiction in admiralty law, the procedures for intervention in civil forfeitures are governed by the Supplemental Rules for Certain Admiralty and Maritime Claims." 326 F.3d at 41. As such, the "standing" jurisprudence established in civil forfeiture actions is equally applicable to *in rem* admiralty actions.

*v. Real Property, Etc.*, 976 F.2d 515, 520 (9th Cir. 1992) (citing *United States v. One Parcel of Land, Etc.*, 902 F.2d 1443, 1444 (9th Cir. 1990). The Ninth Circuit's holding is the logical result of the Supreme Court's decision in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), which instructs that standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Accord Fla. Pub. Interest Research Group Citizen Lobby, Inc. v. EPA*, 386 F.3d 1070, 1083 (11th Cir. 2004) (quoting *Bischoff v. Osceola County,* 222 F.3d 874, 878 (11th Cir. 2000) (following *Lujan* and testing standing through evidence, as opposed to simply accepting the plaintiff's allegations as true).

Applied to the *in rem* setting, this means that "although at the motion to dismiss stage it is enough to allege the elements of standing, at the summary judgment stage the party with the burden of demonstrating standing must demonstrate that there is a genuine issue of material fact as to the standing elements, and at trial standing must be proved by a preponderance of the evidence." *United States v. $57,790.00 in United States Currency*, 263 F. Supp. 2d 1239, 1242 (S.D. Ca. 2003) (citing *Lujan*, 504 U.S. at 561; *Central Delta Water Agency*, 306 F.2d 938, 947 (9th Cir. 2002)). *See also State v. $ 551,985.00 United States Currency*, 235 P.3d 1268, 2010 Kan. App. Unpub. LEXIS 540, *23-24 (Kan. Ct. App. 2010) (affirming decision that intervenor/claimant in *in rem* proceeding lacked standing based on failure to prove standing by a preponderance of the evidence at trial).

*Lujan* and its progeny (including decisions of this Court) prevent a plaintiff, intervenor, or other claimant from making false allegations that would, if true, sustain standing at the dismissal stage, and then continue to misuse the federal courts despite later proof that the allegations supporting standing were unsupported – which is precisely what happened here. Motivation's lack of standing in the district court was established by both (i) the trial court's ruling (not appealed by Motivation) that Motivation's

original claim failed to establish a legally cognizable claim of ownership of the *Res*, and (ii) Motivation's subsequent concession (less than two months after its initial complaint was dismissed) that Motivation's amended claim was factually unfounded. It was only ***after*** Motivation conceded that it has no ownership claim to the *Res* – and, thereby, lacked standing to intervene in the *in rem* action – that Motivation filed a motion for sanctions and engaged in protracted litigation (including substantial discovery) aimed at obtaining sanctions.

The irony of Motivation's motion for sanctions is that it was advanced by a non-party that invoked the district court's jurisdiction in bad faith through a frivolous intervention in which Motivation was seeking a platform to interfere with an *in rem* action brought by a competitor, and not to present any genuine claim of ownership of the *Res*. As such, Motivation was not harmed by any alleged "fraud on the court." Motivation's motion for sanctions is akin to a complaint by a thief who stole a work of art the owner had represented to be a Rembrandt, but was really a worthless reproduction. Motivation has no one to blame but itself for the costs of its own misuse of the judicial system and had no right to seek sanctions against Appellees in the first place or before this Court.

## II.    THE "INHERENT POWER" OF THE DISTRICT COURTS TO SANCTION <u>PARTIES</u> <u>FOR BAD FAITH DOES NOT EXTEND TO APPELLEES</u>

> No statutory mechanism authorizes monetary sanctions against Silverstein, a non-party who was not subject to a Court order and was not counsel of record in the underlying action. The Court's ability to sanction Silverstein can derive only from its "inherent powers."

D.E. 568, at 49.

Appellees challenged the district court's inherent power to sanction Appellees through a Motion to Quash (which also raised other jurisdictional defects). *See* D.E. 459, at 15-21. Relying exclusively upon *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), Judge King denied Appellees' motion through a single paragraph in a four-page order (which also addressed other issues). *See* D.E. 488, at 2. Questions of subject matter jurisdiction are reviewed *de novo*. *See*, *e.g.*, *Elend v. Basham*, 471 F.3d 1199, 1204 (11th Cir. 2006)

(internal citations omitted); *see also Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 619 F.3d 458, 460 (5th Cir. 2010) ("we review *de novo* a district court's invocation of its inherent power") (quoting *FDIC v. Maxxam, Inc.*, 523 F.3d 566, 590 (5th Cir. 2008)). As shown below, Judge King lacked the inherent power to sanction Appellees.

*Chambers* is the leading decision to sustain the existence of the "inherent power" of the district courts to sanction bad faith conduct. *Chambers* does not, however, address, much less sustain, the power of the courts to sanction a party's outside attorneys that are not counsel of record before the district court – especially where, as here, (i) no sanctions were sought from counsel of record in the first instance, and (ii) there was no contention that Movants violated any order of the district court. Rather, *Chambers* involved the limited question of whether the district courts possess the inherent power to sanction a party for contempt of court – which is concededly not at issue here.

> [T]he bad-faith conduct in *Chambers* was undertaken in direct defiance of the sanctioning court. *Chambers* was an action for specific performance of a contract to sell a television station. After signing the contract the owner, Chambers, changed his mind. His efforts to avoid the sale included, *inter alia*, a filing with the Federal Communications Commission seeking permission to replace existing transmission facilities with a new transmission tower to be built on a site beyond the reach of the contract. This filing not only directly violated the district court's order to maintain the status quo pending the outcome of the litigation but also, if successful, would have eviscerated the court's ability to enforce specific performance if it so ordered.

*CJC Holdings, Inc. v. Wright & Lato, Inc.*, 989 F.2d 791, 794 (5th Cir. 1993). *See also Positive Software Solutions, Inc*, 619 F.3d at 460-61 (construing *Chambers* to apply where the conduct at issue is either "in direct defiance of the sanctioning court," or "constitutes 'disobedience to the orders of the Judiciary,'" and instructing that "conduct is beyond the reach of the court's inherent authority to sanction" where it is "neither before the district

court nor in direct defiance of its orders") (quotations and citations omitted).[9]

Although the narrow holding in *Chambers* was that the district courts have inherent power to sanction a party for disobedience of their orders, *Chambers* also supports the extension of that power to a party's counsel of record. *Chambers*, 501 U.S. at 43 ("a federal court has the power to control admission to its bar **and to discipline attorneys who appear before it**") (emphasis added) (internal citations omitted).[10] But, *Chambers* did not even suggest, much less hold, that the inherent powers of the district courts reach beyond a party and its counsel of record, and Appellees are unaware of any decisional law holding that district courts have the inherent power to sanction a party's outside attorneys who have not violated an order of the court and not appeared as counsel of record before the court (and are not even members of the bar of the sanctioning court). Moreover, at least one court has declined to apply the inherent power beyond a party and its counsel of record, reasoning:

> [A]t the pertinent times Walters was New Valley's senior vice president and general counsel. His asserted liability for sanctions is based upon an affidavit he submitted in opposition to plaintiff's summary judgment motion. Rule 11 sanctions are not available against Walters because he was neither "an attorney of record" nor "a party" within the contemplation of the Rule. Brown and Fischer were the attorneys of record. New Valley was the party. Walters was an affiant-witness, who happened also to be an

---

[9] *See also Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1308, 1320-21 (11th Cir. 2002) ("inherent power to oversee attorneys practicing before it" extended to sanctions for filings "deemed abusive and offensive by the court" directed at opposing counsel); *Citizens Bank & Trust Co. v. Case (In re Case)*, 937 F.2d 1014, 1023 (5th Cir. 1991) (explaining that a district court's inherent authority "is based on the need to control court proceeding[s] and [the] necessity of protecting the exercise of judicial authority in connection with those proceedings" by seeing that the court's orders are obeyed) (citing *Chambers*, 501 U.S. at 43).

[10] This authority stems from "[t]he power of a court over members of its bar." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980)). *See also Natural Gas Pipeline Co. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1411 (5th Cir. 1993) (reasoning that "[t]he inherent power of a court to manage its affairs necessarily includes the authority to impose reasonable and appropriate sanctions on errant lawyers practicing before the courts"), *cert. denied*, 510 U.S. 1073 (1994) (internal citations omitted); *Flaksa v. Little River Marine Constr. Co.*, 389 F.2d 885, 888 n.10 (5th Cir. 1968) (tracing the origins of the inherent power to sanction attorneys to "[t]he power of a court to discipline members of its own bar . . . .") (internal citations omitted).

> attorney. His corporate office is sufficient to visit liability
> for sanctions upon New Valley, if Walters' conduct upon behalf of
> that party was in fact sanctionable; but there is no basis in the
> Rule for sanctioning Walters himself.
>
> . . .
>
> For comparable reasons I also decline to sanction Walters under
> § 1927 or the Court's inherent powers.

*Leventhal v. New Valley Corp.*, 148 F.R.D. 109, 112 (S.D.N.Y. 1993). *Accord In re VIII South Michigan Associates*, 175 B.R. 976, 984 (Bankr. N.D. Ill. 1994) (holding that the court lacked the inherent power to sanction a non-party litigation consultant who "helped to develop theories which the [parties] relied on in the litigation" and who "may well have suggested the shots" made by counsel of record). As the court explained in *VIII South Michigan Associates*:

> The decision in *Chambers*, if read broadly, might be used to
> support a holding that a court has the inherent authority to
> sanction any person or entity that is responsible for an abuse of
> the legal system. However, the court declines to read *Chambers* so
> broadly and instead concludes that *Chambers* should be limited to
> parties and their counsel [of record]. First, the only sanctions
> before the Supreme Court in *Chambers* were the sanctions imposed
> on *Chambers* himself in his capacity as a party. Second,
> throughout the opinion, the majority of the Court suggested that
> the inherent power should be limited to imposing sanctions on
> parties and their counsel [of record].

*Id.* at 983.

The inherent power identified in *Chambers* does not extend to non-party outside counsel who are not counsel of record before the district court (or even admitted to practice before that court), and who are not accused of violating any court order. While the district courts' power to sanction bad faith conduct may be inherent, it is not unbounded. Rather, the inherent power is limited to that necessary to control the proceedings before the court and to ensure compliance with its orders. As the Fifth Circuit explained in the decision affirmed in *Chambers*, "[t]o the extent that inherent power is seen as a product of necessity, it contains its own limits." *NASCO*, 894 F.2d at 702, *aff'd sub nom. Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991). Moreover, the Supreme Court has cautioned that inherent powers "must be exercised with restraint and discretion" both "[b]ecause of

their very potency" and "[b]ecause they are 'shielded from direct democratic controls.'" *Chambers*, 501 U.S. at 45; *Roadway Express, Inc.*, 447 U.S. at 764. Quoting the Fifth Circuit, the Supreme Court also wrote in *Chambers* that the inherent power "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." *Chambers*, 501 U.S. at 45 (internal citations omitted). Accordingly, "[t]he threshold for the use of the inherent power sanction is high[,]" and "[s]uch powers may be exercised only if essential to preserve the authority of the court[.]" *Natural Gas Pipeline*, 86 F.3d at 467. The conduct of non-party attorneys who have not appeared as counsel of record before the district court simply does not implicate inherent powers – particularly where, as here, no violation of any court order is alleged and no sanctions were sought from counsel of record.[11]

In his Opinion denying Motivation's motion to sanction Appellees, Judge King also relied upon the district court's opinion in *Helmac Products Corp. v. Roth (Plastics) Corp.*, 150 F.R.D. 563 (E.D. Mich. 1993), to sustain the

---

[11] Indeed, even where the inherent power to sanction conduct does exist, appellate decisions following *Chambers* have recognized that the sanction chosen must employ "'the least possible power adequate to the end proposed[,]'" and that "[i]f there is a reasonable probability that a lesser sanction will have the desired effect, the court must try the less restrictive measure first." *See, e.g., Natural Gas Pipeline Co. of Am. v. Energy Gathering*, 86 F.3d 464, 467 (5th Cir. 1996) (quoting and citing *Spallone v. United States*, 493 U.S. 265, 280 (1990)). Plainly, the "least restrictive measure" of curbing bad faith in litigation (when it occurs) is to sanction counsel of record, which is the "gate keeper" with the ultimate responsibility to refrain from taking positions or filing papers that such counsel does not stand behind, and which cannot avoid responsibility for his or her actions by simply "following orders." *See, e.g., Long v. Quantex Res., Inc.*, 108 F.R.D. 416 (S.D.N.Y. 1985) (holding, for sanctions purposes, that counsel of record, and not out-of-state counsel, is accountable for the conduct of the litigation, even if out-of-state counsel is primarily responsible for the preparation of the suit papers), *aff'd*, 888 F.2d 1376 (2d Cir. 1989); *see also In re De Lorean Motor Co. Litig.*, 59 B.R. 329, 339 (E.D. Mich. 1986) (instructing that there is no "just following orders" defense and that "accountability already lies with the signer, even if it means informing a superior that the proposed pleading is either factually unsound or not substantiated by the existing state of the law"). If counsel of record is directed by a client or its outside attorneys to act in a manner that counsel of record believes to be improper, counsel of record can and should refuse to do so. And, if counsel of record fails or refuses to act appropriately, there is ample power to preserve the court's authority through the inherent power to sanction counsel of record – which power indisputably exists under *Chambers*.

court's inherent power to sanction a non-party. *See* D.E. 568, at 53-54. Unlike the instant case, however, the narrow issue in *Helmac* was whether the inherent power identified in *Chambers* extends to the principal behind a party, who was the "real party in interest" in the litigation. Specifically, *Helmac* involved a motion to sanction an individual, who was both the principal stockholder and chief executive officer of the corporate party, for destroying documents subject to discovery. *See Helmac*, 150 F.R.D. at 564. Finding that the individual respondent in *Helmac* was the "real party interest," the district court reasoned that the power to sanction extended to the respondent because "the individual is as much involved in the litigation as any party would be, and his participation in these events is tantamount to a direct snubbing of the Court's authority by that individual." *Id* at 568. That holding has no relevance to outside counsel for a party, even if they have a financial interest in the outcome of the case because of their fee arrangement. *See United States v. Henry*, 2013 U.S. Dist. LEXIS 133148, *110 (E.D. Va. Sept. 13, 2013) (observing that the exercise of inherent power should be limited to persons or entities who are "(1) parties, (2) subject to a court order, or, (3) real parties in interest"); *In re VIII S. Mich. Assocs.*, 175 B.R. 976, 984 (Bankr. N.D. Ill. 1994) (same) (internal citations omitted). *See also Adell Broad. Corp. v. Ehrich*, 2012 Mich. App. LEXIS 229 (Mich. Ct. App. Feb. 14, 2012) (affirming imposition of sanctions on non-party based on determination that he was the "real party in interest" where he was "the president and director" of the offending parties and had "controlled the companies and filed the complaint on behalf of the companies").

Only one decision of any the U.S. Courts of Appeals has cited *Helmac* for the proposition that inherent power can reach a non-party, and that decision involved the violation of an injunction – a very different situation clearly covered by *Chambers. See Marshak v. Treadwell*, 595 F.3d 478 (3d Cir. 2009). Additionally, district courts within this circuit have claimed

inherent power to sanction the principal of a party[12] but none have claimed the power to sanction outside counsel. Here, Judge King did not find (and Motivation did not claim) that Appellees were the "real party in interest."

In his Opinion denying Motivation's motion for sanctions, Judge King also relied upon *Universal Oil Products Co. v. Root Refining Co.*, 328 U.S. 575 (1946) ("*Universal*") to support his assertion of power to sanction non-parties for "fraud on the court." *See* D.E. 568, at 51-52. *Universal* not only fails to support Judge King's assertion of power, but it reveals the error of his doing so (and of his million dollar award to Motivation's counsel). The brief decision in *Universal* holds only that the district courts possess the authority to appoint *amici* to advocate that a judgment should be set aside based on a fraud on the court. *See Universal*, 328 U.S. at 580-81 (specifically identifying the narrow ground for the decision). The pertinent language, which is helpful to Appellees here, is that (i) persons could be brought before the district court "by appropriate means," and (ii) "the usual safeguards of adversary proceedings must be observed." *Id.* at 580.[13]

---

[12] *See ANZ Advanced Techs., LLC*, 2012 U.S. Dist. LEXIS 29534, at *29 ("highest ranking officers"); *Feldman v. Davidson*, 2009 U.S. Dist. LEXIS 36921, at *6-7 (S.D. Fla. April 13, 2009) (individual who held a "power of attorney" to act for the parties before the Court, and used that power to cause various actions that were the subject of the sanctions motion); *Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, 259 F.R.D. 568, 587-90 (M.D. Fla. 2009) (all "non-parties" subjected to sanctions were counsel of record in the case or counsel who violated a specific discovery order) ), *aff'd* 2009 WL 5606058 (M.D. Fla. November 16, 2009); *Pafumi v. Davidson*, 2008 U.S. Dist. LEXIS 67036, at *7-9 (S.D. Fla. Sept. 3, 2008) (non-party subject to sanctions signed the filings giving rise to sanctions – which were filed *pro se* – and did not contest the Court's authority to sanction him); *Mastercard Int'l, Inc. v. Ishak*, 2004 U.S. Dist. LEXIS 951, at *12-13 (S.D. Fla. Feb. 23, 2004) (involved sanctioning an actual party, and nobody else). The district court herein also relied on *Helmac* to conclude that Miscovich should be sanctioned even though he was a non-party. (D.E. 445 at 20 n.19). Like the principal stockholder and chief executive officer in *Helmac*, Miscovich was the "real party in interest" because he was JTR's sole Managing Member and the holder of a controlling membership interest.

[13] The Supreme Court also held that (i) the "cost of the proceedings" (in that case, the costs of a master) could be assessed against the party that had obtained the fraudulent judgment, but that (ii) the attorneys who were appointed by the court to seek relief from the judgment were not entitled to have their fees paid by the guilty party. *See id.* at 580-81. *See also Crowe v. Smith*, 151 F.3d 217 (5th Cir 1998) (finding sanctions proceeding was in the nature of a criminal contempt proceeding, and reversing grant of monetary sanctions where, among other things, the district court allowed the

While Appellees are second to none in their condemnation of any false testimony in any case, its occurrence does not provide a legal warrant for an inquisition of the knowledge or participation of outside counsel and other non-parties. If the rule were otherwise, every case of the rejection of a party's testimony by a fact-finder would present an issue of attempted "fraud on the court" calling for a similar inquisition as this case into "what the attorney knew and when did he know it."[14]

Consistent with the foregoing, federal courts have recognized less than a handful of situations in which the inherent power may reach a non-party (other than a "real party in interest"):

- The inherent power may extend to a non-party that filed an unsuccessful motion to intervene in the proceedings before the court. *See*, *e.g.*, *Moten v. Bricklayers, Masons & Plasterers Int'l Union of Am.*, 543 F.2d 224 (D.C. Cir. 1976) (sanctioning a non-party who unsuccessfully sought to become a party);

- The inherent power may extend to a court reporter or court personnel who interfere with the court's performance of its judicial function. *See SECO Nev., Inc. v. McMordie*, 884 F.2d 476, 477-78, n.2 (9th Cir. 1989) (sanctioning court reporter for "repeated and flagrant failures to meet court-imposed deadlines" that caused "severe prejudice to both the parties and the court");

- The inherent power may extend to a non-party that violates an injunction. *See*, *e.g.*, *Marshak*, 595 F.3d at 478; and

- This court has affirmed the imposition of sanctions upon a non-party witness for bad faith discovery abuse. *See*

---

proceedings to be "prosecuted" by a lawyer for a client with a financial interest in the outcome).

[14] Although the district court found that Miscovich and Elchlepp committed perjury and verified false pleadings, a "fraud on the court" does not occur simply because a witness commits perjury or a party asserts a false claim. *See Travelers Indemnity Co. v. Gore,* 761 F. 2d 1549, 1551-52 (11th Cir. 1985) (perjury insufficient for fraud on the court). Rather, a "fraud on the court" requires "a corruption of the judicial process itself" through "such flagrant abuses as bribing a judge, employing counsel to exert improper influence on the court, and jury tampering." *Gen. Med., P.C. v. Horizon/CMS Health Care Corp.*, 475 Fed. Appx. 65, 71 (6th Cir. April 10, 2012) (internal citations omitted). The elements of a "fraud on the court" also require that the fraud "in fact deceives the court." *Herring v. United States*, 424 F.3d 384, 386 (3rd Cir. 2005) (internal citations omitted); *see also Gen. Med.*, 475 Fed. Appx. at 71. Neither of these things occurred herein – not even by Miscovich. Moreover, as in *Universal*, the remedy for a true "fraud on the court" is to set aside a judgment that was fraudulently obtained, and not to sanction a non-party. *Accord Chambers*, 501 U.S. at 44 (discussing inherent power of courts to set aside its judgment upon proof it was procured by fraud).

*Sciarretta v. Lincoln Nat'l Life Ins. Co.*, 778 F.3d 1205 (11th Cir. 2015).[15]

Plainly, none of those situations is present here, and Judge King's assertion of inherent power to sanction Appellees extends *Chambers* and its progeny beyond their breaking point.

## III. THE DISTRICT COURT LACKED PERSONAL JURISDICTION OVER APPELLEES, WHO WERE NEVER SERVED WITH LEGALLY VALID PROCESS

Chief Judge Moore ruled that (i) Appellees had not submitted themselves to the court's jurisdiction, and (ii) Motivation failed to serve Appellees with legally valid process. *See* D.E. 333. *See also* D.E. 445, at 3. Chief Judge Moore also has found it would be "unfair" to drag Appellees into this matter after discovery and other proceedings were completed without Appellees' involvement. D.E. 373, at 112:24 to 113:9 (observing it would be "unfair to Mr. Silverstein to have to come in at such a late date"). Motivation thereafter requested that Judge King issue the OSC; Appellees moved to quash the OSC; and Judge King denied the motion. *See* D.E. 488 (Order Denying Motion). As shown below, Judge King erred, as a matter of law in doing so.

Rule 4.1 of the Federal Rules of Civil Procedure provides that process "other than a summons under Rule 4 . . . may be served anywhere within the territorial limits of the state where the district court is located and, if authorized by a federal statute, beyond those limits." Fed. R. Civ. P. 4.1(a). As such, this Court has instructed that "Rule 4 addresses only service of the summons[,]" and "[Rule 4.1] governs service of process other than a summons or subpoena." *United States v. Elmes*, 532 F.3d 1138, 1144

---

[15] In so doing, the Court based its decision on the fact that the sanctions had been imposed for the non-party's bad faith in its capacity as a witness in the proceedings in the district court (which is not involved herein). Moreover, the sanction sustained by the Court was limited to requiring the non-party to "cover" a separate fee award that had been imposed on the party for whose benefit the sanctions were awarded. As the Court explained on page 1214 of its Opinion:

> The district court did not require Imperial to pay Lincoln's own fees, but only those of the Cotton trust that were shifted to Lincoln under Florida law as a result of the judgment against Lincoln. In other words, because of its misconduct Imperial was required to pay the fees of the party that had to prevail in order for Imperial to recover on its loans.

(11th Cir. 2008). The OSC is neither a summons nor a subpoena. Rather, the OSC is an order directing non-parties to respond to Motivation's private motion for sanctions. As such, Rule 4.1(a) governed service of the OSC. *See*, *e.g.*, *Fidelity Nat'l Fin., Inc. v. Friedman*, 2010 U.S. Dist. LEXIS 35851, at *18-19 (D. Ariz. Mar. 12, 2010) ("Because the process here is an OSC and not a summons, the court must look to Rule 4.1(a).").

Rule 4.1(a) limits *where* service may be made. In the absence of a specific federal statute allowing for broader service of the relevant type of process, service is expressly limited to "the state where the district court is located" – which is the state of Florida in this instance. No statute operated to broaden that reach. Thus, service of the OSC on Appellees in Delaware was invalid and did not permit Judge King to exercise jurisdiction over Appelleees. *Accord* Hon. William W. Schwarzer et al., Federal Civil Procedure Before Trial §13:247 (2007) (noting, in discussion of orders to show cause for violations of preliminary injunctions, that "[t]he party sought to be held in contempt is entitled to notice of the [Order to Show Cause]. The order must be served in the state in which the district court is located or within 100 miles from the courthouse in which it was issued.").

Judge King held that the OSC was validly served on Appellees simply because they received actual notice. *See* D.E. 488, at 3. In essence, Judge King reasoned that service of legally valid process is unnecessary when the district court considers an OSC based on the court's "inherent power." Aside from the fact that Judge King was wrong to believe that he had "inherent authority" to sanctions Appellees in the first instance (as shown in Argument II above), Judge King erred in concluding that the mere existence of such power dispenses with the need for legally valid process.

"[W]hen it is sought to charge a person with contempt who was not a party to the original action and thus not already within the jurisdiction of the court, he must be served with process as in any other civil action." *McGuire v. Sigma Coatings, Inc.*, 48 F.3d 902, 907 (5th Cir. 1995) (citing 11A Wright & Miller, *Federal Practice & Procedure* § 2960 at 589); *accord*

*Comverse, Inc. v. Am. Telecomms., Inc. Chile S.A.*, 2009 WL 46446, at *2 n.4 (S.D.N.Y. Feb. 24, 2009) (absent evidence of proper service, the court is "[w]ithout personal jurisdiction" and cannot "hold them in contempt[ ]"). '"Service of process is the mechanism by which the court [actually] acquires' the power to enforce a judgment against the defendant's person or property. In other words, service of process is the means by which a court asserts its jurisdiction over the person." *SEC v. Ross*, 504 F.3d 1130, 1137-38 (9th Cir. 2007) (internal citations omitted). "[I]n the absence of proper service of process, the district court has no power to render any judgment against the defendant's person or property unless the defendant has consented to jurisdiction or waived the lack of process." *Id.* at 1138-39. There is no exception to these fundamental rules where the district court seeks to flex its "inherent power" to investigate an alleged fraud on the court. *Accord Universal Oil*, 328 U.S. at 580 (instructing that a district court can bring persons before it only "by appropriate means" and that "the usual safeguards of adversary proceedings must be observed" when investigating an alleged fraud on the court).

Properly applying the foregoing legal principles, the court in *Fidelity Nat'l Fin., Inc. v. Friedman*, 2010 U.S. Dist. LEXIS 35851 (D. Ariz. Mar. 12, 2010), held that it lacked personal jurisdiction over non-parties because the applicant for relief ("Fidelity") "did not serve the OSC in compliance with Rule 4.1[.]" *Id.* at *22. In that case, Fidelity moved for an order directing non-parties to show cause why they should not be sanctioned under the court's inherent power. *See id.* at *20. Fidelity provided the non-parties with actual notice of the OSC, but did not cause it to be validly served pursuant to Rule 4.1. The court thereafter granted the respondent's motion to dismiss for lack of personal jurisdiction, reasoning that "[t]he familiar 'minimum contacts' test . . . coupled with statutory authorization , provides a *basis* for an exercise of jurisdiction," but "service of process is the *mechanism* by which the court actually acquires the power to enforce a judgment against the defendant's person or property." *Id.* at *13 (internal citations omitted). The

court further explained that "service of process is a distinct and separate concept from the court's personal jurisdiction[,]" and noted that the two distinct concepts are "often conflated" – such as by Judge King here. *Id.*

Like the respondent in *Fidelity*, Appellees were never served with legally valid process. Thus, while Appellees did not engage in any sanctionable conduct, Judge King's authority to consider that issue simply did not exist. This Court should, therefore, vacate all Judge King's various rulings following the issuance of the OSC, without reaching the merits of Motivation's appeal. *See*, *e.g.*, *Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind*, 841 F.2d 646, 649 (5th Cir. 1988) (a judgment rendered in the absence of personal jurisdiction is void and must be set aside).

## CONCLUSION

Motivation is not a defendant that claims to have been wrongfully sued by JTR (much less by Appellees). Nor is Motivation a plaintiff that claims that JTR (much less Appellees) wrongfully defended against a viable complaint brought by Motivation. Rather, Motivation is an intermeddler in the *in rem* action below, which first asserted a legally frivolous and factually implausible claim that was dismissed by the Court (albeit without prejudice) and later conceded that it had no ownership claim to the *Res* – and thereby lacked standing to participate in the *in rem* action below.

It also is undisputed that Appellees (i) were not parties in the district court (or the "real parties in interest"), (ii) were not counsel of record to any party in the district court, and (iii) were not accused of violating any order of the district court. Accordingly, the district court lacked jurisdiction to sanction Appellees.

The district court also lacked personal jurisdiction over Appellees because they (i) were never served with legally valid process, (ii) timely contested the sufficiency of process, and (iii) "specially appeared" without waiving these defenses.

Under settled law, any one of the foregoing defects in the proceedings below is sufficient to render all proceedings involving Appellees a nullity

(and Motivation's lack of standing renders all proceedings following the district court's 2013 Final Order a nullity). Accordingly, Appellees respectfully pray that this Court will grant Appellees' motion to dismiss Motivation's appeal, and vacate the district court's rulings that post-date the district court's Final Order *nunc pro tunc*.

Respectfully submitted,

ADAMS AND REESE LLP                          COFFEY BURLINGTON, P.L.
John T. Rogerson, III
Florida Bar No. 832839                       By:  Jeffrey B. Crockett
john.rogerson@arlaw.com                           Jeffrey B. Crockett
501 Riverside Avenue, 7th Floor                   Florida Bar No. 347401
Jacksonville, FL 32202                            jcrockett@coffeyburlington.com
Telephone:  (904) 355-1700                        David J. Zack
Facsimile:  (904) 355-1797                        Florida Bar No. 641685
                                                  2601 South Bayshore Drive
                                                  Penthouse
                                                  Miami, Florida  33133
                                                  Telephone:  (305) 858-2900
                                                  Facsimile:  (305) 858-5261

*Counsel for Young Conaway Stargatt &*
*Taylor, LLP  and Bruce L. Silverstein, Esq.*

# EXHIBIT 7

**REPLY IN SUPPORT OF MOTION TO DISMISS**

UNITED STATES COURT OF APPEAL
FOR THE ELEVENTH CIRCUIT

_____

CASE NO. 15-14132-D

_____

MOTIVATION, INC.

Claimant/Appellant,
vs.

JTR ENTERPRISES, LLC,

Plaintiff/Appellee.

_____

On appeal from the United States District Court for
the Southern District of Florida, Miami Division
Case No. 4:11-Civ-10074

APPELLEES' JOINT MOTION TO DISMISS APPEAL

John T. Rogerson, III (FBN: 832839)      Jeffrey B. Crockett (FBN: 347401)
john.rogerson@arlaw.com                   jcrockett@coffeyburlington.com
ADAMS AND REESE LLP                       COFFEY BURLINGTON, P.L.
501 Riverside Avenue, 7th Floor           David J. Zack (FBN: 641685)
Jacksonville, FL 32202                    2601 South Bayshore Drive, Penthouse
Telephone:  (904) 355-1700               Miami, Florida  33133
Facsimile:  (904) 355-1797               Telephone:  (305) 858-2900
                                          Facsimile:  (305) 858-5261


*Counsel for Young Conaway Stargatt & Taylor, LLP and Bruce L. Silverstein,*
*Esq.*

**<u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, Appellees Young Conaway Stargatt & Taylor, LLP and Bruce L. Silverstein, Esq., hereby state the following individuals and entities with any known interest in the outcome of this appeal:

Kendall B. Coffey

Jeffrey B. Crockett

Stephen Elchlepp

Kim Fisher

John Gravante

David Horan

JTR Enterprises LLC

Hon. James L. King

Jay Miscovich

Hugh J. Morgan

Motivation Inc.

Hon. K. Michael Moore

Bruce L.. Silverstein

John Siracusa

Paul D. Sullivan

John E. Tuthill

Marlow V. White

Young Conaway Stargatt & Taylor, LLP

David J. Zack

Appellees, Young Conaway Stargatt & Taylor, LLP ("YCST") and Bruce Silverstein ("Silverstein"), hereby move to dismiss the appeal of Motivation, Inc. ("Motivation") from the denial of its motion for sanctions against YCST and Silverstein (together, "Appellees"). Notwithstanding the district court's proper denial of Motivation's motion (on the merits), the district court lacked jurisdiction to entertain the motion in the first instance. As such, Motivation's appeal should be dismissed for lack of jurisdiction and the sanctions proceedings below should be vacated.

This case arises from an *in rem* action filed in 2010 by JTR Enterprises, LLC ("JTR"), seeking a declaration of ownership and salvage rights as to "an unknown quantity of Colombian Emeralds, Amethysts, and Quartz crystals" (the "*Res*") alleged to have been found in international waters in the Gulf of Mexico by JTR's Managing Member, Jay Miscovich ("Miscovich"). Following a bench trial in December 2012, the trial court found the evidence in equipoise as to whether Miscovich found the *Res* or "salted" the discovery site, and entered a Final Order, on January 25, 2013, by which the court denied JTR any relief. *See* DE 199 (the "Final Order").

Nearly a year after entry of the Final Order, at an evidentiary hearing on sanctions against Miscovich and JTR (the "First Sanctions Hearing"), a store owner testified that he had sold Miscovich some 80 pounds of emeralds in 2010, leading the court to find that "by purchasing the emeralds and then 'finding them' at the bottom of the ocean, Miscovich engaged in a fraud to vastly increase their value as purported 'sunken treasure.'" DE 445 at 2-3. The court further found that "Miscovich managed to successfully convince his investors, lawyers, employees of the Smithsonian, appraisers, jewelers, family, friends, the general public, and many others, including investigative reporters from CBS' 60 Minutes, that he had discovered and recovered this treasure from the seafloor in early 2010." *Id*. at 19.

Following the First Sanctions Hearing, Motivation filed a motion for sanctions against Appellees, who were outside counsel to JTR and Miscovich. *See* DE 407. Motivation did not contend that Appellees knew of any fraud when

1

they were retained to represent Miscovich and JTR in 2011, but argued that Appellees should not have continued to represent their clients when alleged "evidence of fraud" emerged in the *in rem* action. *See id*. at 6. Motivation did not tell the Court what Motivation's internal emails revealed: that Motivation knew that there was no evidence of Appellees' knowing participation in any fraud, but that (i) Motivation targeted Appellees because they were seen as "a deep pocket," and (ii) Motivation was "rely[ing] on their desire to settle and not be dragged thru a messy highly publicized trial" *See* DE 559 at 47, 49; DE 459 at 11-13.

The trial court, Hon. James Lawrence King, accepted Motivation's invitation for an inquisition of Appellees' knowledge of their clients' actions by an order to show cause (the "OSC") (DE 451), and rejected Appellees' challenges to subject matter and personal jurisdiction (DE 459). Following a thirteen day evidentiary hearing in November and December of 2014, Appellees prevailed on the merits.[1] Through this appeal, Motivation frivolously challenges that fact-finding. This motion argues that the sanctions proceeding was begun without jurisdiction, that all rulings of the district court should be vacated, and this appeal dismissed as a result. *See*, *e.g.*, *Boyd v. Homes of Legend, Inc.*, 188 F. 3d 1294, 1298 (11th Cir. 1999) (internal citations omitted) (when district court lacked jurisdiction, this Court has jurisdiction only to correct error in entertaining the suit).

## SUMMARY OF ARGUMENT

In the district court, Motivation sought the unprecedented relief of securing an award of sanctions in favor of a non-party with no standing against non-parties who were not counsel of record and who were non-residents

---

[1] Appellees contested the district court's jurisdiction to sanction them, but Judge King overruled those threshold objections, and compelled Appellees to show cause why they should not be sanctioned without even affording them an opportunity to take discovery. *See* D.E. 488. Thereafter, Judge King conducted a lengthy evidentiary hearing, which ultimately resulted in determination that there was no factual basis to sanction Appellees. *See* D.E. 528 (granting equivalent of directed verdict to YCST and Sullivan); D.E. 568 (opinion and order denying sanctions as to Silverstein); D.E. 592 (opinion and order denying Motivation's motion for reconsideration).

of the State of Florida and not served with legally valid process. The district court (per Judge King) erred in indulging Motivation.

At its core, the adversarial system of civil jurisprudence pits one or more plaintiffs against one or more defendants. In appropriate circumstances, a non-party is permitted to intervene. To do so, however, the intervenor must have standing – which Motivation lacked in this matter (as shown in Argument I, *infra*). Absent standing, a putative intervenor cannot invoke the limited jurisdiction of the federal courts – including on appeal. Nor can a district court reach outside of the proceedings before it, and sanction a party's outside attorneys, who were not counsel of record before the district court and not charged with violating an order of the court (as shown in Argument II, *infra*). This is particularly the case where, as here, the non-party Appellees have not been brought before the district court through any legally valid process (as shown in Argument III, *infra*).

### MOTIVATION'S IMPROPER ROLE IN THE PROCEEDINGS BELOW

As shown below, Motivation (i) wrongfully injected itself into the *in rem* proceeding with a factually implausible and legally frivolous claim of intervention that was dismissed by the court, and (ii) later filed a concocted amended claim that Motivation promptly disclaimed. The record shows that Motivation's true purpose in seeking to intervene was (i) to serve as the self-anointed "Treasure Police," and (ii) to provide Motivation a forum to disparage a new business competitor.[2] Without regard to Motivation's *bona fides* (or lack thereof), however, Motivation's concession that it lacked any ownership interest in the "*Res*" means that Motivation lacked standing to participate in the *in rem* proceeding (as shown in Argument I, *infra*).[3]

---

[2] For a more detailed discussion of the record of Motivation's true motivation for injecting itself into the *in rem* action below, *see* D.E. 142, at 3-4 & nn.5-6 (Opposition to Motivation's Motion for Sanctions); D.E. 459, at 36-40 (Motion to Quash and Opposition to Amended Motion for Sanctions), pertinent excerpts of which are attached as Exhibits 1 and 2, respectively.

[3] After conceding that it had no valid claim to the *Res* – and thereby lacked standing in the *in rem* action – Motivation sought to pass itself off as a "*qui tam relator*." The court struck Motivation's references to being a *qui tam relator* from the record because "there are no facts before this Court that would indicate that Motivation is actually working on behalf of a

The proceeding below was an *in rem* action to declare title to the *Res*. Because the action was *in rem*, JTR did not sue any individual or entity. Moreover, JTR's complaint alleged little more than that Miscovich discovered the *Res* in a specified location in the Gulf of Mexico. The complaint contained no allegations as to the origin or value – which remained to be investigated after title to the *Res* was established. *See* D.E. 1 (Complaint).

Motivation claims to be a successor to Treasure Salvors, Inc. ("Treasure Salvors"), which was granted certain rights to certain cargo on two Spanish Galleons (the "*Atocha*" and "*Margarita*") that sank in the Atlantic Ocean in the 17th Century. Motivation injected itself into the *in rem* action on a theory that was, itself, a "fraud." Specifically, Motivation claimed that the *Res* had been cargo on the *Atocha*, which had floated in a barrel against prevailing currents to the Salvage Site that was many miles away from the *Atocha* wreck site. *See* D.E. 10 (Complaint in Intervention). Motivation's claim was not only implausible (and contrary to the laws of physics), but it was fraudulently based on a 1976 district court order that had been vacated, in pertinent part, on appeal.[4] Based on the foregoing, JTR successfully moved to dismiss Motivation's complaint in intervention. *See* D.E. 92.

Motivation next filed an amended claim that posited, with no evidence whatsoever, a concocted theory of a possible theft of *Atocha* emeralds from

_____

government entity with its expressed consent." D.E. 360. Motivation did not appeal this ruling, and is bound thereby.

[4] Specifically, Motivation claimed that a district court order from 1976 (the "1976 Order"), had awarded Treasure Salvors ownership "as against the world of the *Atocha* and *Margarita* shipwrecks and their cargo and scatter 'wherever the same may be found.'" In fact, the Fifth Circuit (which then included Florida) limited the scope of the 1976 Order on appeal, and vacated the overbroad nature of the 1976 Order upon which Motivation relied. *See Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel,* 569 F. 2d 330, 335 (5th Cir. 1978). Moreover, in a subsequent opinion, the Fifth Circuit directed the district court to "make a fresh and complete record" respecting Treasure Salvors' claim. *Id.* at 571. On remand, the district court denied Treasure Salvors any rights beyond a specific "Injunctive Area." *See Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel,* 546 F. Supp. 919 (S.D. Fl. 1991). It is undisputed that the Injunctive Area ends more than 25 nautical miles away from the Salvage Site. As such, Motivation's claim of potential ownership of the *Res* was legally frivolous and based on a misrepresentation of the status of the 1976 Order from the outset – even if it were assumed (*arguendo*) that the implausible factual underpinning of the putative claim was physically possible.

Motivation. Less than two months later, however, Motivation conceded that it lacked any ownership interest in the *Res*, and moved to voluntarily dismiss its amended claim. *See* D.E. 118 (Motion to Voluntarily Dismiss Claim). The *in rem* action then proceeded without Motivation asserting any claim to the *Res*.

## MISCOVICH

Miscovich was not a party to the *in rem* action below. Nonetheless, **after** Motivation conceded that it had no ownership interest in the *Res*, Motivation moved the district court to sanction Miscovich for "fraud on the court." Despite the entry of the Final Order denying JTR any relief on January 25, 2013, Judge King **thereafter** allowed Motivation to conduct substantial discovery in support of its sanctions motion, and ultimately entered an order on August 17, 2015 directing Miscovich's estate to pay Motivation's counsel in excess of $1 million (consisting mainly of fees allegedly earned pursuing sanctions after the Final Order was entered). *See* D.E. 591. Miscovich was deceased when Judge King entered that order; neither Miscovich nor his estate were represented in the proceedings below; and Miscovich's estate lacks the financial capacity to appeal the sanctions award – which was prosecuted by Motivation's counsel and granted *in abstentia* and without even a friend of the court to present a defense. By contrast, when this Court was confronted with a motion to sanction JTR for pursuing an appeal of the Final Order, the Court declined to sanction JTR because, among other things, "JTR has not been represented in this matter by conflict-free counsel." *JTR Enterprises, LLC. v. Columbian Emeralds*, No. 13-10870, at 3 (11th Cir. March 21, 2014) (Order).[5]

---

[5] Judge King also entered an order directing JTR to pay Motivation's counsel just under $175,000. *See* D.E. 590. That Order was entered at a time when JTR had **no** counsel, and was based on an earlier ruling that JTR should have made immediate disclosure of certain information that would, if true, have cast doubt on the validity of JTR's claim, and held that JTR should be sanctioned for the relatively brief time during which JTR delayed disclosure to the court. *See JTR Enterprises, LLC v. An Unknown Quantity, Etc.*, Case No. 11-cv-10074-KMM, at ¶¶ 61-65 (June 19, 2014). That prior ruling also was made when JTR was not represented by conflict-free counsel. Additionally, that ruling was not supported by any cited authority, and will be challenged by Appellees if this appeal proceeds on the merits. With all due respect to the district court, there is no applicable statute, rule of court, or common law precept

**CHIEF JUDGE MOORE RECOGNIZED THE COURT'S LACK OF JURISDICTION OVER APPELLEES, BUT MOTIVATION THEREAFTER MISLED JUDGE KING <u>INTO ALLOWING</u> <u>MOTIVATION TO PURSUE SANCTIONS AGAINST APPELLEES</u>**

At the First Sanctions Hearing (in which Appellees were neither present nor represented) Motivation asked the district court (then Hon. K. Michael Moore) to entertain sanctions against Appellees – who had been outside counsel for JTR, had made no appearance in the *in rem* action resolved a year earlier, and had not participated in the post-Final Order discovery Judge King permitted Motivation to pursue. Chief Judge Moore held that Appellees had not submitted themselves to the court's jurisdiction, and that Motivation had failed to serve Appellees with legally valid process. *See* D.E. 333. *See also* D.E. 445, at 3. Chief Judge Moore also reasoned that it would be "unfair" to drag Appellees into this matter after discovery and other proceedings were completed without Appellees' involvement. D.E. 373, at 112:24 to 113:9 (observing it would be "unfair to Mr. Silverstein to have to come in at such a late date"); *see also id.* at 123:23 to 124:7 ("if they're not within the jurisdiction of the Court, if there is no way to enforce the sanction, then the District Court should not be in a position of just entering orders that it cannot execute on . . . .").

After the First Sanctions Hearing, Motivation persuaded Judge King to issue the OSC. Numerous documents Motivation withheld from the court reflect that Motivation set its sights on Appellees with full knowledge of the lack of any evidence that Appellees were aware of any fraud, and solely to reach into what Motivation called "deep pockets." For example:

- On February 15, 2013, Motivation's counsel, Gene Lewis ("Lewis"), wrote: "[g]oal for all of us is money judgment against deep pockets" – "#1 Silverstein and firm." D.E. 459, Exh. 112.
- On February 19, 2013, Lewis wrote: "we don't need to be spending a lot of time on these guys except as to how to nail Scott, the firm and Bruce and last resort Sullivan." Motivation's President responded "We need to rely on their desire to settle and not be dragged thru a messy highly publicized trial." *Id.*, Exh. 113.

---

that required JTR to voluntarily disclose "potentially" adverse information at a time when JTR was still investigating the information – which are the indisputable facts during the four months prior to JTR's voluntary disclosure of the information at issue.

- On April 9, 2013, Lewis wrote: "All we are after is deep pocket who can pay Kim, us, Hugh and John's folks. [The FBI] has the fraud nailed for Judge King vindication so let's get consensus on how we can wind this down with a solvent judgment debtor(s) in our sights." *Id.*, Exh. 117.

- On April 20, 2013, Lewis wrote: "Friends, let us not forget the mission!!! Silverstein and his law firm, ie a deep pocket! Without that Buster and I are out of here." *Id.*, Exh. 121.

In accordance with its cynical strategy, Motivation refrained from seeking sanctions from JTR's counsel of record, David P. Horan ("Horan"), because Motivation believed that Judge King "liked" Horan. As Motivation's counsel wrote on April 16, 2013:

> Buster and all, ***thinking of politics*** here as well as legal positions. You all know my feelings about Horan nonetheless we have a larger issue than him at stake – winning against Silverstein and his firm. As Hugh [Morgan] knows from being "inside the tent" at the courthouse ***Judge King*** may be disappointed but ***still likes Horan.*** Look how quick he let him off the hook. So, we need to open, in my view, with letting him out on this Motion. D.E. 459, Exh. 118 (emphasis added).

> Motivation's lead counsel at the sanctions hearing responded:

> We have ample evidence that [Miscovich] has committed fraud and perjury, but ***I don't think we have any evidence that [Horan] or [Silverstein] were aware of the fraud*** (unless we infer knowledge f[ro]m the epoxy, but that m[ay] be pushing an inference to[o] far). D.E. 459, Exh. 120 (emphasis added).

The record shows that Motivation used the discovery process allegedly directed at JTR to investigate, at leisure, their potential claims against Appellees as "deep pockets" – all while Appellees were non-parties with no rights to participate in that discovery process:

- On May 17, 2013, Lewis wrote: "Judge King has no notion that our problem is not an award of fees and costs but of how Kim, and us, and John's clients get paid—a solvent creditor-Silverstein's FIRM." D.E. 459, Exh. 123.

- On May 24, 2013, another of Motivation's lawyers, Hugh Morgan ("Morgan"), wrote: "We could go to trial with what we have and are going to get in the immediate future but what we don't have at this time are the deep pockets. That is probably going to take more time." *Id.*, Exh. 125.

- On July 1, 2013, Lewis expressed his hope that a deposition of JTR's counsel of record would give Motivation some evidence to go with in regard to its real "target"—YCST: "even if he can corral Silverstein we won't have the real deep pocket until we get his firm understanding they are the target . . . ." *Id.*, Exh. 129.

In this abuse of due process, Motivation even made a calculated decision to ***not*** depose Appellee Silverstein, so as to avoid the presentation of a full

record to the district court at the First Sanctions Hearing. As Motivation's lead counsel at the sanctions hearing against Appellees advised Motivation's other counsel: "If you depose BS, he'll just get out his side of the story and the testimony will be admissible at trial." D.E. 459, Exh. 131.[6]

Appellees ultimately defeated Motivation's motion for sanctions. But, Appellees should never have been subjected to a sanctions hearing that was (i) "prosecuted" by a party lacking standing to complain of Appellees' actions, (ii) conducted by a court that lacked the power to sanction Appellees, and (iii) inherently unfair to Appellees who were never served with any legally valid process and not parties to the extensive discovery and other proceedings that preceded the sanctions hearing. This is particularly troubling inasmuch as "the very fact that [an] attorney was charged could bring upon him the sting of disrepute." *NASCO, Inc. v. Calcasieu Television & Radio*, 124 F.R.D. 120, 142 (W.D. La. 1989), *aff'd*, 894 F.2d 696 (5th Cir. 1990), *aff'd sub nom. Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).

## ARGUMENT

**I.  MOTIVATION LACKED STANDING TO SEEK SANCTIONS BELOW AND, THEREFORE, LACKS STANDING TO APPEAL THE DENIAL OF SANCTIONS**

In the district court, Appellees challenged Motivation's standing to seek sanctions from Appellees in three separate filings. *See* D.E. 459, at 4, 35-36; D.E. 559, at 77; D.E. 561, at 79. Judge King ruled on the merits of Motivation's motion for sanctions without addressing Appellees' challenge to Motivation's standing. *See* D.E. 488 (order denying Appellees' Motion to Quash, which nowhere addresses Motivation's standing); D.E. 568 (opinion and order denying Motivation's Motion for Sanctions, which nowhere addresses Motivation's standing). This court's consideration of Appellees' challenge to Motivation's standing is *de novo*. *See*, *e.g.*, *Elend v. Basham*, 471 F.3d 1199,

---

[6] For a more detailed discussion of the record of Motivation's bad faith pursuit of sanctions against Appellees, *see* D.E. 459, at 36-40 (Motion to Quash and Opposition to Amended Motion for Sanctions); D.E. 555, at 7-11 (Paul Sullivan's Motion for Sanctions); D.E. 559, at 77-81 (Non-Party Silverstein's Proposed Findings of Fact and Conclusions of Law); D.E. 561, at 79-83 (Silverstein's Post-Sanctions Hearing Brief). For the Court's convenience, pertinent excerpts of D.E. 459, 555, 559, and 561 and their pertinent attachments are attached hereto as Exhibits 2, 3, 4 and 5.

1204 (11th Cir. 2006) (internal citations omitted). As shown below, Appellees' challenge to Motivation's standing was well founded.

"Standing is crucial. The Supreme Court has called it 'perhaps the most important of [the jurisdictional] doctrines.'" *ACLU of Fla. v. Dixie County*, 690 F.3d 1244, 1249 (11th Cir. 2012) (quotation omitted). As such, the federal courts are "under an independent obligation" to examine standing. *United States v. Hays*, 515 U.S. 737, 742 (1995) (quoting *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 230-231, (1990)). *See also United States v. Edwards*, 728 F.3d 1286, 1291 (11th Cir. 2013) (quoting *Hays*, 515 U.S. at 742). Moreover, if a litigant lacks standing to press a claim in the district court, this Court lacks jurisdiction to address the underlying merits of the litigant's claim. *See*, *e.g.*, *Kelly v. Harris,* 331 F.3d 817 (11th Cir. 2003).[7]

"[I]ntervenors who wish to prosecute an appeal on their own must separately fulfill the injury, causation, and redressability requirements of Article III." *Sierra Club v. Babbitt*, 995 F.2d 571, 574 (5th Cir. 1993) (internal citations omitted). Moreover, where an intervenor was the only party litigating the matter in the district court, the intervenor must have had independent standing to litigate the matter in the first instance. See *United States v. One-Sixth Share, Etc.*, 326 F.3d 36, 40-41 (1st Cir. 2003). Where an action is brought *in rem*, the party that initiates the suit is the plaintiff, and the "property subject to forfeiture is the defendant." *One-Sixth Share*, 326 F.3d at 40.[8] Others may intervene as "claimants" only if they have a colorable claim of ownership interest in the *res*. *See United States v. $38,570 U.S. Currency*, 950 F.2d 1108, 1112 (5th Cir. 1992) ("the claimant must come forth with some evidence of his ownership interest in

---

[7] *See also Palomar Pomerado Health Sys. v. Belshe*, 180 F.3d 1104 (9th Cir. 1999) (dismissing appeal and vacating ruling based on lack of standing in district court), *cert denied*, 2000 U.S. LEXIS 117 (Jan. 10, 2000); *Auburn Med. Ctr. v. Ala. State Health Planning & Dev. Agency*, 848 So. 2d 269, 272 (Ala. Civ. App. 2003) (dismissing appeal based on lack of standing below).

[8] *One-Sixth Share* was a forfeiture action, and not an admiralty action. As the court explained, however, "[b]y virtue of the roots of *in rem* jurisdiction in admiralty law, the procedures for intervention in civil forfeitures are governed by the Supplemental Rules for Certain Admiralty and Maritime Claims." 326 F.3d at 41. As such, the "standing" jurisprudence established in forfeiture actions is equally applicable to admiralty actions.

order to establish standing," and "a bare assertion of ownership of the *res*, without more, is inadequate to prove an ownership interest sufficient to establish standing"). Moreover, in order to maintain standing to intervene in an *in rem* action, a claimant ultimately "has the burden of establishing, by a preponderance of the evidence, that he has an interest in the property . . ." *United States v. Real Property, Etc.*, 976 F.2d 515, 520 (9th Cir. 1992) (citation omitted). This is the logical result of the Supreme Court's decision in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), which instructs that standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Accord Fla. Pub. Interest Research Group Citizen Lobby, Inc. v. EPA*, 386 F.3d 1070, 1083 (11th Cir. 2004) (quoting *Bischoff v. Osceola County,* 222 F.3d 874, 878 (11th Cir. 2000) (following *Lujan* and testing standing through evidence, as opposed to simply accepting the plaintiff's allegations as true).

Applied to the *in rem* setting, this means that "although at the motion to dismiss stage it is enough to allege the elements of standing, at the summary judgment stage the party with the burden of demonstrating standing must demonstrate that there is a genuine issue of material fact as to the standing elements, and at trial standing must be proved by a preponderance of the evidence." *United States v. $57,790.00 in United States Currency*, 263 F. Supp. 2d 1239, 1242 (S.D. Ca. 2003) (citing *Lujan*, 504 U.S. at 561; *Central Delta Water Agency*, 306 F.2d 938, 947 (9th Cir. 2002)). *See also State v. $ 551,985.00 United States Currency*, 235 P.3d 1268, 2010 Kan. App. Unpub. LEXIS 540, *23-24 (Kan. Ct. App. 2010) (affirming decision that intervenor/claimant in *in rem* proceeding lacked standing based on failure to prove standing by a preponderance of the evidence at trial).

*Lujan* and its progeny (including decisions of this Court) prevent an intervenor from making false allegations that would, if true, sustain standing at the dismissal stage, and then continue to misuse the federal

courts despite later proof that the allegations supporting standing were unsupported – which is precisely what happened here. Motivation's lack of standing below was established by both (i) the trial court's ruling (not appealed by Motivation) that Motivation's original claim failed to establish a legally cognizable claim of ownership of the *Res*, and (ii) Motivation's subsequent concession (less than two months after its initial complaint was dismissed) that Motivation's amended claim was factually unfounded. It was only **after** Motivation conceded that it has no ownership claim to the *Res* – and, thereby, lacked standing to intervene in the *in rem* action – that Motivation filed a motion for sanctions and engaged in protracted litigation (including substantial discovery) aimed at obtaining sanctions.

The irony of Motivation's sanctions motion is that it was made by a non-party that invoked the court's jurisdiction in bad faith through a frivolous claim by which Motivation was seeking a platform to interfere with an *in rem* action brought by a competitor, and not to present a genuine claim of ownership of the *Res*. As such, Motivation was not harmed by any "fraud on the court." Motivation's sanctions motion is akin to a complaint by a thief who stole a work of art the owner had represented to be a Rembrandt, but was really a worthless reproduction. Motivation has no one to blame but itself for the costs of its own misuse of the judicial system and had no right to seek sanctions against Appellees in the first place or before this Court.

## II. THE "INHERENT POWER" OF THE DISTRICT COURTS TO SANCTION PARTIES FOR BAD FAITH DOES NOT EXTEND TO APPELLEES

No statutory mechanism authorizes monetary sanctions against Silverstein, a non-party who was not subject to a Court order and was not counsel of record in the underlying action. The Court's ability to sanction Silverstein can derive only from its "inherent powers." (D.E. 568, at 49).

Appellees challenged Judge King's inherent power to sanction them through a Motion to Quash (which also raised other jurisdictional defects). *See* D.E. 459, at 15-21. Relying exclusively upon *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), Judge King denied Appellees' motion through a single paragraph in a four-page order (which also addressed other issues). *See* D.E. 488, at 2. Questions of subject matter jurisdiction are reviewed *de novo*.

*See, e.g.*, *Elend v. Basham*, 471 F.3d 1199, 1204 (11th Cir. 2006) (internal citations omitted); *see also Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 619 F.3d 458, 460 (5th Cir. 2010) ("we review *de novo* a district court's invocation of its inherent power") (quotation omitted). As shown below, Judge King lacked the inherent power to sanction Appellees.

*Chambers* is the leading decision to sustain the "inherent power" of district courts to sanction bad faith. But, *Chambers* does not address, much less sustain, the power of the courts to sanction a party's outside attorneys that are not counsel of record before the district court – especially where, as here, (i) no sanctions were sought from counsel of record in the first instance, and (ii) there was no contention that Movants violated any order of the district court. Rather, *Chambers* involved the limited question of whether the district courts possess the inherent power to sanction a party for contempt of court – which is concededly not at issue here.

> [T]he bad-faith conduct in *Chambers* was undertaken in direct defiance of the sanctioning court. *Chambers* was an action for specific performance of a contract to sell a television station. After signing the contract the owner, Chambers, changed his mind. His efforts to avoid the sale included, *inter alia*, a filing with the Federal Communications Commission seeking permission to replace existing transmission facilities with a new transmission tower to be built on a site beyond the reach of the contract. This filing not only directly violated the district court's order to maintain the status quo pending the outcome of the litigation but also, if successful, would have eviscerated the court's ability to enforce specific performance if it so ordered.

*CJC Holdings, Inc. v. Wright & Lato, Inc.*, 989 F.2d 791, 794 (5th Cir. 1993). *See also Positive Software Solutions, Inc*, 619 F.3d at 460-61 (construing *Chambers* to apply only where challenged conduct is "in direct defiance of the sanctioning court," or "constitutes 'disobedience to the orders of the Judiciary,'" and instructing that "conduct is beyond the reach of the court's inherent authority to sanction" where it is "neither before the district court nor in direct defiance of its orders") (citations omitted).[9]

---

[9] *See also Thomas v. Tenneco Packaging Co.,* 293 F.3d 1306, 1308, 1320-21 (11th Cir. 2002) ("inherent power to oversee attorneys practicing before it" extended to sanctions for filings "deemed abusive and offensive by the court" directed at opposing counsel); *Citizens Bank & Trust Co. v. Case (In re Case)*, 937 F.2d 1014, 1023 (5th Cir. 1991) (explaining that a district

Dicta in *Chambers* also supports the extension of inherent power to a party's counsel of record. *Chambers*, 501 U.S. at 43 ("a federal court has the power to control admission to its bar **and to discipline attorneys who appear before it**") (emphasis added) (internal citations omitted).[10] But, *Chambers* did not suggest, much less hold, that the inherent powers reach beyond a party and its counsel of record, and Appellees are unaware of any decisional law holding that district courts have the inherent power to sanction a party's outside attorneys who have not violated an order of the court and not appeared as counsel of record before the court (and are not even members of the bar of the sanctioning court). Moreover, one court has declined to apply the inherent power beyond a party and its counsel of record, reasoning:

> [A]t the pertinent times Walters was New Valley's senior vice president and general counsel. His asserted liability for sanctions is based upon an affidavit he submitted in opposition to plaintiff's summary judgment motion. Rule 11 sanctions are not available against Walters because he was neither "an attorney of record" nor "a party" within the contemplation of the Rule. Brown and Fischer were the attorneys of record. New Valley was the party. Walters was an affiant-witness, who happened also to be an attorney. His corporate office is sufficient to visit liability for sanctions upon New Valley, if Walters' conduct upon behalf of that party was in fact sanctionable; but there is no basis in the Rule for sanctioning Walters himself.
>
> . . .
>
> For comparable reasons I also decline to sanction Walters under § 1927 or the Court's inherent powers.

*Leventhal v. New Valley Corp.*, 148 F.R.D. 109, 112 (S.D.N.Y. 1993). *Accord In re VIII South Michigan Associates*, 175 B.R. 976, 984 (Bankr. N.D. Ill. 1994) (inherent power does not extend to non-party litigation consultant who "helped to develop theories which the [parties] relied on in the litigation"

---

court's inherent authority "is based on the need to control court proceeding[s] and [the] necessity of protecting the exercise of judicial authority in connection with those proceedings" by seeing that the court's orders are obeyed) (citing *Chambers*, 501 U.S. at 43).

[10] This authority stems from "[t]he power of a court over members of its bar." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980)). *See also Natural Gas Pipeline Co. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1411 (5th Cir. 1993) ("[t]he inherent power of a court to manage its affairs necessarily includes the authority to impose reasonable and appropriate sanctions on errant lawyers practicing before the courts"), *cert. denied*, 510 U.S. 1073 (1994) (internal citations omitted); *Flaksa v. Little River Marine Constr. Co.*, 389 F.2d 885, 888 n.10 (5th Cir. 1968) (tracing the origins of the inherent power to sanction attorneys to "[t]he power of a court to discipline members of its own bar . . . .") (internal citations omitted).

and who "may well have suggested the shots" made by counsel of record). As the court explained in *VIII South Michigan Associates*:

> The decision in *Chambers*, if read broadly, might be used to support a holding that a court has the inherent authority to sanction any person or entity that is responsible for an abuse of the legal system. However, the court declines to read *Chambers* so broadly and instead concludes that *Chambers* should be limited to parties and their counsel [of record]. First, the only sanctions before the Supreme Court in *Chambers* were the sanctions imposed on *Chambers* himself in his capacity as a party. Second, throughout the opinion, the majority of the Court suggested that the inherent power should be limited to imposing sanctions on parties and their counsel [of record].

*Id.* at 983.

The inherent power identified in *Chambers* does not extend to non-party outside counsel who are not counsel of record before the district court (or even admitted to practice before that court), and who are not accused of violating any court order. While the district courts' power to sanction bad faith conduct may be inherent, it is not unbounded. Rather, the inherent power is limited to that necessary to control the proceedings before the court and to ensure compliance with its orders. As the Fifth Circuit explained in the decision affirmed in *Chambers*, "[t]o the extent that inherent power is seen as a product of necessity, it contains its own limits." *NASCO*, 894 F.2d at 702, *aff'd sub nom. Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991). Moreover, the Supreme Court has cautioned that inherent powers "must be exercised with restraint and discretion" both "[b]ecause of their very potency" and "[b]ecause they are 'shielded from direct democratic controls.'" *Chambers*, 501 U.S. at 45; *Roadway Express, Inc.*, 447 U.S. at 764. Quoting the Fifth Circuit, the Supreme Court also wrote in *Chambers* that the inherent power "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." *Chambers*, 501 U.S. at 45 (internal citations omitted). Accordingly, "[t]he threshold for the use of the inherent power sanction is high[,]" and "[s]uch powers may be exercised only if essential to preserve the authority of the court[.]" *Natural Gas Pipeline*, 86 F.3d at 467. The conduct of non-party attorneys who have not appeared as counsel of record

before the district court simply does not implicate inherent powers –
particularly where, as here, no violation of any court order is alleged and
no sanctions were sought from counsel of record.[11]

In denying Motivation's motion to sanction Appellees, Judge King also
relied upon the district court's opinion in *Helmac Products Corp. v. Roth
(Plastics) Corp.*, 150 F.R.D. 563 (E.D. Mich. 1993), to sustain the court's
inherent power to sanction a non-party. *See* D.E. 568, at 53-54. Unlike the
instant case, however, the narrow issue in *Helmac* was whether the inherent
power identified in *Chambers* extends to the principal behind a party, who was
the "real party in interest" in the litigation. *See Id* at 568. That holding
has no relevance to outside counsel for a party, even if they have a
financial interest in the outcome of the case because of their fee
arrangement. *See United States v. Henry*, 2013 U.S. Dist. LEXIS 133148, *110
(E.D. Va. Sept. 13, 2013) (observing that inherent power extends only to
persons or entities who are "(1) parties, (2) subject to a court order, or,
(3) real parties in interest"); *In re VIII S. Mich. Assocs.*, 175 B.R. 976,
984 (Bankr. N.D. Ill. 1994) (same) (internal citations omitted). *See also*

---

[11] Even where the inherent power to sanction conduct does exist, appellate
decisions following *Chambers* have recognized that the sanction chosen must
employ "'the least possible power adequate to the end proposed[,]'" and that
"[i]f there is a reasonable probability that a lesser sanction will have the
desired effect, the court must try the less restrictive measure first." *See,
e.g.*, *Natural Gas Pipeline Co. of Am. v. Energy Gathering*, 86 F.3d 464, 467
(5th Cir. 1996) (quoting and citing *Spallone v. United States*, 493 U.S. 265,
280 (1990)). Plainly, the "least restrictive measure" of curbing bad faith in
litigation is to sanction counsel of record, which is the "gate keeper" with
the responsibility to refrain from taking positions or filing papers that
such counsel does not stand behind, and which cannot avoid responsibility for
his or her actions by simply "following orders." *See, e.g.*, *Long v. Quantex
Res., Inc.*, 108 F.R.D. 416 (S.D.N.Y. 1985) (holding that counsel of record,
and not out-of-state counsel, is accountable for the conduct of the
litigation, even if out-of-state counsel is primarily responsible for the
preparation of the suit papers), *aff'd*, 888 F.2d 1376 (2d Cir. 1989); *see
also In re De Lorean Motor Co. Litig.*, 59 B.R. 329, 339 (E.D. Mich. 1986)
(there is no "just following orders" defense and "accountability already lies
with the signer, even if it means informing a superior that the proposed
pleading is either factually unsound or not substantiated by the existing
state of the law"). If counsel of record is directed by a client or its
outside attorneys to act in a manner that counsel of record believes to be
improper, counsel of record can and should refuse to do so. And, if counsel
of record fails or refuses to act appropriately, there is ample power to
preserve the court's authority through the inherent power to sanction counsel
of record – which power indisputably exists under *Chambers*.

*Adell Broad. Corp. v. Ehrich*, 2012 Mich. App. LEXIS 229 (Mich. Ct. App. Feb. 14, 2012) (affirming imposition of sanctions on non-party based on determination that he was the "real party in interest" where he was "the president and director" of the offending parties and had "controlled the companies and filed the complaint on behalf of the companies").

Only one decision of any the U.S. Courts of Appeals has cited *Helmac* for the proposition that inherent power can reach a non-party, and that decision involved the violation of an injunction – a very different situation clearly covered by *Chambers*. *See Marshak v. Treadwell*, 595 F.3d 478 (3d Cir. 2009). Additionally, district courts within this circuit have claimed inherent power to sanction the principal of a party[12] but none have claimed the power to sanction outside counsel. Here, Judge King did not find (and Motivation did not claim) that Appellees were the "real party in interest."

In denying Motivation's motion for sanctions, Judge King also relied upon *Universal Oil Products Co. v. Root Refining Co.*, 328 U.S. 575 (1946) ("*Universal*") to support his assertion of inherent power. *See* D.E. 568, at 51-52. *Universal* not only fails to support Judge King's assertion of power, but it reveals the error of his doing so (and of his million dollar award to Motivation's counsel). *Universal* holds only that the district courts possess the authority to appoint *amici* to advocate that a judgment should be set aside based on a fraud on the court. *See Universal*, 328 U.S. at 580-81 (specifically identifying the narrow ground for the decision). The pertinent language, which is helpful to Appellees here, is that (i) persons could be

---

[12] *See ANZ Advanced Techs., LLC*, 2012 U.S. Dist. LEXIS 29534, at *29 ("highest ranking officers"); *Feldman v. Davidson*, 2009 U.S. Dist. LEXIS 36921, at *6-7 (S.D. Fla. April 13, 2009) (individual who held a "power of attorney" to act for the parties before the Court, and used that power to cause various actions that were the subject of the sanctions motion); *Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, 259 F.R.D. 568, 587-90 (M.D. Fla. 2009) (all "non-parties" subjected to sanctions were counsel of record in the case or counsel who violated a specific discovery order) ), *aff'd* 2009 WL 5606058 (M.D. Fla. November 16, 2009); *Pafumi v. Davidson*, 2008 U.S. Dist. LEXIS 67036, at *7-9 (S.D. Fla. Sept. 3, 2008) (non-party subject to sanctions signed the filings giving rise to sanctions – which were filed *pro se* – and did not contest the Court's authority to sanction him); *Mastercard Int'l, Inc. v. Ishak*, 2004 U.S. Dist. LEXIS 951, at *12-13 (S.D. Fla. Feb. 23, 2004) (involved sanctioning an actual party, and nobody else).

brought before the district court "by appropriate means," and (ii) "the usual safeguards of adversary proceedings must be observed." *Id.* at 580.[13]

While Appellees are second to none in their condemnation of any false testimony in any case, its occurrence does not provide a legal warrant for an inquisition of the knowledge or participation of outside counsel and other non-parties. If the rule were otherwise, every case of the rejection of a party's testimony by a fact-finder would present an issue of attempted "fraud on the court" calling for a similar inquisition as this case into "what the attorney knew and when did he know it."[14]

In the final analysis, Judge King's assertion of inherent power to sanction Appellees extends *Chambers* beyond its breaking point.

### III. THE DISTRICT COURT LACKED PERSONAL JURISDICTION OVER APPELLEES, WHO WERE NEVER SERVED WITH LEGALLY VALID PROCESS

Chief Judge Moore ruled that (i) Appellees had not submitted themselves to the court's jurisdiction, and (ii) Motivation failed to serve Appellees with legally valid process. *See* D.E. 333. *See also* D.E. 445, at 3. Judge Moore also has found it would be "unfair" to drag Appellees into this matter after discovery and other proceedings were completed without Appellees'

---

[13] The Supreme Court also held that (i) the "cost of the proceedings" (*i.e,,* the costs of a master) could be assessed against the sanctioned party, but that (ii) the attorneys who were appointed by the court to seek relief from the judgment were not entitled to have their fees paid by the guilty party. *See id.* at 580-81. *See also Crowe v. Smith*, 151 F.3d 217 (5th Cir 1998) (finding sanctions proceeding was in the nature of a criminal contempt proceeding, and reversing grant of monetary sanctions where, among other things, the district court allowed the proceedings to be "prosecuted" by a lawyer for a client with a financial interest in the outcome).

[14] Although the district court found that Miscovich committed perjury and verified false pleadings, a "fraud on the court" does not occur simply because a witness commits perjury or a party asserts a false claim. *See Travelers Indemnity Co. v. Gore,* 761 F. 2d 1549, 1551-52 (11th Cir. 1985) (perjury insufficient for fraud on the court). Rather, a "fraud on the court" requires "a corruption of the judicial process itself" through "such flagrant abuses as bribing a judge, employing counsel to exert improper influence on the court, and jury tampering." *Gen. Med., P.C. v. Horizon/CMS Health Care Corp.*, 475 Fed. Appx. 65, 71 (6th Cir. April 10, 2012) (internal citations omitted). The elements of a "fraud on the court" also require that the fraud "in fact deceives the court." *Herring v. United States*, 424 F.3d 384, 386 (3rd Cir. 2005) (internal citations omitted); *see also Gen. Med.*, 475 Fed. Appx. at 71. Neither of these things occurred herein – not even by Miscovich. Moreover, as in *Universal*, the remedy for a true "fraud on the court" is to set aside a judgment that was fraudulently obtained, and not to sanction a non-party. *Accord Chambers*, 501 U.S. at 44 (discussing inherent power of courts to set aside its judgment upon proof it was procured by fraud).

involvement. D.E. 373, at 112:24 to 113:9 (observing it would be "unfair to Mr. Silverstein to have to come in at such a late date"). Motivation thereafter requested that Judge King issue the OSC; Appellees moved to quash the OSC; and Judge King denied the motion. *See* D.E. 488 (Order Denying Motion). As shown below, Judge King erred, as a matter of law in doing so.

Rule 4.1 of the Federal Rules of Civil Procedure provides that process "other than a summons under Rule 4 . . . may be served anywhere within the territorial limits of the state where the district court is located and, if authorized by a federal statute, beyond those limits." Fed. R. Civ. P. 4.1(a). As such, this Court has instructed that "Rule 4 addresses only service of the summons[,]" and "[Rule 4.1] governs service of process other than a summons or subpoena." *United States v. Elmes*, 532 F.3d 1138, 1144 (11th Cir. 2008). The OSC is neither a summons nor a subpoena. Rather, the OSC is an order directing non-parties to respond to Motivation's private motion for sanctions. As such, Rule 4.1(a) governed service of the OSC. *See*, *e.g.*, *Fidelity Nat'l Fin., Inc. v. Friedman*, 2010 U.S. Dist. LEXIS 35851, at *18-19 (D. Ariz. Mar. 12, 2010) ("Because the process here is an OSC and not a summons, the court must look to Rule 4.1(a).").

Rule 4.1(a) limits *where* service may be made. In the absence of a specific federal statute allowing for broader service of the relevant type of process, service is expressly limited to "the state where the district court is located" – which is the state of Florida in this instance. No statute operated to broaden that reach. Thus, service of the OSC on Appellees in Delaware was invalid and did not permit Judge King to exercise jurisdiction over Appelleees. *Accord* Hon. William W. Schwarzer et al., Federal Civil Procedure Before Trial §13:247 (2007) (noting, in discussion of orders to show cause for violations of preliminary injunctions, that "[t]he party sought to be held in contempt is entitled to notice of the [Order to Show Cause]. The order must be served in the state in which the district court is located or within 100 miles from the courthouse in which it was issued.").

Judge King held that the OSC was validly served on Appellees simply because they received actual notice. *See* D.E. 488, at 3. In essence, Judge King reasoned that service of legally valid process is unnecessary when the district court considers an OSC based on the court's "inherent power." Aside from the fact that Judge King was wrong to believe that he had "inherent authority" to sanctions Appellees in the first instance (as shown in Argument II above), Judge King erred in concluding that the mere existence of such power dispenses with the need for legally valid process.

"[W]hen it is sought to charge a person with contempt who was not a party to the original action and thus not already within the jurisdiction of the court, he must be served with process as in any other civil action." *McGuire v. Sigma Coatings, Inc.*, 48 F.3d 902, 907 (5th Cir. 1995) (citation omitted); *accord Comverse, Inc. v. Am. Telecomms., Inc. Chile S.A.*, 2009 WL 46446, at *2 n.4 (S.D.N.Y. Feb. 24, 2009) (absent evidence of proper service, the court is "[w]ithout personal jurisdiction" and cannot "hold them in contempt[ ]"). "'Service of process is the mechanism by which the court [actually] acquires' the power to enforce a judgment against the defendant's person or property. In other words, service of process is the means by which a court asserts its jurisdiction over the person." *SEC v. Ross*, 504 F.3d 1130, 1137-38 (9th Cir. 2007) (internal citations omitted). "[I]n the absence of proper service of process, the district court has no power to render any judgment against the defendant's person or property unless the defendant has consented to jurisdiction or waived the lack of process." *Id.* at 1138-39. There is no exception to these fundamental rules where the district court seeks to flex its "inherent power" to investigate an alleged fraud on the court. *Accord Universal Oil*, 328 U.S. at 580 (instructing that a district court can bring persons before it only "by appropriate means" and that "the usual safeguards of adversary proceedings must be observed" when investigating an alleged fraud on the court).

Properly applying the foregoing legal principles, the court in *Fidelity Nat'l Fin., Inc. v. Friedman*, 2010 U.S. Dist. LEXIS 35851 (D. Ariz. Mar. 12,

2010), held that it lacked personal jurisdiction over non-parties because the applicant for relief ("Fidelity") "did not serve the OSC in compliance with Rule 4.1[.]" *Id.* at \*22. In that case, Fidelity moved for an order directing non-parties to show cause why they should not be sanctioned under the court's inherent power. *See id.* at \*20. Fidelity provided the non-parties with actual notice of the OSC, but did not cause it to be validly served pursuant to Rule 4.1. The court thereafter granted the respondent's motion to dismiss for lack of personal jurisdiction, reasoning that "[t]he familiar 'minimum contacts' test . . . coupled with statutory authorization , provides a *basis* for an exercise of jurisdiction," but "service of process is the *mechanism* by which the court actually acquires the power to enforce a judgment against the defendant's person or property." *Id.* at \*13 (internal citations omitted). The court further explained that "service of process is a distinct and separate concept from the court's personal jurisdiction[,]" and noted that the two distinct concepts are "often conflated" – such as by Judge King here. *Id.*

Like the respondent in *Fidelity*, Appellees were never served with legally valid process. Thus, while Appellees did not engage in any sanctionable conduct, Judge King's authority to consider that issue simply did not exist. This Court should, therefore, vacate all Judge King's various rulings following the issuance of the OSC, without reaching the merits of Motivation's appeal. *See*, *e.g.*, *Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind*, 841 F.2d 646, 649 (5th Cir. 1988) (a judgment rendered in the absence of personal jurisdiction is void and must be set aside).

## CONCLUSION

For the reasons set out herein, Appellees respectfully urge the Court to grant Appellees' motion to dismiss Motivation's appeal, and vacate the district court's rulings that post-date the Final Order *nunc pro tunc.*

Respectfully submitted,

ADAMS AND REESE LLP
John T. Rogerson, III
Florida Bar No. 832839
john.rogerson@arlaw.com
501 Riverside Avenue, 7th Floor
Jacksonville, FL 32202
Telephone:  (904) 355-1700
Facsimile:  (904) 355-1797

COFFEY BURLINGTON, P.L.

By:  Jeffrey B. Crockett
     Jeffrey B. Crockett
     Florida Bar No. 347401
     jcrockett@coffeyburlington.com
     David J. Zack
     Florida Bar No. 641685
     2601 South Bayshore Drive
     Penthouse
     Miami, Florida  33133
     Telephone:  (305) 858-2900
     Facsimile:  (305) 858-5261

*Counsel for Young Conaway Stargatt &
Taylor, LLP  and Bruce L. Silverstein, Esq.*