# United States Court of Appeals

*for the*

# Eleventh Circuit

---

JTR ENTERPRISES, LLC, a Delaware Limited Liability Company,

*Plaintiff/Appellee,*

YOUNG CONAWAY STARGATT & TAYLOR; BRUCE L. SILVERSTEIN; PAUL D. SULLIVAN,

*Interested Parties/Appellees/ Cross-Appellants,*

*v.*

MOTIVATION, INC.,

*Claimant/Appellant/Cross-Appellee.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO: 4:11-cv-10074-JLK
(Hon. James Lawrence King)

# INITIAL BRIEF OF APPELLANT/CROSS-APPELLEE

KENNETH W. SUKHIA
SUKHIA LAW GROUP PLC
902 N. Gadsen Street
Tallahassee, FL 32303
(850) 383-9111

A. EUGENE LEWIS, JR.
MARLOW V. WHITE
LEWIS & WHITE, PLC
222 W. Georgia Street
Tallahassee, FL 32301
(850) 425-5000

*Counsel for Appellant/Cross-Appellee*

## Corporate Disclosure Statement

There is no parent corporation or any publicly traded corporation that owns 10% or more of the stock of Appellant Motivation, Inc.

## Certificate of Interested Persons

The undersigned attorney for Appellant Motivation, Inc., certifies that the attached list identifies those persons and entities with an interest in the outcome of the appeal:

Trial Judges:

> King, James Lawrence, Southern District of Florida
> Moore, K. Michael, Southern District of Florida

Attorneys of Record:

> Coffey, Kendal, Miami
> Dorsey, John T., Wilmington, Delaware
> Josefsberg, Robert C., Miami
> Gravante, John III, Miami
> Holloway, John E., Norfolk, Virginia
> Lewis, A. Eugene, Tallahassee
> McLeod, Aaron G., Jacksonville
> Morgan, Hugh J., Key West
> Rogerson, John T. III, Jacksonville
> Rosenthal, Stephen F., Miami
> Kenneth W. Sukhia , Tallahassee
> White, Marlow V., Tallahassee
> Zack, David J., Miami

Other Persons:

> Abt, Taffi Fisher, Sebastian, Florida
> Fisher, Kim H. Fisher, Key West
> Fisher, Juanita L., Key West

Silverstein, Bruce L., Wilmington, Delaware
Sullivan, Paul D., Kailua, Hawaii

Corporations (None Trading Publically)

Coffey Burlington, P. L., Miami
JTR Enterprises, LLC, Delaware
Lewis & White, P. L. C., Tallahassee
Podhurst Orseck, P.A., Miami
Sukhia Law Group, PLLC
Young, Conaway, Stargatt & Taylor, LLP, Wilmington

## STATEMENT REGARDING ORAL ARGUMENT

Given the seriousness of this case, which constituted a "massive fraud against the U.S. District Court and the American system of justice," and the importance protecting the integrity of the Eleventh Circuit in its approach to contemptible behavior, bad faith litigation and willful blindness of the facts by those "substantially controlling" such litigation, Appellant Motivation respectfully urges the Court to hear oral argument in this case.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..................................................... C-1

CERTIFICATE OF INTERESTED PARTIES .................................................... C-1

STATEMENT REGARDING ORAL ARGUMENT .............................................. ii

TABLE OF AUTHORITIES .................................................................................. iv

STATEMENT OF JURISDICTION......................................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................ 1

STATEMENT OF THE CASE.................................................................................. 2

     A.    Nature of the Case and Course of Proceedings................................. 2

     B.    Statement of the Facts ......................................................................... 3

     C.    Standards of Review........................................................................... 35

SUMMARY OF THE ARGUMENT ..................................................................... 36

ARGUMENT AND CITATIONS OF AUTHORITY ........................................... 40

A.     Having found that Silverstein substantially controlled fraudulent
      litigation, the district court erred in concluding that sanctions should
      not be imposed against Silverstein and YCST ............................................ 40

B.     The district court erred by failing to address most of the
      material facts in the case in violation of Rule 52(a)..................................... 51

C.     The District Court properly sanctioned JTR for bad faith litigation tactics
      that were engineered by Silverstein and YCST, but erred by
      refusing to sanction Silverstein and YCST for those same tactics and
      by failing to even address the issue ............................................................. 54

D.     The district court erred by dismissing Motivation's sanctions
      claims against YCST and Sullivan................................................................ 55

CONCLUSION ..................................................................................................... 57

CERTIFICATE OF COMPLIANCE........................................................................ 59

CERTIFICATE OF SERVICE ............................................................................... 59

<u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*,
578 F.3d 1283 (11th Cir. 2009)……………………………………………………...35

*Bryant v. Brooklyn Barbecue Corp*.,
932 F.2d 697 (8th Cir. 1991)……………………………………………………...42

*Cooter & Gell v. Hartman Corp*,
110 S Ct 2447,2461 (1990)………………………………………………………….35

*Curtis v. Commissioner*,
623 F.2d 1047 (5th Cir.1980)…………………………………………………..51

*Diaz v. First Marblehead Corp*.**,**
2016 WL 736361 *4 (11th Cir. 2016)…………………………………………….40

*Dickerson v. Lexington Ins. Co*.,
556 F.3d 290 (5th Cir. 2009)……………………………………………………...35

*EEOC v. United Virginia Bank/Seaboard National*,
555 F.2d 403, 406 (4th Cir.1977…………………………………………………….51

*Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc*.,
57 F.3d 1215 (3d Cir. 1995)……………………………………………………....57

*In re Kunstler*,
914 F.2d 505 (4th Cir. 1990)……………………………………………………...42

*In re Mroz*,
65 F.3d 1567 (11th Cir. 1995)……………………………………………………57

*Indus. Risk Insurers v. M.A.N. Gutehoffnungshütte GmbH*,
141 F.3d 1434 (11th Cir.1998)…………………………………………...42,50

*Jones v. IllIinois Cent. R.R. Co*.,
617 F.3d 843, 850 (6th Cir. 2010)……………………………………………...50

*Lyles v. United States,*
759 F.2d 941 (D.C. Cir. 1985)…………………………………………...36,51,52

*Matthews v. Gaither*,
902 F.2d 877 (11th Cir. 1990)………………………………………………….36

*Ocean Garden, Inc. v. Marktrade Co., Inc.,*
953 F.2d 500,508 (9th Cir. 1991)……………………………………………36

*Ohlander v. Larson*,
114 F.3d 1531, 1537 (10th Cir. 1997)………………………………………….35

*Patterson v. Aiken,*
841 F.2d 386, 387 (11th Cir. 1988)………………………………………….53

*Pavelic & LeFlore v. Marvel Entertainment Group*,
493 U.S. 120 (1989)………………………………………………………………56

*Stevens v. Lawyers Mut. Liab. Ins. Co. of North Carolina*,
789 F.2d 1056 (4th Cir.1986)………………………………………………..42

*Thompson v. Relationserve Media, Inc.,*
610 F.3d 628 (11th Cir. 2010)…………………………………….…..40,43,57

*United States v. Citgo Asphalt Ref. Co.*,
718 F. 3d 184 (3d Cir. 2013)………………………………………………...51

*United States v. Ramirez-Carvajal,*
902 F.2d 30 (4th Cir. 1990)………………………………………………....40,45

*United States v. Gregg,*
179 F.3d 1312 (11th Cir. 1999)……………………………………………...55

*U.S. v. U.S. Gypsum Co*.,
333 U.S. 364 (1948)……………………………………………………………50

*United States v. Wragge,*
893 F.2d 1296 (11th Cir. 1990)……………………………………………..36

<u>Other Authorities</u>

Article III, Section 2, Clause 1 of the United States Constitution…………………1

28 U.S.C. § 1333……………………………………………………………………...1

28 U.S.C. §1291………………………………………………………………………1

Rule 9(h), *Fed.R.Civ.P.* ………………………………………………………………1

*Fed.R.Civ.P.* 52………………………………………………….……………..passim

*Fed.R.Civ.P.* 32(a)………………………………………………………………...58

Instruction 2.09 "Deliberate Ignorance" *Sixth Circuit Pattern Jury Instructions, Criminal Cases* (2011)……………………………………………………………41

Instr. 14.13, *Devitt Blackmar & Wolf*,
Fed. Jury Practice and Instructions (4th Ed.)……………………………………..45

# I. Statement of Jurisdiction

The district court had subject matter jurisdiction pursuant to Article III, Section 2, Clause 1 of the United States Constitution, 28 U.S.C. § 1333, and Rule 9(h), *Fed.R.Civ.P.* This Court has jurisdiction of this direct appeal from a final order of the district court. 28 U.S.C. §1291. The final order was entered August 17, 2015 (DE 592) and notice of appeal was filed on September 14, 2015. (DE 593)

# II. Statement of Issues Presented for Review

A.    Having found that Silverstein substantially controlled fraudulent litigation, the district court erred in concluding that sanctions should not be imposed against Silverstein and YCST.

B.    The district court erred by failing to address most of the material facts in the case in violation of Rule 52(a).

C.    The District Court properly sanctioned JTR for bad faith litigation tactics that were engineered by Silverstein and YCST, but erred by refusing to sanction Silverstein and YCST for those same tactics and by failing to even address the issue.

D.    The district court erred by dismissing Motivation's sanctions claims against YCST and Sullivan.

III. S<small>TATEMENT OF THE</small> C<small>ASE</small>

A.     <u>Nature of Case and Course of Proceedings</u>

On September 6, 2011 JTR Enterprises filed an admiralty claim in the Southern District of Florida against emeralds purportedly found in the Gulf of Mexico. (DE1).  Motivation filed a claim on October 16, 2011, as the coordinates of the *res* were in reasonable proximity to the *Atocha* and *Margarita* injunctive areas and scatter trails, and because no emeralds other than those from those vessels had ever been found in the area. (DE10). On August 14, 2012, Motivation had its first opportunity for its expert to examine the res emeralds, and on August 18, 2012, it moved to withdraw its claim because that inspection revealed that none of the emeralds "had the characteristics indicative of the high quality or evidences of marine immersion common to emeralds recovered from" its injunctive sites and scatter trails and therefore they "could not have been a part of the cargo of the *Atocha* or *Margarita*." (DE118).  On August 21, 2012 the court denied that motion, requiring Motivation to continue to participate in the proceedings. (DE121). As the court explained permitting Motivation to withdraw would have "left me with nobody here to help me find out what the facts are.  Think about that."(Day6p77).

On August 27, 2012, Motivation moved for sanctions against JTR, its managing member Jay Miscovich, its general counsel Bruce Silverstein and others who engaged in or supported dilatory and bad faith litigation. (DE123).  Judge King held a bench trial on JTR's claim December 2012, and the Final Order

denying relief was entered on January 25, 2013. (DE188-199). Miscovich committed suicide on October 29, 2013. A sanctions trial against Miscovich's estate and JTR was held January 13-15, 2014 before Hon. K. Michael Moore, who imposed sanctions against both, noting that the find was a fraud, that JTR failed to timely disclose the presence of modern epoxies, and that the case constituted "a flagrant abuse of the judicial process." (DE368-373,445). In November 2014 to February, 2015 a sanctions trial was held before Hon. J. L. King against Silverstein, his law firm and Paul Sullivan. At the close of movant's case, the court granted motions to dismiss Sullivan and the firm. (DE528). At the conclusion of the trial, the court found JTR's general counsel, Silverstein, "substantially controlled" the fraudulent litigation and bad faith litigation tactics, but nevertheless refused to sanction Silverstein. (DE568). The court denied the Rule 52(b) motion on August 17, 2015 and this appeal followed.

B.   Statement of the Facts

In January 2010, Jay Miscovich and Steve Elchlepp initiated a scheme to defraud based on the "outrageously false" claim Miscovich bought a treasure map and a shard of Spanish colonial pottery for $500 at a Key West bar, and that using that map he and Elchlepp found an emerald treasure on the seafloor. (DE568p2). In fact, Miscovich had purchased the emeralds from a wholesaler in Jupiter, Florida. As part of the scheme, they filed an admiralty claim on September 6, 2011, through an entity called JTR Enterprises, LLC ("JTR"), to obtain judicial

endorsement of their claim. As the court found, that case constituted a "massive fraud" through the "filing of a completely fabricated admiralty case falsely alleging a fictitious discovery of lost treasure from an 18th century Spanish galleon." (Id). By "faking this discovery" they sought a decree awarding them "not only title to the previously planted emeralds," but the exclusive right to "search" the fake site and "continue to 'salt' the site with junk treasure for sale to…purchasers and investors who had been misled into believing the discovery was true and genuine based on the Court's admiralty decree." (Id). The Court held the first sanctions trial in January 2014 and found "by clear and convincing evidence that a fraud has been committed on this Court." (D.E.368,369,370,445at16).

The issue here is whether and when the persons coordinating and controlling the fraudulent litigation knew of or cast a blind eye to the fraud, and whether upon having sufficient knowledge of it they took steps to end it. Appellees Silverstein and Sullivan were members of JTR, and Silverstein was a managing partner in Young, Conaway, Stargatt, & Taylor LLP ("YCST") and was the main attorney overseeing the admiralty litigation on behalf of YCST. (M7¶2). Evidence of knowledge and intent regarding the fraud came primarily from documents and correspondence produced under the crime-fraud exception to the attorney-client privilege, including numerous e-mails that documented extensive internal discussion of the ongoing fraud. The record contains scores of incidents that on their face or upon reasonable investigation made it clear that the "discovery" was

fraudulent. In fact, two sets of Florida lawyers withdrew from representing JTR for ethical reasons, while Silverstein, YCST, and Sullivan continued to conceal and support the fraud even after Miscovich's death. What follows is an abbreviated statement of the facts (a more detailed statement is found in Motivation's proposed findings and conclusions (D.E.560). Though the court made no findings as to most of the material facts in the case, the following facts are primarily party admissions and none of them were contradicted by any evidence at trial. In 2010, Miscovich raised funds from New York investors ("NY Investors") for the phony treasure find. (Silv.Ex7). Miscovich retained Proskauer Rose, LLP, a global firm, to form Emerald Reef LLC and Global Underwater Treasure Salvage LLC to raise funds and do "salvage work" on the fake site. (Day9p32).

In January 2011, the NY Investors sued Miscovich, Elchlepp, and Jay's brother, Scott Miscovich ("Scott"). (Silv.Ex4;Day6p139). Miscovich and his partners retained Delaware firm YCST, which represented them for a contingent 5% interest in the treasure "thought to be worth many millions." (M8¶11;M22p2). YCST's Management Committee member Silverstein was lead counsel in the case. (M3;¶3). The case was settled via a March 29, 2011 Memorandum of Understanding, subject to court approval. (M22;Day9p34). The NY Investors were given a nonrecourse Promissory Note for $5 million secured by an interest in a portion of the emeralds and a right to foreclose if they were transferred without consent. (M22p2-3). In July 2011, Silverstein/YCST, formed P&B Finance, a

vehicle for he and Sullivan to invest in the treasure, and Silverstein invested $80,000. (Day9p37). On August 11, 2011, Silverstein/YCST formed JTR and later caused the transfer of ownership of the emeralds to JTR. (M7¶5;Day9p33-42).

Silverstein then negotiated an agreement with attorney David Horan to file an admiralty case. The agreement, drafted by YCST, identified Silverstein as JTR's outside general counsel and specified Horan was to advise Miscovich and Silverstein on admiralty matters. (M25;Day9p45-6). The agreement specified that all legal services must be "specifically requested and approved by…[Silverstein]." (M25)

On August 13, 2011, Silverstein asked Horan to delay filing the admiralty case until the settlement was approved by the state court because "the greatest risk to the Delaware settlement being disturbed is the filing of the Admiralty proceeding by Jay before the settlement hearing…on Friday, August 19." (M29at1). The settlement was approved on August 19, and Silverstein then delivered to the NY Investors a nonrecourse Promissory Note made by Miscovich, Scott, and Elchlepp in their personal capacities. Without notice to the NY Investors, six days later Miscovich, Scott, and Elchelpp executed a JTR Operating Agreement prepared by Silverstein/YCST conveying all their emerald interest to JTR and rendering worthless the nonrecourse $5 million Promissory Note. (Day8p91;Day9p36,42-44;M24). At the time, Silverstein explained in an email to his cohorts that it was "a bad idea to use Emerald Reef to file the admiralty claim"

because Miscovich and Emerald Reef "had various creditors," who'd commenced or threatened litigation, and that as "a new entity, JTR would have a fresh start, and its debts could be controlled through proper management." (M2-48p1). Silverstein knew the emerald transfer violated the settlement. (Id.).

On August 11, 2011, less than a month before the admiralty case filing, Silverstein wrote that "I find this story incredible, and I have a very difficult time believing it is true" and that "[g]iven how incredible [Miscovich's] story is, I am reluctant to endorse taking legal action (such as filing an admiralty claim) based on the assumption it is true." (M28at2). At trial, Silverstein conceded he "doubted whether an admiralty claim should be filed," he "had doubt [they] had discovered emeralds," and he "had questions about this from the beginning until the end." (Day9p30-31). He even conceded that as of August 2011 he believed the "weight of all the information" did *not* show "it was more probable than not that the discovery was genuine." (Day9p114) In the face of these doubts, on August 19, 2011, three weeks before the admiralty case filing, Silverstein was approached by Miscovich's longtime associate, Peter Tobia, who told Silverstein that Miscovich and Elchlepp "had not discovered…the emeralds in the Gulf of Mexico" as they claimed, but "discovered [them] on land in Florida." (Day6p186;Silv.Ex10). Silverstein testified he needed "more information" to test Tobia's assertions by examining Tobia's emails and interviewing Tobia and corroborating witnesses. (Id.at190).

Silverstein admitted he understood at the time that if "Tobia was accurate, Jay and Steve could not go through with their proceeding because it would be fraudulent…to do so." (Id.at188). Silverstein nevertheless failed to check Tobia's claims before urging the filing of the admiralty case. (Id.at188). *The very day Tobia told Silverstein the emeralds weren't discovered where the admiralty action would be asserting*, Silverstein urged Horan to file the case anyway, because "the filing, combined with the expected press coverage (including 60 MINUTES) *will produce legitimate investors with meaningful investments*." (Silv.Ex.9;Day6p176) (emphasis added). Miscovich and Elchlepp's veracity was still clearly at issue, given Silverstein's statement that they "both understand the drastic consequences that would flow from their supporting a false admiralty filing." (Id). Silverstein admitted he wrote that on August 19, 2011, because he had "reason to believe [Jay and Steve] could possibly be untruthful." (Day6p176).

Tobia threatened to expose the fraud unless he was guaranteed an interest in the emeralds. In an email full of self-serving verbiage, Silverstein offered Tobia a 10% interest in the find if he could prove it was a fraud or a 2% interest if he would acknowledge he had no knowledge contradicting Miscovich's account. (Silv.Ex19p2;Day6p189-99). As the email stated, "Despite what Jay views to be fraudulent and defamatory accusations respecting Jay and the location of his emerald find, Jay recognizes that you were (until recently) a good friend, who provided meaningful moral support in the past."(SilvEx.19). If "you are willing to

acknowledge that you have no knowledge that contradicts Jay's assertion that he discovered the treasure in International Waters off the coast of Florida, then Jay is willing to forgive your past transgressions and allocate a 2% ownership interest in the Treasure that Jay says he discovered in International Waters off the coast of Florida." (Silv.Ex.19) Silverstein testified the 10% offer incentivized Tobia to expose the fraud, but because 10% of an exposed fraudulent find would have little value, he knew Tobia had far more to gain from 2% of an ostensible "ancient treasure." Although Silverstein suggested the 2% offer for his silence was less than the 3% interest previously allocated Tobia, at the time of Silverstein's 2% offer, Tobia wasn't slated to receive any ownership interest. (M29p2) [1] JTR ultimately agreed to grant Tobia a 3.25% interest in JTR. (M6¶45;Day9p72-3). Even Judge King suggested Silverstein's offer letter (Silv.Ex.19) was disingenuously written to convey the false notion Silverstein wanted Tobia to do the right thing. (Day6p76-77). As the Judge stated, "If you match your testimony to what my client says is the truth, I will give you the equivalent of $10 million…at the end of it then, of course, he puts a paragraph or two in and, I told him to go to the police. I told him to go to the police if he wanted to tell his story." (Id.)

---

[1]  If the fraud succeeded and the emeralds were valued as treasure, they thought they could fetch hundreds of millions, and the 2% offer to Tobia was substantial.

While Silverstein claimed he could not ethically contact Tobia, there was no rule preventing contact with Tobia's counsel, and after Tobia became a JTR member, Silverstein was free to speak with him as JTR's lawyer and as a fellow member. (Day9p74). Even after Tobia became a JTR member, however, Silverstein, JTR's general counsel, never asked Tobia a single question about Tobia's claim that the find was fraudulent. (Day9p73-74).

On August 21, 2011, Horan and Silverstein reviewed an email from lawyer Peter Hess advising that Tobia has "known Jay…for a long time and…first became aware of the emeralds in January, 2010." (Day9p76). Tobia called Hess in January, 2010, and "asked a hypothetical as to the legal consequences for treasure discovered 'in international waters.'" *Id*. Totally contradicting Miscovich and Elchelpp's claim to have found the emeralds on a joint dive, Tobia told Hess he was present when "the gemstones were first shown to…Elchlepp – whose eyes bugged out."(Id.)

JTR filed the admiralty case on September 6, 2011. After the filing, the fraud was revealed to Silverstein, YCST, and Sullivan over and over again. Although the district judge did not address most of these "red flags" they were all evidenced at the sanctions trial by either uncontradicted testimony, contemporaneous emails, or party admissions (and often by all three). Each "red flag" is summarized in turn.

Non-Spanish Coins.  On August 18, 2011, Horan warned that if the emeralds were from a Spanish shipwreck Spain would try to take the treasure and they were "going to end up in a very extensive and very expensive litigation against the Kingdom of Spain." ((M1-7p1;Day1p63).   In late August, 2011, Miscovich and Elchelpp brought "a handful" of Danish, English and French coins to Horan, claiming they found them at the emerald site, and asking, "will this prove that this is not a Spanish galleon or have anything to do with Spain?" (Day1p65,69;Day7p8).  When Horan said he didn't believe them, they admitted the coins didn't come from the site.  (Id. at 70).  Miscovich told Silverstein the same phony coin story (M8¶1530).   Before the case was filed, Horan told Silverstein that Miscovich and Elchlepp admitted their coin story was a complete lie. (Day9p84-5). The episode prompted Silverstein "to put in writing that Jay and Steve understand the drastic consequences of a false filing," but after learning of the lie, Silverstein did not speak with Miscovich or Elchlepp about their attempted fraud on the court. (Day9p88-9). Though Silverstein knew with certainty Jay and Steve were willing to lie *about finding explicit treasure items in the Gulf*, he claimed the revelations from Tobia and the plan to defraud the court on a key issue didn't prompt him to suspect the genuineness of the find.  (Day6 p176; Silv.Ex.9).

The 20-Pound Group.  Many weeks after the "treasure" had been identified in the admiralty action, and soon after the phony coin episode, Miscovich and Elchlepp came into Horan's office with a 20-pound "zip lock bag full of little

green emeralds" claiming they found them at the site and "held them back" to keep something for themselves if Spain was awarded the treasure. (Day1,73). As an experienced diver, Horan didn't believe those emeralds came from the site because "it would take something like a year … to recover that [many] small emeralds." (Id.at74). Horan repeatedly advised Silverstein, Sullivan and Scott that he "did not believe the emeralds came from the site." (Id.at75). Although Silverstein claimed "nobody said anything about holding back emeralds to me," (Day7p23). Sullivan testified he discussed the "held-back" issue with Silverstein. (Day10p181-83). In any event, Silverstein confirmed Horan told him Horan didn't believe the 20-pound group came from the discovery site. (Id.at90-91). Silverstein claimed "he came to understand…Horan concluded that the emeralds did come from the site, because…Horan thereafter included the emeralds in the res that he was claiming to the court was found at the site." (Id.at91). But Silverstein admitted that in a December 2011 call Horan told him he was concerned those emeralds "should not have been placed in the *res*…." (Day7p21).

Around December 13, 2011, after Silverstein and Horan learned that three labs discovered modern epoxy resins in the emeralds, Horan again "raised with [Silverstein] concerns about the legitimacy of this 20-pound group." (Day9p113). Horan asked Silverstein and Sullivan to talk with Jay and Steve to determine whether they had made "false claims to the federal court" and whether they had "salted" the "discovery" site. (Day9p111;M1-16). Though Silverstein claimed

that in December 2011 he had no "suspicions and concerns about whether Jay and Steve's claim [was] a fraud on the court," when pressed on cross, he acknowledged he continued to question whether their "story was a fraud." (Day9p114).

The False Map Story. Miscovich had told Silverstein that he had purchased a treasure map at a Key West bar from Cunningham, that Proskauer and the NY Investors wanted to pay Cunningham $50,000 and get a release, and that "a young [Proskauer] attorney dictated a release [to Jay] over…a pay phone – and Jay…then typed it up [and] at some point met with Cunningham…and paid him $50,000." (Day9p12-13). Though Silverstein "had questions" about the veracity of Miscovich's claims "from the beginning to the end" (Day9p30-31) and had specific evidence Miscovich was a fraud (Tobia's information, the coin episode, the "20-pound group"),Silverstein never asked Miscovich to show him this release and never called Proskauer to verify Miscovich's story. Though Silverstein did nothing to investigate whether he was aiding a fraud on the Court, after *60 Minutes* agreed to do a segment on the "treasure," *CBS News* asked to see the release. (Day9p94). On November 18, 2011, Silverstein wrote Horan and Sullivan that "Jay has found the contract respecting the map, and I will be reviewing it after Jay gets me a copy." (M1-14). Proskauer is a global firm, and the one paragraph release was obviously prepared without professional assistance. (M27). The release also includes the unusual handwritten stipulation to "never reveal Mike Cunningham's name to the public." (Id.) Silverstein claimed he believed Jay's

account that a major firm (1) assigned a "young associate" to (2) dictate a one-paragraph release concerning rights thought to be worth millions (3) which release failed to include rudimentary clauses (e.g., choice of law, supersedes all oral promises, notary's statement as to the identity of the signatories, etc.). (Day9p95) The release lists numerous potential treasure items, but not "emeralds." There was nothing time-sensitive requiring phone dictation, given that Miscovich purportedly paid the $50,000 "several months" after buying the map. (M41p16). Miscovich never had Cunningham's number and he testified that for years Cunningham called him "every couple months" just to check in. (M41p24). Presumably, Miscovich amassed $50,000, waited for Cunningham's next call and told him he had $50k for him. Even then, the destitute handyman supposedly waited weeks before bothering to get his windfall $50k. (M41p132). Faced with obvious irregularities, Silverstein again did nothing to check Miscovich's story though it would've been easy to simply check with Proskauer to learn that there was no record of anyone dictating a release as Miscovich claimed. As he did with nearly all evidence casting doubt on Miscovich's incredible tale, Silverstein claimed Miscovich's story about the dictated, amateurish release and payment to Cunningham was completely plausible and "didn't cause me any suspicion whatsoever." (Day9p95-96).

Epoxy Found on Emeralds. On December 1, 2011, Horan, Silverstein and Sullivan learned that French and Swiss laboratories found modern epoxy resins embedded deep inside the emeralds.(Day6p212). Horan argued to Silverstein and

Sullivan that this fact should be immediately disclosed to the Court. Silverstein disagreed. (Day6p219). In a December 8, 2011, email to Horan, Silverstein said he understands Horan "had received further information from [an emerald expert] that has increased [Horan's] concerns *that Jay has been untruthful in his assertion that he found emeralds*…where they said he found them." (M1-1) (emphasis added). Silverstein understood Horan was "once again, considering withdrawing from representing JTR in the admiralty case, and that [Horan believed he] may need to inform the Court…of the Swiss and French test results *and your belief regarding Jay's veracity*." (M1-1)(emphasis added). Silverstein warned Horan that "[u]nless and until we are presented with *conclusive proof* that Jay has been untruthful in his statements made in court filings, it would be a gross violation of professional responsibility" to make such disclosures. (Id.)(emphasis added).

On December 16, 2011, JTR's emerald expert McAllister confirmed that three labs found "conclusively that two modern day epoxy resins are incrusted deep inside the stones," and he urged they "disclose publicly very soon, tomorrow or the day after…the findings and leave the implications for others to determine." (M1-18p1-5) On December 18, 2011, Silverstein warned McAllister he was covered by "non-disclosure agreements" and "confidentiality obligations imposed by law" and told him "to maintain all details of this project in confidence until such time as Jay and/or CBS elect to make the details a matter of public knowledge." (M1-18p3). After complaining he "did not understand that the labs would be asked

to test for enhancements," Silverstein instructed McAllister to "please cease any further testing and arrange for the return [of] any emeralds…sent out for testing,"noting that Miscovich was working with CBS "to get to the bottom of the mystery." (Id.at4). On December 18, 2011 in an email copied to Silverstein, Miscovich wrote the experts who made the epoxy findings stating "I warn you that if you harm my company in ANY WAY YOU…WILL BE RESPONSIBLE FOR ALL DAMAGES EVEN IF $1,000,000,000 OR MORE." (M1-17). On December 19, 2011, Silverstein sent McAllister a correction, saying he didn't mean to instruct him to stop testing. (M1-18). Horan stated in his withdrawal message that although "apologies were made…the damage was done." (M1-4p4)

Silverstein denied trying to "cover-up" the epoxy findings, noting he disclosed them to CBS. But when Silverstein relayed the epoxy information to CBS in December 2011, he knew CBS was contractually prohibited from disclosing it unless and until CBS aired the segment, which was then months away. (Day8p57-59). Silverstein knew Motivation's claim could be dismissed as early as January 2012. (Day8p52;M1-19). By disclosing the information to CBS, Silverstein gained CBS's help reconciling the epoxy findings with Miscovich's story without risking public disclosure in the near term.[2]

---

[2] Silverstein also acknowledged additional reasons for the disclosure of the epoxy findings to CBS: (1) Jay was contractually required to disclose the information to CBS; (Day8p58) and (2) Silverstein wanted to maintain good relations with CBS

The struggle between Silverstein (to block disclosure) and Horan (to disclose to the Court) continued for months. (M1-19(12/19-23/11),M1-20(12/27/11),M1-21(12/28/11),M1-23(1/9/12),M1-24(2/5/12),M1-25(2/6/12),M1-26(2/13/12),M1-27(2/28/12),M1-28(3/1/12)). For example, on December 27, 2011, Horan wrote Silverstein expressing concern that "Jay and Steve have been untruthful with regard to their discovery of the emeralds and their statement that they have no idea how the emeralds got there." (M1-20p1). On March 1, 2012, Horan cautioned Silverstein that "[a]s you are fully aware, we have 'credibility problems' with our client," and that failure to disclose the epoxy findings to the court "would be … equivalent of an affirmative misrepresentation." (Id.). Because the court "is presently under the impression that all of the stones were recovered from some old shipwreck in an area outside the territorial boundaries" and "all the labs have confirmed there is a modern enhancement on the vast majority of the stones that have been tested," Horan believed he had "a moral and ethical obligation to act on my duty to be candid with the court." (M1-3). Horan explained that while he did not have "anywhere near [Silverstein's] investment of time and money in JTR, losing hundreds of hours of my time this late in my legal career would be a bitter pill to swallow," and that ethical rules required him to withdraw if JTR "persists in a course [Horan] reasonably believe[s] is fraudulent,

_____

because he viewed the CBS story as free advertising that could generate "material investments." (Silv.Ex 9p1).

repugnant or imprudent." (Id.). He cautioned that no privilege attaches "with respect to transactions constituting a false claim or perpetration of a fraud" and that although it is "very hard to put my duty as an officer of the court ahead of my personal interest," the "duty to disclose the epoxy to the Court is 'clear.'" (Id.).

In a February 28, 2012 email to Silverstein Horan wrote: "Judge King must get the information about the [epoxy] tests from us, not CBS or the Fishers (or anyone else). I'm sure you all agree." (M1-27p2). Silverstein responded that "[w]hile it might be helpful for the Court to first learn of the enhancement issues from JTR, that is not necessarily the case…" (M1-27p1).

Dive For Emeralds "Free of Modern Substances." Without consulting experts, Silverstein theorized that when cleaning the emeralds Miscovich left a "false positive" for epoxy. (Day9p120-21). To check this theory, Horan and Elchlepp made a dive in January 2012 to obtain un-cleaned emeralds. (Day9p121). On January 9, 2012, Silverstein emailed Elchlepp regarding that dive, *but did not copy Horan*. (Day9p125). Knowing Elchlepp had already schemed to defraud the court with the non-Spanish coins story, Silverstein told Elchlepp "it certainly would be better if the emeralds [found] are free of modern substances." (Day9p125;Silv.Ex.16). Not surprisingly the emeralds "found" on the dive were free of epoxy. (Day9p121-23;M1-33).

Failure to Check the Miscovich Story. In a call with Sullivan and Silverstein on December 13, 2011, Miscovich and Elchlepp claimed "they did not 'salt' the

site," and all the emeralds, "including the 20-pound group" came from the site. (M1-16;Day9p111). If Sullivan and Silverstein wanted to meaningfully check whether they were defrauding the court (other than asking the putative fraudsters if they were frauds) they could have checked the details of Miscovich's release and bank withdrawal story, asked for the receipts for his emerald dives, hired salvagers to check the site, located and interviewed Cunningham, called Proskauer about the release, contacted the notary for the release, interviewed Tobia as to his fraud assertions or talked with Hess — they did none of this.

Horan Suspects the Emeralds Were Planted. When Horan dove the site in 2011, he believed it was genuine. (Day1p58). Silverstein said he was comforted by Horan's endorsement. By August 2012, however, Horan suspected he'd been fooled and the emeralds were planted. (Day1p61-62). He told Silverstein and Sullivan he was concerned because on his dives he "was being shown where the emeralds were…[and]…being directed to specific areas" and that emeralds were possibly "deposited there by someone prior to [Horan] diving." (Day1p62).

Horan Withdraws. As early as December 2011, Horan said he'd have to withdraw for ethical reasons if JTR "persists in a course that I reasonably believe is fraudulent, repugnant or imprudent." (M1-1). Silverstein therefore hired John Siracusa and Joe Janssen as replacement counsel. When, on August 22, 2012, Siracusa advised that "Horan will likely withdraw as counsel today," Silverstein said Horan "needs to be threatened with sanctions and/or suit for malpractice, and

remind[ed] that he contractually consented to personal jurisdiction in Delaware" in the event of client litigation. (Day9p146;M2-24). Silverstein then told Horan withdrawing "would be actionable," and Horan "took that as a threat." (Day1p125). Horan testified that was "the second time he threatened me" and it came close to a "physical altercation." (Id.at126). The earlier threats were addressed in Horan's March 1, 2012 email in which he stressed that "some time ago you made the mistake of threatening me with litigation." (M1-3). Silverstein said it was all a misunderstanding. (Day9p149). Horan moved to withdraw on October 8, 2012 (D.E.138), two months before the admiralty trial. Silverstein knew Horan withdrew because of the coin episode, the 20-pound group "hold-back," the epoxy findings, and suspicions the site was salted. (Day1p62;Day7p21;Day9p150-51).

On August 30, 2012, Horan sent an email to Sullivan that listed his reasons for withdrawing. As a member of JTR's Advisory Board, Sullivan had been closely involved in the management of the litigation. (D.E.302-6¶2). Sullivan spent "conservatively, a hundred hours of conversations" with Horan about the problems that lead Horan to withdraw for ethical reasons. (Day1p76). In fact, Horan and Sullivan specifically questioned where Miscovich was buying the emeralds. (Day1p75-76). In his August 30 email to Sullivan, Horan explained that "if testimony is required in the pending Motions, I highly doubt that I could allow some testimony to stand while fulfilling my responsibility as an officer of the

Court." (M1-4p1). Horan listed a series of what he called "surprises" that were the "primary basis for my withdrawal." (Id.p4). The list described, among other things, (1) when Horan dove the site, he found emeralds only where directed, (2) the non-Spanish coin episode, (3) that an iron cannon showed an "impact pattern" consistent with it being "dropped from a boat," (3) that Horan doubted the 20-pound group came from the site (and that their explanations as to their origin have varied), and (4) that JTR's emerald expert advised that the emeralds were not highly valuable. (M1-4p4-5). After diving the site with Elchlepp and initially believing it to be genuine, Horan reported his concerns to Sullivan that the emeralds had been planted at the site. (Day1p 56,60-62).[3] Horan's withdrawal "didn't create any doubt in [Silverstein's] mind" about the truth of the find. (Day9p152).

Marcial Finds the Emeralds Are Not Highly Valuable. In August 2012, Motivation's emerald expert, Manuel Marcial, examined and valued the entire *res* at no more than $50,000. (Day9p128-30). Although Horan told Silverstein that Marcial was a trustworthy "man of integrity," Silverstein testified his "statements

---

[3] As a member of JTR's Advisory Board, key litigation actions were subject to Sullivan's approval. In fact, JTR's "general outside counsel" advised counsel of record repeatedly that key decisions in the litigation had to be approved by Sullivan. (*See* e.g.M1-14;M1-19). Sullivan was involved in key litigation decisions. (Day1p80;M8¶45-47 94) Sullivan was involved in negotiations with Odyssey Marine concerning disclosure of the epoxy results. (Id.¶60,66-67) Sullivan was also involved in determining whether and when to make important disclosures to the Court. (Day1p103;M2-9;M1-33p1).

caused me no skepticism whatsoever because I did not believe a single word that I heard from Mr. Marcial." (Day1p78-80;Day9p130). This blanket rejection was consistent with Silverstein's reaction to everything contradicting Jay's story.

Miller Finds Emerald Specimens Glued Together. After Marcial's inspection, Siracusa retained expert Mona Miller. (Day2p225-6;Day6p130). In Sepember 2012, Miller opined the emeralds were "not particularly valuable" and worth no more than $600,000, nothing close to the many millions they hoped for. (Day2p229,233). After her inspection, Miller told Siracusa "at least one of the matrix pieces was…assembled, essentially meaning…it was glued." (Day2p234;Silv.Ex.23) On November 20, 2012, Silverstein wrote to Sullivan, Elchlepp and Miscovich that he was "dumbfounded about the new information about the specimens being assembled and manufactured…Jay and Steve – a lot of people have put a lot of time, money and personal reputations behind you. I sincerely hope you have been straight with us." (Day8p11;Silv.Ex23). . Silverstein testified that despite knowing of the modern epoxies for 11 months, he *still* believed the emeralds came from a *colonial era shipwreck*, so the new information led him "*for the first time*" to "start to really think there was possibly something amiss." (Day8p12,17). Paradoxically, at the same time he wrote there was "something amiss" and expressed "hope" the claimants "have been straight with us," Silverstein testified he had no suspicion Miscovich's story was untrue. (Day9p139). At that time, Silverstein knew the gems had epoxy resin, some of the

emeralds had been glued and their total value was small enough that Miscovich could well have purchased them from funds raised from investors.

Another Contradiction of Miscovich's Story.   On October 5, 2012, Motivation advised Silverstein "Dr. Baer, a consultant to [one of Jay's entities] reported Jay said he recovered these emeralds with the assistance of two Mexican divers," a fact inconsistent with Miscovich's story that he and Elchlepp recovered the stones (Day9p156;M5p7).   Silverstein responded simply that "Dr. Baer is mistaken" and he had "never seen any evidence to support Dr. Baer's alleged account."  (Id).   After receiving this information, Silverstein made no effort to contact Baer to investigate this claim. (Day9p157).

Siracusa and Janssen Check Miscovich's Story.  Though the case had been pending over a year and the issue of fraud on the court had been discussed repeatedly, no one from JTR ever checked Miscovich's story. As the December 3 trial approached, new admiralty counsel began checking Miscovich's story that he had withdrawn $50,000 from PNC Bank in April 2010 to pay for Cunningham's release.   On November 23, 2012, Janssen emailed Miscovich and Silverstein that Miscovich's PNC bank statement showed only $43,193 in *total* withdrawals during that time.   Janssen emailed Miscovich that "A contorted explanation is not going to fly with the Court....Please go through the statement and highlight which withdrawals/checks you made to reach $50k paid to Cunningham." (M2-54p7). Janssen continued, "there is evidence of a $50k transfer coming into your account

from the NY Investors – but the money going out…is not enough to pay Mike the $50k and your expenses for that month.  If you did not pay $50k to Mike, it is critical we know now before we go to trial – we can not properly represent you if we do not know this."(Id.at6).  Silverstein replied, if "Jay *did make this up* what difference does it make…so long as Jay does not so testify at the trial;" if "you do not elicit testimony about a map or payment for a map, then any questions on cross are outside the scope of direct and impermissible." (Id.at4,5)

Miscovich then responded with a new story that he "kept as much cash at home…as possible because my atty told me [the] bank…could and would freeze my bank account."  (M2-54p3).  Janssen asked "why did you have no issue leaving 10k in the bank at the end of the month when you had less than $100 at the start?  This type of tale will not fly at trial." (Id.)  Jay responded: "it is not a tale…**you can all go fuck yourselves.**" (Id.)    Silverstein received these emails, and suggested Janssen "tell Jay that you believe him (whether or not you do) to calm him down." (Id.)  Janssen responded that Miscovich "has lied to us in the past about this case, and has changed his story several times to fit whatever new facts we discover." (Id.at2).  Silverstein asked what Jay lied about and Janssen responded, "nothing that I wish to put in writing." (M2-55p1)  Silverstein testified he "wasn't aware that Jay had lied about anything [to Janssen]." (Day9p164).  He claimed Janssen "couldn't think of a specific lie that Jay had told them, they just generally did not trust him at that point." (Day8p30). Though the PNC account

showed Miscovich's story was false, Silverstein encouraged him to say in court what he "knew to be" the truth "without regard to whether you can back it up with proof." (M2-53;Day8p27). At the admiralty trial two weeks later Miscovich perjured himself and testified he withdrew $50k from PNC and paid it to Cunningham. (M41p17). Silverstein received a transcript of Miscovich's testimony, but incredibly claimed he didn't read it carefully, while at the same time claiming Miscovich didn't say anything constituting perjury. (Day10p17). However, in an earlier affidavit, Silverstein stated he learned the details of Miscovich's testimony from reviewing the transcript. (M 8¶165).

Silverstein Threatens Witnesses.  While sequestered as a witness in the admiralty trial, Silverstein threatened two of Motivation's witnesses waiting to testify. Silverstein approached Motivation expert Marcial and "said that [Marcial] had better get [himself] a darn good lawyer very fast if [he] testified in the case." (M46p160). Not surprisingly Marcial "very much…took [that] to be a threat." (Id.). Robert Baer testified Silverstein approached him in the witness area and told him, "if I was going to testify…if I knew what was good for me… I better lawyer up first, or I better get a lawyer" because "if I testified…I would be liable to a lawsuit." (Day12p14-16,18-22;DE220p172-74).  Silverstein's account was no less damning.  He stated he asked them both "if they were represented by counsel" and told them "they would be wise to confer with counsel…to make sure what they were going to say would not get them into any trouble." (M6 ¶52). Judge Moore (at

the first sanctions trial) noted there was "evidence of [Silverstein's] conduct that might fall under the obstruction of justice provisions…there were a number of witnesses who testified [they] felt intimidated or threatened or that other witnesses were threatened by testifying or by having suits filed against them. There…is [also] a criminal provision…Title 18 USC 3, accessory after the fact." (M-45p142-3).

The Wilding Affidavit.  In August 2012 Motivation filed Scott Wilding's affidavit (M21). In 2010 Miscovich showed Wilding "a great number of emeralds," claiming they came from the ATOCHA and offering Wilding a 2% interest for $250,000. Wilding thought "the whole idea was a scam" and declined. (Id.) Citing the affidavit's reference to a planned CBS segment, though CBS was not yet involved, Silverstein gave the affidavit "no credence whatsoever," "totally disregarded it as a piece of trash" and made no effort to talk to Wilding. (Day9p155). Of course, Wilding may have incorrectly recalled the year.

Weather Data Proves Miscovich's Account False.   At the admiralty trial, Miscovich was ordered to reveal the name of the map seller. He was certain he bought the map from his former handyman Mike Cunningham on January 8, 2010 (Echlepp's birthday) and discovered the emeralds on January 11. (M41;DE220p13-14,16-21,36). Armed with that "exact date," Scott Miscovich confirmed severe weather would've made diving nearly impossible. Scott told Silverstein this, but Silverstein dismissed it by claiming the date wasn't clear. (Day10p64).

Motivation finds Cunningham. Motivation first learned details of Miscovich's story at the admiralty trial, and began doing what Silverstein/JTR/Sullivan should have been doing all along -- checking Miscovich's story. On January 2, 2013, Miscovich emailed Silverstein, reporting he'd received "6 calls in the past hour…the Fishers [Motivation] have several private investigators going to every bar, restaurant, fire station, club, etc.…telling my entire town that I have stolen tens of millions from wall street investors…can anything be done about this…if not I will get some people and take it into my own hands …." (M2-57). Miscovich wrote to Silverstein that the Fishers hired a "scumbag atty in Latrobe" who was looking for Cunningham and said, "can we call this atty??????? or **do I just go put a bullet in his fucking head!!!!**" (M2-5) (emphasis added). Despite this incident, Silverstein swore that "I have no personal knowledge of Jay making…any threats of physical violence to anyone connected with this matter." (M6¶65).

FBI Investigation. On January 17, 2013, Silverstein warned Miscovich, "if you made this up, the FBI may one day be knocking at your door." (Id.) Silverstein testified when he wrote this he had no suspicion Miscovich's claim was fraudulent and the fact the FBI was investigating caused him no concern about the truth of Jay's claims because the FBI and US Attorney investigate lots of people. (Day10p31-32).

Hiding Information from Investors. Silverstein testified one reason he initially believed Miscovich was that the NY Investors believed Jay.  Since then, however, he had been careful to keep the NY Investors from learning any damaging information.  In a February 5, 2012 email to Horan giving instructions for a hearing, Silverstein wrote, "it is important [that] there be no disclosure of [the enhancement or Luckenbach] issues to (i) the Court, (ii) Motivation, or (iii) [NY Investor's counsel] and his clients." (M1-24p2).   After Miscovich's December 2012 testimony revealed the details, however, the NY Investors took less than a month to find Cunningham and expose the fraud. Cunningham was Miscovich's former handyman, but he knew nothing about a treasure map, had never been to Key West and was in Pennsylvania prison at the time Miscovich claims to have bought the map from him in Key West.  (DE568p48).

Dives on Site Prove Nothing There.   In September 2012, replacement admiralty counsel Siracusa dove the site with Elchlepp and found 72 emeralds where directed by Elchlepp to look, but none when he looked elsewhere.. (Day2p237-38).  When Siracusa went back alone, he dove the site twice a day for five to seven days and found no emeralds. (Day10p10).  He reported all this to Silverstein. (M2-51). Silverstein testified this caused him no doubt "whatsoever" about the veracity of Miscovich's claims. (Day9p140-143).

Judge King Rejects Admiralty Claim; Credits Baer Testimony. On January 25, 2013, the court issued its Final Order on the admiralty trial, denying JTR any

rights to the find. (D.E.199). That trial was in December 2012, long before disclosure of the crime-fraud emails. Even without that fraud evidence, the court found there was "just as much support for the theory that Jay and Steve planted the stones as there is for the assertion that they found them." (D.E.199p22). The court also found Dr. Baer was credible and the account given by Jay to Dr. Baer about Jay finding the emeralds on dives with two Mexicans "substantially differs from Jay and Steve's testimony." (Id.at4).

<u>Silverstein Suggests a "New Find."</u> Four days after the adverse final order, Silverstein outlined a revealing strategy for addressing it. In an email to Sullivan, Miscovich and other insiders, Silverstein suggested a new entity "be created in which the JTR members all have essentially the same membership interests, which could file a new claim based ***on a new find*** … ***that is made over the next week***…." (M2-30) (emphasis added).

<u>Barr Declaration</u>. Between October 23, 2013 and January 2014, Silverstein reviewed Dean Barr's Declaration recounting a call in which Scott Miscovich stated he and Sullivan checked the weather and found conditions too rough to dive on the dates Jay "discovered" them. (M20¶1(d)). True to form, Silverstein gave Barr's Declaration "no significance whatsoever." (Day10p72).

<u>Tobia Tapes</u>. After the trial, Scott recorded calls with Tobia confirming the fraud, and reported them to Silverstein. Despite the issue's importance, Silverstein

claimed he could not recall if Tobia said Miscovich had purchased the emeralds. (Day10p65-66).

Perjury Concerning the $50,000 Payment for the Release. On February 12, 2013 Siracusa wrote Silverstein that "like it or not, the $50,000 for the release from Mike C has become the soft underbelly of Jay's story." (M2-31;Day10p34-35). Siracusa suggested Miscovich "consider retaining [his] own criminal defense attorney…[because] I believe the penalty for perjury in federal court is 5 years." (M2-31). Silverstein again claimed this email didn't cause him to doubt Miscovich's veracity about finding the emeralds. (Day10p37).

Depositions. In 2013, Motivation deposed Miscovich's Proskauer counsel who testified his firm didn't prepare the Cunningham release or provide any legal services concerning the admiralty claim (M36p10-11,20). Cunningham was also deposed and testified he *was* Jay's former Latrobe handyman, knew of no other Cunningham who worked for Jay, wasn't a diver, had never been to Key West, didn't sell Jay a map, didn't sign a release, didn't receive money from Jay, and was in prison the entire time. (M40p4-6,9,11-14,18-19). Tobia testified he accompanied Miscovich on an emerald buy and the find was "phony." He explained how Miscovich got $60,000 from Anthony Santelli, and confirmed that "that money enabled Jay to obtain 75 to 85 pounds of uncut emeralds." (M10p103-04,107-08; Day10p75).

When these depositions were taken, YCST was representing Miscovich and JTR, and Silverstein was still lead counsel. (M2-34). Though Silverstein and his clients were facing sanctions and would soon be defending those charges, he incredibly claimed that when he received copies or key excerpts of these depositions, he didn't carefully review any of them and didn't recall discussing them with Siracusa. (Day10p38-42).

Siracusa Confronts Miscovich with Evidence of Fraud.  In May 2013 Siracusa wrote in an email to Miscovich, "Jay if there is something you're not telling us, you need to come totally clean. For instance, what is the first Mike/Jay agreement Tobia says he has?  What's the Jupiter connection?  I have heard from two separate witnesses that there were multiple trips to Jupiter.  Is that real or bullshit?  We can't help you if we don't know the whole truth.  You are running out of time." (M2-58).  Silverstein testified this email created no doubt in his mind as to whether Jay had been truthful about his find.  (Day10p51-52).  Silverstein testified, "there were times I had questions about [Miscovich and Elchlepp's] story...and every time I had those questions, the information I would receive in response gave me further comfort that they had, in fact, found [the emeralds]." (Day8p13).  In fact, however, Silverstein ignored the fact that every detail that had been checked had been proven false.

Martorano Statement.  On November 7, 2013, Motivation took a sworn statement from Miscovich's bookkeeper, Lisa Martorano, giving a detailed account

of accompanying Jay on an emerald *buy* in Jupiter. (M11). Although Silverstein received the full statement, he claimed he only "cursorily" reviewed a portion it. (Day10p93).

A Second Cunningham Agreement Found. In October 2013, Siracusa obtained a highly suspicious and never before disclosed February 2010 agreement between Miscovich and Cunningham which purportedly granted Cunningham a 60% interest in the emeralds. (M26;Day2p257-58). On October 16, 2013, Siracusa and Janssen wrote Jay that "we have had some rather serious discussions with Bruce [Silverstein] and Sully [Sullivan]…as to whether any of us continue to believe your story surrounding the April, 2010 Cunningham Release, your payment of $50,000 to him for it, the credibility of Stacey Wolfe's notary log, and if we don't believe the Mike C story, how could we possibly continue to effectively and/or ethically represent JTR through the sanctions hearing." (M2-32). Siracusa said they couldn't continue representing JTR unless Jay "were to acknowledge that your Mike C story is untrue and work towards rectifying the problems that your untruthful trial testimony has caused…[w]e can not expose our law firm and put our licenses on the line for this." (M2-32). Silverstein claimed this email not only gave him no reason to doubt Miscovich's story, but somehow *supported* his belief in Miscovich's veracity. (Id.)

Janssen and Siracusa Withdraw.  On October 17, 2013, Janssen and Siracusa moved to withdraw. (D.E287).  The Court denied the motion the next day. (D.E.287,291).  Miscovich committed suicide on October 29, 2013.

No Receipts for Salvage Work.  Since the Fall of 2011, Janssen and Siracusa had tried to find evidence (consistent with testimony at the admiralty trial) that Miscovich and Elchlepp dove the site 140 to 240 times during 60 to 80 trips to recover 150 pounds of emeralds. (M3¶121n9).  In a December 2013 email to Silverstein, Janssen noted that their "inability/refusal to produce documents which would document trips to the site will also create problems.  We have a few gas receipts…but nothing even close to 20, let alone 70 trips." (M2-39p2). Silverstein refused to acknowledge Janssen's email as "information," claiming "it's not new information.  It's a statement."  (Day10p102).  Silverstein argued that even if Miscovich lied about his discovery story, that doesn't mean he didn't find the emeralds on the sea floor.  But the non-existence of tax-deductible gas and air-fill receipts for 70 offshore trips was concrete proof of the claim's falsity.   In numerous emails, Silverstein stressed his commitment to pursuing the truth.  As he testified, "That was my mantra at all times, we need to know the truth, whatever it was."  (Day7p64).[4] But his professed interest in the truth is belied by his profound indifference to it.  Even at the late date of his December 2014 sanctions trial,

---

[4] Silverstein's emails are so full of self-serving statements about truth that even Jay mocked them, "I think its funny how you do the …cya …lecture to us about every week because of the Fishers accusation of fraud."  (M2-28).

Silverstein acknowledged he did not know and never bothered to find out if they produced any receipts to document the trips. (Day10p103).

Rodriguez's Counsel Contacts JTR. Silverstein testified that during the first sanctions trial, he learned Jorge Rodriguez, a jeweler in Jupiter, would testify he sold emeralds to Jay in bulk. (Day6p101). Although Rodriquez's account was completely consistent with the Tobia and Martorano's accounts, Silverstein testified, "this was the first time I ever heard" anything like this. (Id.at106). In fact, it was the *fourth* time Silverstein had heard about Miscovich's bulk emerald purchases — Barr's Declaration, Tobia's deposition, and Martorano's statement were the first three. Remarkably, Silverstein still sought to validate the find. He suggested the FBI and Motivation were trying to set-up Siracusa and that "Motivation knows that the guy did not sell Jay emeralds, and has paid him to have his attorney call you and lie about what he would say…to try to persuade you to refrain from calling him as a witness." (M2-43). Silverstein urged Siracusa to attack Rodriguez' credibility and "later argue to the Court that…even if the store owner's testimony is given credit, *the most it establishes is that Jay bought 60 pounds of emeralds…and it does not prove that Jay and Steve did not find emeralds in the Gulf of Mexico – as they both have testified."* (M2-43)(emphasis added)). Silverstein rejected out-of-hand any proof Miscovich and Elchlepp didn't discover emeralds.

Even after Jay committed suicide, the fraud continued under the management of Silverstein, his firm and Sullivan. After Sullivan was made aware Rodriguez was prepared to testify he sold the emeralds to Jay in 2010, Sullivan took the stand for two days and defended Silverstein and JTR's action with no mention of the Rodriguez evidence. Only after Motivation forced the attendance of Rodriguez was the truth revealed on the fraud.

C.  Standards of Review

Issues A and C: Standard of Review

While appellate courts review sanctions rulings after trial and on 52(b) motions under the abuse of discretion standard, *Cooter & Gell v. Hartman Corp*, 110 S Ct 2447,2461 (1990), a failure to consider the facts on which the exercise of its judgment ought to be based is an abuse of that discretion. *Ohlander v. Larson*, 114 F.3d 1531, 1537 (10th Cir. 1997); *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 578 F.3d 1283, 1288 (11th Cir. 2009) (district court abuses its discretion where it has made a clear error of judgment). After a bench trial, the district court's findings of fact are reviewed for clear error, and its conclusions of law and mixed questions of law and fact are reviewed *de novo*. *Dickerson v. Lexington Ins. Co*., 556 F.3d 290, 294 (5th Cir.2009).  Although factual findings are ordinarily reviewed under the deferential standard of clear error, where, as here, "the trial court's route to its findings features self-contradiction and confusion,  [the appeals court] may not so defer" and "the appropriate disposition of [such] cases is to

vacate the district court's judgment and remand for further fact finding." *Lyles v. United States,* 759 F.2d 941, 944 (D.C. Cir.1985); *United States v. Wragge*, 893 F.2d 1296, 1299 (11th Cir. 1990).

<u>Issue B: Standard of Review</u>

This Court should determine de novo whether the district court's ruling complied with Rule 52(a). Failure to comply with the strictures of Rule 52(a) requires reversal when a full understanding of the issue presented on appeal is impossible without the aid of more specific findings. *Ocean Garden, Inc. v. Marktrade Co., Inc.,* 953 F.2d 500,508 (9th Cir. 1991).

<u>Issue D:  Standard of Review</u>

This Court reviews the district court's dismissal of claims under a *de novo* standard. *Matthews v. Gaither*, 902 F.2d 877,879 (11th Cir. 1990).

IV. Summary of Argument

A    Having found that Silverstein substantially controlled fraudulent litigation, the district court erred in concluding that sanctions should not be imposed against Silverstein and YCST.

The district court found that Silverstein substantially controlled the fraudulent litigation.  At the time, YCST was acting as JTR's general counsel and Silverstein was the partner assigned as lead counsel for the representation. Undisputed evidence, mostly in the form of party admissions, proved that although Silverstein doubted the veracity of the case, he never checked any details of

Miscovich's story. From before the filing of the admiralty case through the first sanctions trial there was a steady and regular drumbeat of new revelations that the case was fraudulent. Although both sets of Florida lawyers withdrew for ethical reasons, Silverstein and his firm supported the fraud to the end. Applying a standard of objective reasonableness, this Court should find that Silverstein and his firm should be sanctioned for aiding and abetting a fraud on the court with actual knowledge and/or with willful blindness to the dozens of events that revealed to any reasonable person that the case was fraudulent.

B.      The district court erred by failing to address most of the material facts in the case in violation of Rule 52(a).

The district court's opinion sketches out some of the facts in detail, especially Silverstein's explanations for some of his actions. The court concludes that there are a great many questions left unanswered based on the "limited evidence presented" by Motivation, then refers the matter to the United States Attorney for a criminal investigation, presumably of Silverstein. (D.E.568p57-58) In fact, however, the largely undisputed evidence provided a detailed record of the facts, documented by hundreds of contemporaneous emails between the conspirators (produced under the crime-fraud exception to privilege) and nearly 24 hours of testimony and over 400 pages of affidavits from Silverstein himself. If the court made specific findings of the material facts, it could not possibly avoid sanctioning Silverstein and his firm. As it is, the court's opinion addresses some

aspects of the case in detail, but simply ignores most of the facts. Rather than finding the facts specifically, as required by Rule 52(a), the court wrote simply that its conclusion was supported by the "entire record…viewed individually or when taken cumulatively." (D.E.568p57). Because the court's failed to make specific findings and to identify which facts it rejected as unsupported, this Court can't meaningfully review the case without sifting through this extensive record. Because this is precisely what Rule 52(a) was designed to avoid, the order violates that Rule. Because the district court ignored and failed to identify the wealth of evidence augmented by key undisputed facts that supported sanctions, the case should be remanded with instructions to comply with Rule 52(a).

C.     The District Court properly sanctioned JTR for bad faith litigation tactics that were engineered by Silverstein and YCST, but erred by refusing to sanction Silverstein and YCST for those same tactics and by failing to even address the issue.

The district court's rulings contain some perplexing inconsistencies. The court found that JTR committed a massive fraud on the court, but that JTR's fraud itself was not sanctionable. (D.E.445p54n8) The district court *did* properly sanction JTR for its refusal to timely disclose the epoxy findings even though JTR knew those findings would resolve Motivation's claim and permit it to stop expending resources on the case. But even though Silverstein and YCST directed and dictated JTR's failure to timely disclose the epoxy, the district court refused to sanction *them*. The district court never explained these inconsistencies.

Motivation asks this Court to remand the case to the district court with instructions to impose an appropriate sanction on Silverstein and his firm for the bad faith litigation tactics they engineered.

D.   The district court erred by dismissing Motivation's sanctions claims against YCST and Sullivan.

Again, there are aspects of the district court's rulings that defy explanation. The court dismissed claims against Sullivan, a member of JTR's Advisory Board, and a key participant in the fraudulent litigation, and YCST, the firm that acted as JTR's general counsel and, through one of its managing partners "substantially controlled" the fraudulent litigation.  The court stated there was no evidence in the record about YCST and no evidence at all showing that Sullivan either participated in the litigation or knew the case was fraudulent.  There was actually copious evidence in the record of YCST and Sullivan's substantial involvement and knowledge of and/or willful blindness to the fraud.  For example, Sullivan spent at least 100 hours in telephone discussions with JTR's admiralty counsel about the case, including speculation about where Miscovich was buying emeralds.

Uncontradicted evidence proved that Silverstein was on YCST's Management Committee, that YCST was JTR's outside general counsel, and that Silverstein acted in his capacity as a partner at YCST when representing JTR. Again, the district court was either unaware of evidence in the record or chose to ignore it.  Either way, these dismissals should be reversed and the case should be

remanded for further proceedings to resolve the sanctions claims based on the actual record.

## V.  ARGUMENT AND CITATIONS OF AUTHORITY

### ISSUE A

**HAVING FOUND THAT SILVERSTEIN SUBSTANTIALLY CONTROLLED FRAUDULENT LITIGATION, THE DISTRICT COURT ERRED IN CONCLUDING THAT SANCTIONS SHOULD NOT BE IMPOSED AGAINST SILVERSTEIN AND HIS FIRM**

The federal court has inherent power to sanction a litigant, or its general counsel, for perpetrating a fraud on the court. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (2001). In determining whether sanctions are justified, courts apply an "objective standard" to ask "what was known or *reasonably knowable." Thompson v. Relationserve Media, Inc.,* 610 F.3d 628, 665-66 (11th Cir. 2010); *Diaz v. First Marblehead Corp*.**,** 2016 WL 736361 *4 (11th Cir. 2016). As the courts have long recognized, a person's knowledge and intent can be inferred from a willful blindness to facts that would lead a reasonable person to believe a fraud is being committed. *See United States v. Ramirez-Carvajal*, 902 F.2d 30 (4th Cir.1990):

> What a person does is frequently more indicative of his true state of mind than what he says. The element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what otherwise would have been obvious.

902 F.2d 30 at *3 (knowledge may be inferred from a "refus[al] to be enlightened or…to take notice). The Sixth Circuit expressed the same concept in emphasizing

that "[n]o one can avoid responsibility for a crime by deliberately ignoring the obvious." Instruction 2.09 "Deliberate Ignorance" *Sixth Circuit Pattern Jury Instructions, Criminal Cases* (2011).

Here, the district court found that the JTR litigation constituted a massive fraud on the district court and the American system of justice, and that "the whole case had indeed been designed from the beginning to commit a fraud upon the Court." (D.E.568p12). The court also found that "the *evidence overwhelmingly show[ed]* that Bruce Silverstein substantially controlled JTR's action in this litigation." (D.E.568p55). Despite these two pivotal findings, the court concluded Silverstein need face no sanctions whatsoever for his role in "substantially controlling" the fraudulent litigation. (D.E.568p55).

It would be hard to envision circumstances more clearly demonstrating knowledge or willful ignorance than Silverstein's response to the compelling evidence indicating fraud in this case. While knowledge and intent are typically divined through surrounding circumstances alone, in this case the crime fraud exception afforded a rare vantage into the parties' states of mind through their correspondence. A month before the admiralty filing, Silverstein "found the story incredible" and had a "very difficult time believing it was true." Eight days later, Miscovich's associate and "emerald discovery" confidant, Tobia, confirmed Silverstein's suspicions, telling him they had not discovered the emeralds in the Gulf. Silverstein knew if this *was* true the filing "would be fraudulent." He knew

he needed to investigate it.  Not only did he do nothing to check it, but that very night he urged Horan to proceed with the admiralty filing, noting the press coverage would "produce legitimate investors with meaningful investments."  That *alone* should have supported sanctions under the law.  In other words, at a time when Silverstein suspected the case was fraudulent, he wanted to go forward with a plan to use the federal court to help raise investments in the potential fraud.

Sanctions are appropriate when an attorney presents a paper for an improper purpose. Improper purpose is often inferred from circumstantial evidence. For example, it can be inferred from "'excessive persistence in pursuing a claim or defense in the face of repeated adverse rulings.'" *Indus. Risk Insurers v. M.A.N. Gutehoffnungshütte GmbH*, 141 F.3d 1434, 1448 (11th Cir.1998); *Bryant v. Brooklyn Barbecue Corp.*, 932 F.2d 697, 698 (8th Cir.1991) (original complaint filed without a "reasonable inquiry" and for improper purpose of "attract[ing] publicity"); *In re Kunstler*, 914 F.2d 505, 518-19 (4th Cir.1990) (if the central and sincere purpose of a complaint is anything other than to vindicate rights in court, it is filed for an improper purpose, and the court must judge conduct of counsel under an objective standard of reasonableness and consider all the evidence to ascertain the objective intent of the signer); *Stevens v. Lawyers Mut. Liab. Ins. Co. of North Carolina*, 789 F.2d 1056, 1060 (4th Cir.1986).

Surely the courts have a right to expect their "officers" to do all in their power to refrain from facilitating frauds, particularly where the action *itself* is a

"massive fraud" against the court and the justice system. (Day2p328;DE568p2;DE445p54n8). Moreover, where, as here, the specter of fraud was already heavy in the air, the explosive revelation from Tobia confirming the fraud was enough to cause an officer of the court acting *in good faith* to immediately call a halt to the suspect proceeding until an investigation could conclusively *dis*prove the putative fraud. As this court emphasized in *Thompson*, "measured objectively," if a "reasonable investigation would have revealed" that a claim was frivolous or in "error" to a "reasonably competent attorney, then sanctions can be imposed." 610 F.3d at 665-66. Where, as here, the filing in question wasn't merely frivolous or in error, but a fraud on the court and the American justice system itself, there was an even more compelling justification to meaningfully investigate.

This Court has emphasized that "the reasonableness of the inquiry turns on the totality of the circumstances, including, for example, the time available for investigation and whether the attorney had to rely on the client, another member of the bar, or others." *Id*. This record abounds with countless forsaken opportunities to have easily investigated and exposed the fraud. Silverstein made efforts to delay the epoxy disclosure while he and Sullivan searched for ways to explain the modern resins. Had they spent a fraction of that effort checking Miscovich's story at any point along the way, they would have quickly confirmed, as did Motivation once it finally had the chance to do so, that the entire case was a contemptible

fraud.

Among the relatively simple steps they could have taken were (1) checking the details of Miscovich's story, such as bank records regarding the $50k "payment" to Cunningham, (2) viewing the release he claimed Cunningham signed, (3) asking for Jay's tax-deductible oxygen and gas receipts for his scores of dives to "recover" the emeralds, (4) hiring professional salvagers to check the site without Miscovich or Elchlepp, (5) locating and interviewing Cunningham (which Motivation did in a matter of weeks after learning his name), (6) calling Proskauer about the Cunningham release, (7) contacting the notary for the release (8) interviewing Tobia as to his fraud assertions, (9) interviewing persons who corroborated Tobia's account (10) contacting Tobia's attorney, (11) talking with lawyer Hess about Tobia's questions in 2010 about treasure finds, (12) speaking to any of the witnesses who accompanied Miscovich on emerald buys, (13) confirming with the Eagle's Club that Cunningham was there when Jay said he signed the release, (14) contacting attorney Allen Ross to confirm Jay's claim he contacted him to get a notary (15) speaking to Dr. Baer about the claim Miscovich told him he found the emeralds diving with two Mexicans, or (16) interviewing Wilding about his claim Jay showed him 100s of emeralds in 2010 and told him they came from the *Atocha.* It is well understood that "what a person does [or does not do] is frequently more indicative of his true state of mind than what he says" and that "it is reasonable to draw the inference…that a person intends the natural

and probable consequences of acts knowingly done *or omitted*." *Ramirez*, 902 F.2d at *3; Instr. 14.13, Devitt Blackmar & Wolf, Federal Jury Practice and Instructions (4th Ed).

Silverstein's willful blindness could not be better shown than by his failure to take reasonable steps that could have easily confirmed the fraud. But he not only failed to investigate *himself*; he steadfastly rejected all information *from others* corroborating the fraud. Of course Miscovich's story about buying a treasure map at a bar from a former handyman and finding a multi-million dollar treasure three days later was so facially incredible that Silverstein doubted its truth. We know that, only because the crime fraud exception revealed private correspondence he was not expecting to be revealed. Having committed his personal assets and his law firm to the success of the venture and the filing of the admiralty claim, however, Silverstein exhibited an almost fanatical devotion to the outlandish tale as manifested not only in his steadfast failure to investigate, but in his nearly obsessive refusal to give credence to any information discrediting it.

Tobia's report did not dissuade Silverstein or YCST from insisting on filing the admiralty action. The fraudulent non-Spanish coin episode did not prompt him to suspect the genuineness of the find. (Day6p176;Silv.Ex.9). Attorney Hess' email about Tobia caused him "no concern whatsoever." (Day9p77). The 20-pound group issue gave him no reason to doubt the find. (Day7p21). Faced with evidence of modern epoxy embedded in the emeralds, Silverstein didn't even consider the

possibility the emeralds were planted (that was "the furthest thing from my mind") (Day7p63) and he had no "suspicions and concerns about whether Jay and Steve's claim [was] a fraud on the court." (Day9p114). Silverstein testified Jay's story about the dictated, amateurish release and $50,000 payment to Cunningham was "completely plausible" and "didn't cause [him] any suspicion whatsoever." (Day9 95-96). When Horan withdrew over concerns the case was a fraud, that "didn't create any doubt in [Silverstein's] mind about the truth of Jay's find." (Day9p152) When he read the sworn affidavit of the emerald scam Miscovich proposed to Wilding in January 2010, Silverstein "gave the affidavit no credence whatsoever," totally disregarded it "as a piece of trash" and made no effort to talk to Wilding. (Day9p55). Though Horan told him Marcial was a trustworthy man of integrity, when Marcial valued the emeralds at less than $50,000, Silverstein said his "statements caused me no skepticism whatsoever because I did not believe a single word that I heard from Mr. Marcial." (Day1p78-80;Day9p130). After hearing the report of his own expert that the emeralds included some that were glued together, this gave Silverstein no suspicion that Miscovich's story was untrue. (Day9p139). When he learned that Dr. Baer said Miscovich had told him early on that he found the emeralds with two Mexican divers, Silverstein said that "Dr. Baer is mistaken," that he had "never seen anything to support Dr. Baer's alleged account," and that he made no effort to contact Baer. (Day9p157). When new admiralty counsel discovered that Miscovich was lying about withdrawing $50,000 to pay

Cunningham for a release, Silverstein said, "what difference does it make if Jay did make this up," just don't ask him about it at trial and make an outside the scope objection if they bring it up. (M2-54p4-5). When Miscovich was shown to have perjured himself on that very point at trial, Silverstein claimed he didn't even bother to carefully read the transcript of his testimony. (Day10p17). When Scott proved severe weather prevented any diving on the exact date Miscovich said he and Elchlepp discovered the emeralds, Silverstein falsely claimed Miscovich never identified an exact date. (M41;Day10p64). When Miscovich said he wanted something done to stop the Fisher's investigation or "he would get some people and take it into my own hands," Silverstein claimed that wasn't a threat to harm anyone, but a threat to "go to the press and authorities." (Day10p15). When Miscovich complained to Silverstein that the Fishers hired a "scumbag atty in Latrobe" who was looking for Cunningham and wrote, "can we call this atty??????? or **do I just go put a bullet in his fucking head!!!!"** (M2-5), Silverstein testified this was "absolutely not" a threat to harm any lawyer, and in his view Miscovich was not upset that investigators were looking for Cunningham. (Day10p14). When Motivation found Miscovich's former handyman from Latrobe, PA named Mike Cunningham who was in prison in this time-frame, Silverstein suggested "this is not the same Mike Cunningham who sold Jay the map." (M2-28p4). When the FBI and U.S. Attorneys office began investigating, Silverstein said that caused him no concern about the truth of Jay's claims because they

investigate lots of people.  (Day10p31-32).  When the court denied JTR exclusive right to the site, Silverstein urged a new entity be created with the same members to file a new claim "based on a new find…that is made over the next week." (M2-30). Who knew that new and priceless treasure finds were so foreseeable and easy to come by? When Barr gave a Declaration challenging the story, Silverstein gave it "no significance whatsoever." (Day10p72).  When Siracusa wrote that the $50,000 for the release is "the soft underbelly of Jay's story," Silverstein testified this caused him no suspicion about the truth of Jay's discovery claim because, according to Silverstein, if Miscovich perjured himself about the $50,000 payment it had no bearing on whether he lied about finding the emeralds. (Day10p34-36). When Siracusa recommended that Miscovich hire a criminal attorney because of his perjury, Silverstein said that didn't cause him to doubt Miscovich's veracity about finding the emeralds. (Day10p37).  When a series of depositions proved Miscovich's stories about the map, release and payment were blatant lies, Silverstein said he didn't carefully review the depositions though he and his clients were facing sanctions charges. (Day10p38-42). When Siracusa wrote Miscovich about the emerald buys in Jupiter and the fake first contract with Cunningham "giving" him 60% of the find, Silverstein said that email created no doubt in his mind about the truth of the find. (Day10p51-52). When in November 2013, he received the sworn statement from Miscovich's bookkeeper giving a detailed account of accompanying him on one of his emerald buys in Jupiter, Silverstein

claimed he only "cursorily" reviewed a portion of it. (Day10p93). When he received excerpts of Tobia's deposition detailing trips with Miscovich to buy bulk emeralds, Silverstein said he reviewed them but not carefully, and that in any event he gave Tobia "no credibility" whatsoever. (Day10p81). When Siracusa said he couldn't continue to represent Jay given his perjury and couldn't put their licenses on the line, Silverstein claimed that gave him no reason to doubt Miscovich and Elchlepp's truthfulness. When Janssen expressed concern about the failure to produce the tax-deductible receipts for the many diving trips they purportedly took, Silverstein claimed that wasn't new information, it didn't matter, and he never bothered to find out if they had produced such receipts. (Day10p102). Even when he learned the Jupiter jeweler was going to testify he sold bulk emeralds to Miscovich in 2010, Silverstein suggested it was a setup from the FBI to see if they'd still call him to trial and that they should attack his credibility and if that fails, they should argue it only proves he bought 60 pounds of the emeralds but doesn't disprove they found other emeralds in the Gulf. (M2-43).

The question is whether this Court is prepared to declare the following conduct acceptable for an attorney controlling litigation in this circuit: (1) urging an admiralty filing as a general counsel and stakeholder in the claimant in the face of alleged fraud, for the improper purpose of attracting "meaningful investments" in the enterprise, (2) repeatedly failing to conduct reasonable investigations that could've easily confirm the fraud, (3) threatening adverse witnesses preparing to

testimony, (4) threatening attorneys with malpractice for seeking to withdraw for ethical reasons, (5) ignoring and denying clear and compelling evidence of fraud, (6) delaying important disclosures to the U.S. District Court  (7) delaying for nearly a year any opportunity for Motivation to examine the *res* and (8) "excessive[ly] persist[ing] in pursuing a claim…in the face of repeated" and cumulative evidence that by doing so the attorney was perpetrating a massive fraud on the court. *Indus. Risk Insurers*, 141 F.3d at 1448.  Under Rule 52, a final order must not be allowed to stand "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *U.S. v. U.S. Gypsum Co*., 333 U.S. 364, 395 (1948); *Jones v. Illlinois Cent. R.R. Co*., 617 F.3d 843, 850 (6th Cir. 2010) ("A court abuses its discretion when it commits a clear error of judgment, such as applying the incorrect legal standard, misapplying the correct legal standard, or relying upon clearly erroneous findings of fact."). We urge the Court to hold that Silverstein's conduct was not acceptable in this Circuit and that the order fully absolving him was not appropriate on this record, and to remand the case with instructions that the district court impose sanctions on Silverstein and his firm.

## ISSUE B

**THE DISTRICT COURT ERRED BY FAILING TO ADDRESS MOST OF THE MATERIAL FACTS IN THE CASE IN VIOLATION OF RULE 52(b)**

Upon comparing Judge King's Order Denying Sanctions (D.E.568) with the facts set out herein and in Motivation's 52(b) motion (D.E.573), one might question whether there are two cases involved here. That's because the Order addressed some aspects of the case in detail, especially Silverstein's explanations for his actions, but completely omitted any mention of scores of material facts. showing Silverstein's complicity and/or willful blindness.

Rule 52(a) requires trial courts to "find the facts specifically" in all non-jury cases. A chief purpose is to afford the appeals court "a clear understanding of the…basis of the decision of the trial court." *Lyles,* 759 F.2d at, 943-45. "Where the trial court provides only conclusory findings, unsupported by subsidiary findings or by an explication of the court's reasoning with respect to the relevant facts, a reviewing court simply is unable to determine whether or not those findings are clearly erroneous." *Id.*; *see EEOC v. United Virginia Bank/Seaboard National*, 555 F.2d 403, 406 (4th Cir.1977); *Curtis v. Commissioner*, 623 F.2d 1047, 1053-54 (5th Cir.1980). The district court violates Rule 52 when its "inadequate findings render impossible 'a clear understanding of the basis of the decision' and those 'findings are obviously necessary to the intelligent and orderly presentation and proper disposition of an appeal.'" *United States v. Citgo Asphalt*

*Ref. Co.*, 718 F.3d 184, 186-87 (3d Cir.2013). During the trial, the court noted his sanctions ruling on this massive fraud on the judicial system would have "such a far-ranging terribly traumatic effect…that it deserves…actual findings of fact that are based on a record." (Day6p75). Ironically, his ruling failed to make those findings.

In its ruling, the district court wrote that "Motivation identifies numerous 'red flags' which occurred during the course of Silverstein's representation of JTR and Jay both before and after the case was filed." In fact, Motivation identified 30 such red flags. (D.E.560). But without identifying them, the court pronounced that Motivation "chiefly relies on six events in their claim that Silverstein acted in bad faith," and then simply stated that after a review of the six events *and the "entire record"* the evidence "viewed individually or when taken cumulatively" did not indicate Silverstein acted in bad faith. (D.E.568p57).

The final order identified some facts, but simply omitted much of the damning evidence showing knowledge and/or willful blindness. Without recounting the facts relevant to the issue at hand, the court wrote that Motivation complained about numerous "red flags" that taken collectively did not show Silverstein was willfully blind to the fraud — even though the court found that "the *evidence overwhelmingly show[ed]* that Bruce Silverstein substantially controlled JTR's action in this litigation." (D.E.568p55). This is precisely the type of conclusory pronouncement Rule 52 prohibits. *See Lyles,* 759 F.2d at 943-45

(decrying "the insufficiency of the trial judge's factual findings, particularly his failure to address in those findings apparently relevant evidence.") *Patterson v. Aiken,* 841 F.2d 386, 387 (11th Cir. 1988) (the trial court erred in failing to set forth specific findings of *all* the material facts to determine if the conduct was objectively reasonable.).

In this case the court apparently understood that numerous red flags were material because the court made a specific finding that those red flags did not show willful blindness. But what were those red flags?  Given that the ruling was based on an *absence* of proof, the Order violated Rule 52 by failing to fully address the "numerous red flags" that *were* proven but did not (in the district judge's opinion) support a finding of willful blindness.  Under these circumstances, it is impossible for this Court to perform a meaningful review.  Indeed, the question here is not "what happened?" or "who knew what, when?" because those details are well documented and for the most part not in dispute. Rather, the question here is whether the conduct of Silverstein and his firm is acceptable in a federal court in the Eleventh Circuit. Before this Court can address that issue, this Court must know what the red flags were.

Motivation immediately recognized the court's Order didn't comply with Rule 52(a). To remedy the problem and in the hope the court would explain its ruling in sufficient detail to permit meaningful review, Motivation filed a Rule 52(b) motion seeking additional findings. (D.E.573).   In a remarkable ruling on

the motion, the court simply pronounced that all 65 paragraphs of facts cited in the motion, nearly all of which were supported by admissions, contemporaneous correspondence, or sworn testimony, were not supported by any credible evidence. Even if this sweeping pronouncement had been accurate, it raised another perplexing problem for appellate review. If none of the facts in the 65 paragraphs were supported by any credible evidence, what were the numerous red flags the judge referred to? The appeals court cannot know, because the court's order did not specify them. In any event, the dismissal of the 65 paragraphs as unsupported **by any credible evidence** was clearly erroneous because most of those facts were conceded by Silverstein himself and corroborated by contemporaneous emails, including emails the court cited selectively to bolster its conclusions.

## ISSUE C

THE DISTRICT COURT PROPERLY SANCTIONED JTR FOR BAD FAITH LITIGATION TACTICS THAT WERE ENGINEERED BY SILVERSTEIN AND YCST, BUT THE COURT ERRED BY REFUSING TO SANCTION SILVERSTEIN AND YCST FOR THOSE SAME BAD FAITH TACTICS.

Judge Moore sanctioned JTR because its refusal to timely disclose the finding of modern epoxy resins violated an obligation to the court and "perpetuated this litigation." (D.E.445p16-17). In his fact-findings after the third trial, Judge King outlined many of Silverstein's actions to delay disclosure of the epoxy — the conduct that caused Judge Moore to sanction JTR. (D.E.568p34-42). Though

Judge King did not address much of the more damning evidence on this issue (e.g. that Horan expressed his concern that JTR was engaged in "fraudulent, repugnant or imprudent" misconduct (M1-3)), his findings do make clear that Silverstein blocked timely disclosure of the epoxy evidence, which, as Judge Moore found, improperly "perpetuated the litigation." Motivation asks the Court to remand the case with instructions that the district court impose a sanction on Silverstein and YCST for their orchestration of bad faith litigation tactics.

## ISSUE D

### THE DISTRICT COURT ERRED IN DISMISSING MOTIVATION'S SANCTIONS CLAIMS AGAINST YCST AND SULLIVAN.

At the conclusion of Motivation's case, the court dismissed Motivation's Motion for Sanctions as to Sullivan, stating "no evidence was presented as to…Sullivan's interest, financial or otherwise, in the outcome of this case or of his direction and control of this litigation." (D.E.528p30). The Order wasn't based on credibility determinations, which are entitled to deference. *United States v. Gregg,* 179 F.3d 1312,1316 (11th Cir. 1999). Instead, the court simply found there was no evidence implicating Sullivan or YCST. In fact, however, substantial evidence showed that as a member of JTR's Advisory Board, Sullivan was actively involved in the management of the fraudulent litigation and was aware of and continued to advance the fraud even after Miscovich's suicide and even after Rodriquez described Miscovich's emerald purchases (Sullivan testified at the second trial in

defense of JTR after learning these details). In over a hundred hours of phone calls with Horan and emails, including Horan's August 30, 2012 email, Sullivan was aware of or should have known the case was fraudulent. Indeed, he even discussed with Horan where Miscovich was buying emeralds. If Sullivan's conduct in aiding this fraud on the court was deemed acceptable, then the court should have acknowledged the facts and rendered a judgment; but dismissing Sullivan on grounds there was "no evidence" of his complicity was clearly erroneous.

The court also found there was no evidence in the record implicating YCST in any way. (D.E.528p2-3). At the time the court ruled, uncontradicted evidence in the record established that while Silverstein was "substantially controlling" this fraudulent litigation he was a member of the Management Committee of YCST. (Ex.M3¶3). Many lawyers from YCST performed substantial work on this fraudulent case. (Id.at¶10). YCST acted as general outside counsel for JTR and Miscovich. (Id.). Silverstein was "lead attorney at YCST responsible for that representation." (M7¶2). Silverstein's did his legal work for JTR in his "capacity as a partner at YCST." (Id.) This evidence was obviously sufficient to show that YCST, as JTR's general counsel and acting through Silverstein, is subject to sanctions for its substantial control of this fraudulent litigation and JTR's bad faith litigation tactics. *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120 (1989) (there is nothing preventing a federal court from exercising its inherent power to sanction an attorney, a party, or a law firm for their subjective bad faith).

*See In re Mroz*, 65 F.3d 1567, 1576 (11th Cir. 1995) (law firm may be sanctioned under Rule 11); *Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc.*, 57 F.3d 1215 (3d Cir. 1995); *Thompson,* 610 F.3d at 666.

## VI. <u>CONCLUSION</u>

The district Court referred to the scheme as a "massive," "terrible" and "incredible fraud," and he referred to those who perpetrated the fraud as "massive fraudsters." (Day4p19). In one of his affidavits Silverstein outlined his skill and experience as a lawyer who's "rarely" lost a case, etc. (M3¶3-6). Yet the trial court concluded that for more than two years Silverstein "substantially controlled" and Sullivan sat on the Board coordinating a "massive," "terrible" and "incredible fraud" without either ever noticing it was fraudulent. All others having any connection to the case, including Horan, Siracusa, Janssen, Scott Miscovich, Motivation and the NY Investors, saw what was obvious, but this most accomplished lawyer and two principal JTR Board members never noticed. If attorneys and others substantially controlling litigation constituting massive frauds on the court and the American judicial system, are not sanctioned under these facts, then our circuit will have adopted a standard of conduct so permissive that, absent full confessions, the most contemptible, willfully blind, improperly motivated and bad faith behavior could never be sanctioned.  For the reasons set out above, Motivation respectfully urges this Court to reverse the order dismissing Sullivan

and YCST, to reverse the Order declining to impose sanctions against Silverstein, and to remand the case with instructions to impose sanctions against the Appellees.

Respectfully submitted,

/s/ *Ken Sukhia*
Kenneth W. Sukhia
Bar. No. 266256
Sukhia Law Group PLC
902 N. Gadsden Street
Tallahassee, Florida 32303
ksukhia@sukhialawfirm.com
Ph.  (850) 383-9111

A. Eugene Lewis, Jr.
FL Bar No. 94810
Marlow V. White
FL Bar No. 275417
Lewis & White, PLC
222 W. Georgia Street
Tallahassee, FL 32301
lawlaw@polaris.net
Ph. (850) 425-5000

*Counsel for Appellant*

## Certificate of Compliance with Rule 32(a)

This brief complies with the type-volume limitation of *Fed.R.App.P.* 32(a)(7)(B) because this brief contains 13,923 words, excluding the parts of the brief exempted by *Fed.R.App.P.* 32(a)(7)(B)(iii).

*Ken Sukhia*_____
Kenneth W. Sukhia
*Attorney for Appellant*

## Certificate of Service

Undersigned Counsel certifies that the above Initial Brief was served electronically on all counsel of record on April 25, 2016.

*Ken Sukhia*_____
Kenneth W. Sukhia
*Attorney for Appellant*