# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

CASE NO. 15-14132-D

---

## MOTIVATION, INC.

**Claimant/Appellant,**
**vs.**

## JTR ENTERPRISES, LLC,

**Plaintiff/Appellee.**

---

On appeal from the United States District Court for the
Southern District of Florida, Miami Division
Case No. 4:11-Civ-10074

---

## ANSWER BRIEF OF APPELLEES YOUNG CONAWAY STARGATT & TAYLOR, LLP AND BRUCE L. SILVERSTEIN AND INITIAL BRIEF ON CROSS APPEAL

---

Jeffrey B. Crockett (FBN: 347401)
jcrockett@coffeyburlington.com
David J. Zack (FBN: 641685)
dzack@coffeyburlington.com
COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive, Penthouse
Miami, Florida 33133
Telephone: (305) 858-2900
Facsimile: (305) 858-5261

*Counsel for Young Conaway Stargatt & Taylor, LLP*
*and Bruce L. Silverstein, Esq.*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Eleventh Circuit Rule 26.1, Appellees Young Conaway Stargatt & Taylor, LLP and Bruce L. Silverstein, Esq., hereby state the following individuals and entities with any known interest in the outcome of this appeal:

Kendall B. Coffey

Jeffrey B. Crockett

Stephen Elchlepp

Kim Fisher

John Gravante

David Horan

JTR Enterprises LLC

Hon. James L. King

Jay Miscovich

Hugh J. Morgan

Motivation Inc.

Hon. K. Michael Moore

Bruce L. Silverstein

John Siracusa

Paul D. Sullivan

John E. Tuthill

Marlow V. White

Young Conaway Stargatt & Taylor, LLP

David J. Zack

Appellee Young Conaway Stargatt Taylor, LLP has no parent corporation and no publicly held corporation owns 10% or more of it.

## STATEMENT REGARDING ORAL ARGUMENT

Oral Argument of Motivation's appeal is unnecessary and unwarranted. Motivation appeals the district court's discretionary denial of a motion for sanctions, which was based on credibility assessments and factual determinations made following a twelve-day evidentiary hearing. Motivation's appeal cries out for a summary affirmance.

Appellees' Cross-Appeal raises a number of important questions of law – some of which have never been addressed by this Court. Nonetheless, Appellees' do not request oral argument, but would be pleased to present argument if the Court desires.

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ................................................................. 1

STATEMENT REGARDING ORAL ARGUMENT................................... i

TABLE OF CONTENTS........................................................................... ii

TABLE OF AUTHORITIES .................................................................... iv

INTRODUCTION..................................................................................... 1

STATEMENT OF JURISDICTION........................................................ 6

STATEMENT OF THE ISSUES.............................................................. 7

     On Motivation's Appeal ................................................................ 7

     On Appellees' Cross Appeal ........................................................ 7

STANDARD OF REVIEW ...................................................................... 8

STATEMENT OF THE CASE ................................................................. 9

PROCEDURAL HISTORY AND BACKGROUND.............................. 11

     Phase I: Admiralty Action ........................................................... 11

     Motivation's Fictitious Claim to Ownership................................ 12

     Phase II: The "First Sanctions Hearing"..................................... 13

     Phase III: Motivations' Failed Motion For Sanctions Against Appellees.... 16

STATEMENT OF THE FACTS................................................................ 19

     Appellees' Acknowledged Good Faith......................................... 19

     Horan's Pre-Filing "Reasonable Investigation" and Post-Filing Follow-Up 21

     Silverstein's Testimony ............................................................... 29

     Siracusa's Testimony ................................................................... 34

Sullivan's Testimony ................................................................. 35

Character Evidence ................................................................... 35

Uncontradicted Expert Testimony .............................................. 36

The Paper Trail of Contemporanepous Documents ...................... 36

Motivation's So-Called "Red Flags" ........................................... 37

Witnesses Who Did Not Testify ................................................. 39

SUMMARY OF ARGUMENT .............................................................. 40

ARGUMENT ...................................................................................... 41

I.     OVERWHELMING EVIDENCE SUPPORTED THE DENIAL OF
MOTIVATION'S MOTION FOR SANCTIONS ......................... 41

There Was No Evidence of Appellees' Knowledge of Fraud in the Relevant
Time Period ........................................................................... 46

There is no Inconsistency Between the Limited Sanction Against JTR and
The Denial of Motivation's Motion as to Appellees ................... 49

II.    RECORD COUNSEL BORE ULTIMATE RESPONSIBILITY FOR THE
ADMIRALTY ACTION ........................................................... 51

III.   MOTIVATION'S APPEAL OF THE DENIAL OF ITS
RECONSIDERATION MOTION IS FRIVOLOUS ...................... 58

IV.   APPELLEES' CROSS-APPEAL ................................................ 60

CONCLUSION ................................................................................... 64

CERTIFICATE OF SERVICE .............................................................. 65

SERVICE LIST .................................................................................. 66

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Anderson v. City of Bessemer City, N.C.*,
470 U.S. 564 (U.S. 1985).................................................................. 41, 42

*Battles v. City of Ft. Myers*,
127 F.3d 1298 (11th Cir. 1997) ............................................................ 50

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991)............................................................................ 40, 41

*Cooter & Gell v. Hartmarx Corp.*,
496 U.S. 384 (1990)................................................................................ 50

*Davis v. Carl*,
906 F.2d 533 (11th Cir. 1990) .............................................................. 47

*Diaz v. First Marblehead Corp.*,
No. 14-15797, 2016 WL 736361 (11th Cir. Feb. 25, 2016)................ 44

*Feazell v. Tropicana Products, Inc.*,
819 F.2d 1036 (11th Cir. 1987) ............................................................ 58

*Gupta v. U.S. Atty. Gen.*,
556 F. App'x 838 (11th Cir. 2014)........................................................ 62

*Hiram Walker & Sons, Inc. v. Kirk Line*,
30 F.3d 1370 (11th Cir. 1994) .............................................................. 41

*In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*,
538 F.2d 180 (8th Cir. 1976) ................................................................ 62

*In re DeLorean Motor Co. Litig.*,
59 B.R. 329 (E.D. Mich. 1986)............................................................. 50

*In re Mroz*,
65 F.3d 1567 (11th Cir. 1995) ............................................ 40, 44, 45

*Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*,
141 F.3d 1434 (11th Cir. 1998) ............................................................ 44

iv

*Ip v. Henderson,*
    888 F.2d 1376 (2nd Cir. 1989) ............................................................. 50

*Jones v. Illinois Cent. R. Co.,*
    617 F.3d 843 (6th Cir. 2010) ............................................................... 44

*Kornhauser v. Comm'r of Soc. Sec.,*
    685 F.3d 1254 (11th Cir. 2012) .......................................................... 40

*Long v. Quantex Res., Inc.,*
    108 F.R.D. 416 (S.D.N.Y. 1985) ....................................................... 50

*Manhattan Const. Co. v. Place Properties LP,*
    559 F. App'x 856 (11th Cir. 2014)...................................................... 47

*Matthews, Wilson & Matthews, Inc. v. Capital City Bank,*
    614 F. App'x 969 (11th Cir. 2015)...................................................... 62

*Murray v. City of Columbus, Ohio,*
    534 F. App'x 479 (6th Cir. 2013)........................................................ 41

*Octel Communications Corp. v. Theis Research*
    132 F.3d 51 (Fed. Cir. 1997)........................................................... 8, 40

*Patterson v. Aiken,*
    841 F.2d 386 (11th Cir. 1988) ............................................................ 44

*Robinson v. Audi Aktiengesellschaft,*
    56 F.3d 1259 (10th Cir. 1995) ............................................................ 42

*Schiavo ex rel. Schindler v. Schiavo,*
    403 F.3d 1223 (11th Cir. 2005) .......................................................... 41

*Sciarretta v.* Lincoln Nat'l. Life Ins. Co.,
    778 F.3d 1205 (11th Cir. 2015) .................................................. 8, 40, 41

*SICPA Holdings, S.A. v. Optical Coating Lab., Inc.,*
    1996 Del. Ch. LEXIS 137 (Del. Ch. Oct. 10, 1996)........................... 35

*Solomon v. Liberty Cty. Comm'rs,*
    221 F.3d 1218 (11th Cir. 2000) .......................................................... 42

*Tanner v. United States,*
    483 U.S. 107 (1987)..................................................................... 50, 52

*Travelers Indem. Co. v. Gore*,
    761 F.2d 1549 (11th Cir. 1985) ........................................................... 62

*Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel*,
    546 F. Supp. 919 (S.D. Fla. 1981) .................................................... 12

*Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel*,
    569 F.2d 330 (5th Cir. 1978) ........................................................... 12

*UMG Recording, Inc. v. Bertelsmann AG*,
    479 F.3d 1078 (9th Cir. 2007) ......................................................... 61

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ....................................................... 40

*United States v. Ramirez-Chilel*,
    289 F.3d 744 (11th Cir. 2002) ........................................................ 42

*United States v. Sparks*,
    806 F.3d 1323 (11th Cir. 2015) ....................................................... 41

*Wachovia Bank N.A. v. Tien*,
    2014 U.S. App. LEXIS 24632, *10 (11th Cir. Dec. 31, 2014)............... 62

*Wolters Kluwer Fin. Servs., Inc. v. Scivantage*,
    564 F.3d 110 (2d Cir. 2009)............................................................ 18

## **Statutes**

18 U.S.C. § 1927 ................................................................................ 44

## **Rules**

Fed. R. App. P. 26.1 ............................................................................. 1

Florida Rules of Professional Conduct, Rule 4-3.3 .................................. 27

# TABLE OF DEFINITIONS

| | |
|---|---|
| Admiralty Action | *JTR Enterprises, LLC v. An Unknown Quantity, etc.*, Case No. 4:11-cv-10074-JLK (S.D. Fla.) |
| Admiralty Trial | 5-day bench trial of the Admiralty Action |
| Appeal Dismissal Motion | Appellees' Joint Motion to Dismiss Appeal |
| Appeal Dismissal Reply | Reply in Support of Appellees' Joint Motion to Dismiss Appeal |
| *Atocha* | A Spanish Galleon that had sunk in the Atlantic Ocean in the 17th Century |
| Discovery Site | Specified site in international waters in the Gulf of Mexico at which Miscovich and Elchelpp claimed to discovery the *res* |
| Dismissal Order | Order Denying Appellees' Appeal Dismissal Motion |
| Elchlepp | Steve Elchlepp, Jr. |
| Final Order | Opinion and Final Order (D.E. 199) |
| First Sanctions Hearing | Evidentiary hearing in January 2014 on Motivation's original motion for sanctions (D.E. 123) |
| Hearing | Twelve-day evidentiary hearing on the Motion |
| Horan | David P. Horan, Esq. |
| JTR | JTR Enterprises LLC |
| Jurisdictional Response | Appellees' Response to Court's Jurisdictional Questions |
| Miscovich | Jay Miscovich |
| Motion | Motivation's Amended Motion for Sanctions (D.E. |

| | |
|---|---|
| | 407) |
| Motivation | Appellant, Motivation, Inc. |
| Nondisclosure Period | December 2011 through April 2012 time period for which JTR was sanctioned by the court for failing to disclose certain information to the court |
| Opinion | Opinion and Order Denying Sanctions (D.E. 568) |
| OSC | Order to Show Cause (D.E. 451) |
| Reconsideration Motion | Motivation's Motion Under Federal Rule 52(b) for Additional Fact Finding and Under Rule 59(a)(2) and 59(e) to Alter or Amend Judgment (D.E. 573) |
| Record Counsel | Counsel of record to JTR in the Admiralty Action |
| Rodriguez | Jorge Rodriguez |
| Silverstein | Bruce Silverstein, Esquire |
| Siracusa | John Siracusa, Esq. |
| Tobia | Peter Tobia |
| Treasure Salvors | Treasure Salvors, Inc. |
| YCST | Young Conaway Stargatt & Taylor LLP |

# CITATIONS TO THE RECORD

Citations in the form "DE[•] at [•]" are to the corresponding filing in the Admiralty proceeding, *JTR Enterprises, LLC, v. An Unknown Quantity of Columbian Emeralds*, Case No. 4:11-CV-10074-JLK, and the page number, if applicable.

Citations in the form "DX[•] at [•]" are to the corresponding "Silverstein[•]" exhibit admitted into evidence at the Hearing, and the page number, if applicable.

Citations in the form "M[•] at [•]" are to the corresponding Appellant exhibit admitted into evidence at the Hearing, and the page number, if applicable.

| DE1 | Verified Complaint for Maritime Salvage, dated September 6, 2011 |
|---|---|
| DE10 | Verified Statement of Right and Interest and Claim of Motivation, Inc., dated October 16, 2011 |
| DE19 | Notice of Filing Executive Summary of Archaeological Research Design, dated October 18, 2011 |
| DE54 | Second Status Report, dated January 6, 2012 |
| DE78 | JTR Enterprises, LLC's Renewed Motion for Judgment on the Pleadings and Motion to Dismiss Intervener Claimant, Motivation, Inc.'s Verified Claim of Ownership and Memorandum of Law, dated April 5, 2012 |
| DE82 | Third Status Report, dated April 18, 2012 |
| DE92 | Minutes of June 18, 2012 Hearing |
| DE94 | Amended Verified Claim of Motivation, Inc., dated July 3, 2012 |
| DE95 | Transcript of June 18, 2012 Hearing |
| DE118 | Motivation's Motion to Dismiss Its Claim (With Reservations Relative to Post-Dismissal Actions), dated August 17, 2012 |
| DE123 | Motivation's Motion for Sanctions, dated August 27, 2012 |
| DE142 | JTR's Response and Memorandum of Law in Opposition to Motivation's Motion for Sanctions, dated October 10, 2012 |

| DE155 | Order Setting Trial, dated November 2, 2012 |
|---|---|
| DE163 | Joint Pretrial Stipulation, dated November 23, 2012 |
| DE167-1 | Deposition Transcript of Paul Sullivan, dated November 21, 2012 |
| DE172 | Order Severing Motion for Sanctions and Related Issues From Upcoming Trial, dated November 29, 2012 |
| DE199 | Opinion and Final Order, dated January 25, 2013 |
| DE244 | Transcript of November 30, 2012 Hearing |
| DE287 | Janssen & Siracusa, P.A.'s Motion to Withdraw as Counsel for JTR Enterprises, LLC and Supporting Memorandum of Law, dated October 17, 2013 |
| DE291 | Paperless Order Regarding Janssen & Siracusa, P.A.'s Motion to Withdraw as Counsel for JTR Enterprises, LLC, dated October 18, 2013 |
| DE319-1 | Transcript of October 2, 2013 Hearing |
| DE325 | Omnibus Order on Discovery Motions, dated December 10, 2013 |
| DE372 | Transcript of January 14, 2014 Hearing |
| DE373 | Transcript of January 15, 2014 Hearing |
| DE386 | Janssen & Siracusa, P.A.'s Unopposed Renewed Motion to Withdraw as Counsel for JTR and Supporting Memorandum of Law, dated February 4, 2014 |
| DE407 | Motivation's Amended Motion for Sanctions Seeking Entry of Orders Directed to Paul D. Sullivan, Bruce L. Silverstein and Young Conaway Stargatt & Taylor, LLP, Requiring Each of Them to Show Cause as to Why They Should Not be Sanctioned for Bad Faith Litigation and Other Relief (With Memorandum of Law), dated February 28, 2014 |
| DE445 | Findings of Fact and Conclusions of Law, dated June 19, 2014 |
| DE450 | Order Denying Motion for Reconsideration, dated July 10, 2014 |
| DE451 | Order to Show Cause, dated July 25, 2014 |
| DE459 | Specially Appearing Non-Parties Young Conaway Stargatt & Taylor, |

| | |
|---|---|
| | LLP's and Bruce L. Silverstein, Esq.'s Joint (I) Motion to Quash Service of Process and (II) Response and Memorandum of Law in Opposition to Motivation, Inc.'s Amended Motion for Sanctions, dated August 28, 2014 |
| DE461 | Appendix to Specially Appearing Non-Parties Young Conaway Stargatt & Taylor, LLP's and Bruce L. Silverstein, Esq.'s Joint (I) Motion to Quash Service of Process and (II) Response and Memorandum of Law in Opposition to Motivation, Inc.'s Amended Motion for Sanctions, dated August 28, 2014 |
| DE461-14 | Email From Gene Lewis, dated April 16, 2013 |
| DE461-15 | Transcript of June 10, 2013 Conference Before Chancellor Strine |
| DE478 | Specially Appearing Non-Parties Young Conaway Stargatt & Taylor, LLP's and Bruce L. Silverstein, Esq.'s Reply in Further Support of Their Joint Motion to Quash Service of Process, dated September 25, 2014 |
| DE484 | Specially Appearing Non-Parties Young Conaway Stargatt & Taylor, LLP's and Bruce L. Silverstein, Esq.'s (I) Motion to Strike Motivation, Inc.'s Improper Reply Relating to Its Amended Sanctions Motion, or, (II) in the Alternative, Motion for Leave to File a Sur-Reply, dated October 20, 2014 |
| DE488 | Order Denying Motions to Quash and Setting Final Evidentiary Hearing for November 17, 2014, dated October 30, 2014 |
| DE489 | Order Denying Motions to Strike, dated October 30, 2014 |
| DE517 | Specially Appearing Non-Parties Bruce L. Silverstein, Esq. and Young Conaway Stargatt & Taylor, LLP's Memorandum in Opposition to Motivation, Inc.'s Motion for a Ruling on the Application of Collateral Estoppel/Law of the Case, dated November 17, 2014 |
| DE528 | Order Granting Motion to Dismiss of Respondents Paul Sullivan and Young Conaway Stargatt & Taylor, LLP, dated December 2, 2014 |
| DE543 | Transcript of Day 1 of Hearing (11/19/14) |

| DE544 | Transcript of Day 2 of Hearing (11/20/14) |
| --- | --- |
| DE545 | Transcript of Day 3 of Hearing (11/21/14) |
| DE546 | Transcript of Day 6 of Hearing (12/4/14) |
| DE547 | Transcript of Day 7 of Hearing (12/5/14) |
| DE548 | Transcript of Day 8 of Hearing (12/8/14) |
| DE549 | Transcript of Day 9 of Hearing (12/9/14) |
| DE550 | Transcript of Day 10 of Hearing (12/10/14) |
| DE551 | Transcript of Day 12 of Hearing (12/16/14) |
| DE552 | Transcript of Day 11 of Hearing (12/15/14) |
| DE559 | Specially Appearing Non-Party Bruce L. Silverstein's Notice of Filing His Proposed Finding of Fact and Conclusions of Law, dated January 21, 2015 |
| DE561 | Specially Appearing Non-Party Bruce L. Silverstein, Esq.'s Post-Sanctions Trial Memorandum of Law in Opposition to Motivation, Inc.'s Amended Motion for Sanctions, dated January 21, 2015 |
| DE567 | Transcript of Day 4 of Hearing (11/24/14) |
| DE568 | Opinion and Order Denying Sanctions, dated March 16, 2015 |
| DE573 | Motivation's Motion Under Federal Rule 52(b) for Additional Fact Finding and Under Rule 59(a)(2) and 59(e) to Alter or Amend Judgment, dated April 13, 2015 |
| DE582 | Specially Appearing Non-Party Bruce L. Silverstein, Esq.'s Response and Memorandum of Law in Opposition to Motivation's Motion Under Federal Rule 52(b) for Additional Fact Finding and Under Rule 59(a)(2) and 59(e) to Alter or Amend Judgment, dated April 30, 2015 |
| DE592 | Order Denying Motivation's Motion for Additional Fact Finding and to Atler or Amend Judgment, dated August 17, 2015 |
| DE609 | Transcript of Closing Arguments (2/2/15) |
| DX1 | Post email to Barr, dated September 9, 2010 |

| | |
|---|---|
| DX2 | Appraisal Report by Josh Lents, dated December 9, 2010 |
| DX4 | Verified Complaint filed by New York Investors in Florida, dated January 11, 2011 |
| DX7 | Verified Complaint filed by New York Investors in Delaware, dated February 7, 2011 |
| DX8 | Barr email to Toppe, dated July 13, 2010 |
| DX9 | Silverstein email to Horan, dated August 19, 2011 |
| DX10 | Emails between Silverstein and Tobia, dated August 20, 2011 through September 8, 2011 |
| DX12 | Silverstein email to Horan, dated October 27, 2011 |
| DX14 | Silverstein email to Miscovich, dated November 10, 2011 |
| DX16 | Silverstein email to Elchlepp, dated January 9, 2012 |
| DX21 | Emails between Silverstein and Holloway, dated September 28, 2012 |
| YCST093 | Silverstein email to Horan and Siracusa, dated March 26, 2012 |
| YCST190 | Holloway email to White, dated April 17, 2013 |
| YCST191 | Lewis email to Morgan and Holloway, dated April 20, 2013 |
| M1-3 | Emails between Silverstein and Horan, dated March 1, 2012 |
| M1-4 | Green email to Horan, dated August 30, 2012 |
| M1-15 | Silverstein email to Horan, dated December 8, 2011 |
| M1-16 | Silverstein email to Horan, dated December 13, 2011 |
| M1-18 | Silverstein email to Stemm and McAllister, dated December 19, 2011 |
| M1-21 | Silverstein email to Horan, dated December 28, 2011 |
| M1-33 | Silverstein email to Janssen, dated October 1, 2012 |
| M2-9 | Silverstein email to Horan and Siracusa, dated March 26, 2012 |

| | |
|---|---|
| M2-28 | Silverstein email to Miscovich, *et al.*, dated January 17, 2013 |
| M2-37 | Lewis email to Janssen and Siracusa, dated December 2, 2013 |
| M2-42 | Silverstein email to Janssen, *et al.*, dated January 27, 2014 |
| M2-53 | Silverstein email to Siracusa and Janssen, dated November 23, 2012 |
| M2-54 | Silverstein email to Janssen, dated November 24, 2012 |
| M3 | Affidavit of Bruce L. Silverstein, dated October 9, 2012 (DE142-21 and 142-22) |
| M5 | Silverstein email to White, dated October 6, 2012 |
| M6 | Affidavit of Bruce L. Silverstein, dated November 4, 2013 (DE302-1) |
| M7 | Affidavit of Bruce L. Silverstein, dated December 6, 2013 (DE324-1) |
| M8 | Affidavit of Bruce L. Silverstein, dated August 28, 2014 (DE459-1) |
| M10 | Deposition Transcript of Peter Tobia, dated October 30, 2013 |
| M28 | Silverstein email to Elchlepp, dated August 11, 2011 |
| M33 | Silverstein email to Sullivan, *et al.*, dated November 20, 2012 |

# INTRODUCTION

Motivation's appeal of the denial of its motion for sanctions – which was based exclusively on the court's exercise of its discretionary "inherent powers" – is frivolous. The time has come to put an end to Motivation's baseless attacks on Appellees, YCST and Silverstein, who are a respected Delaware law firm and one of its senior partners.

After the district court provided Motivation every possible opportunity to make out a case for sanctions, Motivation failed to do so, with the court concluding:

> After nearly twelve days of taking evidence, including the testimony of eight witnesses and thousands of pages of documentary evidence, Motivation has been unable to present any evidence that Silverstein had actual knowledge of Jay [Miscovich]'s scheme to commit a fraud upon the Court prior to that scheme being revealed on January 13, 2014, the first day of the sanctions hearing in front of Judge Moore.

(DE568 at 55-56).

Motivation responded with its Reconsideration Motion (DE573), which prompted the district court to rule:

> The Court has thoroughly reviewed the 67 additional findings of fact Motivation would have the Court make, just as it thoroughly reviewed Motivation's and Respondent's Proposed Findings of Fact submitted at the close of the trial on Motivation's Amended Motion for Sanctions. The Court finds that much of these proposed findings simply repeat findings already proposed by Motivation and rejected by the Court as not supported by the record or credible witness testimony when it entered its Opinion and Order Denying Sanctions.

(DE592 at 2).

Motivation's recitation of the "facts" on appeal is rife with blatant mischaracterizations of testimony and exhibits, and littered with argumentative conclusions that Motivation misleadingly attempts to support by quoting snippets of testimony and exhibits out of context (sometimes without acknowledging that words have been excised).  Due to space limitations of this brief, Appellees cannot begin to address all of the ways in which Motivation distorts the record.  Appellees did, however, dissect Motivation's positions in 150 pages of post-hearing briefing below (DE559; DE561), which set forth a detailed account of the numerous factual and legal bases supporting the court's credibility assessments, fact-findings and ultimate denial of Motivation's Motion.  Suffice it to say that the facts as found by the district court are well supported by the record and Motivation's contrary version is not.

*     *     *

The *in rem* Admiralty Action below arose out of a claim by an amateur treasure hunter, Miscovich, that he and a diving partner, Elchlepp, found an unknown quantity of emeralds, amethyst and quartz in international waters in the Gulf of Mexico in January 2010.  On the advice of a respected admiralty attorney, JTR was formed to pursue an admiralty action to obtain title to the *res*.

Following the 5-day Admiralty Trial, the trier of fact, Hon. James Lawrence King, denied JTR's claim for relief, finding that "there is just as much support for the theory that [Miscovich] and [Elchlepp] planted the stones as there is for the assertion that they found them." (Final Order at 22-23).  The entry of the Final Order normally

would be the end of the matter in the district court. In this case, however, there ensued an unprecedented and byzantine set of post-trial proceedings with respect to a series of sanctions motions filed by Motivation – a "non-party" that had injected itself into the Admiralty Action as an intermeddler by a false and later abandoned claim to ownership of the *res*, and remained in the case to seek sanctions against JTR, Miscovich and Elchlepp, and a number of other "non-parties" (including Appellees), claiming they all knowingly participated in an attempted "fraud on the court."

The First Sanctions Hearing (before Chief Judge Moore) occurred a year after the Final Order. During that hearing, JTR's Record Counsel (and Appellees) learned, for the first time, that a jeweler claimed to have sold Miscovich 80 pounds of uncut emeralds between March and September of 2010. Based on the jeweler's testimony, the district court concluded that Miscovich used the emeralds to "salt" the Discovery Site in a scheme to defraud future investors and the Court. (DE445). The court ruled that Miscovich would be required to pay Motivation's attorneys' fees and expenses from the date Motivation first injected itself into the Admiralty Action until the date of Miscovich's death a few months before the First Sanctions Hearing. (*See id.*).

This appeal concerns the district court's eventual denial of sanctions against Appellees, who were JTR's "general outside counsel" and Miscovich's counsel in a Delaware Litigation (along with Davis Levin Livingston, who (i) brought the representation of Miscovich to Appellees, and (ii) continued to represent Miscovich throughout the course of the Admiralty Action, *see* M3 at ¶ 15 & n.3). Far from

establishing that Appellees knew Miscovich committed a fraud, the Hearing record established that Appellees are honorable counsel, who consistently represented JTR in a professional manner.

Motivation elected to call only three witnesses at the Hearing:

- Rodriguez, the jeweler who claimed to sell Miscovich 80 pounds of emeralds;

- Horan, who was (i) Miscovich's attorney beginning in March of 2011, and (ii) JTR's Record Counsel in the Admiralty Action from its commencement until two months before the Admiralty Trial; and

- Siracusa, who was (i) Horan's co-counsel during most of the Admiralty Action, (ii) JTR's lead counsel at the Admiralty Trial, and (iii) JTR's lead counsel at the First Sanctions Hearing.

Not one of Motivation's witnesses supported Motivation's claim that Appellees knowingly participated in any fraudulent activity, and both Horan and Siracusa testified that neither they nor Appellees knew of Rodriguez's sale of emeralds to Miscovich, or otherwise knew Miscovich fabricated the emerald discovery, until Rodriguez first told that story a year after the entry of the Final Order.

Furthermore, Silverstein testified at length at the Hearing, and he consistently and credibly denied any knowledge that Miscovich committed fraud prior to the time Rodriguez first surfaced a year after the entry of the Final Order. Silverstein's testimony is consistent with the contemporaneous documentary evidence submitted at the Hearing, which contained the candid comments of Silverstein and others who understood their communications to be privileged when made, and which shows that

Appellees were ethically representing their clients and consistently looking for the truth, not trying to cover it up. Sullivan's testimony was the same.[1]

The Hearing record reflects that Silverstein (i) is a member in good standing of the Delaware Bar, (ii) has been an attorney for approximately 30 years, with a practice predominantly focused on corporation law; (iii) has received professional recognition with respect to his practice in the Delaware Court of Chancery and corporate matters; and (iv) has earned the respect of judges and his fellow attorneys. (*See* M3 at ¶¶ 3-6; DE546 at 112:5-11, 113:1-13, 114:12-25). In that regard, William Chandler (the former chief judge of the Delaware Court of Chancery) testified that he found Silverstein had consistently represented his clients "to the highest standards of the Delaware Bar." (DE544 at 215:14-216:6).

The denial of Motivation's Motion was based on the district court's credibility assessments and fact findings. Motivation conceded below, and concedes on appeal, that the "clear and convincing" standard of proof applied to the Motion. Motivation did not even begin to satisfy that standard.

---

[1] As discussed more fully in Appellees' Motion for Sanctions on Appeal (filed concurrently with this brief), the Hearing record also shows that (i) Motivation filed what everyone, including the district court, knew to be a baseless claim in the Admiralty Action, and (ii) Motivation's purpose in seeking sanctions against Appellees was to dig into a "deep pocket" to pay Motivation's attorneys' fees, regardless of the means by which those fees were pursued.

## **STATEMENT OF JURISDICTION**

For reasons addressed in Appellees' Appeal Dismissal Motion, this Court lacks subject matter jurisdiction to adjudicate the merits of Motivation's appeal because Motivation lacked standing to assert a claim for sanctions in the first instance. (*See* Appeal Dismissal Motion at 1-10, 20; Appeal Dismissal Reply at 2 n.2, 7-8). Based on Motivation's lack of standing below, all rulings that followed the Final Order should be vacated *nunc pro tunc*.

Assuming (*arguendo*) that Motivation does have standing to appeal the denial of the Motion, Appellees agree this Court has subject matter jurisdiction over all issues raised on Motivation's appeal and Appellees' cross appeal.

## STATEMENT OF THE ISSUES

### On Motivation's Appeal

Whether the district court committed an "abuse of discretion" ***and*** committed "clear error" in denying Motivation's Motion, which was premised exclusively upon the court's discretionary exercise of its "inherent powers," and which required Motivation to prove by "clear and convincing evidence" that Appellees knowingly participated in a fraud on the court.

### On Appellees' Cross Appeal

Whether Motivation had standing to pursue sanctions in the district court, and whether the court properly exercised subject matter and personal jurisdiction over Appellees, who were (i) ***not*** counsel of record for any party in the Admiralty Action, (ii) ***not*** parties to the Admiralty Action, and (iii) ***not*** served with legally valid process in connection with the Admiralty Action.

Whether the court erred in granting Motivation attorneys' fees against JTR and Miscovich and in compelling the production of numerous privileged documents.

# STANDARD OF REVIEW

As a general matter, the standard of appellate review of a ruling on sanctions is "abuse of discretion." *See, e.g., Sciarretta v. Lincoln Nat'l. Life Ins. Co.*, 778 F.3d 1205, 1212 (11th Cir. 2015). Additionally, where the denial of sanctions is based on credibility assessments and fact findings following an evidentiary hearing, the appellant must prove "clear error" to prevail on appeal. *See, e.g., id.* at 1213. Further, because Motivation bore the onerous burden of proving its entitlement to sanctions by "clear and convincing evidence," an elevated standard of proof, making the district court's rejection of Motivation's claim all the harder to reverse. *See, e.g., Octel Commc'ns Corp. v. Theis Research*, 132 F.3d 51 (Fed. Cir. 1997) (a decision that a party failed to prove its entitlement to relief by "clear and convincing evidence" is "highly factual and thus is largely immune from appellate review"), *disposition reported at* 132 F.3d 51.

The issues raised by Appellees' Cross-Appeal are largely questions of law, subject to *de novo* review. (*See, e.g.*, Appeal Dismissal Motion at 8, 11, and 20) (citing decisions).

## STATEMENT OF THE CASE

Following the twelve-day Hearing, the court issued its 58-page Opinion denying Motivation's Motion based on the court's finding that Motivation failed to prove by clear and convincing evidence that Appellees knowingly participated in a fraud on the court by Miscovich. (*See generally* DE568).

Silverstein provided the only direct testimony on the subject of Appellees' knowledge and intent. Silverstein testified at length as to Appellees' good faith and lack of knowledge that Miscovich had purchased any of the emeralds he claimed to have discovered prior to January 13, 2014 – *i.e.*, the date that Silverstein both (i) first learned Rodriguez claimed to sell emeralds to Miscovich, and (ii) immediately encouraged JTR's Record Counsel to promptly disclose that information to the court. Silverstein's testimony was supported by numerous contemporaneous e-mails – which bear a hallmark of truth, as they were written with an expectation of privilege.

The other witnesses who testified at the Hearing similarly attested to Appellees' lack of knowledge of any fraud on the court prior to January 13, 2014. Horan provided undisputed testimony of his own diligent pre-filing investigation before the Admiralty Action was commenced, and specifically testified that he and Appellees were unaware that Miscovich purchased any of the emeralds he claimed to have discovered prior to January 13, 2014. Siracusa testified as to his own acceptance of the genuine nature of the emerald discovery based on the information that was known at the time of the Admiralty Trial, and also testified that he (like Appellees) was

unaware that Miscovich purchased any of the emeralds he claimed to have discovered prior to January 13, 2014. Sullivan similarly testified.

Additionally, (i) testimony and evidence was provided as to Silverstein's good character and reputation (including an affidavit and testimony by the former chief judge of the Delaware Court of Chancery), and (ii) an expert witness (a former President of the Florida Bar) testified on behalf of Appellees.

Ample testimony and evidence supported the court's finding that Motivation failed to prove by clear and convincing evidence that Appellees knowingly participated in any fraud on the court. While Motivation asks this Court to make different credibility assessments and fact-findings on appeal, the applicable standards of appellate review do not so permit. Far from showing "clear error" by the district court, Motivation's appeal is so flawed that Motivation should be sanctioned by this Court (as shown in Appellee's Motion for Sanctions on Appeal).

## PROCEDURAL HISTORY AND BACKGROUND

### Phase I: Admiralty Action

Horan – one of the top admiralty lawyers in the country – was Record Counsel in the Admiralty Action from its commencement until a couple months prior to the Admiralty Trial. Horan had represented Miscovich for six months prior to commencing the Admiralty Action, and had informally advised Miscovich before that. Horan was counsel for JTR from the time it was formed on Horan's advice. (*See generally* M8 at ¶ 19; M7 at ¶ 5).

Horan conducted an independent investigation of Miscovich's claim, which included a personal dive of the Discovery Site. (DE543 at 41-44, 56-58, 141-147). Based on his investigation, Horan drafted the complaint in the Admiralty Action without input from Appellees, and signed the complaint. (*See* DE1; M8 at ¶ 30).

A few months after the Admiralty Action was commenced, JTR ran out of funds to pay Horan an agreed monthly retainer. (*See* DE547 at 96, 101, 108; M8 at ¶¶ 28, 72). Siracusa, who agreed to work on a pure contingency fee basis, was engaged to assist Horan in the Admiralty Action, with Horan continuing to make court appearances and serving as lead Record Counsel. When Horan later withdrew from representing JTR, Siracusa's firm stepped up to the role of lead Record Counsel. (DE544 at 218; 274).

## Motivation's Fictitious Claim to Ownership

Motivation injected itself into the Admiralty Action, claiming ownership of the *res* based on an assertion that it had been cargo on the *Atocha* and had floated in a barrel against prevailing currents to the Discovery Site, which Motivation conceded to be "26 to 30 nautical miles" away from the northern-most point of the *Atocha* wreck site and "injunctive area." (DE10 at ¶ 4; DE94 at ¶ 3). Motivation's claim was both factually fanciful and legally baseless. (*See generally* Appeal Dismissal Motion at 3-4; DE561 at 31-33; DE559 at ¶¶ 70-72; DE459 at 36-40; DE142 at 3-4 & nn. 5-6). Horan derided Motivation's fanciful tale from the moment it was made. (*See* DE543 at 77; M3 at ¶¶ 41-47; M8 at ¶¶ 36-43). Judge King concurred, stating: "They did not believe the emeralds floated over in a barrel. Nobody believes they floated over. Mr. Fisher [owner of Motivation] doesn't believe they floated over in a barrel. . . It's pretty miraculous if he did." (DE544 at 328).[2]

The court dismissed Motivation's claim. (DE92 at 2; DE95 at 48-49). Thereafter, Motivation filed an amended claim, based on an equally unsupported theory of possible theft of *Atocha* emeralds by Miscovich. (*See generally* DE94; M8 at ¶ 86). Motivation eventually conceded that it lacked any ownership interest in the

---

[2]    As to the legal issue, following *Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel*, 569 F.2d 330, 335 (5th Cir. 1978), the court in *Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel*, 546 F. Supp. 919 (S.D. Fla. 1981), limited Treasure Salvors' rights to a specified area that Motivation conceded to be more than 25 nautical miles from the Discovery Site. (*See generally* DE78) (JTR's motion to dismiss, which details the legal defect of Motivation's claim) (*See also* M8 at ¶ 37).

*res*, and moved to voluntarily dismiss its amended claim. (DE118). Even as it did so, however, Motivation sought sanctions, claiming Miscovich's "find" was a "fraud on the court." (DE123).

Stating it would "take very seriously" Motivation's allegations, the court conducted "a formal trial to determine (a) whether Plaintiff JTR can prove it was the first, genuine finder of the *res*, or whether JTR perpetrated a fraudulent 'find' in order to create a federal admiralty claim and potentially legitimize stones that are otherwise not relevant to the traditional admiralty concept." (DE155 at 4). The court deferred the issue of sanctions. (DE172). Following a 5-day bench trial, the court found:

> When all is said and done, there are two options: Jay and Steve legitimately found lost stones on the floor of the Gulf, or Jay and Steve placed stones acquired elsewhere on the ocean floor in order to 'find' them and thereby establish an ancient provenance and greatly enhance the value of the stones and the reputation of the men as treasure salvors. **There is just as much support for the theory that Jay and Steve planted the stones as there is for the assertion that they found them.**

(Final Order at 22) (emphasis added).

### Phase II: The "First Sanctions Hearing"

Due to an illness suffered by Judge King, the matter was transferred to Chief Judge Moore, who conducted the First Sanctions Hearing. Before that, Motivation engaged in extensive post-trial discovery. Because Appellees were neither parties nor Record Counsel for any party in the Admiralty Action, they (i) did not participate in the First Sanctions Hearing; (ii) did not cross-examine any witnesses (at depositions or otherwise), request or subpoena documents, or otherwise participate in the

proceedings (other than to object to subpoenas served on Appellees in the District of Delaware); or (iii) did not develop the record in a manner of their choosing at the First Sanctions Hearing. (DE550 at 44, 75).[3]

Nearly a year following the Final Order, Chief Judge Moore conducted the First Sanctions Hearing. Miscovich was deceased by that time, and was tried *ex parte* and *in absentia*. JTR was represented by Record Counsel who had sought leave to withdraw, but were required to defend the hearing over their objection. At the First Sanctions Hearing, Rodriguez testified that he had sold Miscovich 80 pounds of

---

[3] Although the court found that Silverstein "substantially controlled" JTR's actions in the Admiralty Action (Opinion at 55), that finding did not extend to the period following entry of the Final Order. Following entry of the Final Order, Appellees were acting to defend Silverstein's conduct, and not to pursue any claim by JTR in the district court. The record is clear that the Siracusa firm, as JTR's Record Counsel, were solely responsible for JTR's defense in the post-trial sanctions proceedings (and nobody defended Miscovich). (DE550 at 44, 75). Motivation produced no contrary evidence, and the court made no finding that Silverstein controlled any actions in the Admiralty Action beyond the entry of the Final Order.

The court's finding of control also was limited to the time before Horan's withdrawal as Record Counsel, as the finding was premised on the terms of Horan's engagement letter, which required Horan to consult with Silverstein in certain specified circumstances. (*See* M25). The Hearing record did not contain Siracusa's engagement letter (which was very different from the letter with Horan), but Siracusa made clear to Judge King that Silverstein was not JTR's counsel with respect to the Admiralty Trial, and the court ordered that Silverstein be sequestered at that trial. (*See generally* DE244 at 68:16 to 69:15 (argument and ruling on issue); 69:2-3 (Siracusa informing Judge King that Silverstein "doesn't represent the parties in this litigation")) (*See also* M8 at ¶¶ 73-105 (showing that Siracusa was in charge, and Silverstein was largely disregarded). Plainly, Silverstein did not control JTR's conduct of the Admiralty Trial.

emeralds between March and September of 2010,[4] leading Chief Judge Moore to conclude that "by purchasing the emeralds and then 'finding them' at the bottom of the ocean, Miscovich engaged in a fraud to vastly increase their value as purported 'sunken treasure.'" (DE445 at ¶¶ 2-3). Chief Judge Moore found that Miscovich's fraud was not proved until Rodriguez testified. (*Id.* at ¶ 69). Additionally, Chief Judge Moore made the following uncontested finding:

> Miscovich managed to successfully convince his investors, **lawyers**, employees of the Smithsonian, appraisers, jewelers, family, friends, the general public, and many others, including investigative reporters from CBS' *60 Minutes*, that he had discovered and recovered this treasure from the seafloor in early 2010.

(*Id.* at ¶ 67) (emphasis added).

With respect to JTR, Chief Judge Moore identified Motivation's various contentions as follows:

> Motivation contends that it is entitled to sanctions against JTR because this action was litigated "at all costs," even after a reasonable person would have known that the case was based on a fraud. . . . Motivation further contends that the underlying litigation could have been concluded in December 2011 if JTR had revealed expert reports that indicated that the Emeralds were coated with a modern epoxy, which would exclude the Emeralds coming from either the *Atocha* or the *Margarita*. . . . Finally, Motivation claims that, had JTR allowed Motivation to view the Emeralds immediately, Motivation would have quickly concluded, as it did when it finally viewed the Emeralds in August 2012, that the Emeralds did not come from its ships and it would have withdrawn its claim.

---

[4] Rodriguez's testimony was both (i) contrary to what Rodriguez previously had told JTR's Record Counsel, and (ii) unsupported by any documentary evidence. Nonetheless, JTR's Record Counsel made no serious effort to cross-examine or impeach Rodriguez.

(*Id.* at ¶ 5) (citations omitted).

Chief Judge Moore rejected Motivation's contentions, and declined to sanction JTR for anything beyond "Motivation's attorneys' fees and costs, for the period of time from December 2, 2011, to April 18, 2012." (*Id.* at ¶ 61). As Chief Judge Moore explained:

> While Motivation entered the case in October 2011, the Court does not find that sanctions as of this date would be appropriate against JTR. While Motivation claims that it would have quickly exited the case, had they been allowed to inspect the Emeralds, there was a lot of distrust between JTR and Motivation. . . . The Court thus finds that the sanctionable conduct began when JTR withheld information from the Court, not when Motivation made the decision to enter the case. According to the testimony presented at the hearing, JTR did not learn about the epoxy until December 2011.

(*Id.* at ¶ 62 n.16).

Chief Judge Moore further determined that April 18, 2012, was an appropriate cutoff date for sanctions against JTR, reasoning that:

> JTR, the Court, and Motivation were working from the same set of facts. ***Thus, when Motivation soon thereafter filed its Amended Claim, Motivation made an informed decision to stay in the case.***"

(*Id.* at ¶¶ 64-65) (emphasis added).

### Phase III: Motivations' Failed Motion For Sanctions Against Appellees

Following the First Sanctions Hearing, Motivation filed a motion for sanctions against Appellees. (DE407). Motivation did not contend that Appellees knew of any fraud when the Admiralty Action was commenced, but argued that Appellees should

have ceased to represent their clients when alleged "evidence of fraud" later emerged. (*Id.* at 6-7).

Motivation did not tell the court what Motivation's internal emails revealed: Motivation **knew** there was no evidence of Appellees' knowledge of any fraud, but that (i) Motivation targeted Appellees because they were "a deep pocket," and (ii) Motivation was "rely[ing] on their desire to settle and not be dragged thru a messy highly publicized trial." (*See* DE559 at 47, 49; DE459 at 11-13).

The court, now Hon. James Lawrence King, accepted Motivation's invitation for an inquisition of Appellees' knowledge by an Order to Show Cause. (DE451). Appellees filed a Motion to Quash, an Opposition to Motivation's Motion, and a Motion to Strike certain new issues raised by Motivation a few weeks prior to the Sanctions Hearing. (DE459, DE461, DE478, DE484). Among other things, Appellees' filings raised substantial issues of subject matter jurisdiction and personal jurisdiction.[5] Judge King denied Appellees' motions (DE488, DE489), and Appellees were required to defend Motivation's Motion (including new issues raised at the eleventh hour) without any discovery of their accuser or its witnesses.

At the completion of Motivation's presentation of its evidence at the Hearing, the district court denied Motivation's Motion as to YCST (and Sullivan) finding

---

[5]    Prior to the Hearing, Appellees also argued to the court that they were being denied due process, based, among other things, upon Appellees' lack of any discovery. (*See* DE517 at 6 n.3 and 11 n.4).

Motivation's evidence wholly insufficient. (DE528).[6] The court later issued its 58-page Opinion denying Motivation's Motion as to Silverstein, finding that Motivation failed to prove by clear and convincing evidence that Silverstein knowingly participated in a fraud. Motivation filed its Reconsideration Motion, which urged the court to adopt dozens of additional findings. (*See* DE573). That motion was denied with the statement that the proposed findings were "not supported by the record or credible witness testimony." (DE592 at 2).

---

[6]     Although Motivation's efforts on appeal are concentrated on Silverstein (as they were below), Motivation also appeals the dismissal of its Motion as to YCST following the presentation of Motivation's evidence. That aspect of Motivation's appeal is equally frivolous given that the only evidence introduced by Motivation prior to dismissal was that Silverstein is a partner at YCST and a member of the firm's management committee. *See, e.g.*, *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009) (lawyer's bad faith could not be "visited" upon his employer law firm); *accord* Gregory P. Joseph, Sanctions: The Federal Law of Litigation Abuse § 27 (2015) ("Bad faith is personal to the offender. One person's bad faith may not be attributed to another by operation of legal fictions or doctrines such as respondeat superior or vicarious liability").

## STATEMENT OF THE FACTS

What follows is a summary of the detailed record that is summarized in far greater detail in DE559 and DE561. Consistent with the governing standard of review on appeal (discussed herein below), the facts are stated in the light most favorable to Appellees as the prevailing party.

### Appellees' Acknowledged Good Faith

In Motivation's opening argument below, it acknowledged Appellees' good faith at the inception of the Admiralty Action:

> We do not doubt that when they got involved, they believed it was genuine. In fact, Mr. Silverstein personally invested funds in the project. Mr. Sullivan invested funds in the project. Young Conaway has invested a large amount of time and lawyer resources in the project. ***And we don't believe they would have done that if they thought it was a fraud.***

(DE543 at 9:6-12) (emphasis added). Consistent with this concession, and undisputed testimony of Silverstein and others, the court found:

> [W]hen Silverstein first began representing Jay in January of 2011, he did not know that Jay's story was a fraud. In fact, he was presented with circumstantial evidence that seemed to support Jay's story of discovery of a valuable find [and] the genuineness of that find.

(Opinion at 56, *see also id.* at 16-21).

Before Appellees ever met or knew of Miscovich, a group of "New York Investors" – represented by large and well-known law firms (Willkie Farr & Gallagher, Colson Hicks Eidson, and Morris Nichols Arsht & Tunnell) – had filed actions in Florida and Delaware seeking "their rightful share of unique and very valuable treasure" discovered by Miscovich. (DX4 at ¶¶ 1, 6; DX7). In that litigation,

the New York Investors – who has investigated Miscovich's discovery in 2010 – filed affidavits in which they asserted that Miscovich had discovered "sunken treasure, namely emeralds and other gemstones." (Opinion at 19) (*See also* M3 at ¶¶ 15-17; M8 at ¶¶ 11-12). Thus, the matter in which Appellees were engaged to represent Miscovich was a dispute over "who owns" this "amazing and valuable emerald find." (*Id.* at 17). This "contributed to [Silverstein's] own belief in the legitimacy of Jay's find." (Opinion at 19).

One of the New York Investors was particularly impressed by a meeting with Jeffrey Post, Ph.D., Curator of the National Gem and Mineral Collection at the Smithsonian Institute, whose excitement about the discovery was palpable. Post said that that viewing the emeralds was "a once in a lifetime experience" and he wanted to set up a "major display" at the Smithsonian "near the Hope Diamond." (DX1; DX8). Additionally, Post examined some of the emeralds with an electron microscope and found microscopic traces of gold, silver and copper that were "consistent with the idea that these emeralds were on the seafloor associated with gold objects for some period of time." (Opinion at 17-18; DX1). Silverstein confirmed these communications and observations directly with Post. (DE546 at 133; M3 at ¶¶ 11-13).

Silverstein also met with an independent appraiser, Josh Lents, in February 2011. Lents had (i) placed a value of more than $100,000 on just twenty-three of the thousands of emeralds in Miscovich's possession, (ii) found one "specimen" was so rare that he would not even attempt to value it, and (iii) reported that the emeralds

were not treated with oil or other substances (which was consistent with the Smithsonian's investigation, using an electron microscope). (*See* DX2; M3 at ¶ 11; DX1). Silverstein also met with a gemologist at Sotheby's, who appraised one emerald at $40,000. (M3 at ¶ 34). A later appraisal estimated the emeralds' value at between $5 million and $10 million. (DE544 at 280).[7]

### Horan's Pre-Filing "Reasonable Investigation" and Post-Filing Follow-Up

Shortly after being engaged to defend Miscovich in the Delaware Litigation, Appellees advised Miscovich to retain counsel with experience in admiralty matters to advise him on the proper manner of handling his discovery. (*See* DE546 at 115; M8 at ¶ 15). Accordingly, Miscovich engaged Horan. It is undisputed that Horan is a distinguished, ethical and experienced admiralty lawyer. Indeed, there may have been no attorney in the Southern District of Florida more qualified than Horan to advise Miscovich on admiralty matters.

At the Hearing, Horan testified at length as to his pre-filing investigation. Among other things, Horan personally interviewed Miscovich and Elchlepp in Key West (outside of Silverstein's presence) and prepared the papers needed to commence and pursue the Admiralty Action. (M6 at ¶ 27; M8 at ¶ 29). Horan personally conducted what he called a "sanity dive" of the Discovery Site as part of his "due diligence." (DE543 at 57-58, 141). Horan found numerous emeralds at the site and

---

[7]     A more complete discussion of Silverstein's reasons for believing Miscovich had truly discovered emeralds in the Gulf of Mexico appears at DE559 at ¶¶ 9-30 and DE561 at 10-18.

testified that "I believed they had been down there and there was not a real question in my mind as to whether they had been salted onto the site." (*Id.* at 58). After conducting his "sanity dive," Horan called Sullivan and Silverstein to share his excitement about the discovery:

> [Horan] was excited, he was extremely excited – he said he was excited, I'm not just taking that from his words, but he said he was excited, he said it was the real deal, and that he had had concerns prior to that, but that this was a genuine site. He couldn't find a wreck but there were emeralds and he was satisfied that this was a genuine claim and that he should go forward with it . . . .

(DE547 at 12-13). Horan's account "gave [Mr. Silverstein] great comfort." (M3 at ¶ 40; M8 at ¶ 31) (*See also* DE547 at 13:18-23).

Horan "dove the site multiple times" thereafter, and told Mr. Silverstein each time that "he was extremely excited this was a real deal – this was the real deal." (DE548 at 34:2-8). On one of Horan's visits to the Discovery Site, Silverstein accompanied Horan and a crew of persons from CBS News and 60 MINUTES, and witnessed Horan dive into the water and come up with a number of emeralds. As Silverstein wrote in an affidavit in the Hearing record:

> Horan was very excited. He climbed onto the boat with an emerald between his teeth (of which I snapped a picture), and he said something to the effect of "Mark that one for me for when we get title."

(M8 at ¶ 32) (*See also* M3 at ¶ 8).

Thus, Horan "was an independent witness that was vouching for the genuineness of the site." (DE547 at 13:19-23).

Horan also retained Duncan Mathewson, a qualified archaeologist, who prepared a report stating among other things, that (i) more than 10,000 gems had been recovered; (ii) the gem assemblage "clearly represents a cargo loss at sea"; and (iii) "[d]ue to the lack of any diagnostic artifacts, it is impossible at this time to historically identify this site with any particular shipwreck." (DE19 at 5, 6, 9; M-12).[8]

Based on the foregoing, when collateral issues arose as to non-Spanish coins and a new "20 pound group" of emeralds, it did *not* cause Horan to conclude that Miscovich had faked the discovery of the emeralds. (DE543 at 141).[9] Indeed, Horan testified at the Hearing that his ability to ethically pursue the Admiralty Action was not impaired by either of these events. (*Id.*) Like Silverstein, Horan did not view

---

[8] The record reflects that Horan did not consult with Silverstein respecting the archeological report Horan filed in conjunction with the first status report, and which Silverstein did not even see until after Horan filed it with the court. (M7 at ¶ 20; M8 at ¶ 34; DE543 at 146).

[9] Motivation's brief also spends a good deal of time on Tobia, who did not testify at the evidentiary hearing (or any other hearing). Tobia had raised vague questions as to Miscovich's find with Silverstein in August 2011. Silverstein, like Horan and others, found Tobia "untrustworthy" and an "extortionist" who would never answer questions directly. (DE546 at 177, 198; DX10; M6 at ¶¶ 41-46; M8 at ¶¶ 21-27). As such, Tobia's vague statements did not deter Horan's filing or pursuit of the Admiralty Action as JTR's Record Counsel – and Motivation takes no issue with Horan, and Judge Moore expressly found that Horan's actions were entirely proper. (DE373 at 131-32). Moreover, when Tobia eventually was deposed (many months after the trial of the Admiralty Action and outside Appellees' presence), Tobia denied having any personal knowledge of the actual circumstances of Miscovich's and Elchlepp's discovery. (*See* M10 at 101:8-14) ("I have no way of knowing. Only two human beings I know of know the truth, Jay and Steve").

these incidents as disproving Miscovich's claimed discovery – as there was no ready explanation for how Miscovich came to possess thousands of emeralds.[10]

In December 2011, Horan learned that certain testing revealed that some emeralds had a "modern material" (possibly epoxy) on them. (DE546 at 212; M1-15). While Silverstein was "troubled" by the "mystery" of these finding, he also knew that there were a number of potential explanations that were consistent with Miscovich having discovered the emeralds in the Gulf of Mexico – as Miscovich consistently and unshakably claimed to be the case. (*See generally* M3 at ¶¶ 71-84). Among other things, the "modern substances" could have gotten on the emeralds in the process of cleansing them (using detergent, turpentine and other modern substances – and in a basin also used to clean motor parts, no less). (DE547 at 38; DE549 at 120-121). If that were the case, the emeralds still could have been from a Colonial-era wreck. Additionally, there were no less than three other alternatives being explored that were consistent with Miscovich having discovered more modern emeralds in the Gulf of Mexico. Among other things, (i) Sullivan's research indicated that the gems could have come from a 20th Century shipwreck, the *Luckenbach*, which was located in the same vicinity as the Discovery Site (DE543 at 106-108; DE550 at 160-161, 172-174); (ii) Horan had learned of a "shrimp boat" that had been found with emeralds in the vicinity of the Discovery Site thirty years prior (DE548 at 14; DE550 at 171-172); and

---

[10]     Even Rodriguez's testimony did not account for the Smithsonian's observations or the various appraisals that placed a value of multiple millions of dollars on the emeralds. (*See* DE544 at 280).

(iii) Horan also had heard stories of drug runners and other smugglers ditching their cargo in the Gulf of Mexico to avoid detention by the authorities (DE548 at 14; DE550 at 171-72). Based on these various theories – all of which were actively explored and investigated over the following months – everyone agreed that the presence of modern material on some gems "does not disprove anything that Jay and Steve have said" (M1-21) and there was no "conclusive proof that Jay has been untruthful in the statements made in court filings." (M-15) (*See also* M3 at ¶¶ 71-73; M7 at ¶¶ 16, 18, 20).[11]

At Horan's request, Silverstein and Sullivan "cross-examined" Miscovich on the issues. (DE547 at 27). The result was an email communicated to Horan and others in which Miscovich reaffirmed that the discovery was genuine despite being warned that "there are serious consequences resulting from making false statements to a federal court." (M1-16). Nonetheless, in an effort to get "to the bottom of" the issue, Silverstein contacted CBS News and arranged for further testing and investigation – all of which would paid for and conducted by CBS News, which was conducting its own independent investigation of Miscovich's claimed discovery (and ultimately aired a positive story). (M1-18; DX16; M3 at ¶¶ 74-76; M8 at ¶¶ 58-61).

---

[11] The complaint contained no allegations respecting the origin, quality or value of the *res*, only its "find" by Miscovich. (*See generally* DE1 at ¶¶ 3, 5-6; M8 at ¶ 30). The Pretrial Stipulation similarly acknowledged that JTR "has made no claim in this action as to the origin or original ownership of the Salvage Material; and JTR has made no claim in this action as to the value of the Salvaged Material." (DE163 at 5) (*see also* M3 at ¶¶ 94-95).

Plainly, these are not the actions of someone seeking to cover up a fraud. (*See* M6 at ¶¶ 38-39).

There were emails over the next few months in which Horan, Silverstein and others debated the timing of the disclosure of the "modern substances" to the court – which everyone agreed would occur once the significance of the information was fully understood. (*See* M8 at ¶¶ 58, 63-71). Ultimately, Horan agreed to a plan of action in which he would make an additional dive at the discovery site and send the gems for new testing (with no issue of whether a modern substance was added in the cleaning process) and would file a second status report with the court indicating that testing was ongoing. When final results were obtained, they would be filed with the court along with the initial reports in a third status report. Horan did just that, and testified that this course of action, including the filing of the second status report (DE54) and third status report (DE82), complied with his professional duties as Record Counsel. (DE543 at 136, 149). When Elchlepp balked at making another dive to satisfy what he claimed to be baseless suspicions, Silverstein insisted that there be "one more dive" for fresh samples, and stating that "it does not matter what the further testing shows"—"we just need to know the answer – one way or the other." (DX16; M8 at ¶ 65).[12]

---

[12]  In this email, Silverstein stated the obvious to Elchlepp that it would be better if the full tests found "no coating" (which would make the gems more likely to be colonial gems, as everyone had believed), and the court properly rejected Motivation's cynical inference that this comment was "code" that Elchlepp

While Motivation was critical of the second and third status reports, Horan filed them with the court and testified that they were proper and fully satisfied his professional obligations as Record Counsel. (DE543 at 135-36). While Horan testified as to personal friction with Silverstein, Horan described the efforts of all counsel involved (including Silverstein) as "always an effort to keep digging for the truth." (Id. at 163).[13] Horan added: "***don't take any of my comments as saying that I believe that Bruce Silverstein or his firm was involved in faking where those emeralds came from. I think that they were just as taken in as I was from the git-go.***" (Id. at 163-64) (emphasis added). Horan further testified:

> [Miscovich] certainly convinced me early on that this had occurred. Being straightforward, I think he probably convinced Mr. Silverstein. I think he convinced Mr. Sullivan and other people that this was a legitimate find because none of us could figure out where the heck they came from unless he was telling the truth.

(*Id.* at 165).

---

should salt the Discovery Site with untreated emeralds, much less "clear and convincing evidence" that Silverstein was suggesting that Elchlepp do something untoward.

[13] The Hearing record shows that each time that Horan and Silverstein disagreed on something, either Horan prevailed or Silverstein persuaded Horan as to the wisdom of Silverstein's position. The Hearing record further reflects that Silverstein did not and could not command or compel Horan to do anything, much less violate his duties to the court as Record Counsel. Horan acknowledged that all final decisions were his to make as Record Counsel, (DE543 at 132; DE319-1 at 154:9-14), and Silverstein agreed (*See, e.g.,* DX12, DX 14, M2-9; M6 at ¶ 29). In any case, the undisputed testimony of both Horan and Russomano, an expert witness on legal ethics, was that all actions in the case were ethical and proper.

By February 2012, JTR ran out of funds to pay Horan's monthly retainer. (M1-21). Siracusa entered the case as co-counsel for Horan, and was willing to accept the case on a contingency basis due to the perceived high value of the emeralds. (DE544 at 218, 295). Although Horan remained as lead Record Counsel, making all important court appearances for JTR for many months thereafter, Horan ultimately withdrew from the representation. While Motivation claims that Horan withdrew due to proof that Miscovich had committed fraud, that is not what Horan told Silverstein or the court. Had Horan been persuaded that Miscovich's claimed discovery was a fraud, Horan would have been required to have informed the court of that conclusion, and would have done so. *See* Florida Rules of Professional Conduct, Rule 4-3.3 (Candor Toward the Tribunal). Indeed, that is what Horan told Silverstein. (See DE549 at 152:10-14). The sum and substance of Horan's testimony (and actions) is that the pursuit of the Admiralty Action was proper and ethical at all times in which he was involved as JTR's Record Counsel, and that his withdrawal did not result from his discovery of any fraud by Miscovich. (See, e.g., DE543 at 57-58, 132-33, 141, 166-167; M7 at ¶ 8 (quoting Horan's deposition testimony)). That did not occur until Rodriguez's testimony more than a year later. (DE543 at 166-167).[14]

---

[14]     Motivation's Brief discusses M1-4, which is a cover e-mail and memo from Horan to Sullivan, dated August 30, 2012, which Motivation claims to establish that Appellees must have known that Horan's withdrawal was prompted by his belief that Miscovich had committed fraud. (*See* Motivation's Brief at 20-21). Aside from the fact that Horan denied that he had formed such a view prior to January 13, 2014, the record is clear that Sullivan did not share M1-4 or discuss

### Silverstein's Testimony

With the issue of sanctions turning on Appellees' personal knowledge and intent, the only direct testimony on that subject was provided by Silverstein himself. Silverstein's testimony spanned six days of the Hearing. (*See* DE546 through DE552). When specifically asked if he knew that Miscovich's claimed discovery was a fraud prior to January 13, 2014, Silverstein testified:

> No, and I would never have participated in this in any way shape or form, none, if I had known that. I did not know that.
>
> I still find it very hard to believe, but I understand what Mr. Rodriguez testified to.

(DE552 at 72:7-10) (*See also id.* at 72:25-73:16; M7 at ¶ 36).

In addition, the Hearing record contained four affidavits by Silverstein, providing detailed explanation of his actions and knowledge as of all pertinent times. (*See* M3, M6, M7, and M8). A high-level summary of Silverstein's testimony (at the Hearing and in his four detailed affidavits) is that despite his initial skepticism, Silverstein was persuaded of the legitimacy of the find by the repeated, unshakable and consistent representations of Miscovich and Elchlepp, and a number of other items of circumstantial evidence (including the affidavits of the New York investors, the conclusions of Dr. Post of the Smithsonian, the appraisal results, and the results of

---

its contents with Silverstein. (DE550 at 186-187). Based on the foregoing, the court sustained Appellees objection to the admission of M1-4 into evidence against them. (DE543 at 50-51). Although Motivation seeks to use M1-4 against Appellees on appeal, Motivation has not appealed the court's decision to exclude M1-4 from evidence as to Appellees. As such, Motivation's reliance on M1-4 is dirty pool.

an extensive investigation by CBS News, the results of Horan's and Siracusa's dives, and Paul Sullivan's dealings with the Colombian government). (*See generally* DE561 at 10-57) (detailed summary of the record developed at the Hearing that demonstrated that Silverstein's good faith belief that Miscovich's discovery was genuine). (*See also* M3 at ¶¶ 7-40; M8 at ¶¶ 11-14, 31-32). While Motivation falsely claims that Silverstein believed that Miscovich probably was not telling the truth (Motivation's Brief at 7), Silverstein's actual testimony was that "I was convinced by the weight of all the information I was aware of that it was more probable than not that that discovery was genuine." (DE549 at 114).[15] Consistent with his sworn testimony, Silverstein had written an e-mail (believed to be privileged) before the Admiralty Action was commenced, in which Silverstein expressed his state of mind to Horan and others that "despite Jay's quirks, and the incredible nature of his story, I am persuaded that Jay and Steve truly believe that the treasure is real and is in International Waters (at the location they have identified to [Horan]." (DX9). The record contains numerous similar contemporaneous written communications – all of which corroborate Silverstein's sworn testimony at the Hearing.

Appellees relied on JTR's Record Counsel (and others) to investigate and prosecute the Admiralty Action. As JTR's outside counsel, however, Appellees were

---

[15] This is just a single example of what are a trove of misrepresentations and distortions of the record in Motivation's Brief – many (but not all) of which were refuted below in Appellees' post-Hearing submissions (DE 559, DE561, and DE582), and some of which are highlighted in Appellee's Motion for Sanctions on Appeal filed concurrently with this brief.

kept advised as to ongoing matters, and Silverstein participated in emails addressing Miscovich's credibility issues on collateral matters – such as the non-Spanish coins and the "20-pound group." False or uncorroborated statements by Miscovich on these collateral subjects did not mean that Miscovich's representations as to the discovery, itself, were false. (DE552 at 33-37). Privileged emails to and from Silverstein (shared among Miscovich, Elchlepp, Sullivan, Siracusa, Janssen, Horan, and other outside counsel to Miscovich) show that Miscovich consistently defended the legitimacy of the discovery, and all counsel (including Silverstein) accepted the legitimacy of the discovery while consistently addressing potentially contrary evidence. When questions were raised at various points, Silverstein's mantra was as clear as it was ethical: "tell the truth" because "the truth tends to win out" and because not telling the truth results in "serious consequences." (M2-53, M1-16). If this testimony is credited (as it must be on appeal), there is no basis for sanctions.

Prior to the Admiralty Trial, Silverstein learned from JTR's Record Counsel that a collateral aspect of Miscovich's account – relating to Miscovich's claimed payment of $50,000 to the original owner of a map used to find the emeralds – was not supported by documentary proof. (M2-53). As always, Silverstein's response was that "the truth is the only way to go." (*Id.*). Noting that "the only issue in the case is whether Jay truly found emeralds where he says he found them[,]" Silverstein wrote that "Jay absolutely needs to be 100% truthful in whatever testimony he gives in the admiralty trial." (*Id.*) Silverstein also wrote: "I always tell my clients that they must

always tell the truth. Once they do that, the rest is up to the judge. All in all, however, the truth tends to win out." (*Id.*). Silverstein further wrote that "the case has to be presented truthfully" with any false statements "reported to the court." (M2-54). Libelously, Motivation claims that Silverstein's e-mails evidence an effort to suborn perjury. (*See* DE609 at 6-7).

Soon before the Admiralty Trial, Silverstein was "dumbfounded" to hear a report that one of the emeralds appeared to have been "assembled" or "manufactured." (M-33 at 1). Like the modern substances on some emeralds, this information (if accurate) was consistent with the Sullivan's theory about the *Luckenbach* and Horan's report of a shrimp-boat and rumors of smugglers. Nonetheless, Silverstein warned: "Jay and Steve – a lot of people have put a lot of time, money, and personal reputations behind you. I sincerely hope you have been straight with us." (*Id.*).

Appellees did not represent JTR at the Admiralty Trial, and Silverstein was "sequestered" as a fact witness. By way of contrast, Motivation's own lead counsel at the Hearing (Holloway) was an observer at the Admiralty Trial (at that time, for the New York Investors, who he also represented). Before the trial, Holloway had informed Silverstein and that Holloway's clients remained interested in helping JTR market the emeralds despite the existence of epoxy or other modern substances and despite Motivation's claim that the emeralds had little value. (*See* DX21; DE547 at 149-51). After hearing the testimony and evidence at the Admiralty Trial (and before the court determined the evidence was in equipoise), Holloway told Silverstein that

Holloway was not convinced that Miscovich had committed any fraud. (*See* M7 at ¶ 49). As Silverstein testified at the Hearing without contradiction:

> ***Mr Holloway told me that he had not seen any evidence of fraud presented during the course of the [Admiralty] trial*** and that he was content at that time to convey that to his clients. I told Mr. Holloway that I was pleased to hear that because I had not thought there was a fraud and I was glad to hear that after he had sat through the trial he had formed the same conclusion."

(DE547 at 157:1-7) (emphasis added).

After the trial, Silverstein told Miscovich that "the truth tends to prevail" and "everything will work out well for you so long as you really found out what you say you found where you say you found it, and how you say you found it. If, however, you have made this up, the FBI may one day be knocking at your door." (M2-28).

Following the Final Order, Appellees had relatively little involvement in the defense of Motivation's efforts to obtain sanctions from JTR and Miscovich. (DE550 at 44, 75). Silverstein would occasionally be advised of events (mainly after the fact), and did not actively participate in Motivation's discovery process. When Silverstein first learned of Rodriguez's claim that he had sold 80 pounds of emeralds to Miscovich, Silverstein encouraged Siracusa to promptly bring this information to the court's attention. (DX3; *see generally* DE459 at 5-6; DE559 at ¶¶ 182-93). Had JTR not called Rodriguez, the testimony that was the primary basis of Judge Moore's finding of fraud would never have been heard at all. (M2-42).

## Siracusa's Testimony

Siracusa testified that there was no suspicion of fraud when he made an appearance in the case in 2012 – months after the discovery of "modern substances" on some emeralds, and the "non-Spanish coins" and "20-pound group" had been addressed by Horan. (DE544 at 234-235). Like Horan, Siracusa cross-examined Miscovich and Elchlepp (outside Silverstein's presence) and found their stories consistent and aligned. (*Id.* at 239-40). Also like Horan, Siracusa performed his own dives of the Discovery Site and found emeralds. (*Id.* at 237; *see also* DE373 at 140:18-24). Through the time of the Admiralty Trial, Siracusa "believed in the case."[16] (DE544 at 290). It was only after the Final Order that "each deposition raised more questions." (*Id.*) Even so, until Rodriguez' testimony at the First Sanctions Hearing in January 2014, Siracusa continued to believe the discovery was genuine and was planning to dive the Discovery Site after the hearing, looking for more emeralds. (*Id.* at 291; *see also* DE373 at 140:18-142:3).

Siracusa further testified that all filings his firm made in the Admiralty Action were ethical and his responsibility as Record Counsel. (DE544 at 296:6-12). Despite Motivation's threats to Siracusa – including a threat of indictment if he would not assist in the case against Appellees – Siracusa testified at the Hearing that "Bruce [Silverstein] was not involved in the fraud." (*Id.* at 301). Siracusa also told Chief Judge Moore that there was no evidence that Silverstein "had crossed the line."

---

[16]     Sullivan similarly testified. (*See* DE550 at 179).

(DE373 at 144:12-21). Siracusa also confirmed that Silverstein had supported the decision to call Rodriguez as a witness during the First Sanctions Hearing – even though doing so was contrary to Silverstein's interests. (DE544 at 302).

## Sullivan's Testimony[17]

Sullivan consistently testified (at the Hearing, at the First Sanctions Hearing, and in a deposition prior to the Admiralty Trial) that Silverstein worked to learn the truth and had been unable to uncover any proof that Miscovich had salted the Discovery Site. (*See* DE372 at 231, 283-284; DE373 at 10-11, 58-59; DE167-1 at 16, 71, 110; DE550 at 129-31, 136, 158-59, 181-82).

## Character Evidence

Throughout Mr. Silverstein's now 30-year career as a member in good standing of the Delaware Bar, he has conducted himself with integrity and honesty, earning the respect of judges and attorneys. Far from being sanctioned, Mr. Silverstein has been honored as "a distinguished member" of the Bar by an appointment to serve as Special Master by former Chancellor (now Chief Justice) Strine. (*See* DE461-15, Tab 127, at 10-14). *See also SICPA Holdings, S.A. v. Optical Coating Lab., Inc.*, 1996 Del. Ch. LEXIS 137 (Del. Ch. Oct. 10, 1996) (report in another matter in which Mr. Silverstein was appointed as Special Master by former Chancellor Allen).

At the sanctions hearing, two uncontradicted witnesses attested to Silverstein's good character and reputation. William Chandler, the retired chief judge of the

---

[17]    For a summary of Sullivan's background, *see* M3 at ¶ 17 n.4 and Exh. E.

Delaware Court of Chancery, before whom Silverstein had regularly appeared, testified that Silverstein was a capable, zealous, and ethical attorney, whose representation of his clients consistently met "the highest standards of the Delaware Bar." (*See* DE544 at 212-17). Greg Varallo, an attorney who also knew Silverstein well, testified to the same effect that Silverstein was ethical, reliable and commendable, and that Varallo had the highest regard for his professionalism. (*See id.* at 285-87). Both Chancellor Chandler and Mr. Varallo also submitted affidavits, which further expounded upon Silverstein's good character and reputation. (*See generally* DE484, Exhs. A & B).

## Uncontradicted Expert Testimony

Appellees offered undisputed testimony from a qualified expert, Herman Russomanno, Esq. (a former President of the Florida Bar), that Silverstein's conduct complied with all governing rules of professional responsibility. As summarized by Russomanno, the duty of an attorney representing a client is to be a zealous representative for that client's interests and a zealous advocate for that client's version of events, until the point when the attorney has "knowledge" that that version is false or fraudulent, in which case the duty of candor to the tribunal takes precedence. (DE547 at 115-27). Silverstein complied with all ethical imperatives.

## The Paper Trail of Contemporaneous Documents

In addition to twelve days of testimony, the Hearing record included a paper trail of documents. Viewed chronologically, they reflect both (i) that all counsel,

including Silverstein, believed that the emerald find was genuine, and (ii) these same counsel consistently addressed credibility issues ethically and in good faith. The Hearing record is further discussed in DE559 and DE561.

No witness testified that Silverstein ever made any statement inconsistent with his measured and ethical contemporaneous emails – all of which were written at a time when it was believed that they were privileged and not subject to discovery. No witness testified, and no document stated, that Silverstein ever expressed the belief that Miscovich had committed a fraud, much less that Silverstein knew as much.

### Motivation's So-Called "Red Flags"

The so-called "Red-Flags" alleged by Motivation are addressed and refuted in the Hearing record, discussed in Appellees' post-Hearing written submissions, and rejected in the Opinion and subsequent denial of Motivation's baseless Reconsideration Motion. As the court wrote:

> The Court has exhaustively analyzed these events, and indeed the entire record of these proceedings, and finds that the evidence presented by Motivation does not meet the standard of clear and convincing evidence required to sanction Bruce Silverstein, either when viewed individually or when taken cumulatively.

(Opinion at 57).

Moreover, long before the Sanctions Hearing (and prior to the Admiralty Trial), Silverstein, without legal compulsion, sent Motivation's counsel a lengthy email addressing Motivation's allegations that Miscovich's claimed discovery was a fraud. (M5). Silverstein cited the positive 60 Minutes report, Dr. Post's conclusions, and the

perceived high value of the emeralds in JTR's possession with no known explanation for how Miscovich would have obtained thousands of gems valued in the millions of dollars other than finding them in the Gulf of Mexico, as Miscovich consistently insisted to be the case. In this effort to "terminate hostilities," Silverstein went point by point over every so-called red-flag then-identified by Motivation, and asked Motivation's counsel to provide additional information, if any existed (which Motivation never provided). Silverstein concluded his email by saying "*I have yet to find any evidence that persuades me that Jay is engaged in a fraud. If I were persuaded of that fact, I would withdraw as counsel and I would get in line with your client in making claims against JTR and Jay.*" (*Id.* at 14) (emphasis added) (*See also* M7 at ¶ 36). This forthright e-mail, itself, is sufficient to support the court's fact-finding in Appellees' favor.

Moreover, many of the so-called red-flags discussed in Motivation's brief are not red-flags at all, but are Motivation's exaggeration and mischaracterization of the Hearing record, which the district court specifically found were "not supported by the record or credible witness testimony." (DE592 at 2).

Space limitations preclude Appellees from going through each and every one of the supposed red-flags discussed in Motivation's Brief (which is an even longer list than Motivation asserted below). Motivation's so-called red-flags were, however, exhaustively addressed and debunked in DE559 at ¶¶ 75-91 and DE561 at 18-24, 28-30, 33-40, 43-45, 47-56.

## <u>Witnesses Who Did Not Testify</u>

Neither Miscovich nor Elchlepp testified at the Hearing. Miscovich went to his grave asserting that he had truly found emeralds at the Discovery Site (*See* M6 at ¶¶ 2-3), and Elchlepp's most recent statements (including sworn testimony) were to the same effect. Neither Dr. Post, nor any representative of CBS News, nor any of the New York Investors, nor any appraiser, testified at the Hearing. As such, there was no explanation of the various valuations of the emeralds in the record, nor any proof that the "junk emeralds" allegedly sold by Rodriguez were the extremely rare and valuable emeralds examined by Dr. Post, the appraiser, Sotheby's, and the New York Investors.

\*　　　\*　　　\*

The issue before this Court is not the nature and extent of any fraud committed by Miscovich, but only whether Appellees knowingly participated in a fraud. That issue was fully vetted by the district court, and there is no question that its resolution was supported by the testimony and evidence. In such circumstances, this Court can only affirm and remove the cloud on Appellees' reputations by Motivation's malicious and vindictive appeal.

# SUMMARY OF ARGUMENT

The court's credibility assessments and fact-findings are supported by the great weight of the testimony, direct evidence, circumstantial evidence, contemporaneous e-mails, character evidence, and expert testimony. Appellees submit that the court's ultimate ruling is the only one that could have been sustained on this record. It is sufficient that the Hearing record, when viewed in the light most favorable to Appellees, supports the court's ruling that Motivation failed to prove by clear and convincing evidence that Appellees knowingly participated in a fraud on the court.

The actions of Record Counsel, whose conduct was in compliance with their ethical responsibilities, further shields Appellees from any liability in this case. Moreover, acceptance of Motivation's unsupported standard of hindsight liability for failure to discover a fraud would establish a dangerous public policy that would create potential liability for sanctions any time a case presents a credibility dispute.

Finally, Motivation lacked standing to seek sanctions in the first place. As an intermeddler, with no valid standing other than its admittedly false and later withdrawn allegation of ownership to the *res*, Motivation's fees could not be assessed against any party, much less a "non-party" such as Appellees.

# ARGUMENT

## I. OVERWHELMING EVIDENCE SUPPORTED THE DENIAL OF MOTIVATION'S MOTION FOR SANCTIONS

The court's ruling that Motivation failed to prove its entitlement to sanctions by "clear and convincing evidence" is "highly factual and thus is largely immune from appellate review." *Octel Communications Corp. v. Northern Telecom, Inc.*, Case No. 97-1167, 1997 U.S. App. LEXIS 30445, at *35, 1997 WL 697288 *13 (Fed. Cir. Nov. 6, 1997), *disposition reported at* 132 F. 3d 51.

It is undisputed that proof by "clear and convincing evidence" of Appellees' alleged knowing participation in a fraud was required to impose the sanctions Motivation requested. *See* Opinion at 54 (citing cases). *See also Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991); *Sciarretta v. Lincoln Life Ins. Co.*, 778 F.3d 1205, 1212-13 (11th Cir. 2015); *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995). Because Appellees are, in fact, innocent victims of any fraud that may have been committed, it is unsurprising that Motivation was unable to prove Appellees knowingly participated in a fraud – much less by clear and convincing evidence.

The standard of review of a ruling on sanctions issues is "abuse of discretion." *See, e.g., Sciarretta*, 778 F.3d at 1212; *Kornhauser v. Comm'r of Soc. Sec.*, 685 F.3d 1254, 1258 (11th Cir. 2012). "When employing an abuse-of-discretion standard, [this Court] must affirm unless [it] find[s] that the district court has made a clear error of judgment, or has applied the wrong legal standard." *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004). Moreover, "there is a range of choice within which

[this Court] will not reverse the district court even if [this Court] might have reached a different decision." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005). This is particularly the case here, "[b]ecause the court's inherent power to impose sanctions is discretionary, the court is not required to sanction a party or attorney even if it has determined that some wrongdoing has occurred." *Murray v. City of Columbus, Ohio*, 534 F. App'x 479, 485-86 (6th Cir. 2013) (citing *Chambers*, 501 U.S. at 44-45).

Moreover, because the court made factual findings on the issue of alleged bad faith following a twelve day evidentiary hearing, those findings must be affirmed unless they are in "clear error." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564 (U.S. 1985) (reversing clear error finding by Court of Appeals, and criticizing Court of Appeals for substituting its judgment for that of the district court); *Sciarretta*, 778 F.3d at 1213. In reviewing for "clear error," this Court will make all credibility choices in favor of the fact-finder's choice. *Hiram Walker & Sons, Inc. v. Kirk Line*, 30 F.3d 1370, 1374 (11th Cir. 1994) (internal quotations omitted). This Court also will "construe the facts in the light most favorable to the party that prevailed in the district court." *United States v. Sparks*, 806 F.3d 1323, 1333-34 (11th Cir. 2015), *cert. denied,* No. 15-7733, 2016 WL 164934 (U.S. May 16, 2016). Finally, this Court will not reweigh the evidence or reverse credibility assessments and fact findings with respect to conflicting evidence, as it is the exclusive province of the district court to assess the credibility of witnesses and to assign weight to their testimony. *Anderson*,

470 U.S. at 573–74; *Solomon v. Liberty Cty. Comm'rs*, 221 F.3d 1218, 1226–27 (11th Cir. 2000). As this Court has instructed:

> Because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses, . . . where . . . testimonies are in direct conflict . . ., a 'trial judge's . . . choice of whom to believe is conclusive on the appellate court unless the judge credits *exceedingly* improbable testimony.'

*United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) (citations omitted). *See also Anderson*, 470 U.S. at 575 ("when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error").

The standard of appellate review is dispositive. Abundant evidence – including, but not limited to, Silverstein's extensive testimony and corroborating testimony of JTR's Record Counsel – amply supported the court's conclusion that Motivation failed to prove by clear and convincing evidence that Appellees knew that Miscovich had committed fraud. Even if (contrary to the district court's finding) one indulges Motivation and says that there were two equally plausible views of the record, the court's ruling still must be affirmed. As the Supreme Court has instructed: "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574. *See also Robinson v. Audi*

*Aktiengesellschaft*, 56 F.3d 1259, 1268 (10th Cir. 1995) (same) (affirming denial of sanctions for alleged fraud on the court).

Rather than examine the testimony and evidence in the light most favorable to Appellees, as the law requires, Motivation simply urges this Court to draw different inferences from the evidence and to make different credibility assessments and fact-findings based on those different inferences. In that disingenuous and fatally flawed effort, Motivation simply ignores overwhelming testimony and evidence favorable to Appellees, including (i) the direct testimony of Messrs. Silverstein, Horan, Siracusa and Sullivan – all denying Appellees' culpability, (ii) unimpeached character testimony – including by a retired jurist, (iii) the uncontradicted testimony of an ethics expert, Herman Russomanno, Esq., and (iv) dozens of contemporaneous emails, sent under the protection of the attorney-client privilege, in which Silverstein grappled with his duties in his role as outside counsel to JTR to assist Record Counsel in the representation of JTR's interests in the Admiralty Action in an honest, ethical and professional manner.

As a fall-back, Motivation argues that "knowledge and intent *can be inferred* from a willful blindness that would lead a reasonable person to believe a fraud is being committed." (Motivation's Brief at 40) (emphasis added). Leaving aside the many factual defects with the premise, it is plain that the district court, and not Motivation, had the exclusive right to make the choice between the inference of innocence and the inference of guilty knowledge.

Nor does Motivation challenge the legal underpinnings of the court's denial of the Motion. Aside from wayward citation of standards of liability under statutes and rules unrelated to the district court's "inherent powers" (which is the only standard invoked by the Motion),[18] Motivation does not identify any decision that imposed or upheld sanctions in circumstances remotely similar to this case.

The only pertinent "inherent powers" case cited (but not discussed) by Motivation is *In re Mroz*, 65 F.3d 1567. In *Mroz*, the filing of a bankruptcy preference claim by debtor's counsel against the debtor's ex-wife based on a conclusory and unsupported affidavit of the debtor was at issue. When the claim failed of proof, the bankruptcy court imposed sanctions in favor of the wife under the bankruptcy equivalent of Rule 11. This Court **reversed,** finding expressly that the filing of a complaint based on the client's version of the facts was proper and not sanctionable. Applying the standard that a complaint is only frivolous if it "has absolutely no evidence to supports its allegations" and was not supported by any plausible view of the law, 65 F.3d at 1573, the court found that "the filer had a good faith belief after reasonable inquiry that the complaint was well-grounded in fact" and

---

[18]    Many of the decisions cited by Motivation address Rule 11 and its objective standard of liability that applies to Record Counsel, and not Appellees. *E.g.*, *Patterson v. Aiken*, 841 F.2d 386 (11th Cir. 1988); *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434 (11th Cir. 1998). Other decisions are inapposite as they relate to particular statutes and not "inherent powers." *Jones v. Illinois Cent. R. Co.*, 617 F.3d 843 (6th Cir. 2010) (18 U.S.C. § 1927); *Diaz v. First Marblehead Corp.*, No. 14-15797, 2016 WL 736361 (11th Cir. Feb. 25, 2016) (Fair Debt Collection Practices Act).

reversed sanctions under Rule 9011. *Id.* This Court remanded the issue of potential sanctions for the subsequent pursuit of the action under an "inherent powers" analysis, which would depend on whether the counsel thereafter acted in "bad faith," as opposed to simply demonstrating "a lack of diligence." *Id.* at 1576. In this case, the record clearly demonstrates that both a plausible view of the law and evidence from Miscovich and Elchlepp (at a minimum) supported JTR's claims, as demonstrated by, among other things, the district court's initial finding in the Admiralty Trial that the evidence of Miscovich's claimed discovery was in equipoise.

### There Was No Evidence of Appellees' Knowledge of Fraud in the Relevant Time Period

The district court found that Motivation failed to prove Appellees had knowledge of any fraud by Miscovich prior to January 13, 2014. This holding is not only supported by the Hearing record, but it goes far further than was necessary to deny Motivation's Motion.

Any fraud on the district court by Miscovich effectively ended when the Final Order was entered on January 25, 2013. Plainly, that is the latest date Appellees can be argued to have attempted to aid Miscovich in any effort to defraud the district court. As of January 25, 2013, the court had rejected Miscovich's claim that he discovered the emeralds in the Gulf of Mexico, and the only ongoing activity before the district court pertained to Motivation's effort to obtain sanctions.[19] Moreover, by

---

[19] JTR did pursue an appeal of the Final Order (which JTR eventually moved to voluntarily dismiss after Miscovich was found to have committed fraud). The

January 25, 2013, Motivation had asked the court to sanction Silverstein, but had not requested an Order to Show Cause or otherwise caused any process to be served. Accordingly, following entry of the Final Order, Appellees were acting to defend their own conduct, and not to pursue any claim by Miscovich in the district court. The record is clear that the Siracusa firm, as JTR's Record Counsel, was solely responsible for JTR's defense in the post-trial sanctions proceedings (and nobody defended Miscovich). Appellees (i) did not participate in Motivation's post-trial discovery efforts, (ii) were not regularly provided with copies of deposition transcripts, and (iii) did not even receive deposition excerpts until Motivation filed them with the court long after the depositions occurred. (DE550 at 44, 75).

It is significant that Motivation's own lead counsel at the Hearing (Holloway) was an observer at the Admiralty Trial (at that time, representing the New York Investors). Before the trial, Holloway had informed Silverstein and that Holloway's clients remained interested in helping JTR market the emeralds despite the existence of epoxy or other modern substances and despite Motivation's claim that the emeralds had little value. (*See* DX21; DE547 at 149-51). After hearing the testimony and evidence at the Admiralty Trial (and before the court ruled that the evidence was in equipoise), Holloway told Silverstein that Holloway was not convinced that Miscovich had

---

district court made no finding of Appellees' "control" over the appellate process, nor was there any evidence to support such a finding. (*See* M8 at ¶¶ 227-28).

committed any fraud. (*See* M7 at ¶ 49). As Silverstein testified at the Hearing without contradiction:

> ***Mr Holloway told me that he had not seen any evidence of fraud presented during the course of the [Admiralty] trial*** and that he was content at that time to convey that to his clients. I told Mr. Holloway that I was pleased to hear that because I had not thought there was a fraud and I was glad to hear that after he had sat through the trial he had formed the same conclusion."

(DE547 at 157:1-7) (emphasis added).

The court's ruling following the Admiralty Trial was that the evidence of the legitimacy of the find was in equipoise. (Final Order at 22-23) Unquestionably, a case where supporting evidence is in equipoise is the paradigmatic example of a case that can be ethically pursued by its proponent.[20]

Later revelation of facts not known at the time of the Admiralty Trial cannot alter this fact. As the court correctly held, the issue is not what Appellees later learned "with the benefit of hindsight," but what they believed "in light of the universe of facts known at the time each red flag occurred." (Opinion at 56).[21]

---

[20] *Davis v. Carl*, 906 F.2d 533, 537 (11th Cir. 1990) (no sanctions if factual contention is supported by any non-frivolous evidence); *Manhattan Const. Co. v. Place Properties LP*, 559 F. App'x 856, 858 (11th Cir. 2014) (affirming denial of sanctions and noting that "if a party has evidence with respect to a contention that would suffice to defeat a motion for summary judgment based thereon, it would have sufficient 'evidentiary support' for purposes of Rule 11").

[21] Even if Silverstein continued to believe in the validity of Miscovich's claim following the court's finding of equipoise in the evidence, the district court properly concluded that misplaced loyalty or simply being in error is neither "bad faith" nor a basis for sanctions.

In any event, even after entry of the Final Order, neither Appellees nor any of JTR's other current or former counsel knew that Miscovich had committed fraud until Rodriguez came forward with his story nearly a year later – as found by the district court, and as the Hearing record reflects (as explained, in great detail, in Appellees' post-hearing submissions, DE559, DE561). That was the consistent testimony of Silverstein, Horan, Siracusa and Sullivan. (*See* DE546 at 100:22-25; DE548 at 43:2-11; DE550 at 60:8-16 (Silverstein); DE543 at 165-67 (Horan); DE544 at 290-91 (Siracusa); DE550 at 179:8-12 (Sullivan)). Indeed, even Motivation's own counsel conceded at the Hearing that deposition testimony adduced on October 30, 2013 (*i.e.*, many months following the entry of the Final Order) was "the first inkling" that Miscovich purchased the emeralds he claimed to discover. (DE545 at 455:8-9) (*See also* YCST190) (Holloway e-mail months after entry of the Final Order, stating: "I don't think we have any evidence that [Horan] or [Silverstein] were aware of the fraud").

Based on this record, there is no basis to reverse the district court's ultimate finding that Motivation failed to prove by clear and convincing evidence that Appellees were aware of any fraud prior to January 13, 2014, much less prior to the entry of the Final Order.

## There is no Inconsistency Between the Limited Sanction Against JTR and The Denial of Motivation's Motion as to Appellees

Motivation argues that there is an inconsistency between the limited sanction against JTR and the lack of any sanctions against Appellees. (*See* Motivation's Brief

at 54-55). Motivation is wrong, and has not shown that the district court's contrary conclusion was an abuse of discretion or clear error. JTR was sanctioned for failing to voluntarily disclose certain information during the limited "Nondisclosure Period" of December 2011 and April 2012. Moreover, Motivation never sought sanctions against Horan, who was JTR's Record Counsel throughout the Nondisclosure Period. Thus, assuming (*arguendo*) that the court properly sanctioned JTR in the first instance (which Appellees contest), there was no basis to similarly sanction Appellees when JTR's Record Counsel was not sanctioned, and Motivation advances no argument of error respecting that lack of sanctions. Even if Horan had been sanctioned for the Nondisclosure Period, there still would be no basis for sanctioning Appellees, who were not Record Counsel and had not even entered an appearance for JTR in the Admiralty Action. Indeed, the district court never held that its "inherent powers" could reach that far.[22]

---

[22] Motivation also argues that the court erred in failing to sanction JTR for the entirety of the time period that Miscovich was sanctioned. (*See* Motivation's Brief at 55). Again, Motivation is wrong. JTR is an entity, having numerous innocent investors who were unaware of Miscovich's true actions. Also, JTR (unlike Miscovich) was represented in the Admiralty Action by Horan and Siracusa. In the final analysis, Motivation has not shown that Chief Judge Moore committed "clear error" or an "abuse of discretion" in twice rejecting Motivation's request for greater sanctions against JTR. (*See* DE445, DE450).

## II. RECORD COUNSEL BORE ULTIMATE RESPONSIBILITY FOR THE ADMIRALTY ACTION

Counsel of record have a duty of reasonable investigation as to the law and the facts prior to filing of a pleading or any other paper. *E.g.*, *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990); *Battles v. City of Ft. Myers*, 127 F.3d 1298, 1300 (11th Cir. 1997). Counsel of record's duty is "non-delegable." *Tanner v. United States*, 483 U.S. 107, 126 (1987). *See also In re DeLorean Motor Co. Litig.*, 59 B.R. 329, 339 (E.D. Mich. 1986), *aff'd sub nom. In re DeLorean Motor Co.*, 755 F.2d 1223 (6th Cir. 1985) ("accountability already lies with the signer" and there is no "just following orders" defense). This is so even when outside counsel play a substantial role in the litigation. *E.g.*, *Long v. Quantex Res., Inc.*, 108 F.R.D. 416 (S.D.N.Y. 1985), *aff'd*, 888 F.2d 1376 (2d Cir. 1989) (record counsel, and not out-of-state counsel, is accountable for the conduct of the litigation, even if out-of-state counsel is primarily responsible for the preparation of the suit papers), *aff'd*, *Ip v. Henderson*, 888 F.2d 1376 (2d Cir. 1989). Unsurprisingly, there is no authority for sanctioning a party's outside counsel who are not counsel of record – especially where, as here, Record Counsel, itself, is not sanctioned. (*See* Cross-Appeal).

It is undisputed that Record Counsel complied with their non-delegable responsibilities. Motivation did not argue to the contrary at the Hearing. Appellees, who were not Record Counsel, were entitled to rely on Record Counsel in this regard, and Silverstein testified that he did just that. (*See, e.g.,* DE547 at 23; DE549 at 30). The record does not contain any evidence that Appellees were aware of information

not also known to Record Counsel. If anything, the record demonstrates that Record Counsel knew more about the facts than did Appellees. Motivation cannot argue that information sent from Record Counsel to Silverstein is evidence of Appellees' bad faith when that same information did not render pursuit of the case sanctionable as to Record Counsel. This argument turns the law on its head, and demonstrates the correctness of the district court's denial of Motivation's Motion.[23]

While Motivation cites the court's finding (which Appellees contest as overbroad) that Silverstein had "substantial control" over JTR's actions in the Admiralty Action, the record is clear that Silverstein's input, while frequent and substantive, was limited to certain subjects and always deferential to Record Counsel. Horan drafted the verified complaint, drafted the first status report without Silverstein's knowledge, and made all court appearances while he was Record Counsel. While Horan accepted Silverstein's arguments as to the timing of the second and third status reports (which Horan, Silverstein and others collectively drafted) and the concept that Horan's motion to withdraw should be done so as not to harm JTR's interests, these actions did not negate Horan's critical role of Record Counsel – as Horan's testimony and contemporaneous emails clearly state. As Horan testified, the

---

[23]    In bad faith, as indicated in its emails, Motivation decided to "go after" Appellees, which, Motivation cynically believed, as out-of-state counsel would be more likely to be sanctioned than well-known Florida counsel such as Horan. (See DE461-14, Tab 118; YCST191; M2-37). This strategy was both a misjudgment of the fairness of the district court, and fatally flawed legally, since under the law the responsibility for the pursuit of a case rests more heavily on Record Counsel than on referring counsel.

"ultimate final decisions" rested with him as Record Counsel (*see* M3 at ¶ 8), and Horan ultimately bore professional responsibility for filings he made on behalf of JTR, including the content and timing of the status reports. (*See, e.g.,* DE543 at 132:5-7; M7 at ¶ 8) (*See also* DE546 at 63:20 to 64:1) (Sullivan testimony acknowledging that Horan was "in charge of making the ultimate decisions in the admiralty case"). Siracusa similarly testified that he "made the ultimate decisions as counsel of record" without regard to whether Silverstein agreed with those decisions. (DE544 at 290:11-14). Siracusa also "did what [he] wanted to do" at points in the case in which he and Silverstein disagreed on how to proceed. (*Id.* at 273:16-20).

While Silverstein offered his views to Record Counsel, and participated in open and honest debate regarding the litigation, others bore both the authority and responsibility of determining the course of the Admiralty Action. Siracusa acknowledged that "the filings [he] made and the statements in court were [his] responsibility as counsel of record." (*Id.* at 296:10-12). Several documents admitted into evidence show that Silverstein consistently acknowledged that Record Counsel had responsibility for the Admiralty Action. (*See* M28, DX12, DX14, YCST093, and M1-33). Indeed, the record reflects that (i) Silverstein consistently deferred to Record Counsel, (ii) Silverstein was often "out of the loop" on Record Counsel's deliberations, (iii) Record Counsel often rejected Silverstein's recommendations, and (iv) Record Counsel made various filings and decisions with little or no input from

Silverstein. (*See generally* DE459 at 27-31) (setting forth exhaustive list of examples) (*see also* DE544 at 290:11-14; M8 at ¶¶ 73-84).

At the Hearing, Appellees offered undisputed testimony from an unquestionably qualified expert, Herman Russomanno, Esq., that an attorney's duty is to be a zealous representative for that client's interests and a zealous advocate for that client's version of events unless and until the attorney has actual knowledge that the client's case is fraudulent. (DE547 at 115-27).

Judge King, who has presided over federal trials for some forty years, was well aware of the tension between the ethical duties of counsel and the fact that clients may be less than truthful. As Judge King noted, in the vast majority of situations, reliance on the client is not only sufficient but mandated:

> ***I believe my client and the mandate of the lawyer, the incredible responsibility of the lawyer to act in the best interest of his client***, to not go out and tell the Court that my theory, judge —it's a lawyer representing a person in a serious felony case, health care fraud case that may suspect, may even be pretty sure in his mind when he thinks about it, talks to himself preparing the case, that his client filed false Medicare statements and got a big check back, but he never asked him that, probably. He didn't want to know, probably, but you try to work around whether he signed something and you try to present it the best way you can. ***You don't jump up in court and say last night I had an epiphany. I knew for sure my client is guilty. You don't do that.***

(DE567 at 29) (emphasis added).

Motivation's repeated suggestion that "doubts," "issues" or "concerns" about the accuracy of a client's testimony renders continued representation sanctionable must make the blood of any advocate run cold. While the circumstances of this case

are unusual, the basic paradigm is a common one – namely, opposing parties advancing irreconcilably competing versions of the facts, which often means that one party or the other is not telling the truth. Such issues arise in any credibility dispute, for instance a dispute over an oral contract or a disputed conversation, a "he said, she said" criminal case, or a traffic accident where the issue was which party had the green light or was speeding. This situation, an every-day reality in every state and federal court, is familiar to all judicial officers and has been fully addressed by the ethics rules, which require zealous advocacy of a client's interest. As Judge King noted, part and parcel of representing a client in a dispute in our adversarial system is to accept as the basis for action and advocate the client's version of facts so long as there is any support for that version.[24]

This ethical and professional view was precisely that expressed by Silverstein time and again, on issue after issue. Silverstein repeatedly (i) reminded everyone to be truthful and nothing but truthful; (ii) reiterated to them the harmful and dangerous consequences of being less than truthful; and (iii) advocated to JTR's Record Counsel that their duty was to present their client's version of events unless there was "conclusive proof" that it was not truthful. Not only Silverstein, but also Horan, Siracusa and Sullivan all believed that was there was colorable support for the genuineness of the find through the time of Admiralty Trial. Indeed, it was their

---

[24]   In *Mroz*, for example, this Court ruled that it was proper for counsel to file a
       complaint against his ex-wife relying on Mr. Mroz's word. *In re Mroz, supra.*

collective view that the genuineness of the find was supported by the preponderance of the evidence. In any event, it is plain that none of JTR's attorneys had concluded that the find was a fraud prior to First Sanctions Hearing.

In Motivation's view of the law, no lawyer can represent a client unless all of her assertions are supported by unquestionable documentation and are not subject to contradiction or credibility attack. This argument is legally unsupported, is directly contrary to the ethical duties of counsel, and would have devastating consequences for our adversarial system of litigation. As the court repeatedly stated, only if there was "deliberate" and "intentional" participation in a "known" fraud would the duties to the tribunal require withdrawal or disclosure to the Court. After hearing the witnesses and reviewing the evidence, the court determined that Motivation failed to prove that Appellees had such a state of mind.

Motivation does not take issue with the court's finding that Appellees lacked actual knowledge of Miscovich's fraud. Instead, the burden of Motivation's prolix argument is that Appellees should have conducted a more thorough investigation. (*See* Motivation's Brief at 36, 40-54). But, that was the responsibility of Record Counsel, and the record is clear that Appellees were relying on Record Counsel, as well as the Smithsonian, CBS News, and others, to investigate the facts.

Attempting to make a "public policy" argument, Motivation also argues that the court's decision allows some instances of fraud or perjury to go unpunished. To the contrary, the court's decision and reasoning allow for the punishment of those who act

in actual bad faith, or who are knowingly participating in fraud, and protects responsible advocates who could be the subject of sanctions simply because the evidence later reflects that their clients were not telling the truth. Motivation's argument is not only factually and legally unsupported, it is very dangerous public policy as it would chill vigorous advocacy in any case of disputed credibility.

### III. **MOTIVATION'S APPEAL OF THE DENIAL OF ITS RECONSIDERATION MOTION IS FRIVOLOUS**

Motivation's ultimate "Hail Mary" is that this Court should reverse the denial of the Reconsideration Motion and remand for additional fact-findings. The court made short shrift of Motivation's baseless Reconsideration Motion, explaining as follows:

> The Court has thoroughly reviewed the 67 additional findings of fact Motivation would have the Court make, just as it thoroughly reviewed Motivation's and Respondent's Proposed Findings of Fact submitted at the close of the trial on Motivation's Amended Motion for Sanctions. The Court finds that much of these proposed findings simply repeat findings already proposed by Motivation and rejected by the Court as not supported by the record or credible witness testimony when it entered its Opinion and Order Denying Sanctions.

(DE592 at 2).

In so doing, the court addressed only one of the arguments Appellees advanced for denying Motivation's baseless motion. Because space is limited in this brief, Appellees respectfully refer this Court to their opposition to the Reconsideration Motion (DE582) for a discussion of the numerous defects in Motivation's argument. By way of summary, those arguments include the following:

- Motivation's Reconsideration Motion was filed in violation of the local rules of the district court. (*See* DE582 at 3 & n.3).

- The court did nothing more than deny a motion, which does not require any findings of fact. Rule 52(a)(3) unambiguously provides that "[t]he court is not required to state findings or conclusions when ruling on a motion . . ." This rule is not altered simply because the court conducted an evidentiary hearing before denying Motivation's motion. (*See* DE582 at 3-6).

- Even if it were assumed (arguendo) that Rule 52(a)(1)'s requirement for fact-finding was implicated (and it was not), the

58-page Opinion more than satisfied any such requirement. (*See* DE582 at 6-8). As this Court has instructed, Rule 52(a)(1) "does not require a finding on every contention raised by the parties." *Feazell v. Tropicana Products, Inc.*, 819 F.2d 1036, 1042 (11th Cir. 1987); *Wachovia Bank N.A. v. Tien*, 2014 U.S. App. LEXIS 24632, *10 (11th Cir. Dec. 31, 2014) (same) (citations omitted).

- Motivation woefully failed to satisfy is heavy burden for relief pursuant to Rule 58. (*See* DE582 at 9-13).

- The Opinion provides ample basis for this Court to affirm the district court's denial of the Motion. (*See* DE582 at 13-16).

- Motivation's Reconsideration Motion (like its brief herein) blatantly mischaracterizes Motivation's unproven allegations as "facts." (*See* DE582 at 16-17).

Inasmuch as the court met any conceivable requirement for expressing the bases for its denial of Motivation's Motion, Motivation's Reconsideration Motion was frivolous – as is Motivation's appeal of the denial of the Reconsideration Motion. The law does not require a federal court to answer interrogatories from a party, and Motivation must take the court's "No" for an answer.

## IV.   APPELLEES' CROSS-APPEAL

Appellees Cross-Appeal challenges the following:

- The denial of Appellees' Motion to Quash, which was based on (i) Motivation's lack of standing to seek sanctions, (ii) the district court's lack of "inherent power" to sanction Appellees, (iii) the district court's lack of personal jurisdiction over Appellees;

- The orders awarding attorneys' fees to Motivation against JTR and Miscovich;

- The unwarranted invasion of the attorney-client privilege and attorney work product, and

- The Opinion to the limited extent that it sustained the court's "inherent power" to sanction Appellees (even though that power ultimately was withheld by the court).

(*See* Notice of Cross-Appeal, filed herein on September 28, 2015).

The bases for Appellees' Cross-Appeal are addressed in Appellees' (i) Appeal Dismissal Motion, (ii) Appeal Dismissal Reply and (iii) Jurisdictional Response. On February 18, 2016, this Court entered the Dismissal Order, by which the Court denied the Appeal Dismissal Motion "without prejudice to their raising the same substantive arguments in their merits brief on appeal" and carried the Jurisdictional Questions with the main appeal. (Dismissal Order at 2).

Because the issues raised by Appellees' Cross-Appeal of the denial of their Motion to Quash already have been fully briefed in connection with the Appeal Dismissal Motion, Appellees respectfully refer the Court to that briefing in support of those aspects of Appellees' Cross-Appeal. Appellees respectfully submit that the issues raised by their Cross-Appeal are substantial legal issues, which have never been

addressed by this Court, and which command this Court's attention – especially the question of the extent of the district court's "inherent powers" to reach beyond the parties and their Record Counsel. As shown in the briefing of the Appeal Dismissal, no federal court has ever extended the "inherent power" as far as Judge King has done, and the weight of authority is that Judge King has gone too far. Although Appellees ultimately prevailed below, they never should have been subjected to the protracted and expensive proceedings in the first place, and have suffered irreparable economic and reputational injury merely from having been required to do so.

The grounds for Appellees' Cross-Appeal of the orders sanctioning JTR and Miscovich and compelling production of privileged materials are summarized in the Jurisdictional Response. While Appellees incorporate the entirety of the Jurisdictional Response herein by reference, Appellees specifically refer the Court to pages 9 to 13 of the Jurisdictional Response for a discussion of the substantive and procedural irregularities associated with the challenged rulings. Put most simply:

- There was no legal basis to sanction JTR for failing to voluntarily disclose potentially adverse information at a time when JTR's Record Counsel was engaged in a good faith investigation of the validity and significance of the information, and there was no danger that the court would act on JTR's request for final relief while the investigation was pending;[25]

---

[25] The legal error in sanctioning JTR was compounded by the procedural irregularity that the First Sanctions Hearing was conducted without JTR being represented by "conflict-free" counsel. Specifically, JTR's Record Counsel had moved to withdraw from representing JTR a couple months before the First Sanctions Hearing, citing both (i) "irreconcilable differences between the undersigned attorneys and their client," and (ii) "a good faith belief that their

- There was no legal basis to sanction Miscovich, who was both deceased and tried *in abstentia*, without counsel, and without even having been served with judicial process – and there certainly was no basis for requiring Miscovich to pay Motivation's extensive attorneys' fees incurred following the entry of the Final Order; and

- There was no legal basis for a blanket invasion of the attorney-client privilege and work-product protection, even if it were assumed that Miscovich committed a fraud – especially after a magistrate already had reviewed the material *in camera* and concluded that the privileged material did not reflect that any lawyer was acting to facilitate a fraud. (DE325 at 6-7).[26]

Additionally, it should go without saying that all of the challenged orders should be vacated *nunc pro tunc* if, as Appellees' contend, Motivation lacked standing to seek sanctions in the Admiralty Action, in the first instance.

*       *       *

---

further involvement in the post-trial discovery and sanctions hearing would be imprudent." (DE287 at 3). Nonetheless, the court required JTR's Record Counsel to continue its representation of JTR. (DE291). In a later filing (made after the First Sanctions Hearing, but before the court determined to sanction JTR), JTR's Record Counsel stated that they had "suspected" prior to the First Sanctions Hearing that Miscovich had given false testimony at the Admiralty Trial (a fact that JTR's Record Counsel did not previously reveal to the court or to Appellees). (*See* DE386, at 1-2). When this Court was later confronted with a motion to sanction JTR for pursuing an appeal of the Final Order, the Court declined to sanction JTR because, among other things, "JTR has not been represented in this matter by conflict-free counsel." *JTR Enters., LLC. v. Colombian Emeralds*, No. 13-10870, at 3 (11th Cir. March 21, 2014) (Order).

[26] *See also UMG Recording, Inc. v. Bertelsmann AG*, 479 F.3d 1078 (9th Cir. 2007) (reversing invasion of privilege made without considering whether (i) the materials ordered produced were sufficiently related to the attempted fraud therein, or (ii) reasonable conditions to the ordered production were required to protect non-parties (such as Appellees) whose privileged communications were implicated).

Both Chief Judge Moore and Judge King were rightly offended to learn (as they believed to be the case) that Miscovich had sought to commit what the two jurists colloquially termed a "fraud on the court."[27] That offense, however, did not warrant the sanctions proceedings and orders that followed the entry of the Final Order for the reasons explained in the Appeal Dismissal Motion, Appeal Dismissal Reply, and Jurisdictional Response (as well as numerous filings made by Appellees below).

---

[27] In fact, "[a] finding of fraud on the court is justified only by the most egregious misconduct directed to the court itself, such as bribery of a judge or jury or fabrication of evidence by counsel and must be supported by clear, unequivocal and convincing evidence." *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 538 F.2d 180, 195 (8th Cir. 1976). This Court repeatedly has instructed that "mere nondisclosure of allegedly pertinent facts," "fabricated evidence" (by a client), and even "perjury" do not constitute a "fraud on the court" (especially when the effort to do so is unsuccessful). *See, e.g.*, *Matthews, Wilson & Matthews, Inc. v. Capital City Bank*, 614 F. App'x 969 (11th Cir. 2015); *Gupta v. U.S. Atty. Gen.*, 556 F. App'x 838 (11th Cir. 2014); *Travelers Indem. Co. v. Gore*, 761 F.2d 1549, 1552 (11th Cir. 1985).

# CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of 14-point font pursuant to Fed. R. App. P. 32(a)(5). This brief also complies with type-volume word limitation pursuant to Fed. R. App. P. 28.1(e)(2)(B)(i), because it contains 16,250 words, excluding the parts of the brief exempted by this Rule.

By: _____

Jeffrey B. Crockett

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true and correct copy of the foregoing was served by Notice of Electronic Filing generated by CM/ECF, on June 22, 2016, on all counsel or parties of record on the Service List below.

By: _____
Jeffrey B. Crockett

## SERVICE LIST

Arthur E. Lewis, Jr., Esq.
Marlow V. White, Esq.
LEWIS & WHITE, PLC
222 W. Georgia Street
P.O. Box 1050
Tallahassee, FL 32301
mvw@lewisandwhite.com
lawlaw@polaris.net

*Counsel for Appellant Motivation, Inc.*

Ken Sukhia, Esq.
SUKHIA LAW GROUP, PLC
902 N. Gadsden St.
Tallahassee, Florida 32303
ksukhia@sukhialawfirm.com

*Counsel for Appellant Motivation, Inc.*

## CONCLUSION

For the reasons set forth herein (including the various materials incorporated herein by reference) and accompanying Motion to Sanction Appellant, Appellees respectfully urge the Court to (i) affirm the denial of Motivation's Sanctions Motion, (ii) reverse the various rulings challenged by Appellees' Cross-Appeal and vacate those rulings *nunc pro tunc* based on the district court's lack of jurisdiction and power to grant them, and (iii) award Appellees' their legal fees and expenses for being forced to defend Motivation's frivolous appeal.

Respectfully submitted,

COFFEY BURLINGTON, P.L.

By: _____
    Jeffrey B. Crockett
    Florida Bar No. 347401
    jcrockett@coffeyburlington.com
    David J. Zack
    Florida Bar No. 641685
    dzack@coffeyburlington.com
    2601 South Bayshore Drive
    Penthouse
    Miami, Florida 33133
    Telephone: (305) 858-2900
    Facsimile: (305) 858-5261

*Counsel for Young Conaway Stargatt &*
*Taylor, LLP and Bruce L. Silverstein, Esq.*