# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

CASE NO. 15-14132-D

---

## MOTIVATION, INC.

### Claimant/Appellant,

### vs.

## JTR ENTERPRISES, LLC,

### Plaintiff/Appellee.

---

On appeal from the United States District Court for
the Southern District of Florida, Miami Division
Case No. 4:11-Civ-10074

---

## APPELLEES YOUNG CONAWAY STARGATT & TAYLOR, LLP AND
## BRUCE L. SILVERSTEIN'S MOTION FOR SANCTIONS

---

Jeffrey B. Crockett (FBN: 347401)
jcrockett@coffeyburlington.com
David J. Zack (FBN: 641685)
dzack@coffeyburlington.com
COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive, Penthouse
Miami, Florida 33133
Telephone: (305) 858-2900
Facsimile: (305) 858-5261

*Counsel for Young Conaway Stargatt & Taylor, LLP
and Bruce L. Silverstein, Esq.*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, Appellees Young Conaway Stargatt & Taylor, LLP and Bruce L. Silverstein, Esq., hereby state the following individuals and entities with any known interest in the outcome of this appeal:

Kendall B. Coffey

Jeffrey B. Crockett

Stephen Elchlepp

Kim Fisher

John Gravante

David Horan

JTR Enterprises LLC

Hon. James L. King

Jay Miscovich

Hugh J. Morgan

Motivation Inc.

Hon. K. Michael Moore

Bruce L.. Silverstein

John Siracusa

Paul D. Sullivan

John E. Tuthill

Marlow V. White

Young Conaway Stargatt & Taylor, LLP

David J. Zack

Appellee Young Conaway Stargatt Taylor, LLP has no parent corporation and no publicly held corporation owns 10% or more of it.

Pursuant to Rule 38 of the Federal Rules of Appellate Procedure ("Rule 38"),[1] Appellees, Bruce Silverstein and Young Conaway Stargatt & Taylor LLP, respectfully urge this Court to assess their attorneys' fees and costs against Motivation as "damages" for its pursuit of a frivolous appeal.

## **INTRODUCTION**

Appellees do not file this motion lightly, but believe it is appropriate to do so after due consideration. Motivation has misused the weapon of allegations of bad faith for years, and its employment in this Court is so inappropriate as to warrant sanctions. While Appellees can never be fully compensated for the irreparable harm to their reputations caused by Motivation's unending persecution, an award of double their costs on appeal will, at least, serve the salutary purposes of Rule 38.

Viewed most favorably to Motivation, the case below involved a claim that Jay Miscovich falsely claimed to discover a treasure. There is not, and never was, any basis to sanction Appellees for Miscovich's conduct. As the record indisputably reveals, Motivation knew full-well that there was no evidence that Appellees intentionally or knowingly participated in any fraud, and Motivation filed its motion to sanction Appellees in order to coerce a settlement of convenience. After Appellees would not capitulate, Motivation unsurprisingly offered no evidence that Appellees

---

[1]    Unless specifically defined herein, all capitalized terms have the meaning ascribed in Appellees' Brief in Opposition to Motivation's Appeal and in Support of Appellees' Cross-Appeal ("Appellees' Brief"), filed concurrently with this motion.

intentionally or knowingly participated in any fraud – as the district court found after sitting through a 12-day Hearing. Motivation now continues its persecution of Appellees through an appeal in which Motivation asks this Court to reverse credibility assessments and fact-findings of the district court. In so doing, Motivation ignores all evidence favorable to Appellees, and recites the alleged "facts" in its own favor – all contrary to governing legal standards. Motivation's appeal is, of course, doomed to failure under the governing standard of appellate review, and meets the test of "frivolousness" under Rule 38.

## STATEMENT OF FACTS

Appellees were engaged to defend Miscovich in the Delaware Litigation, which occurred a year after Miscovich claimed to discover emeralds in the Gulf of Mexico, and more than six months prior to the commencement of the Admiralty Action. From the start, Appellees advised Miscovich to engage admiralty counsel to handle his admiralty claim, which was outside Appellees' field of expertise. (*See* DE546 at 115:1–24; M8 at ¶ 15). Based on that advice, Miscovich hired Horan and, later, Siracusa to pursue an admiralty claim. The Hearing record reflects that (i) Horan and Siracusa each independently investigated Miscovich's claim, (ii) Horan commenced the Admiralty Action, (iii) Siracusa tried the Admiralty Trial, and (iv) at all pertinent times, both Horan and Siracusa expressed their expert view to Appellees (and others) that there was more than sufficient evidence to merit the commencement, pursuit, and trial of the Admiralty Action pursuant to Rule 11.

As detailed in Appellees' Brief, more than a year after the Admiralty Trial and nearly a year after a Final Order was entered in the Admiralty Action (finding the evidence in equipoise), evidence emerged that Miscovich had purchased emeralds from a jeweler and "salted" the Discovery Site. To quote Chief Judge Moore, who first made that finding:

> Miscovich managed to successfully convince his investors, **lawyers**, employees of the Smithsonian, appraisers, jewelers, family, friends, the general public, and many others, including investigative reporters from CBS' *60 Minutes*, that he had discovered and recovered this treasure from the seafloor in early 2010.

(DE445 at ¶ 67) (emphasis added). Appellees were among the "lawyers" Miscovich convinced he discovered a sunken treasure – as were (i) JTR's Record Counsel in the Admiralty Action, and (ii) Miscovich's other outside counsel in the Delaware Litigation, who represented Miscovich before Appellees were engaged to do so, who continued to represent Miscovich throughout the course of the Admiralty Action, and who were copied on most of the e-mails in the Hearing record.

In twelve days of argument and testimony at the Hearing, (i) Appellees denied that they intentionally or knowingly participated in any fraud, (ii) Record Counsel testified that Appellees were unaware of any fraud prior to the First Sanctions Hearing, (iii) witnesses testified to Appellees' impeccable character and reputation, (iv) an ethics expert testified on Appellees' behalf, and (v) numerous documents were introduced that demonstrated Appellees' good faith, and not one shred of documentary evidence showed that Appellees intentionally or knowingly participated in any fraud.

3

Not surprisingly, the Opinion denying Motivation's Motion includes a specific finding that Motivation failed to present "any evidence" that Appellees intentionally or knowingly participated in any fraud. (*See* Opinion at 55-56). Moreover, it is undisputed that Motivation's burden below was to persuade the district court of Appellees' alleged culpability by "clear and convincing" evidence, and that it would have been insufficient for Motivation to establish Appellees' culpability by a preponderance of the evidence – which Motivation failed to do, in any event.

Plainly, a discretionary denial of sanctions in such circumstances cannot be reversed on appeal under the governing standards of review. (*See* Appellees' Brief).

## **ARGUMENT**

## **MOTIVATION SHOULD BE SANCTIONED PURSUANT TO RULE 38**

### A. **Governing Legal Standard**

Rule 38 provides, in its entirety, as follows:

> If a court of appeals determines that an appeal is frivolous, it may, after a separately filed motion or notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee.

Rule 38 sanctions "are available to remedy the waste in the resources of the appellant and the Court." *Jones v. Clayton County*, 184 Fed. Appx. 840, 842 (11th Cir. 2006). *See also Taliaferro v. Freeman*, 595 Fed. Appx. 961, 964 (11th Cir. 2014) ("In the interest of judicial economy, and in an attempt to dissuade meritless appeals like this one, we find that sanctions against [appellant] are appropriate."); *U.S. v. A*

*Single Family Residence*, 803 F.2d 625, 632 (11th Cir. 1986) (instructing that "clearly frivolous claims . . . waste judicial resources and those of the appellee").[2]

"Rule 38 sanctions have been imposed against appellants who raise 'clearly erroneous claims' in the face of established law and clear facts." *Suazo v. NCL (Bahamas), Ltd.*, __ F.3d __, No. 14-15351, 2016 WL 2642065, at *12 (11th Cir. 2016) (quoting *Farese v. Scherer*, 342 F.3d 1223, 1232 (11th Cir. 2003).[3] Examples of frivolous arguments include (i) "submitting rambling briefs that make no attempt to address the elements requisite to obtaining reversal," (ii) "failing to explain how the lower tribunal erred or to present clear or cogent arguments for overturning the decision below," (iii) "citation of inapplicable or irrelevant authorities," and (iv) "misrepresenting facts or law to the court." *Finch v. Hughes Aircraft Co.*, 926 F. 2d 1574, 1579 (Fed. Cir. 1991). Motivation's Appeal implicates all of the above.

Finally, Rule 38 sanctions are based on an objective standard (*i.e.*, a showing of bad faith not required), and making a non-frivolous argument will not immunize a frivolous one. *In re Perry*, 918 F.2d 931 (Fed. Cir. 1990).

---

[2]   *See also Nagle v. Alspach*, 8 F.3d 141, 145 (3d Cir. 1993) (instructing that "[t]he purpose[s] of Rule 38 damages" are (i) "to compensate appellees," (ii) to "preserve the appellate court calendar for cases worthy of consideration, and (iii) "to discourage litigants from unnecessarily wasting their opponents' time and resources") (internal citations omitted).

[3]   *See also Spiegel v. Continental Illinois Nat'l Bank*, 790 F.2d 638, 650 (7th Cir. 1986) ("An appeal is frivolous where the result is obvious or when the appellant's argument is wholly without merit."); *Wilton Corp. v. Ashland Castings Corp.* 188 F.3d 670 (6th Cir. 1999) (appeal is frivolous where the appellant "essentially had no reasonable expectation of altering the district court' judgment based on law or fact").

**B. Motivation's Appeal is Frivolous Because Motivation Cannot Succeed in Overturning a Decision Based on Credibility Assessments and Fact-Findings**

Rule 38 sanctions have been awarded where "the only hope [appellant] had of prevailing on appeal was for [the Court of Appeals] to reverse the trial judge's findings of fact which were based on the credibility of several witnesses," and the appellant does no more than "restate and reargue facts and credibility issues previously ruled upon by the district court." *Rennie v. Dalton*, 3 F.3d 1100, 1110 (7th Cir. 1993); *see also District No. 8 Association of Machinists & Aerospace Workers, AFL-CIO v. Clearing, a Division of U.S. Industries, Inc.*, 807 F.2d 618, 623 (7th Cir. 1986) (granted sanction based on "arguments . . . [that] . . . constitute nothing more than a restatement of its position rejected by the district court and an attempt to plead that the district court should have credited its witnesses rather than the testimony presented by [the appellee]"); *In re Generes*, 69 F.3d 821, 828 (7th Cir. 1995) (granting sanctions where appellant "offered no justification for his conduct in the district court, other than to re-assert his own version of the facts, arguing that we should believe him and not [appellees].") *Munoz v. Strahm Farms, Inc.*, 69 F.3d 501, 504-505 (Fed. Cir. 1995) (imposing sanctions under Rule 38 because "[t]here is no basis in law or fact for reversal of the jury's verdict in light of the cumulative evidence that supports the verdict"). That is precisely the case here.

Motivation's appeal presents a compelling case for Rule 38 sanctions. In summary, both of JTR's Record Counsel (Horan and Siracusa) confirmed that Appellees acted ethically. Silverstein and Sullivan testified at length, and their

testimony was credited by the district court. Motivation's own lead counsel at the Hearing (in an email he never believed would be seen by any Court) used wording remarkably similar to the district court ("I don't think we have any evidence") when referring to Motivation's allegations that Silverstein knowingly participated in a fraud. (YCST 190) (*See also* pages 8-9, *infra*). The court also was presented with substantial evidence of Motivation's bad faith – as further addressed herein below. The district court also heard character witnesses for Appellees and an expert witness who opined that Horan and Siracusa, as Record Counsel, were the "captains of the ship" upon whom Silverstein could rely. (DE552 at 103:15-104:1; DE548 at 178:15-17, 203:17-204:1; DE550 at 47:9; DX14.) For Motivation to reargue the facts based on the court's findings with this record is the height of frivolity.

## C.    <u>Motivation Has Proceeded in Bad Faith (Below and on Appeal)</u>

This appeal also is frivolous because it was filed as an improper attempt to extract legal fees in the form of sanctions – even though Motivation was aware all along there was no basis to pursue sanctions against Appellees. Motivation's motion for sanctions was advanced through a frivolous intervention to interfere with an *in rem* action brought by a competitor. (*See generally* Appeal Dismissal Motion at 3-4; DE561 at 31-33; DE559 at ¶¶ 70-72; DE459 at 36-40; DE142 at 3-4 & nn. 5-6). As such, any "harm" to Motivation was self-inflicted and not the subject of potential reimbursement. Motivation's motion for sanctions was in the nature of a thief who complained that the work of art he stole was a forgery. As a result, Motivation has no

one to blame but itself for the costs of its own misuse of the judicial system and had no right to seek sanctions from anyone in the first place.

Motivation's misconduct continued in seeking sanctions from Appellees, which were viewed by Motivation's counsel as a means to compensate themselves for bringing the misguided intervention (presumably on a contingent fee basis). From the beginning, Motivation's expressed goal was to obtain a settlement from Appellees or their insurer, which they regarded as a "deep pocket." On April 20, 2013, Motivation's counsel wrote an email stating, ***"[f]riends, let us not forget the mission!!! Silverstein and his law firm, ie a deep pocket!"*** (YCST191 at 1) (emphasis added). Lewis further wrote that the "mission" not as a search for truth, but to "accelerate the caging of the deep pockets" (*Id.*). In response to one such e-mail from Lewis, Motivation's President, Kim Fisher, replied: ***"We need to rely on their desire to settle and not be dragged thru a messy highly publicized trial."*** (*See* DE559 at 47, 49; DE459 at 11-13) (emphasis added).[4]

While Motivation was making accusations in court against Appellees, Motivation's internal emails (ordered to be produced to JTR in connection with the First Sanctions Hearing) proved that Motivation knew its accusations were unfounded. After Motivation filed its initial motion to sanction Appellees, Holloway (who later served as Motivation's lead counsel at the Hearing) wrote:

---

[4] For a more complete recitation of the substantial evidence of Motivation's bad faith in pursuing sanctions from Appellees, *see generally* DE459 at 9-14; DE559 at ¶¶ 153-78; DE561 at 57-62, 79-83.

We have ample evidence that Jay has committed fraud and perjury, but *I don't think we have any evidence that [Horan] or [Silverstein] were aware of the fraud* (unless we infer knowledge f[ro]m the epoxy, but that m[ay] be pushing an inference to[o] far.

(YCST 190) (emphasis added).  (See also M8 at ¶ 127) (quoting Holloway email that noted "THE PERPETRATORS" were "NOT HORAN OR SILVERSTEIN").

Holloway also had sat through the entirety of the Admiralty Trial as a representative for the New York Investors.  After hearing the testimony and evidence at the Admiralty Trial (and before the court ruled that the evidence was in equipoise), Holloway told Silverstein that Holloway was not convinced that Miscovich had committed any fraud.  (*See* M7 at ¶ 49).  As Silverstein testified:

> *Mr Holloway told me that he had not seen any evidence of fraud presented during the course of the [Admiralty] trial* and that he was content at that time to convey that to his clients.  I told Mr. Holloway that I was pleased to hear that because I had not thought there was a fraud and I was glad to hear that after he had sat through the trial he had formed the same conclusion.

(DE547 at 57:1-7).  This testimony is conspicuously omitted from Motivation's Brief – like reams of other substantial evidence favorable to Appellees (which is discussed in Appellee's Brief on appeal and in greater detail in Appellees' post-Hearing submissions below – DE559 and 561).

Numerous documents Motivation sought to withhold from the court reflect that Motivation set its sights on Appellees with full knowledge of the lack of evidence that Appellees were aware of any fraud, and solely to reach into what Motivation called "deep pockets."  In accordance with its cynical strategy, Motivation refrained from

seeking sanctions from Horan, who was Record Counsel, because Motivation believed that the district court judge "liked" Horan and would be unlikely to sanction him, although it is all but impossible to sanction referring counsel without sanctioning counsel of record. (DE459, Exh. 118). In their abuse of due process, Motivation even made a calculated decision to avoid deposing Silverstein prior to the First Sanctions Hearing, so as to avoid the presentation of a full record to the district court. As Holloway advised Motivation's other counsel:

> If you depose [Silverstein] he'll just get out his side of the story and the testimony will be admissible at [the First Sanctions Hearing].

(DE459, Exh. 131).

Other examples of Motivation's bad-faith tactics include the following:

- Suggesting to Sullivan that the parties should skip the inspection of the emeralds and say that they were from the *Atocha* and share the proceeds of that fraud with Motivation. (M3 at ¶ 49; M8 at ¶ 45);

- Suggesting to Silverstein that ethics charges would be filed against him if he did not persuade Miscovich to back down, while at the same time acknowledging that Motivation never believed the emeralds were from the *Atocha*. (M7 at ¶ 47);

- Violating the Hobbs Act and blackmail statutes by telling witnesses that they could face indictments if they did not cooperate with Motivation. (YCST 275);[5] and

---

[5]   *See also* DE544 at 297:16–298:4 ("[S]uggestions were made from Motivation's team that there was an FBI investigation ongoing in the case and that indictments would be looming or forthcoming and that I needed to either settle the case or withdraw or I might be indicted along with the rest of the group which I found very interesting because I have worked with the Federal Bureau of Investigation before and they typically do exactly what they want and don't tell anybody, especially in civil cases, you know, what the status of their

- In the same vein, improperly informing witnesses they might avoid both civil and criminal liability if they cooperated with Motivation's efforts in the Admiralty Action. (M2-39).

Perhaps, the most telling example of Motivation's bad-faith litigation tactics is its underhanded efforts just prior to the January 2014 First Sanctions Hearing to coerce a number of persons (including JTR's Record Counsel, Sullivan, and Appellees' co-counsel from the Delaware Litigation) to sign a false Stipulation containing statements of "fact" designed to aid Motivation's efforts to sanction Appellees in consideration of Motivation's agreement to refrain from pursuing sanctions against them. (*See* M2-37) (*See also* M7 at ¶¶ 47-57 and Exhs A, B and C). In essence, Motivation was telling witnesses that Motivation believed they were innocent of any wrongdoing and that Motivation was willing to sign the stipulation so stating, but that Motivation would seek sanctions against them if they refused to sign an agreement that pointed the finger at Appellees. Commendably, none of the witnesses succumbed to Motivation's pressure tactics. That sort of unethical behavior is emblematic of Motivation's actions throughout the course of the Admiralty Action.

From its role as a fraudulent intervenor to an officious intermeddler alleging fraud by Appellees, Motivation has continued to make reckless and unsupported allegations about Appellees – all publicly available to be quoted by anyone at

---

investigations are or what they are planning to do, et cetera. So to the extent that that was a threat, that occurred."); *id.* at 300:5–13 (Lewis "suggested that he was concerned for myself, for the welfare of my law partner Joe and his wife Christie, that if we didn't settle, we would be in serious trouble").

whatever risk of harm to Appellees' reputations. After considering the entire record developed connection with Motivation's Motion – which cost Appellees well in excess of a million dollars in attorneys' fees to defend against – the district court found "no evidence" that Appellees intentionally or knowingly participated in any fraud prior to the time that JTR's own counsel came forward with such evidence.

Motivation is now pursuing an appeal of the district court credibility assessments and fact findings to this Court, with no viable legal basis, raising no serious legal issue, and simply asking this Court to make different credibility assessments and findings of fact than were made by the district court. As Motivation brought the appeal frivolously to "cage deep pockets," sanctions should be awarded under Rule 38. *Wilton Corp. v. Ashland Castings Corp.* 188 F. 3d 670 (6th Cir. 1999) (sanctions will likewise be ordered when the appellee's arguments "essentially had no reasonable expectation of altering the district court' judgment based on law or fact").

**D.  Motivation Blatantly Mischaracterizes the Opinion and the Record**

Courts will impose Rule 38 sanctions for briefs "rife with deliberate misrepresentations of the facts." *Association for Disabled Americans, Inc. v. Pebb*, 555 F. App'x 876, 878 (11th Cir. 2014). Motivation's recitation of the "facts" on appeal is pervaded by a failure to cite any of the abundant evidence favorable to Appellees. Furthermore, it is rife with blatant mischaracterizations of the testimony and exhibits, and littered with unsupported (and unsupportable) argumentative conclusions that Motivation attempts to substantiate by mischaracterizing emails and

misquoting snippets of testimony and exhibits out of context (and sometimes without acknowledging that words have been excised). Attached hereto (as Exhibit A) is a summary of just some of numerous misstatements and mischaracterizations in Motivation's Brief.[6] At a minimum, this summary demonstrates that Motivation's recitation of the facts is not in the light most favorable to Appellees, as required by the standard of review. Some of Motivation's more blatant mischaracterizations of the record are discussed below.

- On page 7 of its brief, Motivation falsely claims that Silverstein "conceded that as of August 2011 he believed that the 'weight of all the information' did *not* show that 'it was more probable than not that the discovery was genuine.'" (Emphasis by Motivation). Silverstein's actual testimony was the diametric opposite: "I was convinced by the weight of all the information I was aware of that it was more probable than not that that discovery was genuine." (DE549 114:19-21).[7]

- On page 34 of its brief, Motivation writes that Silverstein "suggested the FBI and Motivation were trying to set-up Siracusa and that 'Motivation knows that the guy did not sell Jay emeralds, and has paid him to have his attorney call you and lie about what he would say…to try to persuade you to refrain from calling him as a witness.'" This is a blatant mischaracterization of a series of

---

[6] Even Exhibit A addresses only a portion of the trove of misrepresentations and distortions of the record in Motivation's brief – many more (but not all) of which were refuted below in Appellees' post-Hearing submissions. (*See* DE559, DE561, and DE582).

[7] Consistent with this testimony, Silverstein wrote before the Admiralty Action was commenced: "despite Jay's quirks, and the incredible nature of his story, I am persuaded that Jay and Steve truly believe that the treasure is real and is in International Waters (at the location they have identified to [Horan]." (DX9). The Hearing record contains numerous other contemporaneous written communications – all of which corroborate Silverstein's testimony at the Hearing.

*questions* Silverstein had asked, which Motivation mischaracterizes as affirmative statements. (*See* M2-43).

- On page 24 of its brief, Motivation states that M2-55 reflects that "Silverstein asked what Jay lied about and [Record Counsel] responded, 'nothing that I wish to put in writing.'" Motivation omits a significant proviso in the same sentence of M2-55, in which JTR's Record Counsel wrote that the "lie" was "nothing that would affect anyone's testimony in the case" – which plainly means that it was not about whether the emerald discovery was genuine. Motivation also ignores Silverstein's testimony that the Record Counsel later told him that were mistaken about what they had considered to be a lie in M2-55. (DE548 at 30).

- On page 20 of its brief, Motivation misstates that Silverstein "knew Horan withdrew because of the coin episode, the 20-pound group 'hold back,' the epoxy findings, and suspicions the site was salted." In fact, Silverstein testified: "What I understood [Horan] concluded was that he couldn't get along with the client anymore and he just didn't want to represent the client." (DE 549 at 150-51). Additionally, the record indisputably demonstrates that JTR's inability to pay Horan a $25,000 monthly retainer, as previously agreed, was a factor in his withdrawal. (*See* DE547 at 96, 101, 108; DE547 at 150;M1-25; M1-21; DE 484-3 at 7-8; M1-27).

- On page 7 of its brief, Motivation asserts that M28 is an e-mail in which Silverstein advised against commencing the Admiralty Action based on "[Miscovich's] story." The insertion of Miscovich's name in brackets is by Motivation. In fact, the only fair reading of M28 is that Silverstein was referring to a "story" by the New York Investors, who were then claiming that Miscovich found the emeralds at a different undersea location and that the emeralds were, therefore, subject to the claim of a different treasure hunter who was supported by the New York Investors.[8]

---

[8] Just prior to the commencement of the Admiralty Action, the New York Investors claimed, for the first time, that the emeralds were found at another underwater location known as the "Kirby Site" (or the "Ken Rose Site"), but produced no evidence to support their claim. In an e-mail dated August 11, 2011, Silverstein wrote "I find this story incredible, and I have a very difficult time believing it is true" and that "[g]iven how incredible this story is, I am

- On pages 25 and 26 of its brief, Motivation similarly asserts that Judge Moore "noted" during argument at the First Sanctions hearing that there was "evidence of [Silverstein's] conduct that might fall under the obstruction of justice provisions." In fact, Judge Moore "asked" Siracusa if there was such evidence. Additionally, Judge Moore noted that (i) Motivation's position on that point had been "contradicted, I think to some extent by [JTR's] witnesses," (ii) Silverstein was not a party to First Sanctions Hearing, and (iii) "you never know if you hear all the facts" and "we haven't heard from all of the witnesses." (DE373 at 142:9-16, 146:16 to 147:8). Ultimately, Judge Moore made no finding on the issue in his decision. (DE445).

- Throughout its brief, Motivation falsely asserts that Silverstein somehow attempted to defraud investors, took actions to deny the New York Investors the fruits of a settlement agreement resulting from a mediation of the Delaware Litigation, threatened witnesses, and otherwise acted in violation of applicable rules of professional responsibility.[9] There is not a shred of truth to Motivation's scandalous assertions – all of which were (i) collateral to the Motion, which was based solely on Motivation's false accusation that Appellees knowingly participated in a "fraud on the court," (ii) not subject to discovery, (iii) not fully fleshed out by Appellees on account of their lack of relevance to the Motion, and (iv) ultimately rejected by the district court as "not supported by the record or credible witness testimony" (DE592 at 2).

---

reluctant to endorse taking legal action (such as filing an admiralty claim) based on the assumption it is true." (M-28 at 2) (*See also* M8 at ¶¶ 22-23). On page 7 of its brief, Motivation misleadingly cites Silverstein as referring to "[Miscovich's] story" as a basis for not proceeding with the Admiralty Action. The context of Silverstein's email shows that that the "story" he wrote about in that e-mail was the "story" being told by the New York Investors. Moreover. Silverstein was right to find that story incredible, as no evidence has ever supported the concept of an emerald discovery at the Kirby Site.

[9] The court sustained an objection to a question as to whether the transfer breached the Delaware settlement agreement. (DE549 at 56). The undisputed record shows that the New York Investors were not harmed, nor intended to be harmed, by the transfer or the pursuit of the Admiralty Action. (*Id.* at 41-47; 62; DE552 at 13, 41; M7 at ¶ 34).

- Throughout its brief, Motivation repeatedly refers to Silverstein as JTR's "general counsel" – even asserting that the Court found Silverstein to be such on page 55 of the Opinion. (*See* Motivation's Brief at 3). In fact, Appellees consistently denied that Silverstein was JTR's "general counsel" (*see, e.g.*, DE324-1 at ¶¶ 2-8; DE459 at 31-32; DE549-1 at ¶¶ 116-20; DE559 at ¶ 224; DE561 at 74-75; M8 at ¶¶ 116-20), and the district court found that Silverstein was JTR's "general outside counsel" (as reflected in Horan's engagement agreement, M25) – which is materially different from being "general counsel" (or even "outside general counsel").[10]

---

[10] Although the terms "general outside counsel" and "outside general counsel" use the same words in a different order, the difference in order is grammatically and legally significant. The term "outside counsel" is, as it implies, an attorney who works for a client at a law firm (or as a solo practitioner), and is not an officer or "employee" of the client. The term "general" further describes the relationship, such that the "outside counsel" has been engaged to provide "general" legal services. Where "outside counsel" is engaged to provide limited or specific services, they are sometimes characterized as "special outside counsel." By contrast, the term "general counsel" is a term of art (typically capitalized as "General Counsel"), and refers to an officer of a company, who is the company's highest ranking in-house attorney. *See, e.g., China Mariners' Assur. Corp. v. M.T. W.M. Vacy Ash*, 1999 U.S. Dist. LEXIS 2674, at *19 (S.D.N.Y. March 9, 1999) ("A corporation's general counsel is an 'officer'"); *In re Grievance Proceeding*, 2002 U.S. Dist. LEXIS 18417, at *9 (D. Conn. 2002) ("the general counsel by definition is a corporation lawyer"); *see also* Merriam-Webster On-Line Dictionary, at http://www.merriam-webster.com/dictionary/general%20counsel (defining "general counsel" as "a lawyer at the head of the legal department (as of a corporation or governmental subdivision)"). In this context, the term "General" (and sometimes "Chief") connotes the rank of in-house counsel. Occasionally (but not typically), a company will employ an "outside" attorney to serve as its General Counsel. When that occurs, the term "outside General Counsel" may be used. M25 refers to Mr. Silverstein as JTR's "general outside counsel" – which is an accurate description of the fact that Mr. Silverstein performed general legal services (as contrasted with only specified legal services), and did so as a partner in a law firm (and not as a hired employee of JTR). Mr. Silverstein was never JTR's "General Counsel." Moreover, as a practitioner skilled in matters of corporate law, Silverstein plainly understood the difference between "general

### E. Motivation's Appeal of the Denial of the Reconsideration Motion is Frivolous

Motivation frivolously invokes Rule 52(a)(1) to argue that the court erred in denying the Reconsideration Motion. (*See* Motivation's Brief at 51-53). Motivation's argument is frivolous – especially when the standard of appellate review of the denial of a motion for reconsideration is abuse of discretion. *See, e.g.*, *Beepot v. JP Morgan Chase Nat'l Corporate Servs.*, 626 F. App'x. 935 (11th Cir. 2015) (per curiam) (affirming denial of motion for reconsideration based on asserted violation of Rule 52(a)(1)); *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (stating standard or appellate review).

As a factual matter, the court made numerous findings of fact in its 58-page Opinion denying Motivation's Motion (and in its follow-on opinion denying Motivation's baseless Reconsideration Motion). Indeed, in its Reconsideration Motion, Motivation conceded (as it must) that "the Court's 49 pages of background and facts specifically identifies [sic] numerous facts." (DE573 at 3). This concession highlights the frivolity of Motivation's appeal.

As a legal matter, Motivation's reliance upon Rule 52(a)(1) is frivolous for all of the reasons set forth in (i) the court's denial of the Reconsideration Motion (DE592), (ii) Appellees' opposition to the Reconsideration Motion (DE582), and (iii) Appellees' Brief on appeal (at pages 58-59). Most significantly, the court's

---

outside counsel" and "outside general counsel" when he agreed to be characterized as the former (and not the latter) in Horan's engagement letter.

discretionary denial of Motivation's Motion was governed by Rule 52(a)(3), which

specifies that findings of fact are "not required" when the court decides a motion. The

Ninth Circuit's decision in *Nuveen Municipal High Income Opportunity Fund*, 730

F.3d 1111 (9th Cir. 2013), is particularly instructive on this point. In that case, as

here, the district court denied a motion for attorneys' fees, and the frustrated movant

complained that the court's alleged failure to specifically address each and every

contention advanced by the losing party violated Rule 52. The Ninth Circuit

summarily rejected the movant's argument, as follows:

> The main complaint in the City's cross-appeal is that the court did not
> individually address each of its arguments for defense costs [on the disputed
> issue]. In fact, the order provides considerable detail as to the court's
> reasoning and nothing requires the district court to respond to each argument
> tit-for-tat or in explicit detail. Indeed, this court "infer[s] from the court's
> denial of the City's motion that it made the determinations necessary to
> support its order."

*Id.* at 1127. *See also Jewel Tea Co. v. Kraus*, 204 F.2d 549, 550 (7th Cir. 1953)

(instructing that Rule 52(a)(3), and not Rule 52(a)(1), governs the denial of a motion).

Based on the plain language of Rule 52(a)(3), the Ninth Circuit has sanctioned

an appellant for arguing that a district court violated Rule 52(a)(1) by failing to make

findings of fact when denying a motion. *See Feurt v. Mack*, 1990 U.S. App. LEXIS

20267 (9th Cir. Nov. 19, 1990). Appellees respectfully urge this Court to do the same.

Even if it were assumed (*arguendo*) that Rule 52(a)(1) applied to the Court's

denial of Motivation's Sanctions Motion (which is not the case), Rule 52(a)(1)

expressly provides that a district court's findings of fact "may be stated on the record

after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." Plainly, the 58-page Opinion is more than adequate to satisfy Rule 52(a)(1). *See Jewel Tea Co*, 204 F.2d at 550.

This Court has instructed that Rule 52(a)(i) does not require a finding of fact on every contention raised by the parties. *See, e.g., Feazell v. Tropicana Products, Inc.*, 819 F.2d 1036, 1042 (11th Cir. 1987). This Court has further instructed that (i) district courts need not "state the evidence or any of the reasoning upon the evidence, nor assert the negative of rejected propositions," and (ii) "the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts." *Stock Equip. Co., a Unit of Gen. Signal Corp. v. Tennessee Valley Auth.*, 906 F.2d 583, 592 (11th Cir. 1990) (internal citations and quotation marks omitted). As such, the 58-page Opinion actually ***exceeds*** this Court's settled standards when Rule 52(a)(1) applies (which it does not here), and Motivation's argument that the Opinion violates Rule 52(a)(1) is nothing less than frivolous.

Given the inapplicability of Rule 52(a)(1), the district court's adverse credibility findings in rejecting Motivation's Reconsideration Motion, and the district court's acknowledged discretion, Motivation's appeal on this issue is frivolous.

*     *     *

For all these reasons, Appellees respectfully request an award of double their legal fees and other costs as damages under Rule 38.

Respectfully submitted,

COFFEY BURLINGTON, P.L.

By: _____

Jeffrey B. Crockett
Florida Bar No. 347401
jcrockett@coffeyburlington.com
David J. Zack
Florida Bar No. 641685
2601 South Bayshore Drive
Penthouse
Miami, Florida 33133
Telephone: (305) 858-2900
Facsimile: (305) 858-5261

*Counsel for Young Conaway Stargatt &*
*Taylor, LLP and Bruce L. Silverstein, Esq.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true and correct copy of the foregoing was served by

Notice of Electronic Filing generated by CM/ECF, on June 22, 2016, on all counsel or

parties of record on the Service List below.

By: _____
Jeffrey B. Crockett

## SERVICE LIST

Arthur E. Lewis, Jr., Esq.
Marlow V. White, Esq.
LEWIS & WHITE, PLC
222 W. Georgia Street
P.O. Box 1050
Tallahassee, FL 32301
mvw@lewisandwhite.com
lawlaw@polaris.net

*Counsel for Appellant Motivation, Inc.*

Ken Sukhia, Esq.
SUKHIA LAW GROUP, PLC
902 N. Gadsden St.
Tallahassee, Florida 32303
ksukhia@sukhialawfirm.com

*Counsel for Appellant Motivation, Inc.*

# EXHIBIT A

## MOTIVATION'S [MIS]STATEMENT OF THE CASE IN ITS BRIEF

| Page in Brief | Statement in Motivation's Brief | Reason Statement is Inaccurate or Misleading | Motivation Cite |
|---|---|---|---|
| 4 | As the court found, that case constituted a "massive fraud" . . . . | The court did not use the term "massive fraud" anywhere in the Opinion. | DE568 at 2 |
| 5 | Miscovich retained Proskauer Rose, LLP, a global law firm, to form Emerald Reef LLC and Global Underwater Treasure Salvage LLC . . . . | The cited testimony reflects that the New York Investors, and not Miscovich, engaged the Proskauer firm. | Day9 (DE549) at 32 |
| 7 | On August 11, 2011, less than a month before the admiralty case filing, Silverstein wrote that "I find this story incredible, and I have a very difficult time believing it is true" and that "[g]iven how incredible [Miscovich's] story is, I am reluctant to endorse taking legal action (such as filing an admiralty claim) based on the assumption it is true." | As reflected in the cited e-mail, the "story" Silverstein found to be "incredible" and had a "very difficult time believing" was not Miscovich's "story" but the New York Investors' story discussed in the immediately prior e-mail that the emeralds were discovered at the "Kirby" site. The bracket to add "[Miscovich's]" is inaccurate and misleading. | M28 at 2 |
| 7 | Silverstein knew the emerald transfer violated the settlement. | There was no evidence that Silverstein was aware of any violation of the Delaware settlement at the time the transfer occurred, and there was substantial evidence that Silverstein sought to ensure that of settlement was honored at all times – even after the New York Investors had violated it. The testimony at trial was that the New York investors were advised of, did not object to, and monitored the JTR admiralty lawsuit, and that any arguable "technical violation" of the Delaware settlement addressed in Exhibit M2-48 was remedied by a further settlement agreement that provided the New York Investors with an explicit security interest in the emeralds held by JTR. | M2-48 at1 |

1

## MOTIVATION'S [MIS]STATEMENT OF THE CASE IN ITS BRIEF

| Page in Brief | Statement in Motivation's Brief | Reason Statement is Inaccurate or Misleading | Motivation Cite |
|---|---|---|---|
| 7 | He even conceded that as of August 2011 he believed that the "weight of all the information" did *not* show that "it was more probable than not that the discovery was genuine." (Emphasis by Motivation) | Motivation has omitted words from the quote, and added its own words in place of the omitted word. When the full quotation is written, without Motivation's misleading omissions and additions, the opposite meaning is clear:<br><br>"At all times, except for a brief moment in August when I actually expressed the view that they probably shouldn't go forward unless David [Horan] felt it was appropriate, I was convinced by the weight of all the information I was aware of that it was more probable than not that the discovery was genuine." (DE549 at 114:17-21). | Day9 (DE549) at 114 |
| 8 | In an email full of self-serving verbiage, Silverstein offered Tobia a 10% interest in the find if he could prove it was a fraud or a 2% interest if he would acknowledge he had no knowledge contradicting Miscovich's account. | The actual testimony was that the offer Miscovich directed Silverstein to make to Tobia would provided Tobia a 10% interest if could demonstrate that "the Treasure was discovered at a location different than Jay already has identified . . ." Although this offer provided Tobia every incentive to reveal any contrary information he had as to the location of the find, Tobia never did so, and indeed in his deposition disclaimed any personal knowledge on the point. (*See* DE546 at 189-199). | Silv.Ex19 (DX19)<br><br>Day6 (DE546) at 189-99 |

| | | MOTIVATION'S [MIS]STATEMENT OF THE CASE IN ITS BRIEF | |
|---|---|---|---|
| **Page in Brief** | **Statement in Motivation's Brief** | **Reason Statement is Inaccurate or Misleading** | **Motivation Cite** |
| 9 | Although Silverstein suggested the 2% offer for his silence was less than the 3% previously allocated to Tobia, at the time of Silverstein's 2% offer, Tobia wasn't slated to receive any ownership interest. | The testimony and documentary evidence was that Miscovich and the New York Investors had previously agreed to allocate a 3% interest to Tobia. Additionally, Silverstein testified that "It was my view that I communicated to Jay that Tobia should never get anything, that he hadn't done anything that I could tell warranted him getting three percent, but that was the deal that Jay had made with him months before I ever got into the picture." (DE546 at 193:1-6) | M29 at 2 |
| 10 | While Silverstein claimed he could not ethically contact Tobia, there was no rule preventing contact with Tobia's counsel, and after Tobia became a member of JTR, Silverstein was free to speak with him as JTR's lawyer and as a fellow member. Even after Tobia became a JTR member, however, Silverstein, JTR's general counsel, never asked Tobia a single question about Tobia's claim that the find was fraudulent. | While Silverstein personally did not contact Tobia after their initial e-mail exchanges, his testimony was that he understood that others (including counsel of record) were doing so. | Day9 (DE549) at 73-74 |
| 11 | [A]fter learning of the lie [with respect to the Non-Spanish coins or whatever], Silverstein did not speak with Miscovich or Elchlepp about their attempted fraud on the court. | The cited testimony is that Silverstein relied on counsel of record (in this case Horan) to do the relevant due diligence, as Horan assured Silverstein he would do, and testified before Judge King that he did in this case. | Day9 (DE549) at 88-9 |

3

## MOTIVATION'S [MIS]STATEMENT OF THE CASE IN ITS BRIEF

| Page in Brief | Statement in Motivation's Brief | Reason Statement is Inaccurate or Misleading | Motivation Cite |
|---|---|---|---|
| 11 | Though Silverstein knew with certainty Jay and Steve were willing to lie *about finding explicit treasure items in the Gulf*, he claimed the revelations from Tobia and the plan to defraud the court on a key issue didn't prompt him to suspect the genuineness of the find | Silverstein's testimony was that he deferred to and relied on Horan (who had the direct conversation with Miscovich and Elchlepp) on this point: "David had met repeatedly with Jay and Steve outside of my presence and reported back to me that he was satisfied after speaking with them that the coin incident was not a problem for him, that he was still prepared to go forward with an admiralty filing." (DE546 at 177:10-14). Silverstein's further testimony on this point explained his personal view: "So these things had happened and they were not something I disregarded, I took them seriously. So I, as well as Paul [Sullivan], as well as Scott [Miscovich], as well as David [Horan], all separately and at sometimes in combination spoke with Jay and Steve to make sure they understood that you cannot go into admiralty court, you can't go into any court, but you can't go into a Federal Court and make a false claim. We weren't there in January of 2010 when you found the emeralds, we have all kinds of evidence that suggest you're being sincere, but there are some things coming up that give us reasons to be concerned about you and we want to understand what's happening. So we went through those things. They insisted that they found the emeralds where they said, how they said, when they said." (DE546 at 177:15-178:3). | Day6 (DE546) at 176<br><br>Silv.Ex.9 (DX9) |

4

## MOTIVATION'S [MIS]STATEMENT OF THE CASE IN ITS BRIEF

| Page in Brief | Statement in Motivation's Brief | Reason Statement is Inaccurate or Misleading | Motivation Cite |
|---|---|---|---|
| 12 | Silverstein claimed "nobody said anything about holding back emeralds to me." | Silverstein was answering a query from the judge addressing his original state of mind, before this issue arose. Later, Silverstein was told by others that Miscovich and Elchlepp had held emeralds back, and this issue was fully addressed in Silverstein's testimony. *See* (DE547 at 16-25). | Day7 (DE547) at 23 |
| 12-13 | Though Silverstein claimed that in December 2011 he had no "suspicions and concerns about whether Jay and Steve's claim [was] a fraud on the court," when pressed on cross, he acknowledged he continued to questions whether their "story was a fraud." | Silverstein's repeated testimony was that while "I had questions at all times from the beginning of my engagement by Jay, Steve and Scott, in January of 2011 through January 13, 2014, as to what truly occurred, because I wasn't there," (DE549 at 114:13-16) he never had any doubt that there was sufficient evidence to allow the ethical pursuit of the Admiralty Action.<br><br>To again quote Silverstein: "At all times, except for a brief moment in August when I actually expressed the view that they probably shouldn't go forward unless David [Horan] felt it was appropriate, I was convinced by the weight of all the information I was aware of that it was more probable than not that the discovery was genuine. That's not to say I didn't have questions. I always have questions if I didn't have firsthand knowledge. So I had questions. I had questions I'm sure on this date. I had questions after this date. And I had questions before this date. But my view, based on everything I knew, was that it was more likely than not that this was a genuine find." (DE549 at 114:17-115:2). | Day9 (DE549) at 114 |

5

## MOTIVATION'S [MIS]STATEMENT OF THE CASE IN ITS BRIEF

| Page in Brief | Statement in Motivation's Brief | Reason Statement is Inaccurate or Misleading | Motivation Cite |
|---|---|---|---|
| 17 | For example, on December 17, 2011, Horan wrote Silverstein expressing concern that "Jay and Steve have been untruthful with regard to their discovery of the emeralds and their statement that they have no idea how the emeralds got there." | Horan was asking a question, not making an affirmative statement. Horan wrote: "Since Bruce's email seems to be based on concrete terms, I would like to know what would prove that Jay and Steve have been untruthful with regard to their discovery of the emeralds and their statement that they have no idea how the emeralds got there. Why any one of us may accept as conclusive proof may very well be different." Horan testified at trial that he never reached the conclusion that Miscovich's version was false until Rodriguez's testimony as the First Sanctions Hearing. (DE543 at 166-67) | M1-20 at 1 |
| 20 | Silverstein then told Horan withdrawing "would be actionable," and Horan "took that as a threat." Horan testified that was "the second time he threatened me" and it came close to a "physical altercation." | The supposed "threat" (never intended as such), was an expression of Silverstein's opinion, later accepted by Horan, that Horan's withdrawal should be done so as not to prejudice JTR, precisely because no one (including Horan) had any proof of fraud by Miscovich. While Horan and Silverstein did have a misunderstanding on the point, as Silverstein testified, the relevant fact is that Horan and Silverstein ultimately agreed that Horan was entitled to withdraw in such a manner as not to harm JTR's interests. (See, e.g., M6 at ¶¶ 59-62). | Day1 (DE543) at 126. |

6

## MOTIVATION'S [MIS]STATEMENT OF THE CASE IN ITS BRIEF

| Page in Brief | Statement in Motivation's Brief | Reason Statement is Inaccurate or Misleading | Motivation Cite |
|---|---|---|---|
| 20 | Silverstein knew Horan withdrew because of the coin episode, the 20-pound group "hold-back," the epoxy findings, and suspicions the site was salted. | "David was misled, just as I was misled, into believing this was a genuine site. And he did not withdraw, as I understood it, because he concluded there was a fraud. He certainly never told me that." (DE549 at 152:15-18).<br><br>–Further: "David told me that he believed it was a genuine site based on everything he knew at that time. If he believed otherwise, I am confident, as he told me he would do, he would have told the Court otherwise." (DE549 at 152:10-14). | Day1 (DE543) at 6<br><br>Day7 (DE547) at21<br><br>Day9 (DE549) at 150-51 |
| 21–22 | Although Horan told Silverstein that Marcial was a trustworthy "man of integrity," Silverstein testified his "statements cause me no skepticism whatsoever because I did not believe a single word that I heard from Mr. Marcial." | Although Horan testified as to his personal belief that Marcial was a man of integrity, Horan did not testify that he ever shared that view with Silverstein. Rather, Horan testified that he told Silverstein that Horan "thought it would be very easy to have Marcial look at the emeralds and make a determination as to whether he believed they came from the Atocha or Margarita."<br><br>Additionally, Silverstein's testimony is taken out of context and omits the balance of Silverstein's statement in which he said "[a]t the time I thought [Marcial] was someone who was in the pocket of Motivation and would say anything that helped their cause, and I did not believe him." (DE549 at 130:19-21). | Day1 (DE543) at 78-80<br><br>Day9 (DE549) at 130 |

7

## MOTIVATION'S [MIS]STATEMENT OF THE CASE IN ITS BRIEF

| Page in Brief | Statement in Motivation's Brief | Reason Statement is Inaccurate or Misleading | Motivation Cite |
|---|---|---|---|
| 23 | On October 5, 2012, Motivation advised Silverstein "Dr. Baer, a consultant to [one of Jay's entities] reported Jay said he recovered these emeralds with the assistance of two Mexican divers," a fact inconsistent with Miscovich's story that he and Elchlepp recovered the stones Silverstein responded simply that "Dr. Baer is mistaken" and he had "never seen any evidence to support Dr. Baer's alleged account." After receiving this information, Silverstein made no effort to contact Baer to investigate this claim. | Silverstein's cited testimony is that his understanding was that Baer's account of the discovery was a "treatment," i.e. fiction, and certainly not an account based on personal knowledge. | Day9 (DE549) at 156<br><br>M5 at 7<br><br>Day9 (DE549) at 157 |
| 29 | Four days after the adverse final order, Silverstein outlined a revealing strategy for addressing it. In an email to Sullivan, Miscovich and other insiders, Silverstein suggested a new entity "be created in which the JTR members all have essentially the same membership interests, which could file a new claim based on a new find ... that is made over the next week...." | Inasmuch as the admiralty trial ended with an express finding of inconclusive evidence, Silverstein (a non-admiralty lawyer) raised the idea of considering a new filing to pursue similar relief based on additional evidence "if it were appropriate to do so." (M2-30) There is no evidence of anyone following up, or any action being taken with respect to this floated idea. | M2-30 |
| 31-32 | On November 7, 2013, Motivation took a sworn statement from Miscovich's bookkeeper, Lisa Martorano, giving a detailed account of accompanying Jay on an emerald *buy* in Jupiter. | Lisa Martorano did not testify that she accompanied Miscovich on a buy. Rather, she recounted accompanying Miscovich to Jupiter, where he left her at a McDonalds for about an hour. Marorano testified that Miscovich told her his cash went "to pay my divers, they needed gas and equipment, and stuff, so I mean, I had to pay them for their services." | M11 |

8

| | MOTIVATION'S [MIS]STATEMENT OF THE CASE IN ITS BRIEF | | |
|---|---|---|---|
| Page in Brief | Statement in Motivation's Brief | Reason Statement is Inaccurate or Misleading | Motivation Cite |
| 32 | In October 2013, Siracusa obtained a highly suspicious and never before disclosed February 2010 agreement between Miscovich and Cunningham which purportedly granted Cunningham a 60% interest in the emeralds. On October 16, 2013, Siracusa and Janssen wrote Jay that "we have had some rather serious discussions with Bruce [Silverstein] and Sully [Sullivan]...as to whether any of us continue to believe your story surrounding the April, 2010 Cunningham Release, your payment of $50,000 to him for it, the credibility of Stacey Wolfe's notary log, and if we don't believe the Mike C story, how could we possibly continue to effectively and/or ethically represent JTR through the sanctions hearing." Siracusa said they couldn't continue representing JTR unless Jay "were to acknowledge that your Mike C story is untrue and work towards rectifying the problems that your untruthful trial testimony has caused...[w]e can not expose our law firm and put our licenses on the line for this." Silverstein claimed this email not only gave him no reason to doubt Miscovich's story, but somehow supported his belief in Miscovich's veracity. | The email in question (M2-32) also states to Miscovich "We all agree that we just don't know whether you and Steve actually found the stones at the site. There is certainly sufficient evidence that you did and that the stones were submerged for sometime." Silverstein testified that this was why the email did not cause him to doubt Miscovich's story regarding the find. (*See* DE548 at 20:16-21:3, 23:22-24:20). This also occurred nearly ten months following entry of the Final Order. | M26<br><br>Day2 (DE544) at 257-58<br><br>M2-32 |

9