# United States Court of Appeals for the
# Eleventh Circuit

---

JTR ENTERPRISES, LLC, a Delaware Limited Liability Company,

*Plaintiff/Appellee,*

YOUNG CONAWAY STARGATT & TAYLOR; BRUCE L. SILVERSTEIN; PAUL D. SULLIVAN,

*Interested Parties/Appellees/ Cross-Appellants,*

*v.*

MOTIVATION, INC.,

*Claimant/Appellant/Cross-Appellee.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO: 4:11-cv-10074-JLK

---

(Hon. James Lawrence King)

# APPELLANT/CROSS-APPELLEE'S RESPONSE TO APPELLEES/CROSS-APPELLANTS' MOTION FOR SANCTIONS

KENNETH W. SUKHIA
SUKHIA LAW GROUP PLC
902 N. Gadsden Tallahassee,
FL 32303 (850) 383-9111

A. EUGENE LEWIS, JR.
MARLOW V. WHITE
LEWIS & WHITE, PLC
222 W. Georgia Street
Tallahassee, FL 32301
(850) 425-5000

*Counsel for Appellant/Cross-Appellee*

**Introduction**

Appellees claim they "do not file their motion lightly," but from beginning to end of the case below they described Motivation's intervention and filings as "frivolous" and baseless. Not once did the lower court make such a finding. It is Silverstein and his firm whose motion is frivolous. For example, they claim their experts "undisputed" testimony was that "all actions in the case were ethical and proper." (Mot.p27n13). To the contrary, the witness acknowledged that if Silverstein threatened witnesses waiting to be called, as two witnesses testified, such threats *would be* unethical. (DE551p14-16,18-22). On October 5, 2012, Motivation advised Silverstein that Miscovich consultant Dr. Baer reported that Miscovich said he "recovered these emeralds with the assistance of two Mexican divers," a story totally contrary to Miscovich's discovery tale. (M5p7; DE549 p156). Silverstein responded that "Dr. Baer is mistaken" and that he had "never seen any evidence to support Dr. Baer's alleged account." *Id.* Silverstein, however, made no effort to contact Baer to get more details about this account. (DE549 p157). Instead, he tried to suppress Baer's testimony by threatening him with litigation while Baer waited to testify in court. He also threatened Motivation expert M. Marcial. Silverstein's intimidation of witnesses[1] who had evidence of the

---

[1] Silverstein also threatened two other witnesses outside of the courthouse, Neil Ash and Dean Barr, two of the New York Investors. (DE526-1Tr.Jan13;pp137-38, 196-97)

fraud is itself evidence showing "consciousness of guilt which raises an inference of actual guilt." *United States v. Harmon*, 721 F.3d 877, 884 (7th Cir. 2013).

After the first sanctions trial Judge Moore echoed these concerns. Noting he had "heard a lot about Mr. Silverstein…as an actor in the proceedings" and asking JTR's counsel Siracusa, who described Silverstein as a zealous advocate, why Silverstein didn't appear to testify for JTR. (M45p125). The Court observed:

> You heard the evidence, I think you heard evidence that was
> contradicted, I think to some extent by your witnesses, of conduct that
> might fall under the obstruction of justice provisions, intimidating a
> witness. There were a number of witnesses who testified, including the
> last witness that was called who testified that he felt intimidated or
> threatened or that other witnesses were threatened by testifying or by
> having suits filed against them.  There…also is a criminal code
> provision for Title 18, United States Code, Section 3, accessory after the
> fact.  Do you wish to comment on any of the evidence that was
> presented with respect to those accusations?
>
> MR. SIRACUSA: Against which parties, Mr. Silverstein?
>
> THE COURT: Yes.

(DE526-3;M45p142).

Silverstein testified at his sanctions hearing that "the first time I ever heard" about Jay buying bulk emeralds was at the first sanctions trial in January 2014, when the Jupiter, Florida jeweler said he sold bulk emeralds to Jay. (DE546p101) In truth, that was the fourth time he had heard about bulk emerald sales to Miscovich (*Id*.p106).*See* Barr Declaration(M20¶1(d)), Tobia's deposition excerpts (M10p103-04,107-08;DE550p75) and Martorano's sworn statement

(M11;DE550p93). Upon learning Rodriguez would testify he sold the emeralds to

Jay, Silverstein wrote

> If this guy really did sell Jay 60 pounds of emeralds, why has Motivation
> not called him as a witness? That makes no sense. Is it possible that
> Motivation knows that the guy did not sell Jay emeralds, and has paid
> him to have his attorney call you and lie about what he would say in
> order to try to persuade you to refrain from calling him as a witness? Is it
> possible that Motivation and the FBI are trying to set you [Siracusa] up
> by seeing if you will tell this guy to refrain from showing up after hearing
> from his attorney what he supposedly will say? …If this guy does show
> up and testify…I think you just need to deal with his credibility, and later
> argue to the Court that (i) this is the first time anybody that has supported
> Jay, Steve and JTR has ever heard of this and (ii) even if the store
> owner's testimony is given credit, the most it establishes is that Jay
> bought 60 pounds of emeralds…and it does not prove that Jay and Steve
> did not find emeralds in the Gulf of Mexico as they both have testified…

(M2-43). This email illustrates Silverstein's reaction to nearly all of the evidence

showing Jay and Steve to be frauds. Anything that undercut the treasure claim was

rejected out-of-hand.

After the second sanctions trial, Judge King found that:

> [T]he evidence overwhelmingly shows that Silverstein substantially
> controlled JTR's actions in these proceedings. For starters, the retainer
> agreement between Jay, JTR, and Horan designates Silverstein as JTR'S
> "general outside counsel," and requires Horan to seek "specific
> authorization" from both Jay and "general outside counsel" (i.e.,
> Silverstein) before undertaking any of a litany of tasks necessary to the
> maintenance of the instant action. Motivation Ex. M-25. Moreover, and
> as detailed throughout the Court's Findings of Fact… countless emails
> from Silverstein to JTR'S admiralty counsel demonstrate that he was
> substantially in control of this litigation. From forbidding the filing of
> various reports in this case, to drawing and revising pleadings and
> motions in this case, to participating in trial strategy discussions,
> Silverstein's control is plain.

(DE568;p55). Judge King referred the matter to the U.S. Attorney for such action as he deemed appropriate. (DE568;p57-58)

## Horan and Janssen & Siracusa

Appellees hide behind both Horan and successor admiralty counsel Janssen & Siracusa throughout their motion. They claim, for instance that "Horan and Siracusa, as Record Counsel, were the 'captains of the ship' upon whom Silverstein could rely." (Mot.at 7). Judge King found, however, that "the evidence overwhelmingly shows that Silverstein substantially controlled JTR's actions in these proceedings," that "countless emails from Silverstein to JTR'S admiralty counsel demonstrate that he was substantially in control of this litigation" and that "[f]rom forbidding the filing of various reports in this case, to drawing and revising pleadings and motions in this case, to participating in trial strategy discussions, Silverstein's control is plain." (*Id*.at 55) Appellees' focus on Horan and Siracusa is inherently flawed for another reason. Prior to the admiralty trial, Horan withdrew as counsel and Janssen & Siracusa unsuccessfully moved to withdraw as counsel. As detailed in Appellant's Initial Brief, the record is replete with contemporaneous written correspondence making it clear both counsel sought to withdraw over ethical concerns about their clients and the validity of their clients' story. (In.Brp15-20,33;DE287). By late 2011, all the attorneys were aware that modern epoxy was infused in the emeralds, Tobia reported the emeralds weren't

discovered in the Gulf as Miscovich claimed and Miscovich was willing defraud the court by falsely claiming to have found non-Spanish coins to remove Spain as a claimant. By early 2013, it was clear to all counsel that (1) Miscovich's bank records didn't support his claim to have withdrawn $50,000 to pay the map seller for a release (2) on the date Miscovich claimed they found the emeralds the seas were too rough to permit such a dive (3) the clients had fraudulently held back 20 pounds of emeralds for themselves as insurance against an adverse judgment (4) all of the emerald stones were found in virtual plain view just sitting on the sea bed surface (5) in dives unescorted by Miscovich and Eschlepp no emeralds were found and (6) the person Miscovich said he bought the supposed treasure map from at a bar in Key West was in prison at the time and had never been to Key West.

Afterward, one signal after another revealed they were dealing with a fraudulent claim. But Horan and Siracusa's response differed from Appellees' response in a crucial respect: While both sets of admiralty counsel moved to withdraw as counsel to Miscovich and JTR (Horan before the admiralty trial and Siracusa before the first sanctions trial), there is no indication in the record that Movant/Appellees had any intention to withdraw as counsel for them.

Appellees state that "not one shred of documentary evidence showed that Appellees intentionally or knowingly participated in any fraud." Even if that *were* accurate, it is neither the appropriate test nor Appellant's position on appeal. As

Appellant made clear in its Initial Brief, "[t]he issue here is whether and when the persons coordinating and controlling the fraudulent litigation knew of, or cast a blind eye to, the fraud, and whether upon having sufficient knowledge of it they took steps to end it." (In. Br. 4). The issue is whether they had reason to conduct, and conducted, a diligent investigation; not whether they were conspirators in a plot to defraud the court. As this Court emphasized, "measured objectively," if a "reasonable investigation would have revealed" that a claim was frivolous or in error to a "reasonably competent attorney, then sanctions can be imposed." *Thompson v. Relationserve Media, Inc.,* 610 F.3d 628,665-66 (11th Cir. 2010). By ignoring the host of red flags, failing to take reasonable steps to investigate them and persisting in the litigation despite them, Appellees engaged in bad faith litigation and prevented the truth from being revealed for more than three years. Sanctions were called for because they substantially controlled bad faith litigation, whether or not they were conclusively shown to have intentionally participated in the fraud. *Amlong & Amlong, v. Denny's, Inc*., 500 F.3d 1230 (11th Cir. 2007):

> We have previously held…that "if an attorney has failed to conduct a reasonable inquiry into the matter, then the court is obligated to impose sanctions even if the attorney had a good faith belief that the claim was sound." *Mroz*, 65 F.3d at 1573. It will not do to rest upon a "gut feeling" that one's client is a victim. See *Blue*, 914 F.2d at 541. As the Fourth Circuit warned in *Blue*:
>
>> Undoubtedly there are instances in which an attorney acts irresponsibly by failing to investigate the facts behind his

client's claim and by instead relying solely on the client's testimony to support his case. "Counsel cannot escape liability, as they attempt to here, by relying solely on their belief that their clients genuinely feel that they were not fairly treated."[2] "No longer is it enough for an attorney to claim that he acted in good faith, or that he personally was unaware of the groundless nature of an argument or claim."

*Id.* at 542 (citations omitted). Thus, the Amlongs' good faith in their belief in their client does not insulate them from the requirements of the federal rules to investigate the claims they bring to the court.

*Id.* at 1268.

Appellees claim Rule 38 sanctions should be imposed for rearguing credibility issues. As Appellant made clear in the Initial Brief, however, credibility of witnesses is not an issue in this case and the Order from Judge King never made "credibility" findings.[3] (DE568) As pointed out in the Initial Brief, the primary evidence took the form of contemporaneous emails and other documents.

## Motivation Has Proceeded in Good Faith

Appellees say Motivation's appeal is an improper attempt to extract legal fees even though Motivation was aware "all along there was no basis" for the intervention. Without Motivation's intervention, and dogged pursuit of the facts the fraud would have succeeded![4] As to Appellees' criticism of the decision to limit the sanction motion to those with "deep pockets," as J. Moore asked, "if you

---

[2] See, Mot.p.13 n7.
[3] The opinion twice uses "incredible," but not in reference to the believability of any witness.
[4] *See* J. Moore's summary of events. M45pp129-140, particularly pp.132,140.

did prevail (on the sanctions motion), is there a culpable individual out there that can compensate you for your losses?" (DE526-3p125). Many could be liable for sanctions but most were impecunious peripheral characters.[5]

Appellees' also complain Motivation did not seek sanctions from other people, like Horan and Siracusa. First, that issue is wholly irrelevant to this appeal. Second, Horan and Siracusa's response to the evidence of fraud was entirely different than Silverstein's and their concerns led them to move to withdraw.[6]

Appellees claim Motivation's "mission [is] not…a search for truth" but an effort to sanction a deep pocket. Motivation is the **only** participant in this case, however, who steadfastly searched for the truth. If Appellees had been searching

---

[5] As Judge King noted, "this Order does not foreclose the possibility that other actors, against whom no sanctions were sought, can be held accountable."

[6] Horan expressed his concern to Silverstein that JTR was engaged in "fraudulent, repugnant or imprudent" misconduct (M1-3). Silverstein knew Horan "had received…information from [an emerald expert] that has increased [Horan's] concerns *that Jay has been untruthful in his assertion that he found emeralds*…where they said he found them." (M1-1) Horan believed "Jay and Steve have been untruthful with regard to their discovery of the emeralds and their statement that they have no idea how the emeralds got there." (M1-20p1). On March 1, 2012, Horan cautioned Silverstein that "[a]s you are fully aware, we have 'credibility problems' with our client," Horan explained to Silverstein that ethical rules would require him to withdraw if JTR "persists in a course [Horan] reasonably believe[s] is fraudulent, repugnant or imprudent." (*Id*.) He told Silverstein he was concerned because on his dives he "was being shown where the emeralds were…[and]…being directed to specific areas" and that emeralds were possibly "deposited there by someone prior to [Horan] diving." (Day1p62). In an August 30, 2012 email, Horan set out lies from the clients giving him ethical reasons to withdraw. (M1-4. InBr.p20-21). Janssen & Siracusa shared such concerns and moved to withdraw as well.

for truth also, they would have quickly discovered, as Motivation did, that the so-called Emerald "discovery" was a disgraceful fraud on the court and the American judicial system. Based only on the disclosures from Tobia at the outset that the find was not "discovered" as claimed and Dr. Baer's contradiction regarding Miscovich's first discovery story, the Appellees could have tracked down those claims and promptly gotten to the bottom of the fraud.

Motivation entered the litigation on October 16, 2011, and the litigation would have ended immediately had JTR allowed Motivation's highly respected emerald expert to examine the emeralds and rule them out as coming from Motivation's protected sites. As it was, not until August 14, 2012, was he finally able to examine the emeralds and find they could not have come from Motivation's 1622 shipwreck and were of dubious value. Two days after the inspection, Motivation filed its motion to dismiss its claim (DE118). J. King, however, denied the motion and kept Motivation as a competing advocate. (DE121)[7] Sanctions against those controlling the litigation are even more appropriate where, as here, Motivation was *compelled* to incur the expense of litigation.

Movants make much of the fact that Holloway told Silverstein he did not see evidence of fraud presented *in the admiralty case*, claiming that testimony was "conspicuously omitted" from Motivation's brief. But that statement was made at

_____

[7] Here, again, J. Moore gave kudos to J. King for doing so. (M45pp122-23)

the conclusion of the admiralty trial, *before* anyone had access to the crime-fraud correspondence revealing the extent of Appellees' complicity.

Appellees' claims about a "false Stipulation" are highly misleading. (Mot.p11). The document referenced was a draft proposed settlement and the terms were negotiable. Appellees' use of a settlement proposal as a weapon in litigation to support a motion for sanctions underscores their willingness to stretch the limits of good faith in a motion ironically alleging impropriety.

Appellees claim there was "'no evidence' that Appellees intentionally or knowingly participated in any fraud prior to the time that JTR's own counsel came forward with such evidence." (Mot.p12). The fact is, JTR's counsel was compelled by Motivation's counsel to advise the court that Rodriguez would testify. *See* Affidavit of John Tuthill, (DE562-2). Tuthill affirmed that

> Any contention in which Mr. Siracusa indicated *he* decided to approach the Judge to make Rodriguez's suspected future testimony known to the Judge is *not* accurate. It was my suggestion although Mr. Siracusa initiated the presentation and conversation with Judge Moore and his proposal to assist by having the US Marshal escort Jorge Rodriguez to Miami is on the record.

(DE562-2)(Emphasis in original.) Rodriguez testified on the last day of the proceedings. Siracusa has never contradicted Tuthill's affidavit.

### Appellees' Motion Argues Matters Properly Raised in Brief, Misleads This Court and Wastes Judicial Resources

Appellees claim Motivation failed to cite evidence favorable to them, mischaracterized testimony and exhibits and included argumentative conclusions.

(Mot.p12-16). They have violated the 20-page limit by adding a 9-page single spaced "Exhibit A" which is merely an extension of the argument and doubles the allowable space. As a result Motivation is not able to address all of Appellees' contentions, most of which are mere arguments that belong in a brief.

Appellees' object to Motivation's contention that on August 11, 2011, Silverstein doubted the veracity of Miscovich's story. (M-28). Silverstein had suggested the admiralty case should not be filed based on an assumption the "story" is true. In its brief, Motivation added the bracketed word "Miscovich" to reveal that it was Miscovich's story Silverstein doubted. Appellees argue the bracketed "Miscovich" was "inaccurate and misleading." claiming the cited email revealed only that Silverstein doubted Rose's story that Miscovich took the emeralds from a site owned by Rose.[8] They are wrong. In his testimony, Silverstein confirmed that in the M-28 email, he was indeed expressing his view that he doubted Jay Miscovoch's story was true. (Day 9p29-30). With reference to the M-28 email he was asked, "As of August 11. 2011, you were having a very difficult time believing Jay's story was true?" Silverstein responded, "That's right. As of August 11, 2011, that was my state of mind." (DE549p29-30). Much later Silverstein reversed his position on his prior clear admission.

---

[8] Silverstein and his firm's spin makes no sense. Why would JTR conceivably file the admiralty case based on an assumption that Miscovich stole the emeralds from Kenny Rose's site?

Also, Silverstein and his firm claim Motivation should be sanctioned for "misleading" this Court by stating that Judge King found that this case involves a "massive fraud" on the court. (Mot.Ex.A,p.1). The claim is ludicrous. Judge King repeatedly described it as a "massive fraud" on the court and at one point characterized it as "Massive, [the] biggest fraud I've ever seen in 50 years on this court." (DE544p327;DE567p19,32,96; DE554p15; DE546pp167,169;DE549p54; DE609pp27,37). Judge King's written order may not have used that term, but he did say the fraudulent litigation, which Silverstein and his firm "substantially controlled" for two years, was "criminal." (DE568p2). If anything Motivation could be cited for understatement. That Silverstein and his firm include this kind of nonsense in a motion for sanctions underscores the monumental waste of time and resources caused by their ill-considered and frivolous motion for sanctions.

Appellees correctly state the New York Investors and not Miscovich retained the Proskauer Rose law firm (Mot.ExA,p.1); but the Investors engaged Proskauer to create the documents that framed the entity into which they invested millions of dollars, with Miscovich holding the controlling 51%. Appellees take issue with Motivation's claim that Silverstein knew the emerald transfer violated the settlement with the New York Investors, and claim there was no evidence that Silverstein was aware of any violation of the Delaware settlement at the time the transfer occurred. But that is not correct. Silverstein sent copies of the relevant

MOU and Promissory note to other counsel on September 18, 2012 and he delivered to the NY Investors a nonrecourse Promissory Note executed by Miscovich, Scott, and Elchlepp in their personal capacities. (M2-48). Six days later, Miscovich, Scott, and Elchelpp executed a JTR Operating Agreement prepared by Silverstein/YCST conveying all their emerald interest to JTR and rendering worthless the nonrecourse $5 million Promissory Note. (DE548p91; DE549p36,42-44; M24). Contrary to Appellees' claim, Silverstein knew and wrote to fellow counsel that the emerald assignment "was a technical violation of the settlement…because the assignment took the ownership rights to the treasure away from Jay, Scott and Steve, and gave them to JTR." (M2-48). Miscovich and Silverstein had to have known the transfer of the res to JTR was a gross material breach of the settlement with the New York Investors.

In reference to Silverstein's August 11, 2011 email, Appellees take issue with the phrasing on page 7 of Motivation's Brief that in August 2011 Silverstein believed the weight of the evidence "did not show it was more probable than not that the discovery was genuine." (Mot.Ex.Ap2). But that is precisely what Silverstein's testimony revealed. He testified that "*except for a brief moment in August when I expressed the view that they probably shouldn't go forward,*" (i.e. the August 11, 2011 email, M-28) he felt the weight of the information showed it was more probable than not that the discovery was genuine. That must mean that

in August 2011 he did *not* feel it was more probable than not that the discovery was genuine, which is exactly what Motivation stated on page 7 of its brief. Silverstein elsewhere confirmed this was his state of mind at that time.  When he was asked "(a)s of August 11. 2011, you were having a very difficult time believing Jay's story was true," Silverstein responded, "That's right.  As of August 11, 2011, that was my state of mind." (M28;DE549pp29-30).  Only a week later Tobia told Silverstein the emeralds were found on land and not discovered in the ocean as claimed by Jay..  Rather than investigating that claim, Silverstein that same night urged Horan to file the admiralty action.

Appellees take issue with Motivation's paraphrase of the offer to Tobia to deal with his claims. (Mot.Ex.A.p2). The argument is totally specious. Tobia *was* offered a 2% interest in the find if he acknowledged he had no knowledge contradicting Miscovich's account and a 10% interest if he could prove it was a fraud (which of course would have rendered the 10% virtually worthless.). The email setting out and discussing the offer is in the record for the Court to see.  It is perfectly reasonable to see the offer as an effort to procure Tobia's cooperation and silence. The Appellees' are the ones who have put an implausible spin on it.

The remaining alleged misstatements in the brief all amount to nothing other than disputes over the meaning and interpretation of the emails and other record evidence.  Of course, the Appellees take issue with various facts as stated and

characterized in the Appellant's Initial Brief. They are free to and have indeed raised those points in their Answer Brief. But each side in every appeal tends to view and interpret the evidence differently. All of the challenged statements in Appellant's Initial Brief are supported by citations to the record and none of them are inaccurate. The emails and testimony are cited for the court's review and assessment and both sides are free to provide their own assessment as to their meaning and import. By escalating such disputes into an effort to sanction the opposing party, Appellees have themselves misapplied the rules and have engaged in precisely the type of frivolous and inappropriate abuse of the system and waste of judicial resources that their motion for sanctions purportedly decries.

Silverstein constantly uses Horan to deflect himself from his failures to investigate Miscovich's *bona fides*. Had Horan testified that Silverstein was dodging his duty to inspect, Horan would have made the case against *himself*. As it was, however, he challenged Silverstein frequently and told him that although he at first thought the story was true, he came to doubt the veracity of the discovery claim. When Horan finally moved to withdraw as counsel for JTR, he sent a litany of reasons, "[t]he primary basis for my withdrawal is the accumulation of numerous surprises along the way" (M1-4 p4-5; DE 467-Ex5 p21-22) which should have convinced Silverstein and his firm to withdraw. The surprises were related to the ethical concerns arising from the client's lies and frauds and to

Horan's concerns over the veracity of the find. (In Br. p19-21). The first 7 of the

8 "surprises" (a through h) all occurred before February 2012. Item h provided:

> For a long time, I have requested Bruce appear (sic) Pro Hac Vice in
> our litigation. He has actually been calling most of the shots, but he
> refuses to appear. Now it seems Bruce would like to blame others for
> problems in this case. (Bruce has sent emails to me that state that he
> has found some of my actions "unacceptable".)

### **Motivation's Appeal of the Denial of the Reconsideration Motion**

Appellees argue Motivation should be sanctioned for challenging the district

court for addressing only six of the 30 material facts in the case. Motivation

argued it is not possible to meaningfully review the district court's ruling because

the order failed to identify and address all red flags, and it is their accumulated

impact that renders those red flags material facts illustrating Silverstein and his

firm's willful blindness. The court held that after considering the cumulative effect

of all the evidence, Motivation had proven by "overwhelming evidence" that

Silverstein "substantially controlled" a major "fraud" on the court, but that

Motivation did not prove that Silverstein was reckless or willfully blind to the

fraud he controlled. The problem is that, because he omitted discussion of most of

the red flags, nobody knows what key facts the district court found and relied on

when considering the cumulative impact of the entire record. For example,

according to Silverstein's own testimony and a contemporaneous email, it is clear

that in August, 2011, before the first red flag flew (a week later Tobia revealed the

fraud to Silverstein) Silverstein thought Miscovich's story was probably false. Given that the issue is focused on Silverstein's state of mind and his recklessness in substantially controlling a massive fraud on the court for two years, this may be the most critical fact in the case -- but the district judge ignored it.  Motivation filed a motion under Rule 52(b) asking the court to make additional findings and included 65 paragraphs of highly germane facts not addressed by the district court. Appellees call this the "Reconsideration Motion."  While the motion did include a request for reconsideration, Motivation appeals on the ground that the district court did not reveal all of its material findings.

Appellees argue it is frivolous for Motivation to argue that the district court was required to find and reveal all the material facts.  They focus on the difference between a bench trial and a ruling on a motion and cite *Nuveen High Yield Municipal Bond Trust v. City of Alameda*, 730 F.3d 1111 (9th Cir. 2013). In *Nuveen*, the court explained, "*Rule 52(a)(1)* governs findings in *bench trials*. *Rule 52(a)(3)*, governing *motions*, provides '[t]he court is **not required** to state findings or conclusions when ruling on a motion under Rule 12 or *56 or, unless these rules provide otherwise, on any other motion*.' *Fed. R. Civ. P. 52(a)(3)."*    *Id*. at 1123 (emphasis in original). Here, we have a bench *trial* prompted by a motion.

There appears to be no clear rule or case law defining a bench trial. That's probably because everybody already knows what a trial is.[9] In the proceeding below, all parties filed proposed findings before and after the trial. The trial itself involved 11 days of evidence and argument, and hundreds of exhibits. As it is, this Court cannot perform a meaningful review without digging through the extensive record because the district court did not reveal all the material facts that were proven and considered cumulatively as not showing willful blindness. Appellees' argument that the district court need not make any findings at all is absurd. How could an appellate court perform a meaningful review of a bench trial with an extensive record without proper fact-findings below?

The most striking thing about Silverstein and YCST's motion is not that they debate the propriety of requiring fact-findings after a bench trial. It is their claim that after much serious consideration and soul searching, they felt compelled to

---

[9] Judge King and lawyers representing Appellees certainly thought the proceeding was a trial. See Day 1;DE543p8, line 3, Judge King referred to the "trial held by Judge Moore." David Zack, one of Silverstein and his firm's attorneys, asked Jorge Rodriquez if he had given testimony at the trial on January 15, 2014. (*Id*. at 40) Judge King said, "[T]his is exactly why I really don't do this in my trials." (*Id*. at 89) Judge King granted the motion of Silverstein's for what he (and Silverstein and his firm's lawyers) acknowledged was, in effect, a directed verdict after trial. (*Id*. at 345, 368, 376, 378, 379, 386, 389) Judge King requested findings of fact and conclusions of law without objection. (DE551p6.).

reluctantly file a motion for sanctions, but then base their motion on such a frivolous and shaky arguments.

## Conclusion

In the entire family of possible legal motions, this motion may be the strangest of all — the *frivolous* motion for sanctions. Motivation's contention is that Silverstein and his firm were reckless and willfully blind to the fraud they "substantially controlled" for over two years. Motivation has cited 30 incidents indicative of the fraud that were all known to Silverstein and all were proven by undisputed evidence, mostly in the form of Silverstein's admissions and backed by contemporaneous emails. The district court refused to address most of these incidents, which prompted Motivation's Rule 52(b) motion below.

Silverstein and his firm have now filed two diversionary motions (motion to dismiss appeal and motion for sanctions) which appear designed to shift this Court's attention from the merits of Motivation's appeal. The district court found specifically that Motivation proved by "overwhelming evidence" that Silverstein "substantially controlled" the "criminal" fraud on the court. Motivation presented undisputed evidence (mostly in the form of Silverstein's own testimony and contemporaneous emails produced under the crime-fraud exception to attorney client privilege), that (1) Silverstein thought Miscovich's story was probably false in August 2011; (2) after August 2011 Silverstein was aware of at least 30 different

events that put him on notice of the fraud (including specific details of the fraudulent scheme); and (3) Silverstein did nothing to confirm whether or not he was managing a fraud on the court, other than repeatedly asking Miscovich (a person who Silverstein admitted was not always truthful) whether Miscovich was a fraud. The district court held that all the red flags, considered cumulatively, did not demonstrate that Silverstein was reckless or willfully blind to the criminal fraud he was controlling, but the district court limited its fact-findings to parts of 6 of the 30 red flags. Further, while the district court sanctioned JTR Enterprises, LLC ("JTR") for bad faith litigation tactics engineered by Silverstein, the court never explained why it refused to sanctions Silverstein and YCST for acting in bad faith. Whatever the lower court thought of the conduct, the question is whether the conduct is acceptable in this Circuit - a question that is difficult to address without detailed fact-findings addressing all 30 red flags proven in the 11-day trial held below. Given the importance of the integrity of the judicial process, it is critical that the merits of this matter be carefully reviewed by this Court.

Respectfully submitted,

*s/ Ken Sukhia*

A. Eugene Lewis, Jr.
Marlow V. White
LEWIS & WHITE, PLC
222 W. Georgia Street
Tallahassee, FL 32301
(850) 425-5000

Kenneth W. Sukhia (FL Bar 266256)
SUKHIA LAW GROUP, PLC
902 N. Gadsden St.
Tallahassee, Florida 32303
(850) 383-9111
*ksukhia@sukhialawfirm.com*
*Counsel for Appellant Motivation*

## Certificate of Interested Persons and Corporate Disclosure Statement

Undersigned attorney for Appellant certifies that the attached list identifies those persons and entities with an interest in the outcome of the appeal:

Trial Judges:

King, James Lawrence, Southern District of Florida

Moore, K. Michael, Southern District of Florida

Attorneys of Record:

Coffey, Kendal, Miami

Dorsey, John T., Wilmington, Delaware

Josefsberg, Robert C., Miami

Gravante, John III, Miami

Holloway, John E., Norfolk, Virginia

Lewis, A. Eugene, Tallahassee

McLeod, Aaron G., Jacksonville

Morgan, Hugh J., Key West

Rogerson, John T. III, Jacksonville

Rosenthal, Stephen F., Miami

Kenneth W. Sukhia , Tallahassee

White, Marlow V., Tallahassee

Zack, David J., Miami

Other Persons:

Abt, Taffi Fisher, Sebastian, Florida

Fisher, Kim H. Fisher, Key West

Fisher, Juanita L., Key West

Silverstein, Bruce L., Wilmington, Delaware

Sullivan, Paul D., Kailua, Hawaii

Corporations (None Trading Publically)

Coffey Burlington, P. L., Miami

JTR Enterprises, LLC, Delaware

Lewis & White, P. L. C., Tallahassee

Podhurst Orseck, P.A., Miami

Sukhia Law Group, PLLC

Young, Conaway, Stargatt & Taylor, LLP, Wilmington

I HEREBY CERTIFY that, in addition to the service by the CM/ECF system, I electronically served PDF-copies hereof on all attorneys of record, including counsel for Appellees on this 11th day of July 2016.

*s/ Ken Sukhia*

Kenneth W. Sukhia (FL Bar 266256)
SUKHIA LAW GROUP, PLC
902 N. Gadsden St.
Tallahassee, Florida 32303
Phone:     (850) 383-9111
*ksukhia@sukhialawfirm.com*

A. Eugene Lewis, Jr.
Marlow V. White
LEWIS & WHITE, PLC
222 W. Georgia Street
Tallahassee, FL 32301
(850) 425-5000
*Counsel for Appellant Motivation Inc.*