UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

JTR ENTERPRISES, LLC,

                Plaintiff/Appellee,

vs.                                                      Appeal No. 15-14132-D

MOTIVATION, INC.,                          *D. C. Case No. 4:11-CV-10074*

                Claimant/Appellant
_____/

## APPELLANT MOTIVATION'S RESPONSE TO SULLIVAN'S MOTION TO STRIKE PORTIONS OF REPLY BRIEF

I. <u>Applicable Law</u>

The procedural bar concerning initial and reply briefs was "properly developed and utilized" to prevent the appellant from surprising and disadvantaging the appellee by "rais[ing] ***a completely new issue in its reply brief***." *Cousin v. Trans Union Corp.,* 246 F.3d 359, 373 n. 22 (5th Cir. 2001). It's clear from the case law, including that relied on by Sullivan, that the rule is intended to deal with new *arguments and issues. See*, *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("it is well settled in this circuit that a party abandons *an issue* 'by failing to list or otherwise state it as an issue on appeal'); *Big Top Koolers, Inc. v. Circus-Man Snacks, Inc.*, 528 F.3d 839, 844 (11th Cir. 2008) ("We decline to address an argument advanced by an appellant for the first time in a reply brief."); *United States v. Levy*, 379 F.3d 1241,

1244 (11th Cir.2004) (Court will not "consider *issues raised for the first time* in an appellant's reply brief."); *Tallahassee Mem'l Reg'l Med. Ctr. v. Bowen*, 815 F.2d 1435, 1446 n.16 (11th Cir. 1987) ("It is well settled that a party cannot *argue an issue* in its reply brief that was not preserved in its initial brief.").

Sullivan claims (1) that the arguments in the Initial Brief as to Sullivan were not presented adequately to give him fair notice of the issues and facts at play, and (2) that new issues were raised in the Reply Brief. Neither claim is true.

II. <u>The Issue and Arguments in the Initial Brief Were Clear and Broad Enough To Give Sullivan Full and Fair Notice of the Issues and Facts at Play</u>.

A. <u>Abandonment</u>

An issue can be abandoned when it is not raised in the appeal. There can be no question that Motivation was appealing the trial court's order finding there was "no evidence" of Sullivan's culpability. There was also no question that the issue was whether there was any evidence to show Sullivan's culpability and willful blindness. The scope of the appeal and the issues raised were evident from and delineated in (1) the order under review, which dismissed Sullivan and found "no evidence" that Sullivan substantially participated in the litigation or knew or had reason to know the case was fraudulent, (2) the Civil Appeal Statement's notice of the Issues to be Raised on Appeal filed in this Court at the outset of the appeal, and (3) the Statement of the Issues in Motivation's Initial Brief. Appellant's Civil Appeal Statement left no doubt as to the issues being raised in the appeal:

Statement of Issues To Be Decided on Appeal

> (3). The trial court dismissed Motivation's sanctions claims against Paul Sullivan [D.E. 528] on the basis that Motivation did not present and the record did not contain any evidence that Sullivan was involved in managing the fraudulent litigation or any evidence that Sullivan was willfully blind or had knowledge of the fraud. In fact, Motivation submitted substantial un-contradicted evidence that Sullivan was directly involved in extensive dealings with Miscovich concerning the treasure-find fraud and that as a member of JTR's advisory committee Sullivan was substantially engaged directly with JTR's trial counsel throughout the pertinent time period and the trial. Evidence of Sullivan's knowledge and involvement included: (a) his extensive discussions questioning JTR principal, Jay Miscovich, whether he had actually brought the alleged treasure-find emeralds rather than finding them on the sea floor as he had claimed, (b) JTR's general counsel repeatedly advised Florida counsel that Sullivan's approval was required for key litigation decisions, (c) JTR's trial counsel warned Sullivan that emeralds had been planted at the site, that a cannon ball was planted at the site, that Miscovich claimed falsely to have found a 20 pound bag of emeralds at the site, that Miscovich claimed falsely to have found coins at the site, and other facts making clear the fraudulent nature of this case. Did the trial court err when it dismissed Sullivan based on the mistaken conclusion that there was no evidence at all in the record that implicated Sullivan?

Eleventh Circuit Civil Appeal Statement Q5. From the above statement alone Sullivan knew the appeal placed at issue all facts relating to Sullivan's knowledge of and participation in the fraudulent litigation. The issue is straightforward. The lower court found there was "no evidence" to show Sullivan's complicity. As Motivation observed in its Initial Brief, given the record evidence, including the extensive correspondence among the participants, the issue was whether the district court erred in dismissing Sullivan on grounds there was "***no evidence***" of his complicity. (In.Br 1). As Motivation argued, "the district court was either unaware

of evidence in the record or chose to ignore it," and "[e]ither way, these dismissals should be reversed and the case should be remanded for further proceedings to resolve the sanctions claims based on the actual record." In. Br. 39. The simple issue, then, was whether there were any facts belying the court's ruling that there was *no* evidence of complicity whatsoever. The Movant clearly knew the issue. In his Response Brief he characterized the issue as a question of whether Motivation *failed to prove by clear and convincing evidence* that Sullivan substantially participated in the litigation or engaged in any bad faith conduct, and he claimed that Motivation's action for sanctions lacked any factual basis and legal merit from its inception and that Motivation introduced *"no evidence in support of its claims."* (Ans. Br 1-2, 22). Motivation didn't abandon the issue but clearly premised this appeal upon it.

B. Waiver

The Movant disapproves of the method by which Appellant sets out the relevant facts pertaining to Sullivan, but there are only so many ways, and so much space, in which to lay them out. Of course, Motivation has but one, volume-limited, Initial Brief in which to articulate the facts relating to multiple parties, each of whom may file separate full-length briefs. Motivation is limited in its Initial Brief to but a single statement of facts, and in this case it chose to set out the facts sequentially, identifying the facts as to each of the respondents when they logically arose in that chronology. Movant complains about having to "parse"

4

through that evidence to ascertain what facts related to Sullivan, but it could hardly have been a difficult task to identify them in the 30 page statement of facts, which includes clear headings identifying each pertinent subject and "red flag" which cast doubt on the truthfulness of the treasure claims. Moreover, because various emails show Sullivan's knowledge of and attempts to deal with the "red flags," the notion that a majority of those facts related only to the two other respondents is also not accurate.

The Movant decries the Initial Brief's "short" argument as to Sullivan. Mot. 5) ("a mere two paragraphs."). Of course there is no requirement that arguments be lengthy, only that they adequately convey the issue and avoid unfair surprise.[1] *See*, *U.S. v. Gray,* 780 F.3d 458, 464 (1st Cir 2015); *Barnes ex.rel. Estate of Barnes v. Koppers, Inc.,* 534 F.3d 357, 362 (5th Cir. 2008) ("[I]n *one paragraph* of her brief comprising two sentences, Barnes makes a federal preemption claim …. Despite the brevity of her briefing, the point is not so insufficiently raised as to be waived."). In *Gray*, the appellee claimed the opening brief offered only a "skeletal, perfunctory argument." 534 F.3d at 362. Noting that Gray presented "a short but on-point argument in her opening brief" the Court held "the argument has been sufficiently developed and is not waived" where the party stated the issue, "outlined the sequence of events during jury instruction and provided a transcript

---

[1] To the contrary, appellate court encourages and "commends" briefs which are "short and to the point." *See Application of Doran*, 251 F.2d 848, 849 (U.S. CCPA 1958); Eighth Circuit Rule 28.

of the proceeding." *Id.* The Court in *Gray* also noted that she "further developed her argument in her reply brief" and that during oral argument "she focused entirely on this single issue." *Id. See also, Holmes v. Spencer,* 685 F.3d 51, 66 (1st Cir. 2012) (waiver inappropriate where an appellant's brief "reveals enough of the raw materials" underlying a claim to allow the court to have no trouble discerning the argument); *Williams v. Woodford,* 384 F.3d 567.587 n.5 (9th Cir. 2004) (argument that was addressed only in eight sentences in a footnote of the opening brief was not waived where brief contained appellant's contentions, included citations to authorities and the record, "identified the basis of [appellant's] disagreement with the district court's ruling," and included the "requested relief from the court."). Here, the Initial Brief (1) "outlined the sequence of events," revealing "the raw materials underlying the claim" with citations to the record (pgs. 3-34, 39, 55), (2) "identified the basis of [Motivation's] disagreement with the district court's ruling" (pgs 39, 55-56) and (3) included the "requested relief from the court" (pgs 40, 55, 57). Here the facts and argument in the Initial Brief were broad enough to belie Movant's claim that Motivation raised "new" arguments in its Reply Brief.

      1. <u>The Sequence of Events and Raw Materials Underlying the Claim</u>

The Initial Brief identified numerous facts underlying its claim that the trial court erred in finding there was "no evidence" of Sullivan's knowledge and complicity. These facts included, among other things, (1) that "the fraud was

6

revealed to…Sullivan over and over again" through numerous "red flags" evidenced by "testimony, contemporaneous email or party admissions," all set out in the succeeding 24 pages of the Brief (p.10); (2) that as a member of JTR's Advisory Board, key litigation actions were subject to Sullivan's approval and that JTR's "general outside counsel" advised counsel of record repeatedly that key decisions in the litigation had to be approved by Sullivan. (M1-14;M1-19); (3) that Sullivan was indeed involved in key litigation decisions. (Day1p80;M8¶45-47 94); (4) that Sullivan was involved in negotiations with Odyssey Marine concerning disclosure of the epoxy results. (Id.¶60,66-67); (5) that Sullivan was also involved in determining whether and when to make important disclosures to the Court. (Day1p103;M2-9;M1-33p1); (6) that Miscovich and Elchlepp showed up at Horan's office with 20 pounds of emeralds and said they held them back in case the admiralty ruling went against them (M1-16); (7) that Horan repeatedly advised Sullivan that he "did not believe the [20-pound group of] emeralds came from the site (Day1at75);" (8) that "Horan asked Silverstein and Sullivan to talk with Jay and Steve to determine whether they had made 'false claims to the federal court' and whether they had 'salted' the 'discovery' site. (M1-16);" (9) that in December 2011 Sullivan learned that modern epoxy was found by two of the labs (M1-1; M1-16); (10) that Sullivan was aware that Horan had received further information from an emerald expert that increased Horan's concerns "that Jay has been untruthful in his assertion that he found emeralds where he said they he found them" and that

7

Horan was "once again, considering withdrawing from representing JTR" (M1-1); (11) that Sullivan, Horan and Silverstein had discussions about the status reports (M1-21¶7); (12) that by August 2012, "Horan suspected he'd been fooled and the emeralds were planted" and "he told Silverstein and Sullivan he was concerned" because on his dives he "was being shown where the emeralds were…[and]… being directed to specific areas" and that emeralds were possibly "deposited there by someone prior to [Horan] diving." (Day1p61-62); (13) that as a member of JTR's Advisory Board, Sullivan had been closely involved in the management of the litigation. (D.E.302-6¶2); (14) that Sullivan spent "conservatively, a hundred hours of conversations" with Horan about the case, including the problems that led Horan to withdraw for ethical reasons. (Day1p76); (15) that Horan and Sullivan specifically questioned where Miscovich was buying the emeralds (Day1p75-76); (16) that after diving the site with Elchlepp and initially believing it to be genuine, Horan reported his concerns to Sullivan that the emeralds had been planted at the site. (Day1p 56,60-62); (17) that on August 30, 2012, Horan sent an email to Sullivan that listed his reasons for planning to withdraw; (18) that in his August 30, 2012 email to Sullivan, Horan explained that "if testimony is required in the pending Motions, I highly doubt that I could allow some testimony to stand while fulfilling my responsibility as an officer of the Court." (M1-4p1); (19) that in the email to Sullivan Horan listed a series of what he called "surprises" that were the "primary basis for my withdrawal." (Id.p4); (20) that the list described, among

other things, (a) when Horan dove the site, he found emeralds only where directed, (b) the fact that Miscovich and Elchlepp conspired to commit a fraud on the court by producing non-Spanish coins and falsely claiming they were found at the site to defeat a claim from Spain that could cause them to lose all rights to the "treasure" in the admiralty case, (c) that an iron cannon supposedly found at the site showed an "impact pattern" consistent with it being "dropped from a boat," (d) that Miscovich and Elchlepp again defrauded the court by showing up in Horan's office with 20 pounds of emeralds they claimed they found at the site but held back as insurance in case they lost the admiralty case, (e) the fact that Horan doubted the 20-pound group came from the site (and that their explanations as to their origin have varied), and (f) that JTR's emerald expert advised that the emeralds were not highly valuable. (M1-4p4-5).

In its Initial Brief Motivation also identified facts exhibiting willful blindness on the part of Sullivan and Silverstein:

> This record abounds with countless forsaken opportunities to have easily investigated and exposed the fraud. Silverstein made efforts to delay the epoxy disclosure while he and Sullivan searched for ways to explain the modern resins. Had they spent a fraction of that effort checking Miscovich's story at any point along the way, they would have quickly confirmed, as did Motivation once it finally had the chance to do so, that the entire case was a contemptible fraud.
>
> If Sullivan and Silverstein wanted to meaningfully check whether they were defrauding the court (other than asking the putative fraudsters if they were frauds) they could have checked the details of Miscovich's release and bank withdrawal story, asked for the receipts for his emerald dives, hired salvagers to check the site, located and interviewed Cunningham,

> called Proskauer about the release, contacted the notary for the release, interviewed Tobia as to his fraud assertions or talked with Hess ─ they did none of this.

In.Br.18-19, 43. The Initial Brief also pointed out that in a stream of emails on October 16 and 17, 2013, all of which were sent to Sullivan and Silverstein, second admiralty counsel Siracusa told Miscovich that his firm would also need to withdraw because "we have had some rather serious discussions with Bruce [Silverstein] and Sully [Sullivan]…as to whether any of us continue to believe your story surrounding the April, 2010 Cunningham Release, your payment of $50,000 to him for it, the credibility of Stacey Wolfe's notary log" (M2-32). (In. Br. 32). He explained "If we don't believe the Mike C story, how could we possibly continue to effectively and/or ethically represent JTR through the sanctions hearing." (M2-32). (In.Br.32).

### 2. Basis for Disagreement with the District Court

In its Initial Brief Motivation clearly stated the basis for its disagreement with the trial court's ruling, emphasizing that while "[t]he court stated there was…no evidence at all showing that Sullivan either participated in the litigation or knew the case was fraudulent…[t]here was actually copious evidence in the record of…Sullivan's substantial involvement and knowledge of and/or willful blindness to the fraud." In. Br. p39. As Motivation put it in its argument, the trial court dismissed the case "as to Sullivan, stating 'no evidence was presented as to…Sullivan's interest, financial or otherwise, in the outcome of the case or of his

direction and control of this litigation.' (D.E.528p30)." (In.Br.55). Motivation argued that this finding was clearly erroneous because, as set out in the Initial Briefs facts above, "substantial evidence showed that as a member of JTR's advisory Board, Sullivan was actively involved in the management of the fraudulent litigation and was aware of and continued to advance the fraud..." Furthermore, Motivation argued that in the over 100 hours of conversations with Horan, including discussions with Horan about "where Miscovich was buying [the] emeralds," and in the scores of emails introduced at trial, "including Horan's August 30, 2012 email" outlining the fraudulent activity prompting Horan to withdraw, "Sullivan was aware of or should have known the case was fraudulent." In.Br. 55

### 3. Requested Relief From The Court.

Motivation "urge[d] this Court to reverse the order dismissing Sullivan" and "to remand the case with instructions to impose sanctions against the Appellees." In. Br. 57.

The issues regarding Sullivan, the facts supporting Motivation's arguments and the relief requested were all clear from the Initial Brief.

### III. Motivation Did Not Raise New Issues in Its Reply Brief.

The issue in Motivation's appeal was extremely broad – whether, contrary to the lower court's ruling, there was *any* evidence to show Sullivan's knowledge and complicity, through direct knowledge, interest, willful blindness, or any other

means. Sullivan claims in his motion that Motivation's Initial Brief left him unable to ascertain the issues and arguments being made and that Motivation is forbidden in its reply from "developing" argument on such ill-defined issues. (Mot. 6-7) ("appellant must put appellee on notice of the issues being raised; Court's job is 'not to hunt for issues that an appellant may or may not have intended to raise.'"). But Sullivan's arguments are belied by his own Answer Brief, in which he had no trouble identifying and joining the issues and facts raised in Motivation's Initial Brief. By no means did Motivation unfairly surprise or disadvantage Movant by "raising *a completely new issue in its reply brief*." *Cousin,* 373 F.3d n 22. In fact, his Answer Brief reflects that he knew full well the issues and facts which were at play. It's clear that in framing the Issues Sullivan knew what broad issues and facts were raised by the Initial Brief. He even added a new issue of his own:

  I. WHETHER THE DISTRICT COURT LACKED JURISDICTION OVER SULLIVAN.

  II. WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION IN GRANTING SULLIVAN'S MOTION FOR INVOLUNTARY DISMISSAL OF MOTIVATION'S SANCTIONS CLAIM FOR MOTIVATION'S FAILURE TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT SULLIVAN SUBSTANTIALLY PARTICIPATED OR HAD A SUBSTANTIAL INTEREST IN THE LITIGATION.

  III. WHETHER THE DISTRICT COURT'S RULING SHOULD BE AFFIRMED ON THE ALTERNATE GROUND THAT MOTIVATION FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT SULLIVAN ENGAGED IN BAD-FAITH CONDUCT.

Ans. Br. 1-2.

Sullivan claimed in his Answer Brief that Motivation's action for sanctions lacked any factual basis and legal merit from its inception and that Motivation introduced "*no evidence in support of its claims.*" *Id.* 22. He argued the court correctly dismissed Sullivan because he had "no substantial participation" in the proceedings. *Id*. 26. He claimed there was *no evidence* to show bad faith conduct. *Id*. He argued that "*the documentary evidence* failed to implicate Sullivan in Miscovich's fraud." *Id*. He argued "Sullivan's conversations with Horan do not prove that Sullivan **knew about** or furthered the fraud." *Id.* 35. He addressed Horan's August 30, 2012 email, claiming that "just because Sullivan learned that Horan had become convinced with the benefit of 'hindsight' that Miscovich's story was so unreliable that he felt compelled to withdraw as JTR's counsel does not mean that Sullivan automatically knew that Miscovich's claim was a fraud." *Id*. 11, 39. As to the 100's of hours of conversations with Horan, he suggested that "[f]ar from evidencing some bad-faith intent to perpetrate a fraud on the court, those communications demonstrate Sullivan's good intentions." *Id.* 36. He claimed the evidence showed that "any involvement Sullivan had in the admiralty litigation was 'minor,' short of the mark of the 'substantial' participation required…" *Id*. 38. He even referenced the emails showing that Sullivan was to approve key filings, and attempted to explain why that didn't render him meaningfully involved in the litigation. Ans. Br. 45. Finally, he set out numerous facts which he claimed

showed that Sullivan not only didn't act in bad faith but proactively urged that the court be informed of evidence damaging to JTR's position in the admiralty case.

Sullivan argues that (1) in its Reply Brief Motivation should be prohibited from addressing the lower court's undo reliance on Siracusa's and Horan's testimony and "developing" arguments about email streams and other evidence Motivation cited to in its Initial Brief, (2) that this Court should strike all references to Sullivan's own actions and testimony in the admiralty case, and (3) that the Court should strike all Reply Brief references to Silverstein's and Tuthill's affidavits, which were part of the record in the case below and were filed prior to Sullivan's sanctions hearing. For a number of reasons, the court should deny that request.

First, Sullivan should not be heard to argue he was unfairly surprised or disadvantaged by Motivation's reference to facts directly addressing arguments and facts *presented by Sullivan* in his Response Brief. In his Response Brief Sullivan argued Siracusa and Horan's testimony was dispositive in resolving the case in Sullivan's favor. In its Reply Brief, Motivation discussed why their testimony was not dispositive and why the court's order gave too much deference to their testimony. Sullivan argues it constituted an entirely "new argument" to suggest that the district court's order lacked factual support because he placed undo reliance on Siracusa and Horan. The Response Brief was replete with arguments claiming their testimony was dispositive in resolving the case in

14

Sullivan's favor. Likewise, a strong theme of the Response Brief is the claim that during the admiralty trial Sullivan insisted that the evidence from Jorge Rodriguez, the emerald wholesaler confirming that Miscovich purchased the emeralds, be revealed promptly to the trial court. Tuthill's affidavit shows that claim is not correct. Moreover, after the JTR team learned that Rodriguez admitted selling the emeralds to Miscovich but before the team knew for certain that he would appear to testify, Sullivan took the stand in the Admiralty trial and testified for two days in effect defending the treasure find, suggesting he still believed it was true and never mentioning Rodriguez' revelation about the sale. It's absurd to suggest Sullivan was disadvantaged or surprised by issues and arguments directly refuting arguments Sullivan pressed in his Response Brief. *See Walker v. Exeter Region Coop. Sch. Dist.,* 284 F.3d 42, 47 (1st Cir.2002) (where appellees raised argument in response brief, "prudence dictated that [appellants] counter with a reply brief showing that the [appellees] were wrong"); *Cousin,* 246 F.3d 359, 373 n. 22. As the Court explained in *Cousin*

> Although Trans Union's initial brief did not directly address some of the specific acts that may have formed the basis of the jury's § 1681n verdict and that Cousin discusses in his response brief, we believe that Trans Union's appeal questioning the evidentiary sufficiency of the willfulness claim sufficiently raised the issue of Trans Unions' willful conduct for us to consider all the arguments. Indeed, Cousin's brief raising all the purported willful acts is a tacit acknowledgment that the general issue of willful conduct was presented in Trans Union's brief. Furthermore, unlike the more contemptible situation where an appellant raises a completely new issue in its reply brief, disadvantaging the appellee, and for which the procedural bar concerning initial briefs was properly developed and

utilized, we see no real new issue in the reply brief, but rather responsive arguments to the appellee's own contentions, and, therefore, little or no prejudice. With that in mind, we review the sufficiency of the willfulness claim.

246 F.3d at 373 n. 22.

Second, even if there had been no reference in the Response brief to facts and arguments relevant to the issue presented on appeal, Motivation should not be prohibited from citing and arguing in its Reply Brief *whatever* evidence bears on that key issue. In this case, that issue was whether there was any evidence to refute the judge's finding that there was "no evidence." *See*, *Travelers Property Cas. Ins. Co. of America v. National Union Ins. Co. of Pittsburg, Pa.,* 621 F.3d 697, 712 (8th Cir. 2010). In *Travelers*, the appeal and Initial Brief addressed a certain overriding issue. As the Court explained,

> Through Travelers' own statements, its references to authority, and its discussion of that authority, the issue of industry standards permeates the portion of Travelers' opening brief directed towards the relative priority of Travelers and National Union. National Union's arguments to the contrary focus largely on the labels employed in Travelers' brief rather than the content of the arguments. Travelers plainly did not waive any issues or arguments surrounding industry standards or the nature of excess and primary coverage.

*Id*.

In the same way, Motivation did not waive *any* issues or arguments surrounding the trial court's ruling dismissing Sullivan and finding no evidence of Sullivan's complicity. *See Universal Title Ins. Co. v. United States*, 942 F.2d 1311, 1314 (8th Cir. 1991) (noting that where the government in the district court

"essentially addressed the issue of whether the equities supported [the plaintiff's subrogation claim]," the district court arguments were "broad enough to encompass all of" the government's subrogation related arguments on appeal). As the court explained in *Universal Title*, "[t]he real question should be whether the new argument is such as to raise a new issue.... it would be in disharmony with one of the primary purposes of appellate review were we to refuse to consider each nuance or shift in approach urged by a party...." 942 F.2d at 1314, *quoting In re Osweiler*, 52 C.C.P.A. 1427, 346 F.2d 617, 621 (1965).

Third, the Appellee is not prejudiced because all of the facts and arguments they challenge in the Reply Brief are raised and before this Court on Appellee's cross-appeal. See *Cousin,* 373 F.3d n 22 (declining to strike arguments where there is "little or no prejudice" to the movant). Because the cross-appeal challenged the district court's denial of Sullivan's motion for sanctions against Motivation, the court properly considered all evidence known to Motivation about Sullivan's conduct and interests in the enterprise. Because in the very same appeal, (indeed in the same brief --Motivation's Reply and Response Brief), Motivation and Sullivan addressed the very arguments and facts Sullivan seeks to strike from the Reply Brief, there is no prejudice in any event.

Finally, Appellee argues Motivation should be barred from referencing certain facts because the trial court refused to allow their consideration at trial. But the law is clear that any decision that led to the trial court's final ruling is properly

reviewable by this Court, and that this Court may determine it was error for the trial court in assessing Sullivan's complicity to not consider all the relevant evidence of his knowledge and activity, including the Tuthill Affidavit, Silverstein Affidavits and Sullivan's own testimony in the admiralty trial underlying these entire proceedings. *See Gaylor v. North Springs Associates*, *LLLP*, 648 Fed. Appx. 807, 810 (11th Cir. 2016). As the court noted in *Gaylor,*

> [a] notice of appeal that *names the final judgment suffices to support review of all earlier orders* that merge in the final judgment under the general rule that appeal from a final judgment supports review of all earlier interlocutory orders, at least if the earlier orders are part of the progression that led up to the judgment rather than being separate from that progression.
>
> 16A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3949.4 (4th ed.) (footnote omitted); see *Kong v. Allied Prof'l Ins. Co.,* 750 F.3d 1295, 1301 (11th Cir.2014); *Barfield v. Brierton,* 883 F.2d 923, 930 (11th Cir.1989). The order confirming that Mr. Gaylor had standing to sue and the order granting him injunctive relief were both indisputably part of the progression that led to the final judgment in this case. Accordingly, they fell within the scope of North Springs' notice of appeal and we may properly consider them.

648 Fed. Appx. 807, 810 (emphasis added); *See also*, *Dickerson v. Alabama*, 667 F.2d 1364, 1367 (11th Cir.), cert. denied, 459 U.S. 878, 103 S.Ct. 173, 74 L.Ed.2d 142 (1982) (Court has the discretionary power to supplement the record on appeal, even to include evidence not reviewed by the court below).

Conclusion

For all of the above reasons Motivation opposes the Motion to Strike and

urges the Court to deny the Motion.

Respectfully submitted,

Certificate of Interested Persons and Corporate Disclosure Statement

The undersigned attorney for Appellant Motivation, Inc., certifies that the attached list identifies those persons and entities with an interest in the outcome of the appeal:

Trial Judges:

King, James Lawrence, Southern District of Florida
Moore, K. Michael, Southern District of Florida

Attorneys of Record:

Coffey, Kendal, Miami
Dorsey, John T., Wilmington, Delaware
Josefsberg, Robert C., Miami
Gravante, John III, Miami
Holloway, John E., Norfolk, Virginia
Lewis, A. Eugene, Tallahassee
McLeod, Aaron G., Jacksonville
Morgan, Hugh J., Key West

Rogerson, John T. III, Jacksonville

Rosenthal, Stephen F., Miami

Kenneth W. Sukhia , Tallahassee

White, Marlow V., Tallahassee

Zack, David J., Miami

Other Persons:
Abt, Taffi Fisher, Sebastian, Florida
Fisher, Kim H. Fisher, Key West
Fisher, Juanita L., Key West

Silverstein, Bruce L., Wilmington, Delaware
Sullivan, Paul D., Kailua, Hawaii

<u>Corporations (None Trading Publically)</u>
Coffey Burlington, P. L., Miami
JTR Enterprises, LLC, Delaware
Lewis & White, P. L. C., Tallahassee

Podhurst Orseck, P.A., Miami
Sukhia Law Group, PLLC
Young, Conaway, Stargatt & Taylor, LLP, Wilmington

\* \* \*

I HEREBY CERTIFY that service was accomplished by filing through the CM/ECF system on this 13th day of October 2016.

Respectfully submitted,

*s/ Ken Sukhia*

| | |
|---|---|
| A. Eugene Lewis, Jr. | Kenneth W. Sukhia (FL Bar 266256) |
| Marlow V. White | SUKHIA LAW GROUP, PLC |
| LEWIS & WHITE, PLC | 902 N. Gadsden St. |
| 222 W. Georgia Street | Tallahassee, Florida 32303 |
| Tallahassee, FL 32301 | (850) 383-9111 |
| (850) 425-5000 | ksukhia@sukhialawfirm.com |

*Counsel for Appellant Motivation Inc.*